T.C. Memo. 2001-167

UNITED STATES TAX COURT

ESTATE OF H.A. TRUE, JR., DECEASED, H.A. TRUE, III, PERSONAL REPRESENTATIVE, AND JEAN D. TRUE, ET AL.[1], Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 10940-97, 3408-98, 3409-98.                   Filed July 6, 2001.

Buford P. Berry, Emily A. Parker, and Ronald M. Morris, for petitioners.

Richard D. D'Estrada and Robert A. Varra, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

Contents

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . 8

_____

[1]Cases of the following petitioners are consolidated herewith:  Jean D. True, docket No. 3408-98 and Estate of H.A. True, Jr., Deceased, H.A. True, III, Personal Representative, docket No. 3409-98.

Issue 1.  Does Book Value Price Specified in Buy-Sell
          Agreements Control Estate and Gift Tax Values of
Subject Interests in True Companies?  . . . . . . . . . . .  10

FINDINGS OF FACT  . . . . . . . . . . . . . . . . . . . . . . .  10

    I.  Background . . . . . . . . . . . . . . . . . . . .  11
        A. True Family  . . . . . . . . . . . . . . . . .  11
        B. Formation and Growth of True Companies  . . . .  12
           1. Reserve Drilling  . . . . . . . . . . . . .  12
           2. True-Brown Partnerships . . . . . . . . . .  13
           3. True Oil and True Drilling  . . . . . . . .  14
           4. Belle Fourche Pipeline Co.  . . . . . . . .  15
           5. Black Hills Oil Marketers, Inc./True Oil
              Purchasing Co./Eighty-Eight Oil Co./Black
              Hills Trucking, Inc.  . . . . . . . . . . .  18
           6. True Ranches  . . . . . . . . . . . . . . .  20
           7. White Stallion Ranch, Inc.  . . . . . . . .  21
           8. Other True Companies  . . . . . . . . . . .  22
        C. Methods of Accounting Used by True Companies  .  23
        D. Family Members' Employment in True Companies  .  24
        E. Family Gift Giving and Business Financing
              Practices  . . . . . . . . . . . . . . . . .  27

   II.  True Family Buy-Sell Agreements  . . . . . . . . .  28
        A. Origin and Purpose  . . . . . . . . . . . . . .  28
        B. First Transfers of Interests in Belle
              Fourche, True Oil, and True Drilling to
              True Children  . . . . . . . . . . . . . . .  30
        C. Wyoming U.S. District Court Cases on Belle
              Fourche and True Oil Transfers  . . . . . .  35
        D. Tamma Hatten's Withdrawal From True Companies .  39
        E. Use of Similar Buy-Sell Agreements in All
              True Companies Except White Stallion;
              Amendments and Waivers  . . . . . . . . . .  42
        F. Unique Provisions of White Stallion Buy-Sell
              Agreement  . . . . . . . . . . . . . . . . .  48
        G. Future of True Family Buy-Sell Agreements . . .  50

  III.  Transfers in Issue . . . . . . . . . . . . . . . .  51
        A. 1993 Transfers of Partnership Interests by
              Dave True  . . . . . . . . . . . . . . . . .  51
        B. 1994 Estate Transfers . . . . . . . . . . . . .  53
        C. 1994 Transfers by Jean True . . . . . . . . . .  55

   IV.  Subsequent Income Tax Litigation Regarding
              Ranchland Exchange Transactions . . . . . . .  55

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

    I.  Do Family Buy-Sell Agreements Control
        Estate Tax Value? . . . . . . . . . . . . . . . . . 59
      A. Framework for Analyzing Estate Tax Valuation
         Issues . . . . . . . . . . . . . . . . . . . . 59
      B. Development of Legal Standards . . . . . . . . 61
        1. Case Law Preceding Issuance of Regulations . 62
        2. Regulatory Authority and Interpretive
          Rulings . . . . . . . . . . . . . . . . . . 67
        3. Case Law Following Issuance of Regulations
          and Revenue Ruling 59-60 . . . . . . . . 70
          a. Was Agreement Entered Into for Bona Fide
            Business Reasons? . . . . . . . . . . 71
          b. Was Agreement a Substitute for
            Testamentary Dispositions? . . . . . . 72
            1. Testamentary Purpose Test . . . . . . 73
            2. Adequacy of Consideration Test . . . . 74
        4. Statutory Changes . . . . . . . . . . . . . 79

   II.  Do 1971 and 1973 Gift Tax Cases Have Preclusive
       Effect? . . . . . . . . . . . . . . . . . . . . . . 81
      A. Petitioners' Collateral Estoppel Argument . . . 81
      B. Legal Standards for Applying Collateral
        Estoppel . . . . . . . . . . . . . . . . . . . 82
      C. Collateral Estoppel Impact of 1971 and 1973
        Gift Tax Cases . . . . . . . . . . . . . . . . 85
        1. Bona Fide Business Arrangement Issue . . . . 86
        2. Whether Book Value Equaled Fair Market
          Value as of Agreement Date Issue . . . . . 87

  III.  Do True Family Buy-Sell Agreements Control
       Estate Tax Values? . . . . . . . . . . . . . . . . 90
      A. Was the Offering Price Fixed and Determinable
        Under the Agreements? . . . . . . . . . . . . 91
      B. Were Agreements Binding During Life
        and at Death? . . . . . . . . . . . . . . . . 91
      C. Were Agreements Entered Into for Bona
        Fide Business Reasons? . . . . . . . . . . . . 99
      D. Were Agreements Substitutes for Testamentary
        Dispositions? . . . . . . . . . . . . . . . . 101
        1. Testamentary Purpose Test . . . . . . . . 101
          a. Decendent's Health When He Entered Into
            Agreements . . . . . . . . . . . . . 101
          b. No Negotiation of Buy-Sell Agreement
            Terms . . . . . . . . . . . . . . . . 102
          c. Enforcement of Buy-Sell Agreement
            Provisions . . . . . . . . . . . . . . 107

d. Failure To Seek Significant Professional Advice in Selecting Formula Price . . . 109

e. Failure To Obtain or Rely on Appraisals in Selecting Formula Price . . . . . . . 112

f. Exclusion of Significant Assets From Formula Price . . . . . . . . . . . . . 114

g. No Periodic Review of Formula Price . . . 115

h. Business Arrangements With True Children Fulfilled Dave True's Testamentary Intent . . . . . . . . . . . . . . . . 118

2. Adequacy of Consideration Test . . . . . . 120

a. Petitioners' Brodrick v. Gore/Golsen Argument . . . . . . . . . . . . . . . 121

b. Petitioners' Assertion That Respondent Impermissibly Applied Section 2703 Retroactively . . . . . . . . . . . . 124

c. Did Tax Book Value Pricing Formula Represent Adequate and Full Consideration? . . . . . . . . . . . 128

3. True Family Buy-Sell Agreements Were Substitutes for Testamentary Dispositions 140

E. Conclusion: True Family Buy-Sell Agreements Do Not Determine Estate Tax Values . . . . . 141

IV. Do True Family Buy-Sell Agreements Control Gift Tax Values? . . . . . . . . . . . . . . . 144

A. Framework for Analyzing Gift Tax Valuation Issues . . . . . . . . . . . . . . . . . . 145

B. Buy-Sell Agreements Do Not Determine Value for Gift Tax Purposes . . . . . . . . . . . 146

C. Application of Gift Tax Rules to Lifetime Transfers by Dave and Jean True . . . . . . . 149

1. True Family Buy-Sell Agreements Do Not Control Gift Tax Values . . . . . . . . . 149

2. Lifetime Transfers by Dave and Jean True Were Not in Ordinary Course of Business . 151

V. Impact of Noncontrolling Buy-Sell Agreements on Estate and Gift Tax Valuations . . . . . . . 153

Issue 2. If True Family Buy-Sell Agreements Do Not Control Values, What Are Estate and Gift Tax Values of Subject Interests? . . . . . . . . . . . 155

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . 155

I. True Oil . . . . . . . . . . . . . . . . . . . . 156

II. Belle Fourche . . . . . . . . . . . . . . . . . . 158

III. Eighty-Eight Oil . . . . . . . . . . . . . . . . . 161

IV. Black Hills Trucking . . . . . . . . . . . . . . . 164

V. True Ranches . . . . . . . . . . . . . . . . . . . 166

VI. White Stallion . . . . . . . . . . . . . . . . . . 168

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . 169

I. Expert Opinions . . . . . . . . . . . . . . . . . 169

II. Experts and Their Credentials . . . . . . . . . . 171
A. Petitioners' Expert, John H. Lax . . . . . . . 171
B. Petitioners' Expert, Curtis R. Kimball . . . . 172
C. Petitioners' Expert, Dr. Robert H. Caldwell . . 173
D. Petitioners' Expert, Michael S. Hall . . . . . 174
E. Respondent's Expert, John B. Gustavson . . . . 174

III. Preliminary Matters Regarding Valuation . . . . . 175
A. Respondent's Alleged Concessions Regarding
Valuation Discounts . . . . . . . . . . . . 175
B. Role of Burdens and Presumptions in
Cases at Hand . . . . . . . . . . . . . . . 180
C. Petitioners' Aggregation and Offset Argument . 183

IV. Valuations of True Companies in Dispute . . . . . 186
A. True Oil . . . . . . . . . . . . . . . . . . . 186
1. Marketable Minority Interest Value . . . . 186
a. Kimball Reports . . . . . . . . . . . 186
b. Final Lax Report . . . . . . . . . . 191
c. Gustavson Report and Respondent's
Position . . . . . . . . . . . . . 193
d. Court's Analysis . . . . . . . . . . 196
2. Marketability Discounts . . . . . . . . . 204
a. Kimball Reports . . . . . . . . . . . 204
b. Final Lax Report . . . . . . . . . . 207
c. Gustavson Report/Rebuttals and
Respondent's Position . . . . . . . 207
d. Court's Analysis . . . . . . . . . . 208
3. Summary of Proposed Values and Court's
Determinations of Values of Interests in
True Oil . . . . . . . . . . . . . . . 215
B. Belle Fourche . . . . . . . . . . . . . . . . 217
1. Value of Total Equity on a Marketable
Basis . . . . . . . . . . . . . . . . . 217

        a. Kimball Report . . . . . . . . . . . 217
        b. Initial and Final Lax Reports . . . . . . 218
        c. Gustavson Report and Respondent's
           Position . . . . . . . . . . . . . . 221
        d. Court's Analysis . . . . . . . . . . 224
     2. Marketability Discounts . . . . . . . . . 233
        a. Kimball Report . . . . . . . . . . . 233
        b. Initial and Final Lax Reports . . . . . . 235
        c. Respondent's Position . . . . . . . . . 235
        d. Court's Analysis . . . . . . . . . . 236
     3. Summary of Proposed Values and Court's
       Determinations of Values of Interests
       in Belle Fourche . . . . . . . . . . . 240
C. Eighty-Eight Oil . . . . . . . . . . . . . 241
     1. Marketable Minority Interest Value . . . . 241
        a. Kimball Reports . . . . . . . . . . . 241
        b. Final Lax Report . . . . . . . . . . 241
        c. Respondent's Position . . . . . . . . . 242
        d. Court's Analysis . . . . . . . . . . 243
     2. Marketability Discounts . . . . . . . . . 246
        a. Kimball Reports . . . . . . . . . . . 246
        b. Final Lax Report . . . . . . . . . . 247
        c. Respondent's Position . . . . . . . . . 247
        d. Court's Analysis . . . . . . . . . . 247
     3. Summary of Proposed Values and Court's
       Determinations of Values of Interests
       in Eighty-Eight Oil . . . . . . . . . . 250
D. Black Hills Trucking . . . . . . . . . . . 252
     1. Value of Total Equity on a Marketable
       Basis . . . . . . . . . . . . . . . . 252
        a. Kimball Report . . . . . . . . . . . 252
        b. Initial and Final Lax Reports . . . . . . 253
        c. Respondent's Position . . . . . . . . . 255
        d. Court's Analysis . . . . . . . . . . 256
     2. Marketability Discounts . . . . . . . . . 261
        a. Kimball Report . . . . . . . . . . . 261
        b. Initial and Final Lax Reports . . . . . . 262
        c. Respondent's Position . . . . . . . . . 262
        d. Court's Analysis . . . . . . . . . . 263
     3. Summary of Proposed Values and Court's
       Determinations of Values of Interests
       in Black Hills Trucking . . . . . . . . 266
E. True Ranches . . . . . . . . . . . . . . 268
     1. Marketable Minority Interest Values . . . . 268
        a. H&H Report . . . . . . . . . . . . 268
        b. Kimball Reports . . . . . . . . . . . 270
        c. Final Lax Report . . . . . . . . . . 270
        d. Respondent's Position . . . . . . . . . 272

               e. Court's Analysis . . . . . . . . . . . 273
           2. Marketability Discounts . . . . . . . . . . 274
               a. Kimball Reports . . . . . . . . . . . 274
               b. Final Lax Report . . . . . . . . . . 275
               c. Respondent's Position . . . . . . . . 275
               d. Court's Analysis . . . . . . . . . . 275
           3. Summary of Proposed Values and Court's
             Determinations of Values of Interests
             in True Ranches . . . . . . . . . . . . 278
      F. White Stallion . . . . . . . . . . . . . . 280
          1. Marketable Minority Interest Values . . . . 280
               a. Kimball Report . . . . . . . . . . . 280
               b. Initial and Final Lax Reports . . . . . 280
               c. Respondent's Position . . . . . . . . 281
               d. Court's Analysis . . . . . . . . . . 281
           2. Marketability Discounts . . . . . . . . . . 284
               a. Kimball Report . . . . . . . . . . . 284
               b. Initial and Final Lax Reports . . . . . 284
               c. Respondent's Position . . . . . . . . 285
               d. Court's Analysis . . . . . . . . . . 285
           3. Summary of Proposed Values and Court's
              Determinations of Values of Interests
             in White Stallion . . . . . . . . . . . 287

Issue 3.  Did Jean True Make Gift Loans When She Transferred
         Interests in True Companies to Sons in Exchange for
         Interest-Free Payments Received Approximately 90
         Days after Effective Date of Transfers? . . . . . . 288

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . 289

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . 297

    I. Summary of Arguments . . . . . . . . . . . . . . 297

   II. Jean True's Sales Were Completed on Notice Dates . 300

  III. Sections 483 and 1274 Do Not Prevent Below-Market
     Loan Treatment Under Section 7872 . . . . . . . 308

   IV. Deferred Payment Arrangements Are Below-Market
     Gift Loans Subject to Section 7872 . . . . . . . 313
     A. Loan . . . . . . . . . . . . . . . . . . . . . 313
     B. Below-Market Loan . . . . . . . . . . . . . . 314
     C. Gift Loan . . . . . . . . . . . . . . . . . . 315

    V. Amounts of the Gifts--Application of Section 7872 . 317

Issue 4.    Are Petitioners Liable for Valuation Understatement
            Penalties Under Section 6662(a), (g), and (h)?   . 320

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . 320

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . 322

Appendix . . . . . . . . . . . . . . . . . . . . . . . . . . . 334

        Schedule 1 . . . . . . . . . . . . . . . . . . . . . . 334
        Schedule 2 . . . . . . . . . . . . . . . . . . . . . . 335
        Schedule 3 . . . . . . . . . . . . . . . . . . . . . . 336

BEGHE, Judge:  Respondent determined Federal gift and estate tax deficiencies and accuracy-related penalties under sections 6662(a), (g), and (h)[2] in the following amounts:

| Docket No. | Tax | Year | Deficiency | Penalties |
|---|---|---|---|---|
| 10940-97 | Gift | 12/31/93 | $15,201,984 | $6,080,794 |
| 3409-98 | Estate | 06/04/94[1] | 43,639,111 | 17,455,644 |
| 3408-98 | Gift | 12/31/94 | 17,094,788 | 6,791,715 |
| Totals | | | 75,935,883 | 30,328,153 |

[1] Date of death.

Introduction

In each of these consolidated cases, respondent determined a gift or estate tax deficiency and penalty arising from a gross valuation understatement.  The deficiencies and penalties relate to valuations of ownership interests in various corporations and partnerships (collectively, the True companies), subject to buy-sell agreements, transferred individually in 1993 by H.A. True,

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect as of the date of Dave True's death (for estate tax purposes) or dates of Dave and Jean True's alleged gifts (for gift tax purposes).  All Rule references are to the Tax Court Rules of Practice and Procedure.

Jr., deceased, (docket No. 10940-97),[3] reported by the Estate of H.A. True, Jr., H.A. True, III, personal representative (estate) by reason of H.A. True, Jr.'s death in 1994 (docket No. 3409-98), or transferred by Jean True individually in 1994 (docket No. 3408-98) (collectively, petitioners).[4]  Petitioners timely filed petitions with this Court contesting the deficiencies and penalties and claiming a refund of whatever overpayment of estate tax might arise from payments of administration expenses not claimed on the estate tax return.  After concessions, the following issues are to be decided:

1.  Does the book value price specified in the buy-sell agreements control estate and gift tax values of the subject interests in the True companies (buy-sell agreement issue);

2.  If the True family buy-sell agreements do not control values, what are the estate and gift tax values of the subject interests (valuation issue);

---

[3]Jean True is a party to docket No. 10940-97 solely because she elected to be treated as donor of one-half of the gifts H.A. True, Jr. made during 1993.  See sec. 2513.

[4]We include the estate in the collective term, petitioners, for ease of reference only.  This reference does not suggest whether we regard the personal representatives' residences, or the decedent's domicile at death, to be controlling for appellate venue purposes under sec. 7482(b)(1).  See Estate of Clack v. Commissioner, 106 T.C. 131 (1996).  The issue is not implicated in the cases at hand because Dave True and the estate's personal representatives were all domiciled in the same jurisdiction (Wyoming) at all relevant times.  See infra pp. 11-12.

3. Did Jean True make gift loans when she transferred interests in the True companies to her sons in exchange for interest-free payments received approximately 90 days after the effective date of the transfers (gift loan issue); and

4. Are petitioners liable for valuation understatement penalties under section 6662(a), (g), and (h) (penalty issue)?

We hold in respondent's favor that the buy-sell agreements do not control estate and gift tax values. We value the subject interests at amounts greater than the prices paid under the buy-sell agreements and hold that understatement penalties apply to parts of the resulting deficiencies. We hold for respondent on the gift loan issue.

For convenience and clarity, findings of fact and opinion are set forth separately under each issue. The findings of fact regarding any issue incorporate, by this reference, the facts as found with respect to any issue previously addressed.

Issue 1. Does Book Value Price Specified in Buy-Sell Agreements Control Estate and Gift Tax Values of Subject Interests in True Companies?

FINDINGS OF FACT

Some of the facts have been stipulated by the parties and are so found. The stipulation of facts, supplemental stipulation of facts, associated exhibits, and oral stipulations are incorporated by this reference.

I.   Background

  A.   True Family

Henry Alphonso True, Jr. (known as H.A. True, Jr. or Dave True) was born June 12, 1915, and resided in Casper, Wyoming, from 1948 until his death on June 4, 1994, 1 week before his 79th birthday.  He was survived by his wife, Jean True, his children, Tamma True Hatten (Tamma Hatten), H.A. True, III (Hank True), Diemer D. True (Diemer True), and David L. True (David L. True) (collectively, the True children), his grandchildren, and great-grandchildren.

The Natrona County, Wyoming, probate court (probate court) appointed Jean True, Hank True, Diemer True, and David L. True (personal representatives) as co-personal representatives of the estate.  After approving the estate's final accounting, the probate court discharged the personal representatives on December 13, 1995.

Dave True's Last Will and Testament, dated September 14, 1984 (will), provided that the residue of his estate should be paid to the trustees under the H.A. True, Jr. Trust dated September 14, 1984 (living trust), as amended.  Under the living trust, Jean True, Hank True, Diemer True, and David L. True were appointed as first successor trustees (trustees) upon Dave True's death.

The personal representatives, trustees, and Jean True individually, resided in Casper, Wyoming, at the times they filed their petitions with this Court.

B.   Formation and Growth of True Companies

    1.   Reserve Drilling

Dave True graduated from college and married Jean True in 1938.  During the next 10 years, he worked in the oil and gas business for the Texas Co. (later known as Texaco) in various positions, eventually becoming Wyoming State superintendent of drilling and production, based in Cody, Wyoming.  During this time, Tamma (1940), Hank (1942), and Diemer (1946) were born.

In 1948, Dave True left the Texas Co., moved his family to Casper, Wyoming, and became manager of Reserve Drilling Co. (Reserve Drilling), a one-rig contract drilling business.  Dave and Jean True's youngest child, David L. True, was born in 1950. By 1951, Dave True owned 15 percent of Reserve Drilling, Doug Brown, an attorney, owned 10 percent, and unrelated companies owned the remaining interests.  Reserve Drilling generated substantial profits and acquired additional rigs under Dave True's management.  Eventually, the unrelated companies sold their interests to Dave True and Doug Brown, who financed their purchases with borrowed funds.

2.  True-Brown Partnerships

Dave True and Doug Brown jointly pursued other business ventures (collectively, True-Brown partnerships).  Among them was True & Brown Drilling Co., a partnership formed in 1951 that engaged in contract drilling and also acquired working interests in oil and gas properties.  Dave True worked long hours in the field on the drilling rigs, while Doug Brown worked regular hours in the Casper office.  Dave True came to believe that he was contributing more than 50 percent of the efforts required to run the company.  In 1954, Dave True offered to sell his interest, or to buy Doug Brown's interest, at a stated price.  Doug Brown chose to sell his interests in all the True-Brown partnerships, and Dave True financed his purchase through an oil payment (bank loan payable out of oil production).[5]

These experiences influenced Dave True's business philosophy and generated his interest in using buy-sell agreements.  Dave True decided that he never again would incur outside debt to finance acquisitions and that he would allow only family members to be his partners in future business ventures.

_____

[5]Other than intimations that the purchases and sales of the outsiders' interests in Reserve Drilling and the True-Brown partnerships were at arm's length, there is no indication in the record how the purchase prices in these transactions were established.  See infra pp. 16-17 with respect to purchases-redemptions of outside shareholders' interests in Belle Fourche Pipeline Co.

### 3. True Oil and True Drilling

Following termination of the True-Brown partnerships in 1954, Dave and Jean True formed True Oil Co. (True Oil) and True Drilling Co. (True Drilling). These were Wyoming general partnerships in which Dave and Jean True initially owned 95-percent and 5-percent interests, respectively.

True Oil acquired working interests in oil and gas properties and looked for new reserves. In general, True Oil would do farm-in deals (do exploratory drilling on prospects identified by others) rather than develop its own deals. Dave True was an operator, who actually drilled and operated wells and arranged to sell production, rather than a promoter, who sells non-operating royalty interests to third parties. True Oil's customers included both related and unrelated parties; however, on average, about half of its production was purchased by related entities.

True Drilling owned and operated drilling rigs and performed contract drilling services for related and unrelated customers. True Oil was one of True Drilling's largest customers.

Dave True was a "wildcatter". He enjoyed the challenge of drilling exploratory wells on leased acreage far from established fields, rather than drilling developmental wells on established fields. True Oil's early efforts were rewarded with discoveries of fields in the Rocky Mountain region (Wyoming, North Dakota,

Montana).  Dave True was also a pioneer in the successful use of water flooding to increase recoverable reserves.

Dave True believed that the only way to perpetuate his business would be to find and develop replacement reserves and that doing so would require substantial exploration and development outlays.  True Oil expended considerable funds without generating substantial additional production.  From 1972 to 1998, True Oil spent approximately $174 million on exploration and drilling costs that resulted in dry holes.[6]  Dave True's continuing commitment to exploration for new reserves, and his aversion to incurring outside debt, required the partners to channel their profits from True Drilling and other True companies into True Oil in order to finance continued exploration activities.

Effective August 1, 1973, Dave True gave each of his children 8-percent general partnership interests in True Oil and True Drilling.  The owners and ownership percentages immediately after the gifts were:  Dave True (63 percent), Jean True (5 percent), and each of the four True children (8 percent).

### 4.  Belle Fourche Pipeline Co.

In 1957, Dave True and other Wyoming operators organized Belle Fourche Pipeline Co. (Belle Fourche) as a Wyoming

---

[6]True Oil's total intangible drilling costs from 1972 through 1998 were $301,016,235, which included costs of drilling on proven properties, developmental drilling, and exploratory drilling.  Fifty-eight percent of total intangible drilling costs (approximately $174 million) were spent on nonproductive wells.

corporation to build and operate a gathering system for the Donkey Creek field in the Powder River Basin.  Dave True and the other local operators organized Bell Fourche because they had encountered difficulty in getting their crude oil to market from newly discovered, remote fields.  They therefore decided to build their own pipeline, rather than transport crude oil by truck to trunk lines or connect new wells to existing gathering pipelines owned by others.  In later years, Belle Fourche substantially expanded its operations to serve other fields as a common carrier gathering system with multiple outlets to trunk lines.

Belle Fourche generated substantial cash-flow from fees for transporting crude oil.  Its customers included both True companies and unrelated entities.  However, the majority of its business was from unrelated entities.

In the 1960's, Dave and Jean True acquired full ownership of the shares of Belle Fourche through redemptions of the share interests of the other holders.[7]  There were no buy-sell agreements that would have dictated the redemption prices for Belle Fourche stock.  All but one of the redemptions were at preceding yearend book value (determined on a GAAP basis, see

---

[7]Petitioners' direct testimony characterized these transactions as stock purchases by Dave and Jean True, while the appraisal of Standard Research Consultants (SRC)(see infra pp. 37-39) characterized them as corporate redemptions.  The SRC appraisal provided more detailed information regarding the transactions and appears to be more reliable.

infra p. 23); the exception, which amounted to 24 percent[8] of the total shares initially issued, was for more than book value.

In 1967, after having acquired all outstanding shares, the Trues caused Belle Fourche to make an S corporation election. Belle Fourche relied on shareholder loan, rather than equity, as its main source of financing after electing S status. Between March 31, 1971 (the company's fiscal yearend), and June 15, 1971, Dave and Jean True received earnings distributions of approximately $2.8 million,[9] thereby reducing reported book value from $99.90 to $38.69 per share.

In August 1971, the True children each purchased a 1-percent interest in Belle Fourche from the corporation. The True family's accountant, Cloyd Harris (Mr. Harris), advised the True children also to lend money to Belle Fourche so that each stockholder's pro rata share of outstanding loans to the corporation would reflect his or her percentage interest. This was intended to preserve Belle Fourche's S corporation status by avoiding the appearance of a second class of stock. The True children paid $38.69 per share to purchase the stock (476 shares each) and lent the company $127.26 per share at 8-percent

---

[8]29,244 shares (redeemed December 1962 at $17/share vs. book value of $13.13/share) divided by 120,004 shares (issued at formation) equals approximately 24 percent (rounded).

[9]$4,569,000 (book value at 3/31/71) less $1,769,500 (45,734 shares outstanding x $38.69 book value/share at 6/15/71) equals $2,800,000 (rounded) decrease in book value due to distributions made within 2-1/2 months after fiscal yearend.

interest, payable on demand.  The children financed the transaction with cash gifts from their parents over the years and with earnings distributions from their prior investments in other True companies.  The owners and ownership percentages immediately after the purchases were:  Dave True (91 percent), Jean True (5 percent), and each of the four True children (1 percent).

5.  Black Hills Oil Marketers, Inc./True Oil Purchasing Co./Eighty-Eight Oil Co./Black Hills Trucking, Inc.

Black Hills Oil Marketers, Inc. (Black Hills Oil), was formed by Dave True in 1963 to market and transport crude oil. Initially, the activities of Black Hills Oil centered on supporting Belle Fourche's pipeline operation by moving and accumulating marketable quantities of oil.  However, Black Hills Oil's business quickly expanded to include purchasing oil from unrelated parties and providing shipping services.

Black Hills Oil's marketing activities consisted of buying crude oil from lease operators, shipping it through a pipeline while retaining title, and reselling it with a markup at the other end.  In the late 1970's, the True family began conducting oil marketing activities through True Oil Purchasing Co. (TOPCO) rather than through Black Hills Oil.  In 1980, one of TOPCO's customers could not fulfill a purchase obligation and filed for bankruptcy.  The Trues became concerned that this default might adversely affect TOPCO's ability to meet its own obligations.

They therefore liquidated TOPCO and transferred its crude oil marketing business to a preexisting Wyoming general partnership, Eighty-Eight Oil Co. (Eighty-Eight Oil).

Dave and Jean True owned 95 percent and 5 percent, respectively, of Eighty-Eight Oil when they formed it in 1956. In 1975, the four True children each purchased an 8-percent general partnership interest from Dave True, which reduced his partnership interest to 63 percent.

The crude oil marketing business operated by Eighty-Eight Oil and its predecessors generated considerable cash-flows; the Trues regarded it as a "cash cow". Eighty-Eight Oil often served its partners as a repository of excess cash. At times, due to disproportionate capital contributions or withdrawals, the capital accounts of the partners varied widely from their interests in profits and losses. During the 1990's, Eighty-Eight Oil transacted most of its business with unrelated parties.

Black Hills Trucking, Inc. (Black Hills Trucking), began as a division of Black Hills Oil that transported crude oil to pipelines. Its services grew to include moving drilling rigs and hauling water, livestock, products, and pipe for related and unrelated customers. As a result of the expansion of the activities of Black Hills Trucking, and regulatory price caps imposed on Black Hills Oil, the True family decided to make Black Hills Trucking a separate entity.

In 1977, Black Hills Trucking was organized as a Wyoming corporation; it was initially owned by Dave True (63 percent), Jean True (5 percent), and the four True children (8 percent each). The company elected S corporation status in December 1977. The market for trucking services was competitive and depended heavily on demand from the oil industry. As a result, Black Hills Trucking generally lost money after the drop in oil prices that occurred in the mid-1980's.

6. True Ranches

Dave True individually owned and operated cattle ranches as early as 1957. In 1976, the True family incorporated the ranches and their operations as True Ranches, Inc., a Wyoming corporation that elected to be treated as an S corporation from its formation (ranching S corporation). The True children each purchased a 1-percent interest in the ranching S corporation on formation.

Later, the True family formed Double 4 Ranch Co., a Wyoming partnership, to engage in ranching operations in Australia. The initial partners and ownership percentages were: Dave True (63 percent), Jean True (5 percent), and the True children (8 percent each). In 1983, the partnership's name was changed to True Ranches, a Wyoming partnership (ranching partnership), and it began leasing ranching assets from the ranching S corporation. The ranching S corporation was dissolved in 1986; thereafter, all ranching activities were conducted by the ranching partnership.

True Ranches operated on 350,000 acres of owned and leased land in Wyoming. It is a vertically integrated cattle operation, running herds of cows and their offspring from conception through finishing ready for slaughter. True Ranches also operated feedlots and farmed to produce feed for its own cattle, including grass hay, alfalfa hay, and corn.

True Ranches maintained a year-round breeding herd on eight operational units and cross-bred three breeds of cattle, Angus, Charolais, and Hereford. The weaned, heavier steer calves went into one of the feedlots for finishing, while the lighter steers were wintered on hay and energy feeds and were subsequently sent to feedlots at heavier weights. When finished cattle were ready for slaughter, True Ranches would sell them to the packers directly, without using auctions or third parties. Besides finishing all its own raised cattle, True Ranches also purchased outside cattle to maximize the use of its feedlot capacity.

### 7. White Stallion Ranch, Inc.

White Stallion Ranch, Inc. (White Stallion), an Arizona S corporation, was formed in 1965 to operate a dude ranch. Initially, the stock was owned by Dave True (47.5 percent) and Jean True (2.5 percent), and by Dave True's brother, Allen True (25 percent), and his wife, Cynthia True (25 percent).

The shareholders contracted to restrict the transfer of White Stallion stock outside the families of Allen True

(designated Group 1) and Dave True (designated Group 2). The contract required the transferring shareholder first to offer any shares for sale to the remaining member of his group. If no such member remained, the transferring shareholder had to offer the shares to members of the other group, equally. In all cases, the purchase price was book value (excluding intangibles), which was to be determined by White Stallion's certified public accountant. In 1982, the True children each purchased 4-percent interests from Dave True at book value, thereby becoming members of Group 2. In the same year, Allen True and Cynthia True gave 12.5-percent interests to each of their two children, who then became members of Group 1.

### 8. Other True Companies

The True family owned and operated at least 19 other businesses, including a bank holding company (Midland Financial Corp.), a drilling supplies wholesaler (Toolpushers Supply Co.), and an environmental cleanup company (True Environmental Remediating LLC). Those that were formed as corporations were incorporated under the laws of Wyoming, except for Midland Financial Corp., a Delaware corporation. Those that were formed as general partnerships (and limited liability companies) were also organized under Wyoming law.

C.  Methods of Accounting Used by True Companies

Most of the True companies maintained their books and records on a tax basis and not in accordance with generally accepted accounting principles (GAAP).  There were two exceptions:  (1) Belle Fourche had GAAP basis books before the Trues obtained 100-percent ownership, and (2) Midland Financial Corp. kept its books according to bank regulatory requirements, which approximated GAAP.

For certain True companies, there were substantial differences between book value computed on a tax basis and book value computed on a GAAP basis.  For Black Hills Trucking and Belle Fourche, the differences resulted primarily from deducting accelerated depreciation of tangible personal property for income tax purposes.  No significant tax to GAAP differences existed for Eighty-Eight Oil (and its predecessors) because the bulk of the assets held after spinning off the trucking division consisted of cash and cash equivalents.  True Oil's tax to GAAP discrepancies resulted from:  (1) Deduction of intangible drilling costs for tax purposes versus capitalization under either the successful

efforts[10] or full cost[11] methods permitted by GAAP and (2)

deduction of the higher of cost or percentage depletion for tax

purposes.  In the case of True Ranches, tax to GAAP differences

arose primarily from the deduction of prepaid feed expenses for

tax purposes.  Because feed expenses and other costs of raising

livestock were deducted in the years paid, no cost basis was

allocated to raised (as opposed to purchased) livestock.

True Oil maintained a qualified profit-sharing plan.  The

contribution formula required that intangible drilling costs <u>not</u>

be deducted in computing annual profit for plan purposes.

Without this adjustment, True Oil might never have reported a

profit and therefore, would not have been required to make any

contributions to the plan to provide retirement benefits for

employees.

D.  <u>Family Members' Employment in True Companies</u>

Jean True worked in the family businesses in various

capacities.  She coordinated construction, renovation, and

maintenance of the True companies' buildings and managed customer

---

[10]The successful efforts method capitalizes oil and gas exploration costs if they produce commercial reserves but otherwise currently deducts the cost of dry holes.  See Brock et al., Petroleum Accounting Principles, Procedures, & Issues, at 224-225 (3d ed. 1990).

[11]The full cost method capitalizes all oil and gas exploration costs whether or not they result in dry holes.  An annual (downward) adjustment may be required if such capitalized costs exceed the market value of underlying reserves.  See <u>id.</u> at 230, 337-338, 350.

and employee relations.  She attended business meetings and industry functions with Dave True, entertained customers and business associates in their home, and administered various employee awards programs.

The True children, and sometimes grandchildren and children's spouses, also worked for the True companies over the years.  From junior high school through college, the True sons spent summers, holidays, and weekends working as roustabouts and lease scouts in the oil fields, roughnecks on the drilling rigs, and ranch hands on the family ranch.

After graduating from college, the True sons worked full time for the family businesses in various capacities.  In 1973, Hank True became the manager of Black Hills Oil, and eventually assumed responsibility for Belle Fourche, Eighty-Eight Oil, and True Environmental Remediating LLC.  Diemer True went to work for Black Hills Oil's trucking division in 1971, and thereafter managed Black Hills Trucking as a separate company.  He also took charge of Toolpushers Supply Co. in 1980.  David L. True graduated from college in 1973 and became manager of True Ranches in 1976 and of True Drilling in 1980.

While Dave True yielded operating responsibilities to his sons over time, he retained overall decision-making authority. However, he exercised this authority by building consensus through discussions with his wife and sons rather than by edicts.

After Dave True died, the True sons added joint management responsibility for True Oil to their other duties.

Tamma Hatten briefly worked for the True companies as personnel coordinator.  Her husband, Donald Hatten (Don Hatten), worked full time for the True companies from 1973 to 1984.  His positions included assistant drilling superintendent and assistant treasurer of True Drilling.

The True children (including Tamma Hatten before her withdrawal, see infra pp. 39-42) always owned equal percentage interests in each True company, regardless of the extent of their individual participation in managing the various businesses.

Starting as high school students, the True children participated in the True companies' annual supervisors' meetings and semiannual family business meetings.  Once they became owners, the True children and their spouses began attending monthly Partners, Officers, Directors, and Shareholders meetings (PODS meetings).  The PODS meetings followed an agenda and kept the family informed of the True companies' operations.

All the True children had children of their own by the time Dave True died; Tamma Hatten and Diemer True also had grandchildren.  Only two of Diemer True's children, out of all of the grandchildren and great-grandchildren, worked full time for the True companies.

E.  Family Gift Giving and Business Financing Practices

Dave and Jean True made gifts to some or all of their children (and their children's spouses) every year but one between 1955 and 1993; gifts were not made in 1984 due to the oversight of an in-house accountant-bookkeeper.  They gave cash or ownership interests in various True companies valued at the maximum allowable amount that would not trigger gift tax (except for 1973, the only year in which taxable gifts occurred).

When the True children were minors, the gifts were administered through a guardianship arrangement established by Dave True, as guardian.  In later years, cash gifts to True children and their spouses were deposited into business bank accounts that were separately designated by recipient.  Gifts to a spouse were first lent to the True child, and then those combined funds were invested in the True companies, either by purchasing ownership interests or by making interest-bearing loans, or both.  The True companies' bookkeepers maintained detailed records of these transactions.

The True children and their spouses never received their gifts as cash in hand; however, the donees were generally aware that their gifts were being invested on their behalf.  They had no specific knowledge of how or when they acquired their earliest interests in the True companies.

II. True Family Buy-Sell Agreements

    A.  Origin and Purpose

The True-Brown partnership experience convinced Dave True not to own businesses with outsiders. He therefore used buy-sell provisions to restrict a related owner's ability to sell outside the True family. Such provisions were included in partnership agreements, for True companies that were partnerships, and in stockholders' restrictive agreements, for those that were corporations (collectively, buy-sell agreements).

The original Eighty-Eight Oil, True Oil, and True Drilling partnership agreements, entered into by Dave and Jean True in the mid-1950's, prohibited a partner from transferring or encumbering his or her interest. In addition, they provided that if Jean True were to die or become disabled, Dave True would be obligated to purchase her interests at book value. Alternatively, the partnership would terminate with Dave True's death or disability. These agreements served as prototypes for later buy-sell agreements. Dave True incorporated the provisions restricting transfers to outsiders and setting the transfer price at book value into all subsequent versions of the True companies' corporate and partnership buy-sell agreements (except for White Stallion--see infra p. 48).

Dave True also felt strongly that owners should actively participate in the family business to avoid any divergence of

interests between active and passive owners.  He had witnessed the conflicts that arose in other families when active owners wanted to retain profits and grow the business, while passive owners sought to distribute and consume profits.  Accordingly, in 1973, after all the True children (or their spouses) were working full time in the business, Dave True incorporated an active participation requirement into the True family buy-sell agreements.  In general, the active participation requirement provided that if an owner (or owner's spouse) ceased to devote all or substantial time to the business, he or she would be deemed to have withdrawn from the business, absent unanimous agreement to the contrary by the active owners.

Dave True's philosophy was further memorialized in the August 1988 "Policy for the Perpetuation of the Family Business" (policy), which was executed by the then-active participants and spouses.  The policy articulated and adopted Dave True's goal "to perpetuate the family business by providing for ownership succession through family members who qualify as active participants".  The policy defined "active participants" as follows:

> Active participants are those family member-owners who actively participate in the decision-making process for family business decisions and policies or who work full time in the businesses.  The goal in designating active participants is to avoid fragmentation of the family business in future generations and to meld it into a rational business organization.  A family member who limits their involvement principally to disbursing

dividends or cash payments to him or herself or other
family members shall not be an active participant nor
retain ownership. * * *  A non-active family member-
owner may designate his or her spouse who does work
full time in the business to be considered for
qualification of the family member-owner as an active
participant. * * *

B.  First Transfers of Interests in Belle Fourche, True Oil,
and True Drilling to True Children

In the early 1970's, the True children acquired interests in
three True companies:  Belle Fourche, True Oil, and True
Drilling.  Dave True's purpose in enabling his children to
acquire these interests was to perpetuate the family businesses
by fostering the children's interest in owning and managing them.
Dave True was in good health in 1971 and 1973 when he
orchestrated these acquisitions by his children.

In August 1971 (as described supra pp. 17-18), Belle Fourche
sold stock, representing a 1-percent ownership interest, to each
True child for a combination of cash and loans made to the
corporation by the child.[12]  At that time, the True children
ranged from approximately 21 to 31 years of age.  The purchase
price ($38.69 per share) was based on Belle Fourche's book value
as of the end of the preceding fiscal year, less dividends paid
within 2-1/2 months thereafter.  Subsequently, the stockholders

---

[12]Mr. Harris testified that Dave True sold 1-percent
interests in Belle Fourche to each of his four children.
However, the minutes of the Belle Fourche Board of Directors
meeting and the SRC appraisal indicate that the company sold its
stock to the children.

executed a Stockholders' Restrictive Agreement (corporate buy-sell agreement), which provided that if a stockholder died or otherwise wished to sell stock, the remaining stockholders would purchase it in amounts directly proportional to their preexisting holdings.  The purchase price was to be the book value of the stock at the end of the preceding fiscal year, less any dividends paid to stockholders within 2-1/2 months immediately following the fiscal yearend.  The corporate buy-sell agreement stated that it was binding upon the heirs and executors of a deceased stockholder.  It did not include an active participation requirement because David L. True was still in college when the agreement was executed.

Effective August 1, 1973, Dave True gave each of his children an 8-percent interest in True Oil and in True Drilling. At that time, the True children ranged from approximately 23 to 33 years of age.  As a result of these gifts, the new partners made the following identical amendments (among others) to both companies' partnership agreements (partnership buy-sell agreements):

5.  No partner shall in any way attempt to dispose of, sell, encumber, or hypothecate his interest in the partnership except in accordance with the provisions of the Partnership Agreement relating to withdrawal or death of a partner, or, except in the normal course of business, any of the assets thereof.

6.  If any partner shall resign, become legally disabled or bankrupt, assign his interest in the partnership for the benefit of his creditors, or

institute any proceedings for temporary or permanent relief from his liabilities, or shall suffer an attachment or execution to be levied on his share or interest in the partnership, or a judgment shall be entered against him and stay of execution thereupon shall expire, or if he shall attempt to encumber or hypothecate his partnership interest, he shall be deemed to have filed a Notice of Intent to Withdraw, and his interest in the partnership shall be disposed of as provided in this Agreement.

7.   In the event of the death of a partner or the filing with the partnership by a partner of Notice of Intent to Withdraw (the deceased partner or the partner filing such notice shall hereinafter be referred to as the "Selling Partner"), the Selling Partner shall be obligated to sell and the remaining partners shall be obligated to purchase the Selling Partner's interest in the partnership for the purchase price described herein.  The remaining partners shall purchase the Selling Partner's interest in proportion to their respective shares in the net profits of the partnership and the purchase price shall be payable within six months after death or the filing of the Notice of Intent to Withdraw.  The purchase price of the Selling Partners's interest shall be the book value of the partnership multiplied by the Selling Partner's percentage interest in the net profits of the partnership, [13] said book value to be determined as of the end of the month immediately preceding the date of the death or filing of Notice of Intent to Withdraw less any withdrawals made by the partners subsequent to end of the preceding month.  The book value of the partnership shall be determined in accordance with the accounting methods and principles customarily followed by the partnership.  Appropriate adjustments shall be made for over or under withdrawals by a partner.

8.   The partnership shall continue in business and shall not be terminated unless the holders of 50% or more of the total interest in partnership capital and profits sell their interests as provided herein, or unless all of the partners agree to such termination.

---

[13]See infra p. 47 and note 20.

9. In the event that a partner or partner's spouse ceases to devote all or a substantial part of his time to the business of the partnership, he shall be deemed to have filed with the partnership a Notice of Intent to Withdraw, unless the remaining partners unanimously agree to permit such partner to continue as a partner.

The True children received no independent legal or accounting advice when they entered into the buy-sell agreements. They did not know who drafted the agreements or why, in the case of Belle Fourche, they were required to structure the purchase with a combination of stock and debt. However, the True children, having been exposed from childhood to Dave True's business philosophy, understood his reasons for including the active participation and book value purchase price requirements in the buy-sell agreements.

Dave True consulted with Mr. Harris, the family's longtime accountant and principal tax and economic adviser, and C.L. Tangney (Mr. Tangney), Mr. Harris's employer, before entering into the buy-sell agreements. On one occasion, Dave True also discussed the True Oil and True Drilling buy-sell agreements with Claude Maer (Mr. Maer), an attorney who was assisting the True companies on an unrelated income tax matter.

Dave True mainly consulted with Mr. Harris regarding using a tax book value purchase price formula under the buy-sell agreements. Mr. Harris was not a professional appraiser and had no significant practical experience in valuing businesses.

The buy-sell agreements did not provide a mechanism for periodic review or adjustment to the book value purchase price formula, other than what would occur as a result of changes in book value.

Messrs. Harris and Tangney recommended that Dave True obtain an appraisal of True Oil's oil and gas reserves contemporaneously with the gifts to the children because they expected the book value gift valuation to be challenged by the Internal Revenue Service (IRS). Either the True Companies or Dave and Jean True, personally, had been audited for income tax purposes regularly in all tax years preceding the gifts. The appraisal was prepared by Bernie Allen[14] (B. Allen report), an engineer from Casper, Wyoming, before Dave True made the gifts of True Oil interests to his children. No appraisal of Belle Fourche was prepared contemporaneously with the sale of 1-percent interests to the True children.

The B. Allen report indicated that as of August 1, 1973, True Oil had reserves of 5,297,528 barrels of proved developed oil and 8,551,994 thousand cubic feet (Mcf) of proved developed gas, and that the fair market value of its oil and gas properties

---

[14]The B. Allen report was not admitted into evidence because it could not be located at the time of trial. However, the SRC appraisal prepared for purposes of the subsequent True Oil gift tax case cited valuation data derived from the B. Allen report. We assume that the information contained in the SRC appraisal accurately reflects the data set forth in the B. Allen report.

(including leases) was $9,941,000. The results of the B. Allen report were generally discussed at True family meetings; however, there is no evidence in the record that the True children reviewed the report in detail before signing the True Oil buy-sell agreement. Mr. Harris did not use the B. Allen report to advise members of the True family (at the time of signing the True Oil buy-sell agreement) that tax book value was the appropriate standard; he reviewed the report only in connection with subsequent gift tax litigation.

    C.   <u>Wyoming U.S. District Court Cases on Belle Fourche and True Oil Transfers</u>

Dave True timely filed a 1973 Federal gift tax return reporting gifts of an 8-percent interest in True Oil and in True Drilling to each of his children. Jean True consented to treat the gifts as having been made one-half by each spouse. Each True Oil gift was reported to have a fair market value of $54,653, which represented the tax book value of an 8-percent interest as of August 1, 1973. The 1971 transfers of Belle Fourche stock to the True children (valued at $38.69 per share) had not been reported on a gift tax return because they were structured as sales by the corporation.

The Commissioner determined gift tax deficiencies against Dave and Jean True for the 1971 Belle Fourche transfers. The Trues paid the gift taxes assessed and filed a refund suit in the U.S. District Court for the District of Wyoming, designated as

True v. United States, Docket No. C79-131K (D. Wyo., Oct. 1, 1980) (1971 gift tax case).  On October 1, 1980, after a trial, the District Court (Judge Kerr) issued Findings of Fact and Conclusions of Law that stated:  "Taking into consideration all of the facts and circumstances including the reasonable inferences to be drawn therefrom, * * * the fair market value of the stock in question as of the date of August 2, 1971 was $38.69 per share", the book value price at which the sales to the True children had been made.  Judgment was entered accordingly, and the United States did not appeal.

The Commissioner also determined gift tax deficiencies against Dave and Jean True for the 1973 gifts to the True children of partnership interests in True Oil and True Drilling. However, the Commissioner conceded the deficiency relating to True Drilling.  The Trues paid the True Oil gift tax deficiencies and filed a refund suit with the same court as the 1971 gift tax case, designated as True v. United States, Docket No. C81-158, reported as 547 F. Supp. 201 (D. Wyo. 1982) (1973 gift tax case). On September 27, 1982, after a trial, Judge Kerr issued a Memorandum Opinion that concluded:

> Taking into consideration all the facts and circumstances and the reasonable inferences to be drawn therefrom, * * * the method of valuation used by the plaintiffs in this case offers a more complete and fair estimation of the fair market value to be used in the valuation of the 8% interests given as gifts to plaintiffs' children.  Application of plaintiffs' valuation method results in a finding * * * that the

　　fair market value of each 8% interest was properly
　　determined at $54,653.

Judgment was entered accordingly, and the United States did not appeal.

Although members of the True family asserted at trial that they believed that the book value buy-sell provisions were valid and enforceable as a result of the favorable outcomes of the 1971 and 1973 gift tax cases, neither they nor Dave True engaged counsel to advise them of the legal effects of those cases on future transfers pursuant to the buy-sell agreements. In fact, as described infra pp. 51-52, Dave True saw the 1993 transfers as his opportunity to test the ability of the buy-sell agreements to fix Federal gift tax value.

In preparing for litigation of the 1971 and 1973 gift tax cases, Dave True obtained appraisals for the transferred interests in Belle Fourche (valued as of August 2, 1971) and True Oil (valued as of August 1, 1973) from Standard Research Consultants (SRC). The SRC appraisals supported the True family positions in the 1971 and 1973 gift tax cases.

After evaluating Belle Fourche's historical performance, along with overall economic and industry trends, SRC used the earnings and book value approaches to derive a "freely traded value" for the transferred stock. The earnings approach required determining various price-earnings multiples for comparable public companies, adjusting them for Belle Fourche's unique

characteristics, and applying them to Belle Fourche's actual earnings data. Similarly, the book value approach analyzed rates of return on common stock equity and price-to-book value ratios of comparable public companies and applied them (after adjustments) to Belle Fourche's actual book value at the valuation date. After assigning more weight to the earnings approach, SRC derived a freely traded value for Belle Fourche stock of $120 per share. SRC explained that the freely traded value "would have been * * * [the] fair market value on the valuation date * * * had there been an active public market for the stock at that time."

SRC opined that, because Belle Fourche lacked a public market for its stock and the transferred shares represented minority interests, a willing, knowledgeable buyer would demand a discount from the freely traded value. While SRC examined average marketability discounts[15] used in public company transactions, it did not use this information in its analysis. Instead, SRC concluded that, because the minority interest shareholders (the True children) could never look forward to a public market and were limited to the sales price fixed in the

---

[15]SRC described the transferred interests' lack of marketability and control as being "infirmities" that must be accounted for in any sale to a hypothetical purchaser. However, SRC's analysis seemed to blend the two concepts, and, ultimately, referred only to a marketability discount and not to a minority discount.

buy-sell agreement, the fair market value of their shares on August 2, 1971, was the book value calculated under the buy-sell agreement, or $38.69 per share.

SRC generally followed the same methodology in valuing the partnership interests in True Oil transferred by Dave True as of August 1, 1973. However, instead of using the book value approach, SRC used the net asset value (NAV) approach combined with the earnings approach. This required a two-step process: (1) Marking the balance sheet to market to derive NAV, and (2) applying a discount to NAV based on comparable public companies' ratios of price to NAV. After again assigning greater weight to the earnings approach, SRC determined the freely traded value of an 8-percent interest in True Oil to be $535,000 (rounded) on the valuation date. Finally, SRC applied the same lack of public market rationale, as in its Belle Fourche appraisal, to disregard the freely traded value and to conclude that fair market value was limited to the buy-sell agreement formula price, or $54,653 for an 8-percent interest.

D. Tamma Hatten's Withdrawal From True Companies

Tamma Hatten had never shown an avid interest in participating in the True family businesses, and her husband had played a relatively minor role in the management of the True companies. On July 23, 1984, when Tamma Hatten was 44 years old, she notified her family (in writing) of her intent to withdraw

from and sell her interests in the True companies, as required under the buy-sell agreements. She and her husband were eager to purchase and independently run their own ranching operation. Tamma Hatten did not seek separate legal or other professional counsel in connection with the sale of her interests in the True Companies. Instead, she relied on Dave True and his advisers to determine the sales prices of all those interests under the buy-sell agreements and to structure the methods of payment.

Dave True's legal advisers drafted the Agreement for Purchase and Sale of Assets, dated August 10, 1984, which outlined the terms for sale of Tamma Hatten's business holdings (including partnership interests, corporate stock, notes, and lease interests). The total purchase price was $8,571,296.22, composed of a cash payment of $4,234,000 and payment to a specially created escrow account for the balance. The escrow, established by Dave True and his advisers, deviated from the requirements of the True companies' buy-sell agreements. Its purpose was to provide security for payment of Tamma Hatten's share of accrued contingent liabilities (if any) and a management vehicle for her investments.

Tamma Hatten received over $8.5 million in aggregate value for her True companies' interests, but that amount included certain offsets. For example, both Eighty-Eight Oil and True Oil had negative book values at the buy-sell agreements' valuation

dates; as a result, Tamma Hatten in effect was required to pay the other owners in order to dispose of her interests in those companies (i.e., her overall sales proceeds were reduced). The negative offsets were $1,405,449.35 for Eighty-Eight Oil and $466,560.35 for True Oil. In the case of True Oil, the negative book value was attributable to the deductions, which had been taken for tax purposes, of intangible drilling and development costs.

After the sale, Tamma and Don Hatten moved from Casper to Thermopolis, Wyoming, where they bought a ranch and were no longer involved in True family business activities. Dave and Jean True thereafter ceased making annual gifts to Tamma and amended their wills (and other estate planning documents) to delete any specific provision for Tamma Hatten and her family.[16] This was done because the Trues believed that Tamma Hatten was financially secure as a result of the sale. Moreover, Dave True believed that his estate should go to his sons so that they might invest the assets in the family businesses. One of Dave True's testamentary documents entitled "Appointment of Trust Estate" (appointment document), see infra p. 53, characterized the circumstances as follows:

---

[16]However, under sec. 5.3 of the Appointment of Trust Estate dated Sept. 14, 1984, if Dave True were to have been predeceased by his wife, sons, and his sons' lineal descendants, then Tamma Hatten would have been the taker in default of Dave True's estate.

2.5 Advancement. Prior to the time of execution [of this Appointment], my daughter, Tamma T. Hatten, * * * severed her financial ties with the True companies, and thus her potential inheritance has been fully satisfied during my lifetime.

There is no current expectation by Tamma Hatten, her mother, or her brothers, that Jean True or any other member of the True family will make any further financial provision for Tamma or her family.[17]

E. Use of Similar Buy-Sell Agreements in All True Companies Except White Stallion; Amendments and Waivers

The buy-sell agreements (and related amendments) used by the True family were substantially identical, except for White Stallion. In general, the partnership buy-sell agreements mirrored True Oil's partnership agreement, and the corporate buy-sell agreements mirrored Belle Fourche's Stockholders' Restrictive Agreement. The buy-sell agreements were not tailored to the specific type of business or industry in which each True company operated, and they all shared the following attributes: (1) Transfer restrictions, (2) mandatory purchase and sale requirements, (3) book value purchase price formulas derived using the company's customary accounting methods (tax basis), and (4) active participation (by owner or spouse) requirements.

---

[17]The only exception is the True Family Education Trust, created by Dave and Jean True in 1983 (before Tamma Hatten's withdrawal) for the benefit of all the True children's descendants. Dave and Jean True contributed to this trust, which is irrevocable, after their daughter's withdrawal. Therefore, Tamma Hatten's descendants have continued to derive financial benefits from this trust.

Over the years, the buy-sell agreements were amended on several occasions. Generally applicable amendments included: (1) Clarifying that owners could transfer their interests to qualified revocable living trusts without triggering the buy-sell provisions, (2) applying the buy-sell provisions to sales of partial interests, and (3) making special allowances for an owner's legal disability. In addition, the Belle Fourche buy-sell agreement was amended as of August 1, 1973, to include, inter alia, an active participation requirement that previously had been omitted due to David L. True's status as a student at the time of the original sales to the children in 1971.

All the preexisting buy-sell agreements were amended and restated as of August 11, 1984 (1984 amendments), to reflect, among other things, Tamma Hatten's withdrawal from the True companies.[18] In most cases, the 1984 amendments were the last amendments made to the buy-sell agreements before Dave True's death.[19]

The parties to the corporate buy-sell agreements, as amended and restated by the 1984 amendments, were: Dave and Jean True, the True sons, and the subject corporation. The amended

---

[18]Except White Stallion, which was amended on Sept. 20, 1984.

[19]True Environmental Remediating LLC's operating agreement was not entered into until June 30, 1992. However, its provisions were consistent with the 1984 amendments to the other True companies' buy-sell agreements.

corporate buy-sell agreements included the following relevant provisions:

    1. Restriction of Stock.  a.  Until termination of this agreement none of the stock of the company shall pass or be disposed of in any manner whatsoever, whether by voluntary or involuntary action, to any person, partnership or corporation except in accordance with the terms of this agreement; * * *. * * *

    b.  Each share of stock shall remain subject to this agreement, and each corporation (including the Company), partnership, trust, and person who now holds or may acquire any of the stock, in any manner, nevertheless shall hold it subject to the provisions of this agreement whenever and as often as any of the sales events herein mentioned may occur.

    2.  Events requiring the mandatory sale and purchase include any attempt to pass or dispose of the stock in any manner whatsoever, whether by voluntary or involuntary act, specifically including, but not limited to, the following events (hereinafter called "sales events"):

    2a.  Sale.  In the event any Shareholder desires at any time to sell all or part of his or her stock in the Company, he or she shall so notify the Purchasing Shareholders in writing. * * * Thereafter, the Selling Shareholders shall sell and the Purchasing Shareholders shall purchase such stock in accordance with the terms of paragraphs 3, 4, and 5 hereof.  Such sale and purchase shall be consummated within six (6) months after receipt by the Purchasing Shareholders of such written notice.

    2b. Death of Shareholder.  In the event of the death of any one of the * * * [Shareholders], the deceased Shareholder, as the Selling Shareholder, shall sell and the Purchasing Shareholders shall purchase all the stock of the Selling Shareholder in accordance with paragraphs 3, 4, and 5 hereof.  This agreement shall be binding upon the heirs and personal representatives of such decedent and the trustees of any qualified trust, all of which shall be included in the term "Selling Shareholder."  The actual transfer relating to such sale and purchase as herein provided shall be made

within six (6) months after such Shareholder's death.
* * *

                    *   *   *   *   *   *   *

    2d.  Shareholders' Required Activities.  In the
event a Shareholder or his or her spouse ceases to
devote all or a substantial part of his or her time to
the business of the company or any one of its
affiliates for any reason, * * * such Shareholder shall
be deemed to be the Selling Shareholder and to have
notified the other Shareholders of a desire to sell his
or her stock as provided in paragraph 2a unless the
remaining Shareholders unanimously agree to permit such
a Shareholder to continue as a Shareholder.

    3.  Buy and Sell Agreement.  The parties hereto
agree that on the occurrence of each and every sale
event, the Selling Shareholder, shall sell to the
Purchasing Shareholders, and the Purchasing
Shareholders shall purchase, in direct proportion to
the interest which each owns in said corporation
represented by stock ownership in the company * * * all
of the shares of stock owned by or for the benefit of
the Selling Shareholder or all of the shares offered
for sale by the Selling Shareholder for the purchase
price as set forth in paragraph 4 below.

    4.  Price.  The price of any shares sold hereunder
shall be the book value of the stock at the end of the
preceding fiscal year, less any and all dividends paid
to the Shareholders prior to the effective date of
sale, plus income computed in accordance with the
Internal Revenue regulations generally requiring
allocation on a per share, per day basis.  The book
value of the stock shall be determined in accordance
with the accounting methods and principles customarily
followed by the corporation.  [Emphasis added.]

    5.  Effective Date. The effective date for the
determination of purchase price and transfer of stock
will be the earliest of (A) the date of death of the
Selling Shareholder * * * or (C) the date of notice of
desire to sell as herein defined.  Except that for
purposes of (A) * * * above, if such date falls within
two and one-half (2-1/2) months following the end of a
fiscal year, the effective date will be two and one-
half (2-1/2) months after the end of that fiscal year.

6. <u>Termination</u>. This agreement shall remain in force until death of the survivor of the Shareholders * * * and shall then terminate.

Before the 1984 amendments, the book value price formula in the corporate buy-sell agreements was different. Formerly, the price was computed by taking the stock's book value at the end of the preceding fiscal year less dividends paid <u>within 2-1/2 months immediately following the fiscal yearend</u>. Furthermore, there was no reference to a per share, per day allocation of income before the 1984 amendments.

The partnership buy-sell agreements, as amended and restated by the 1984 amendments, included substantively identical provisions to those cited above. However, the following modifications, which were unique to partnerships, were included:

20. <u>Price</u>. The price of any partnership interest or portion thereof shall be the <u>book value of the Selling Partner's capital account</u> as of the close of business of the day immediately preceding the sales event. The book value of such capital account shall be determined in accordance with the accounting methods and principles customarily followed by the partnership, and in accordance with the Internal Revenue Code and appropriate regulations relating to the determination of the Partner's distributive share of income, expenses and other partnership items. [Emphasis added.]

21. <u>Effective Date</u>. The effective date for the transfer of partnership interest shall be the date of death of a Partner, * * * or the date of an event requiring a mandatory sale and purchase.

22. <u>Termination of Partnership</u>. The partnership shall continue in business and shall not be terminated unless the holders of 50% or more of the total interest in partnership capital and profits sell their interests within the same year as provided herein, or unless all

of the Partners agree to such termination.  In such event, the interest of the Partners shall be settled and adjusted in the same manner, and upon the same basis as provided in the death or disability of a Partner.

Before the 1984 amendments, the book value price formula in the partnership buy-sell agreements was different.  Formerly, the purchase price was determined as of the end of the month immediately preceding the sales event and was computed by multiplying the book value of the partnership (less any withdrawals made by the partners after the end of the preceding month) by the Selling Partner's percentage interest in partnership net profits (percentage of total partners' capital formula).[20]

At times, members of the True family formally waived their purchase rights under the various True companies' buy-sell agreements.  For example, in connection with the merger of Black Hills Oil into Black Hills Trucking in 1980, the True family agreed to waive any Black Hills Trucking buy-sell provision that would restrict the exchange of stock between the two companies. In April 1981, the True family waived the Belle Fourche buy-sell provision requiring all purchases to be in proportion to the

[20]The percentage of total partners' capital formula first appeared in the amended partnership agreement between Dave True, Jean True, and the True children dated Aug. 1, 1973.  However, the original partnership agreement between Dave and Jean True dated June 1, 1954, calculated the purchase price based on the selling partner's capital account balance at the close of the month closest to the sales event.

owners' preexisting ownership percentages in order to allow Jean
True and the True children (but not Dave True) to purchase
additional shares from the company.  Similarly, Jean True waived
her purchase rights under the Rancho Verdad buy-sell agreement in
July 1983, when Dave True sold 8-percent interests to each of the
True children, thereby allowing them to enter that partnership.
Lastly, in October 1985, the True family waived their purchase
rights under the Toolpushers buy-sell agreement to allow the
trustee of the True Companies Employees' Profit Sharing Trust
(Employees' Trust) to sell its Toolpushers stock back to the
company.[21]

F.  Unique Provisions of White Stallion Buy-Sell Agreement

In July 1982, the original White Stallion buy-sell
agreement, see supra p. 22, was amended to reflect the admission
as stockholders of Dave and Jean True's children and Allen and
Cynthia True's children.  While the White Stallion buy-sell
agreement shared some of the common characteristics of other True
company agreements, it also contained certain unique provisions.
For example, under the provision entitled "Buy and Sell
Agreement", if a stockholder were to die, become legally
disabled, or desire to sell all or part of his stock, the

[21]Under the Nov. 20, 1976, Toolpushers Stockholders'
Restrictive Agreement, Employees' Trust was specifically exempted
from the buy-sell restrictions.  As a result, the October 1985
purchase price for Employees' Trust's shares was not limited to,
and in fact exceeded, book value.

remaining members of his group (Allen True's family comprised group 1, and Dave True's family comprised group 2) were obligated to purchase the stock on a pro rata basis. The stockholder, his heirs, and trustees, etc., were likewise obligated to sell to those group members. Similar to the other True companies' buy-sell agreements, the purchase price reflected the transferred shares' book value at the end of the preceding fiscal year, less dividends paid within 2-1/2 months of such fiscal yearend.

An additional restriction, found only in White Stallion's buy-sell agreement, provided:

> 13. First Right of Refusal. If the Shareholders holding 100% of the stock held in either Group 1 or Group 2, above, desire to transfer by lifetime sale all of the interests held by Shareholders comprising that group (hereinafter "Selling Group") to someone other than the Shareholders comprising the other group (hereinafter "Nonselling Group"), the Selling Group shall not do so without first offering in writing to sell such interests to the Shareholders comprising the Nonselling Group on the same terms and conditions as any bona fide offer received (in writing) by the Selling Group for its interests. The Nonselling Group shall have thirty (30) days from the date the written offer and proof of the bona fide offer are mailed to the Nonselling Group within which to accept such offer in writing. Each Shareholder comprising the Nonselling Group shall have the right to purchase the Selling Group's interest, in the ratio that his or her stock bears to the total stock held by the Nonselling Group. If a Shareholder in the Nonselling Group declines to exercise his or her rights to purchase a portion of the Selling Group's stock interest, the remaining Shareholders comprising the Nonselling Group desiring to purchase such portion shall have an additional fifteen (15) days to do so in the ratio that their stock ownership bears to the total stock ownership of the Shareholders comprising the Nonselling Group exercising such right to purchase.

This provision was included in the White Stallion buy-sell agreement at Allen True's request.

The White Stallion buy-sell agreement was amended and restated again on September 20, 1984, to reflect, inter alia, Tamma Hattan's withdrawal from the partnership.

G.  Future of True Family Buy-Sell Agreements

After Dave True's death and Jean True's subsequent sale of most of her interests ,see infra pp. 53-55, the True sons alone owned a majority of the True companies,[22] and they have continued the preexisting buy-sell agreements.  Under those agreements, upon a brother's death, his estate would be required to sell, and the surviving brothers would be required to purchase, the deceased brother's interest at book value.  At the death of the last surviving brother, the beneficiaries of his estate would receive 100-percent ownership of the True companies.  This scenario assumes that none of the True sons' children become actively participating owners of the True companies, which may or may not happen in the future.

The True sons have considered this problem and discussed it with Mr. Harris.  They have decided to wait until the conclusion of this litigation before making any changes to the buy-sell agreements.

---

[22]Jean True retained her interests in only True Drilling, White Stallion, and Smokey Oil Co.

III.  Transfers in Issue

    A.  1993 Transfers of Partnership Interests by Dave True

    Effective January 1, 1993, Dave True sold part of his ownership interest in all True companies that were partnerships to his wife and sons, pursuant to the buy-sell agreements. Before the transfers, Dave True held a greater than 50-percent general partnership interest in each company.  Mr. Harris recommended that Dave True reduce his ownership interest to less than 50 percent, in order to avoid termination of the partnerships (for income tax purposes) at his death.  Mr. Harris was concerned that as a result of such termination, the partnership agreements, which embodied the buy-sell provisions, would become subject to new valuation rules under Chapter 14 of the Internal Revenue Code (Chapter 14).[23]  To prevent this from happening, Dave True sold enough of his interests to reduce his and Jean True's combined ownership to below 50 percent.  Although Dave True had health issues before the 1993 transfers, including back problems and a chronic pulmonary insufficiency that required him to be on oxygen full time, the True family and Mr. Harris did

_____

[23]The parties stipulated that the True companies' existing partnership agreements and shareholders' restrictive agreements were entered into before Oct. 9, 1990 (effective date for Chapter 14 rules), and were not substantially modified after Oct. 8, 1990.

not consider Dave True's ailments to be life threatening or his death to be imminent at the time of his 1993 transfers.[24]

Dave True timely filed a 1993 Federal gift tax return (Jean True signed as consenting spouse) disclosing the transfers but treating them as sales, thereby reporting no taxable gifts. Mr. Harris expected the return to be audited and the transaction to be challenged by the IRS. Dave True saw this risk as his opportunity to test (through litigation) the existing buy-sell agreements' ability to fix transfer tax value of the True companies.

On March 3, 1997, respondent issued to the estate and to Jean True, individually, duplicate Notices of Deficiency (collectively, 1993 gift tax notice), determining that the values of interests transferred by Dave True in 1993 were higher than reported book value.[25] However, since issuing the original 1993 gift tax notice, respondent has conceded the reported values of interests in Rancho Verdad and True Drilling that were transferred by Dave True in 1993. Appendix schedule 1, infra,

---

[24]In response to a question from the Court, Mrs. True testified that Dave True had been a smoker, but that he hadn't smoked for some time before his death. Mrs. True had previously testified that Dave True was "on oxygen for chronic bronchitis for about 2-1/2 years before he died."

[25]Jean True's notice of deficiency was identical to the estate's and was issued solely because she consented to split gifts made by Dave True for calendar year 1993.

lists the transferred interests and compares the 1993 gift tax notice values to amounts paid by the purchasers.

B.  1994 Estate Transfers

Dave True died of a heart attack on June 4, 1994.  Before his death, he had transferred substantially all his assets to his living trust.  Under section 5.2 of the living trust, Dave True reserved the power to appoint the trust estate at the time of his death to "such persons, corporations or other entities and in such shares and interests as I may specify by appropriate provisions in any instrument executed and acknowledged by me and delivered to the [trustees of the living trust]."  On September 14, 1984, Dave True had exercised his power of appointment by executing the appointment document.

Under the appointment document Dave True bequeathed to his sons the maximum amount that could pass without estate tax by reason of the unified credit (equally and free of trust) and the remainder of the trust estate to a qualified terminable interest property trust (QTIP trust) for Jean True.  At Jean True's death (or from the beginning, had Jean predeceased Dave), the balance of the trust estate and any tangible personalty was to be divided equally among his sons or their heirs.  However, before these bequests were funded, and pursuant to the terms of the buy-sell agreements, the trustees of the living trust sold Dave True's interests in the True companies to Jean True, Hank True, Diemer

True, and David L. True at book value effective June 3, 1994. The sales were effected by a closing that occurred on or about September 20, 1994.

On March 3, 1995, the estate timely filed a Federal estate tax return (estate tax return) reflecting, inter alia, the cash proceeds received from the sale of the True companies under the heading "H.A. True, Jr. Irrevocable [sic] Trust".

On January 20, 1998, respondent issued the estate a notice of deficiency (estate tax notice) determining that the underlying values of the True companies that were reported on the estate tax return were higher than book value. However, since issuing the estate tax notice, respondent has conceded the reported values of Dave True's interests in Rancho Verdad, True Drilling, Toolpushers Supply Co., Midland Financial Corp., Smokey Oil Co., Inc., and Roughrider Pipeline Co. that were sold by the estate in 1994. Appendix schedule 2, infra, lists Dave True's interests and compares the estate tax notice values to amounts paid by the purchasers. In addition, respondent has stipulated that the estate would be entitled to an increased marital deduction under section 2056 if the value of interests in the True companies that were sold to Jean True was determined to be greater than the purchase prices under the buy-sell agreements.

C.  1994 Transfers by Jean True

After Dave True died, Jean True no longer wished to be actively involved in all the True companies.  Accordingly, on June 30 and July 1, 1994, she gave notice to her sons of her intent to sell most of her interests in the True companies.  Jean True sold her interests to her sons at book value, pursuant to the terms of the buy-sell agreements.

Jean True timely filed a 1994 Federal gift tax return disclosing the transactions but treating them as sales, thereby reporting no taxable gifts.

On January 20, 1998, respondent issued to Jean True a notice of deficiency (1994 gift tax notice), determining that the values of interests she sold in 1994 were higher than reported book values.  However, since issuing the 1994 gift tax notice, respondent has conceded the reported values of interests in Roughrider Pipeline Co., Rancho Verdad, Toolpushers Supply Co., and Midland Financial Corp. that were sold by Jean True in 1994.  Appendix schedule 3, infra, lists the interests sold and compares the 1994 gift tax notice values to amounts paid by the purchasers.

IV. Subsequent Income Tax Litigation Regarding Ranchland
    Exchange Transactions

During the 1980's, the True family (except Tamma Hatten) purchased land and operating assets to add to their ranching operations.  Each purchase took place through the same series of

steps, described as follows (generally, ranchland exchange transactions): First, instead of True Ranches directly acquiring the ranchlands, the True family arranged for Smokey Oil Co. (Smokey Oil) to purchase the parcels of real property for an aggregate purchase price of over $6.8 million, while True Ranches acquired the operating assets of each ranch. At the time, Smokey Oil (a Wyoming S corporation) was owned by Dave True (72.3935 percent), Jean True (24.1316 percent), and the True sons (1.1583 percent each). Second, Smokey Oil transferred the ranchlands to True Oil in exchange for selected productive oil and gas leases, which the parties treated as a like-kind, tax-free exchange under section 1031. Third, True Oil immediately distributed the newly acquired ranchlands to the individual partners of True Oil (Dave and Jean True and the True sons) as tenants in common. Fourth, the partners then contributed their undivided interests in the ranchlands to True Ranches by general warranty deed. The partnership distribution and contribution transactions were treated as nonrecognition transactions under sections 721 and 731.

The intent of the True family in carrying out this series of acquisitions, transfers, and exchanges was to create income tax benefits. Through the operation of section 1031(d), which essentially provides that the basis of property received in a nonrecognition exchange is the same as the basis of property

transferred, Smokey Oil received depletable oil and gas leases with the same cost basis as the nondepreciable ranchlands it had transferred in the exchange with True Oil. This allowed Smokey Oil to claim cost depletion deductions for the leases on its tax returns for 1989 and 1990 under section 612, which, if sustained, would have resulted in substantial income tax savings to the True family. True Oil, on the other hand, received the nondepreciable ranchlands with a zero basis because the oil and gas leases it exchanged pursuant to section 1031 were fully cost depleted. Through subsequent transfers, True Ranches acquired the ranchlands with the same zero basis as True Oil's oil and gas leases. By so doing, the True family intended to reap the tax benefits of turning nondepreciable assets (ranchlands) into cost-depletable assets (oil and gas leases) in the hands of Smokey Oil. In addition, the ranchland exchange transactions rid True Oil of fully cost-depleted assets (oil and gas leases) and gave True Ranches a zero basis in otherwise nondepreciable assets (ranchlands).

If these transactions had been effective for income tax purposes, they would also have created transfer tax benefits by reducing the prices payable under the True Ranches and Smokey Oil buy-sell agreements. They would have reduced the book value of the ranchlands to zero and thereby reduced the book value formula prices to be paid for partnership interests in True Ranches under

the terms of the True Ranches buy-sell agreement.  Because of the transfer of basis to the depletable oil and gas properties, the ultimate prices to be paid for interests in Smokey Oil under its buy-sell agreement would have been expected to be reduced to less than the costs of the purchased ranchlands.

On audit of the True Oil, Smokey Oil, and True Ranches tax returns for 1989 and 1990, the IRS determined that the substance-over-form and step transaction doctrines required that the various intermediate steps of these transactions be collapsed and that they be viewed as a unitary transaction in which True Ranches acquired directly the land and depreciable assets of the ranch properties.  Because Smokey Oil was deemed not to have acquired the ranchlands, the IRS treated these transactions as if there had been no exchange between Smokey Oil and True Oil.  The IRS disallowed Smokey Oil's cost depletion deductions claimed on the leases received in the exchanges, and it allocated the income from those leases back to True Oil.

The True family paid the deficiencies and filed administrative claims for refund.  After the IRS disallowed the refund claims, the True family filed a refund suit in U.S. District Court for the District of Wyoming.  The Government filed motions for partial summary judgment, contending (inter alia) that under the step transaction doctrine the ranchland exchange transactions were a single transaction in which True Ranches

alone acquired all the ranch property (real property and operating assets).  The District Court granted the Government's motion for summary judgment, designated as True v. United States, No. 96-CV-1050-J, (Nov. 12, 1997), and held that the step transaction doctrine required the recharacterization of the ranchland exchange transactions as the IRS had determined.  On appeal, the Court of Appeals for the Tenth Circuit affirmed the District Court's decision regarding the ranchland exchange transactions.  See True v. United States, 190 F.3d 1165, 1177-1180 (10th Cir. 1999).  On November 15, 1999, the Court of Appeals for the Tenth Circuit denied petitioners' petition for rehearing and rehearing en banc.

OPINION

I.  Do Family Buy-Sell Agreements Control Estate Tax Value?

Case law and regulatory authority have interpreted the general estate tax valuation provisions of section 2031 to include special rules that allow qualifying buy-sell agreements to control estate tax fair market value.

A.  Framework for Analyzing Estate Tax Valuation Issues

Federal estate tax is imposed on the transfer of the taxable estate of every United States citizen or resident.  See sec. 2001(a); U.S. Trust Co. v. Helvering, 307 U.S. 57, 60 (1939).  The taxable estate is defined as the gross estate less prescribed deductions. See sec. 2051.  All property interests owned by the

decedent at death are included in the gross estate; the value of the gross estate generally is determined as of the date of death. See secs. 2031(a), 2033; sec. 20.2031-1(b), Estate Tax Regs.

Fair market value is the standard for determining value of transfers of property subject to Federal estate tax. See United States v. Cartwright, 411 U.S. 546, 550 (1973). Fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Id. at 551; see sec. 20.2031-1(b), Estate Tax Regs. The willing buyer and seller are hypothetical persons, rather than specific individuals or entities, and their characteristics are not necessarily the same as those of the actual buyer or seller. See Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990) (citing Estate of Bright v. United States, 658 F.2d 999, 1006 (5th Cir. 1981)). The hypothetical willing buyer and seller are presumed to be dedicated to achieving the maximum economic advantage. As stated in Estate of Newhouse, 94 T.C. at 218: "This advantage must be achieved in the context of market conditions, the constraints of the economy, and the financial and business experience of the corporation existing at the valuation date."

Generally, the shares of a closely held corporation for which there is no public market, in the absence of recent arm's-

length sales, are to be valued by taking into account the company's net worth, prospective earning power, dividend-paying capacity, and other relevant factors.[26]  See <u>Estate of Andrews v. Commissioner</u>, 79 T.C. 938, 940 (1982); sec. 20.2031-2(f)(2), Estate Tax Regs.; Rev. Rul. 59-60, 1959-1 C.B. 237.  Similarly, the valuation of partnership interests requires (1) a fair appraisal (as of the valuation date) of all assets of the business, tangible and intangible, including goodwill, (2) an analysis of the business' demonstrated earning capacity, and (3) consideration of other "relevant factors" noted in the stock valuation rules.  See sec. 20.2031-3, Estate Tax Regs.

The value of property as of the decedent's date of death is a question of fact requiring the trier of fact to weigh all relevant evidence of value and to draw appropriate inferences. See <u>Estate of Newhouse v. Commissioner</u>, <u>supra</u>; <u>Hamm v. Commissioner</u>, 325 F.2d 934, 938 (8th Cir. 1963), affg. T.C. Memo. 1961-347.

B.  <u>Development of Legal Standards</u>

The legal standards for allowing buy-sell agreements to determine estate tax value have developed over time.  Some cases

---

[26]"Other relevant factors" listed in the regulation include: (1) Goodwill of the business, (2) economic outlook in the particular industry, (3) company's position in the industry and its management, (4) degree of control represented by block of stock to be valued, and (5) values of securities of corporations engaged in the same or similar lines of business that are listed on a stock exchange.  See sec. 20.2031-2(f)(2), Estate Tax Regs.

laid out fundamental objective requirements that, if met, permitted the formula price provided by a buy-sell agreement to establish fair market value under predecessors of section 2031. Other cases and the estate tax regulations have expanded those requirements to address such subjective concerns as whether the buy-sell agreement was a bona fide business arrangement and not merely a device to make a testamentary disposition at a bargain price.

### 1. Case Law Preceding Issuance of Regulations

Before the issuance of regulations under section 2031, courts addressed the effect of option contracts or buy-sell agreements on the valuation of business interests by examining whether restrictions in the agreement put a ceiling on the price the owner (or his estate) could receive at disposition. Specifically, buy-sell agreements were required (1) to be enforceable against the parties, (2) to specify a price, and (3) to bind transferors both during life and at death in order to be given dispositive effect for estate tax valuation purposes. See Lomb v. Sugden, 82 F.2d 166, 167 (2d Cir. 1936); Wilson v. Bowers, 57 F.2d 682, 683 (2d Cir. 1932); Estate of Salt v. Commissioner, 17 T.C. 92, 99-100 (1951) (generally, the Wilson-Lomb test). Although these requirements were developed in the context of corporate buy-sell agreements, they were also applied to partnership buy-sell agreements. See Brodrick v. Gore, 224

F.2d 892, 896 (10th Cir. 1955); Estate of Weil v. Commissioner, 22 T.C. 1267, 1273-1274 (1954); Hoffman v. Commissioner, 2 T.C. 1160, 1178-1180 (1943), affd. sub nom. Giannini v. Commissioner, 148 F.2d 285 (9th Cir. 1945).

In addition, courts developed other tests to help decide whether buy-sell agreements controlled estate tax value. In Bensel v. Commissioner, 36 B.T.A. 246 (1937), affd. 100 F.2d 639 (3d Cir. 1938), the arm's-length nature of the agreement convinced the Court that a corporate buy-sell agreement controlled estate tax value. In Bensel, 36 B.T.A. at 247, a majority shareholder (father) had granted employee (son) an option to purchase father's stock at his death for a fixed price, in order to retain son's valuable services. Father and son were estranged at all relevant times. See id. When son exercised the option at father's death, the fair market value of the stock exceeded the option price. See id. at 249-250.

The Commissioner argued, in the alternative, for inclusion in the gross estate at date of death value under the theory that decedent (1) retained an interest to alter, revoke, or amend under section 302(d) of the Revenue Act of 1926, ch. 27, 44 Stat. 71, or (2) made a transfer in contemplation of death under section 302(c). See Bensel v. Commissioner, 36 B.T.A. at 251. However, the hostilities and constant bargaining between father and son convinced the Court that son was not the natural object

of father's bounty and that the option price was what adverse parties dealing at arm's length would have agreed to. See id. at 252-253. Accordingly, the Court concluded that the option was neither a substitute for a testamentary disposition, nor a device for avoiding estate tax, so that section 302(c) and (d) did not apply. See id. at 253-254. Instead, son's exercise of the option was either a bona fide sale for adequate and full consideration or, like Wilson and Lomb, completely outside the scope of section 302 of the Revenue Act of 1926. See id. at 254.

Similarly, we stated in Estate of Littick v. Commissioner, 31 T.C. 181 (1958), that if "for the purpose of keeping control of a business in its present management, the owners set up in an arm's-length agreement * * * the price at which the interest of a part owner is to be disposed of by his estate to the other owners, that price controls for estate tax purposes, regardless of the market value of the interest to be disposed of". Id. at 187 (emphasis added).

Other facts that courts considered in evaluating whether buy-sell agreements should determine estate tax value included: (1) Tax avoidance motives for entering into buy-sell agreements, see May v. McGowan, 194 F.2d 396, 397 (2d Cir. 1952); Estate of Littick, 31 T.C. at 186, (2) that the purchasers under the buy-sell agreement were natural objects of the decedent-seller's bounty, see Hoffman v. Commissioner, 2 T.C. at 1179, and (3) that

the buy-sell agreement's price, when originally fixed, represented full and adequate consideration and was not a testamentary substitute, see id.; Bensel v. Commissioner, 36 B.T.A. at 254; Baltimore Natl. Bank v. United States, 136 F. Supp. 642, 654 n.7 (D. Md. 1955).

The Court of Appeals for the Tenth Circuit indicated, in Brodrick v. Gore, supra, that if a partnership buy-sell agreement were entered into in bad faith, that could jeopardize the ability of the agreement to control value for estate tax purposes. In Brodrick v. Gore, 224 F.2d at 894, a father and his two sons agreed to sell their interests in an oil and gas partnership, during life or at death, only to each other at book value. After the father's death, the sons petitioned the probate court to be compelled, as executors, to sell the father's interest to themselves at book value. See id. After a hearing, the probate court found that the partnership agreement was valid, the estate was obligated to sell at book value, the sons were obligated to purchase, and book value[27] was correctly calculated. See id. at 895.

The Commissioner determined a deficiency in estate tax on the ground that the fair market value of the father's interest

---

[27]Neither the published report of Brodrick v. Gore, 224 F.2d 892, 896 (10th Cir. 1955), nor the briefs, which we have reviewed, specify the basis on which book value was to be computed (e.g., financial statement, tax, or cash basis) under the partnership buy-sell agreement.

exceeded book value on his date of death.  See id. at 895.  The sons paid the deficiency, brought a District Court refund suit, and prevailed on a motion for summary judgment.  See id.  The Commissioner appealed to the Court of Appeals for the Tenth Circuit, which affirmed the judgment in favor of the executor-sons.  See id. at 897.

Applying the Wilson-Lomb test, the Court of Appeals for the Tenth Circuit held that the estate tax value was properly limited to book value because the sale to the sons at book value was required under a reciprocal and enforceable agreement.  See id. at 896.  The Court of Appeals held the probate court's prior judgment to be a binding determination that:  (1) The executors were obligated to sell to the surviving partners at book value and (2) the calculation of book value was correct.  See id.

The Court noted that if the Commissioner had pleaded affirmatively that the partnership agreement was executed in "bad faith," or that the probate court proceeding was collusive or nonadversarial, there might have been a genuine issue of material fact.  See id. at 897.  However, as stated by the Court:  "With no such issues of fact joined, the question whether the estate tax should be computed on the basis of the book value or the market value was one of law."  Id.

## 2. Regulatory Authority and Interpretive Rulings

In 1958, the Treasury issued final regulations under section 2031, concerning the valuation of stocks and bonds for estate tax purposes, applicable to estates of decedents dying after August 16, 1954.  See sec. 20.2031-2, Estate Tax Regs.  In particular, section 20.2031-2(h) addresses the valuation of securities owned by a decedent at death subject to an option or contract to purchase held by another person.  See sec. 20.2031-2(h), Estate Tax Regs.  The regulation states that the effectiveness of the agreement to determine the value of securities for estate tax purposes depends on the circumstances of the case.  See id.  For instance, the option or contract price is accorded little weight if it did not bind the decedent equally during life and at death. See id.  The regulation further states:

> Even if the decedent is not free to dispose of the underlying securities at other than the option or contract price, such price will be disregarded in determining the value of the securities unless it is determined under the circumstances of the particular case that the agreement represents a bona fide business arrangement and not a device to pass the decedent's shares to the natural objects of his bounty for less than an adequate and full consideration in money or money's worth.  [Id.; emphasis added.]

Although the regulation as a whole, and this subsection in particular, have been subsequently amended, the changes do not affect the cases at hand.[28]  Cases applying the regulation have

---

[28]Sec. 20.2031-2, Estate Tax Regs., was amended June 14, 1965 by T.D. 6826, 1965-2 C.B. 367; Apr. 26, 1974 by T.D. 7312,
(continued...)

interpreted the "bona fide business arrangement" and "not a testamentary device" tests to be conjunctive (i.e., both tests must be satisfied independently to give the agreement dispositive effect). See Dorn v. United States, 828 F.2d 177, 182 (3d Cir. 1987); St. Louis County Bank v. United States, 674 F.2d 1207, 1210 (8th Cir. 1982); Estate of Lauder v. Commissioner, T.C. Memo. 1992-736 (Lauder II). This means that a buy-sell agreement can be both a bona fide business arrangement and a testamentary device, with the result that it will not be given dispositive effect for estate tax valuation purposes. See Lauder II.

In 1959, the Commissioner issued Revenue Ruling 59-60, which was intended to "outline and review in general the approach, methods and factors to be considered in valuing shares of the capital stock of closely held corporations for estate tax and gift tax purposes." Rev. Rul. 59-60, 1959-1 C.B. 237. Revenue Ruling 59-60 has been widely accepted as setting forth the appropriate criteria to consider in determining fair market value. See Estate of Newhouse v. Commissioner, 94 T.C. at 217. Section 8 of the ruling addresses the effect of agreements

---

[28](...continued)
1974-1 C.B. 277; Sept. 30, 1974 by T.D. 7327, 1974-2 C.B. 294; Sept. 13, 1976 by T.D. 7432, 1976-2 C.B. 264, and Jan. 28, 1992 by T.D. 8395 (1992 amendment), 1992-1 C.B. 816. Only the 1992 amendment affected subsec. 20.2031-2(h), Estate Tax Regs., by adding a cross-reference to sec. 2703 (and the regulations thereunder) for special rules involving options and agreements (including contracts to purchase) entered into (or substantially modified after) Oct. 8, 1990. See infra pp. 79-81.

restricting the sale or transfer of stock on estate and gift tax value.  See Rev. Rul. 59-60, 1959-1 C.B. at 243.

First, the ruling describes a situation in which stock was acquired by a decedent subject to an option reserved by the issuing corporation to repurchase at a certain price.  The ruling states that the option price usually will be accepted as fair market value for estate tax purposes, under the rubric of Revenue Ruling 54-76.  See id.; Rev. Rul. 54-76, 1954-1 C.B. 194.  However, Revenue Ruling 59-60 further states that the option price does not control fair market value for gift tax purposes.  See Rev. Rul. 59-60, 1959-1 C.B. at 244.

Second, the ruling provides another formulation of the Wilson-Lomb test.  It states that if the option or buy-sell agreement (1) resulted from voluntary action by the stockholders and (2) was binding during life and at death of the stockholders, then the agreement may or may not, depending on the circumstances of each case, fix the value for estate tax purposes.  See id.  The ruling adds, however, that the agreement would be a factor to evaluate with other relevant factors in determining fair market value.  See id.

Third, the ruling lists factors that must always be considered in valuing closely held stock "to determine whether the agreement represents a bonafide business arrangement or is a device to pass the decedent's shares to the natural objects of

his bounty for less than an adequate and full consideration in money or money's worth." Id. The factors mentioned are: The relationship of the parties, the relative number of shares held by the decedent, and other material facts. See id.

### 3. Case Law Following Issuance of Regulations and Revenue Ruling 59-60

Cases decided after the issuance of section 20.2031-2(h), Estate Tax Regs., and Revenue Ruling 59-60, supra, reflect new expressions of the Wilson-Lomb test. Specifically, the formula price under a buy-sell agreement was considered binding for Federal estate tax purposes if: (1) The offering price was fixed and determinable under the agreement; (2) the agreement was binding on the parties both during life and after death, (3) the agreement was entered into for bona fide business reasons,[29] and (4) the agreement was not a substitute for a testamentary disposition[30] (generally, the Lauder II test). See Lauder II

---

[29]We refer to this requirement as the business purpose prong of the Lauder II test. See Estate of Lauder v. Commissioner, T.C. Memo. 1992-736 (Lauder II). This is equivalent to the requirement of sec. 20.2031-2(h), Estate Tax Regs., that the agreement represent a bona fide business arrangement. See Lauder II (using the terminology of this Court and the regulation interchangeably); sec. 20.2031-2(h), Estate Tax Regs.

[30]We refer to this requirement as the nontestamentary disposition prong of the Lauder II test. This is equivalent to the requirement of sec. 20.2031-2(h), Estate Tax Regs., that the agreement not be a device to pass the decedent's shares to the natural objects of his bounty for less than an adequate and full consideration in money or money's worth. See Lauder II (using the terminology of this Court and the regulation interchangeably); sec. 20.2031-2(h), Estate Tax Regs.

(tracing the origins of the test through case law and regulations). The first two prongs of the Lauder II test had been addressed directly by the courts in the Wilson-Lomb line of cases. However, after the issuance of section 20.2031-2(h), Estate Tax Regs., the attention of the courts shifted to the last two prongs, which had only been adverted to in some early cases.

### a. Was Agreement Entered Into for Bona Fide Business Reasons?

In several cases, courts considered whether parties had bona fide business reasons for entering into buy-sell agreements. For example, instituting a buy-sell agreement to maintain exclusive family control over a business repeatedly has been found to be a bona fide business purpose. See Estate of Bischoff v. Commissioner, 69 T.C. 32, 39-40 (1977); Estate of Littick v. Commissioner, 31 T.C. at 187; Lauder II; Estate of Seltzer v. Commissioner, T.C. Memo. 1985-519; Estate of Slocum v. United States, 256 F. Supp. 753, 755 (S.D.N.Y. 1966). In addition, using buy-sell agreements to assure continuity of company management policies and to retain key employees also have been held to be bona fide business purposes. See Estate of Reynolds v. Commissioner, 55 T.C. 172, 194 (1970); Bommer Revocable Trust v. Commissioner, T.C. Memo. 1997-380. However, as we noted in Lauder II: "legitimate business purposes are often 'inextricably mixed' with testamentary objectives where * * * the parties to a restrictive stock agreement are all members of the same immediate

family."  Lauder II, T.C. Memo. 1992-736, 64 T.C.M. (CCH) 1643,
1657, 1992 T.C.M. (RIA) par. 92,736, at 92,3731 (quoting 5
Bittker, Federal Taxation of Income, Estates & Gifts, par.
132.3.10, at 132-54 (1984)).  As a result, courts required
taxpayers independently to satisfy both the business purpose and
nontestamentary disposition prongs of the Lauder II test.

### b.  Was Agreement a Substitute for Testamentary Dispositions?

In evaluating whether buy-sell agreements were substitutes
for testamentary dispositions, greater scrutiny was applied to
intrafamily agreements restricting stock transfers in closely
held businesses than to similar agreements between unrelated
parties.  See Dorn v. United States, 828 F.2d. 177, 182 (3d Cir.
1987); Lauder II; Hoffman v. Commissioner, 2 T.C. at 1178-1179
("The fact that the option is given to one who is the natural
object of the bounty of the optionor requires substantial proof
to show that it rested upon full and adequate consideration.").

Courts analyzed several factors and employed various tests
to ascertain whether buy-sell agreements were meant to serve as
substitutes for testamentary dispositions.  In Lauder II, we
organized the analysis into two categories:  (1) Factors
indicating that a buy-sell agreement was not the result of arm's-
length dealing and was designed to serve a testamentary purpose
(testamentary purpose test), and (2) tests to determine whether a
buy-sell agreement's formula price reflected full and adequate

consideration in money or money's worth (adequacy of consideration test). No particular factor or test was weighted more heavily than another; but rather, courts considered all circumstances to determine whether buy-sell agreements were adopted for the principal purpose of achieving testamentary objectives. See St. Louis County Bank v. United States, 674 F.2d at 1210-1211; Lauder II; Estate of Carpenter, T.C. Memo. 1992-653.

### 1. Testamentary Purpose Test

Under the testamentary purpose test, factors indicating that a buy-sell agreement was not the result of arm's-length dealing and was designed to serve a testamentary purpose included (1) the decedent's ill health when entering into the agreement, see St. Louis County Bank v. United States, 674 F.2d at 1210; Estate of Lauder v. Commissioner, T.C. Memo. 1990-530 (Lauder I); Estate of Slocum v. United States, 256 F. Supp. at 755, (2) lack of negotiations between the parties before executing the agreement, see Bommer Revocable Trust v. Commissioner, T.C. Memo. 1997-380; Lauder II; Bensel v. Commissioner, 36 B.T.A. at 253 (finding no testamentary purpose due to evidence of hostile negotiations), (3) lack of (or inconsistent) enforcement of buy-sell agreements, see St. Louis County Bank v. United States, 674 F.2d at 1211; Estate of Bischoff v. Commissioner, 69 T.C. at 42 n.10 (finding that agreement was not a testamentary substitute due, in part, to

enforcement when son died),[31] (4) failure to obtain comparables or appraisals to determine the buy-sell agreement's formula price, see Bommer Revocable Trust v. Commissioner, supra; Lauder II, (5) failure to seek professional advice in selecting the formula price, see Bommer Revocable Trust v. Commissioner, supra; Lauder II, (6) lack of provision in buy-sell requiring periodic review of a stated fixed price, see Bommer Revocable Trust v. Commissioner, supra, (7) exclusion of significant assets from the formula price, see Lauder II (finding that omission of all intangible assets from book value formula suggested testamentary purpose), and (8) acceptance of below market payment terms for purchase of decedent's interest, see Bommer Revocable Trust v. Commissioner, supra.

## 2. Adequacy of Consideration Test

Before determining whether the formula price in a buy-sell agreement represented full and adequate consideration in money or money's worth, courts were required to decide, as a preliminary matter, when and how the adequacy of consideration test would be applied. For example, would the adequacy of consideration be tested when the buy-sell agreement was adopted or when the buy-sell restrictions were invoked at the decedent-stockholder's death? In addition, the term "adequate and full consideration",

---

[31]But see Bommer Revocable Trust v. Commissioner, T.C. Memo. 1997-380 (disagreeing with the taxpayer's contention that record of prior enforcement requires that buy-sell agreement be respected for estate tax purposes).

which was not defined in section 20.2031-2(h), Estate Tax Regs., required interpretation.

In general, courts evaluated the adequacy of consideration as of the date the buy-sell agreement was executed, rather than at the date for valuing property to be included in the decedent-shareholder's gross estate. See St. Louis County Bank v. United States, 674 F.2d at 1210; Lauder II; Estate of Bischoff v. Commissioner, 69 T.C. at 41 n.9; Bensel v. Commissioner, 36 B.T.A. at 253. However, in exceptional circumstances, courts examined the adequacy of consideration and conduct of parties after the buy-sell agreement date if intervening events within the parties' control caused a wide disparity between the buy-sell agreement's formula price and fair market value. See St. Louis County Bank v. United States, 674 F.2d at 1211; Estate of Rudolph v. United States, 93-1 USTC par. 60,130, at 88449-88450, 71 AFTR 2d 93-2169, at 93-2176-93-2177 (S.D. Ind. 1993). In St. Louis County Bank, supra at 1209, the intervening event (conversion from moving, storage, and delivery business to real estate rental business) "had a significant, adverse impact" on the stock's value as computed under the buy-sell agreement's formula price (computed as 10 times average annual net earnings per share for 5 preceding years).[32]

---

[32]The moving business generated substantial yearly income (high in 1968 of $1,061.15 per share; low in 1970 of $597 per share), as defined under the stock purchase agreement's formula.
(continued...)

In Estate of Reynolds v. Commissioner, 55 T.C. at 194, we considered whether the ultimate disparity between unrestricted market price per share and the formula price could have been predicted by the parties at the time they executed a voting trust agreement. In that case, we found that the restrictive provisions of the voting trust agreement were not determinative of estate or gift tax value and were at most a factor to be considered in valuing the voting trust certificates.[33] See id. at 191. The decedents' family entered into the voting trust agreement to maintain the family's controlling interest in the Kansas City Life Insurance Co., a publicly traded company. See id. at 174-175. At the voting trust agreement date in 1946, the unrestricted, over-the-counter market price of the underlying stock was 2-1/2 times the voting trust formula price (25 times the average annual cash dividend paid on a share of common stock of the company over the preceding 3-year period). See id. at

[32](...continued)
However, while engaged in the rental real estate business, the company's stock value under the formula went down to $0 per share from 1971 to 1975. See St. Louis County Bank v. United States, 674 F.2d 1207, 1209 (8th Cir. 1982).

[33]The restrictive provisions were held not to fix estate and gift tax values because (1) the voting trust certificates could have been freely given or bequeathed without triggering the restrictive provisions and (2) this Court considered inapplicable the approach of the Court of Appeals for the Second Circuit in the Wilson-Lomb line of cases because of the lack of regard for the "retention value" of the voting trust certificates. See Estate of Reynolds v. Commissioner, 55 T.C. 172, 188-192 (1970); see infra p. 148 regarding gift tax valuation implications of retention value.

193-194. By 1962 (year of death), the ratio of unrestricted market price to voting trust formula price had become 10 to 1. See id. at 194. The Commissioner argued that the restrictive provisions should be disregarded in valuing the shares because the voting trust agreement in Reynolds represented a device and was not a bona fide business arrangement under section 20.2031-2(h), Estate Tax Regs. See id. However, we found that there were bona fide business reasons for the Reynolds voting trust agreement, and that "the large discrepancy between market price per unrestricted share and formula price per unit was not the result of any cleverly devised plan to lower the testamentary value of [decedents'] * * * investments in the company". Id. at 194-195. Therefore, the voting trust agreement was factored into the determination of fair market value, rather than being completely disregarded.

To apply the adequacy of consideration test, courts were required to determine the meaning of the phrase "adequate and full consideration in money or money's worth" used in section 20.2031-2(h), Estate Tax Regs. In Estate of Bischoff v. Commissioner, 69 T.C. at 41 n.9, we concluded that consideration was adequate because the formula price to be paid for a partnership interest represented the fair market value of partnership assets. In Dorn v. United States, 828 F.2d at 181, the Court of Appeals for the Third Circuit observed that "Although few cases have relied on Treasury Regulation

§20.2031(h) [sic] for support, those which do discuss it support the position that the option price affects the value of the gross estate only if the option was granted at arm's length." In Bensel v. Commissioner, 36 B.T.A. at 253-254, the adequacy of consideration test was met when the agreement was entered into because "the price agreed upon between the father and son was not too low. That is, it was not lower than the price at which persons with adverse interests dealing at arm's length might have been expected to have agreed." Similarly, in Estate of Carpenter v. Commissioner, T.C. Memo. 1992-653, we held that a book value price was reasonable (i.e., adequate and full) because it was the result of arm's-length negotiations conducted at the time the buy-sell agreement was created.

An instructive articulation of the adequacy of consideration test was presented in Lauder II, 64 T.C.M. (CCH) 1643, 1660, 1992 T.C.M. (RIA) par. 92,736, at 92-3733 through 92-3734, in which we stated:

> Notably, the phrase "adequate and full considera-tion" is not specifically defined in section 20.2031-2(h), Estate Tax Regs. In defining the phrase, we begin with the proposition that a formula price may reflect adequate and full consideration notwithstanding that the price falls below fair market value. See, e.g., Estate of Reynolds v. Commissioner, 55 T.C. 172, 194 (1970). In this light, the phrase is best interpreted as requiring a price that is not lower than that which would be agreed upon by persons with adverse interests dealing at arm's length. Bensel v. Commissioner, supra. Under this standard, the formula price generally must bear a reasonable relationship to the unrestricted fair market value of the stock in question.

In summary, to satisfy the adequacy of consideration test, given the greater scrutiny applied to intrafamily agreements restricting transfers of closely held businesses interests, the formula price under the buy-sell agreement must be comparable to what would result from arm's-length dealings between adverse parties, and it must bear a reasonable relationship to the unrestricted fair market value of the interest in question.

## 4. Statutory Changes

In 1990, Congress enacted the Chapter 14 special valuation rules. See secs. 2701-2704 (Chapter 14); Omnibus Budget Reconciliation Act of 1990 (OBRA), Pub. L. 101-508, sec. 11602(a), 104 Stat. 1388-491, 1388-500 (1990). These rules were enacted to replace the complex, overly broad estate freeze rules of recently enacted section 2036(c)[34] with targeted rules that were designed to assure more accurate valuation of property subject to transfer taxes. See S. 3209, 101st Cong. 2d Sess. (1990), 136 Cong. Rec. 30538.

Chapter 14 includes section 2703, which codifies rules regarding the impact of restrictions (options, agreements, rights to acquire or use property at less than fair market value, or limitations on sale or use of property) on valuation for estate and gift tax purposes.[35] See sec. 2703. New section 2703

---

[34]See Omnibus Budget Reconciliation Act of 1987, Pub. L. 100-203, sec. 10402, 101 Stat. 1330-431.

[35]SEC. 2703. CERTAIN RIGHTS AND RESTRICTIONS DISREGARDED.
(continued...)

applied to agreements, options, rights, or restrictions entered into, granted, or substantially modified after October 8, 1990.[36] See OBRA sec. 11602(e)(1)(A)(ii), 104 Stat. 1388-500.

The Senate bill (S. 3209) explained that the rules requiring options, rights, or restrictions (1) to be bona fide business arrangements and (2) not to be devices to transfer property to members of the decedent's family for less than full and adequate consideration in money or money's worth, see secs. 2703(b)(1) and

---

[35](...continued)
    (a)  General Rule.--For purposes of this subtitle, the value of any property shall be determined without regard to--

        (1) any option, agreement, or other right to acquire or use the property at a price less than the fair market value of the property (without regard to such option, agreement, or right), or

        (2) any restriction on the right to sell or use such property.

    (b) Exceptions.--Subsection (a) shall not apply to any option, agreement, right, or restriction which meets each of the following requirements:

        (1) It is a bona fide business arrangement.

        (2) It is not a device to transfer such property to members of the decedent's family for less than full and adequate consideration in money or money's worth.

        (3) Its terms are comparable to similar arrangements entered into by persons in an arms' length transaction.

[36]We summarize sec. 2703 to complete our analysis of the evolution of legal standards on the ability of buy-sell agreements to control estate tax value.  However, the parties have stipulated that the provisions of sec. 2703 do not apply to the cases at hand.  See supra note 23.

(2), were similar to those contained in section 20.2031-2(h), Estate Tax Regs. See S. 3209, supra at 30540-30541. S. 3209 also emphasized that the business arrangement and device requirements were independent tests. See id. Further, S. 3209 explained that OBRA added a third requirement, that the terms of the option, agreement, right, or restriction must be comparable to similar arrangements entered into by persons in an arm's-length transaction. See id. According to S. 3209, this requirement was not found in prior law. See id.

II. Do 1971 and 1973 Gift Tax Cases Have Preclusive Effect?

A. Petitioners' Collateral Estoppel Argument

Petitioners argue that under the doctrine of collateral estoppel, or issue preclusion, we are bound by certain determinations of the U.S. District Court for the District of Wyoming in the 1971 and 1973 gift tax cases. In petitioners' view, the District Court found, as to True Oil and Belle Fourche, that (1) their buy-sell agreements were bona fide business arrangements and (2) book value of the transferred interests equaled fair market value as of the agreement dates.[37]

---

[37]Petitioners explain that the District Court explicitly determined that book value equaled fair market value for the two companies, describing this as an "ultimate" fact in the 1971 and 1973 gift tax cases and an "evidentiary" fact in the cases at hand. In contrast, petitioners contend that the District Court implicitly held that the buy-sell agreements were bona fide business arrangements, because the District Court took the agreements into account in determining fair market value of the True Oil and Belle Fourche transferred interests. Petitioners

(continued...)

Petitioners assert that the requirements for applying collateral estoppel articulated in Peck v. Commissioner, 90 T.C. 162, 166-167 (1988), affd. 904 F.2d 525 (9th Cir. 1990), have been met; therefore, respondent is precluded from relitigating those two issues.  We disagree.  Moreover, petitioners acknowledge that respondent is not estopped from arguing that the True companies' buy-sell agreements were testamentary devices that were not controlling for estate tax purposes.  We agree.

B.  Legal Standards for Applying Collateral Estoppel

The doctrine of collateral estoppel provides that, once an issue of fact or law is "actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation."  Montana v. United States, 440 U.S. 147, 153 (1979) (quoting Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n.5 (1979)).  Collateral estoppel is a judicial doctrine designed to protect parties from unnecessary and redundant litigation, to conserve judicial resources, and to

---

[37](...continued)
characterize this as an "evidentiary" fact in the 1971 and 1973 gift tax cases and an "ultimate" fact in the cases at hand.  An evidentiary fact is a fact that is necessary for or leads to the determination of an ultimate fact.  See Black's Law Dictionary 611 (7th ed. 1999).  An ultimate fact is a fact essential to the claim or the defense. See id. at 612.  In Meier v. Commissioner, 91 T.C. 273, 283-286 (1988), the Tax Court regarded the distinction between ultimate and evidentiary facts as irrelevant in applying collateral estoppel.  See infra pp. 84-85.

foster certainty in and reliance on judicial action.  See <u>Monahan</u>
<u>v. Commissioner</u>, 109 T.C. 235, 240 (1997).  This Court, in <u>Peck</u>
<u>v. Commissioner</u>, <u>supra</u> at 166-167, prescribed the following five
conditions that must be satisfied before applying collateral
estoppel to a current factual dispute (the <u>Peck</u> requirements):

> (1) The issue in the second suit must be identical in all respects with the one decided in the first suit.

> (2) There must be a final judgment rendered by a court of competent jurisdiction.

> (3) Collateral estoppel may be invoked against parties and their privies to the prior judgment.

> (4) The parties must actually have litigated the issues and the resolution of these issues must have been essential to the prior decision.

> (5) The controlling facts and applicable legal rules must remain unchanged from those in the prior litigation. [Citations omitted.][38]

Collateral estoppel may be used in connection with matters
of law, matters of fact, and mixed matters of law and fact.  See
<u>Meier v. Commissioner</u>, 91 T.C. 273, 283 (1988).  Moreover, its
focus is on the identity of issues, not the identity of legal
proceedings, so that it may apply to issues of fact or law
previously litigated even though the claims differ.  See <u>Bertoli</u>
<u>v. Commissioner</u>, 103 T.C. 501, 508 (1994)(citing <u>Meier v.</u>
<u>Commissioner</u>, 91 T.C. at 286).  Collateral estoppel cannot apply

---

[38]The Court of Appeals for the Tenth Circuit used a similar
test to determine whether collateral estoppel applied.  See <u>Klein</u>
<u>v. Commissioner</u>, 880 F.2d 260, 262-263 (10th Cir. 1989).

if the party against whom it is asserted did not have a full and fair opportunity to litigate the issue in the earlier proceeding. See Meier v. Commissioner, 91 T.C. at 286 (citing Allen v. McCurry, 449 U.S. 90 (1980)). To determine whether the issue to be precluded in case 2 was identical to an essential issue actually litigated in case 1 (Peck requirements 1 and 4), early cases disagreed over whether the facts found in case 1 had to be ultimate facts or instead, included both ultimate and evidentiary facts. See Meier v. Commissioner, 91 T.C. at 284 (citing The Evergreens v. Nunan, 141 F.2d 927, 928-929 (2d Cir. 1944) (Evergreens)). In Amos v. Commissioner, 43 T.C. 50 (1964), affd. 360 F. 2d 358 (4th Cir. 1965), this Court adopted the Evergreens "ultimate facts" test, which limited the use of collateral estoppel to ultimate facts found in the second case. However, more recent cases and commentators have criticized the Evergreens approach and its limitation of collateral estoppel to ultimate facts. In Meier v. Commissioner, supra at 284-286, we abandoned the Evergreens approach and adopted the rationale of Comment j, Restatement, Judgments 2d, section 27 (1982), which focuses not on whether the facts to be precluded from being relitigated were evidentiary or ultimate, but on whether the parties recognized the issue as important and necessary to the first judgment.[39]

---

[39]The Restatement reads as follows:

(continued...)

C.  Collateral Estoppel Impact of 1971 and 1973 Gift Tax
    Cases

We now evaluate the 1971 and 1973 gift tax cases and the

cases at hand, in light of the Peck requirements, to determine

whether we are precluded from deciding whether True Oil's and

Belle Fourche's (1) buy-sell agreements were bona fide business

---

[39](...continued)
    Determinations essential to the judgment.  It is
sometimes stated that even when a determination is a
necessary step in the formulation of a decision and
judgment, the determination will not be conclusive
between the parties if it relates only to a "mediate
datum" or "evidentiary fact" rather than to an
"ultimate fact" or issue of law.  It has also been
stated than [sic] even a determination of "ultimate
fact" will not be conclusive in a later action if it
constitutes only an "evidentiary fact" or "mediate
datum" in that action.  Such a formulation is
occasionally used to support a refusal to apply the
rule of issue preclusion when the refusal could more
appropriately be based on the lack of similarity
between the issues in the two proceedings.  If applied
more broadly, the formulation causes great difficulty,
and is at odds with the rationale on which the rule of
issue preclusion is based.  The line between ultimate
and evidentiary facts is often impossible to draw.
Moreover, even if a fact is categorized as evidentiary,
great effort may have been expended by both parties in
seeking to persuade the adjudicator of its existence or
nonexistence and it may well have been regarded as the
key issue in the dispute.  In these circumstances the
determination of the issue should be conclusive whether
or not other links in the chain had to be forged before
the question of liability could be determined in the
first or second action.
    The appropriate question, then, is whether the
issue was actually recognized by the parties as
important and by the trier as necessary to the first
judgment.  If so, the determination is conclusive
between the parties in a subsequent action * * *.
[Restatement, Judgments 2d, sec. 27 (1982).]

arrangements and (2) book values equaled their fair market values on the agreement dates.

We preface the inquiry by noting that petitioners properly raised the collateral estoppel issue in their petition. See Rule 39. The jurisdictional competency of the District Court in the 1971 and 1973 gift tax cases has not been questioned. Judgments were entered, and the Government did not appeal. The parties to the cases at hand were also parties to the 1971 and 1973 gift tax cases (i.e., both petitioners and respondent were parties or privies in the earlier gift tax cases and were bound by those decisions).[40] In sum, conditions (2) and (3) of the Peck requirements are satisfied.

### 1. Bona Fide Business Arrangement Issue

Petitioners argue that we are precluded from deciding whether the True Oil and Belle Fourche buy-sell agreements represented bona fide business arrangements under section 20.2031-2(h), Estate Tax Regs., because the District Court implicitly made this determination in the 1971 and 1973 gift tax cases. We disagree with petitioners, because the issue was not

---

[40]Specifically, the taxpayers in the 1971 and 1973 gift tax cases were: Dave True, Jean True, Tamma Hatten, Hank True, Diemer True, and David L. True. Petitioners in the cases at hand are: Dave True's estate (considered his privy) and Jean True. The fact that the True children are not parties, in their own right, to the cases at hand does not cause the remaining parties to fail Peck requirement 3. See Peck v. Commissioner, 90 T.C. 162, 166-167 (1988), affd. 904 F.2d 525 (9th Cir. 1990).

actually litigated and decided in the 1971 and 1973 gift tax
cases and was not essential to those decisions (flunking Peck
requirement 4).  Therefore, we proceed independently to determine
whether the True companies' buy-sell agreements were entered into
for bona fide business reasons.  See discussion infra pp. 99-101.

2.  Whether Book Value Equaled Fair Market
Value as of Agreement Date Issue

The District Court's findings that tax book value equaled
fair market value for the True Oil and Belle Fourche interests
transferred as of the buy-sell agreement dates in 1971 and 1973
also do not have preclusive effect in the cases before us.  This
is because the issues in these cases (the fair market value of
the interests in question many years later) are not identical to,
and were not actually litigated in or essential to the District
Court's decisions in the 1971 and 1973 gift tax cases.

In the 1971 and 1973 gift tax cases, the District Court
determined the fair market values (as of the agreement dates) of
transferred interests in Belle Fourche and True Oil, explicitly
taking into account the depressive effect that the buy-sell
agreements had on value.  In those cases, the District Court
independently determined that fair market value equaled book
value at the agreement dates without finding that the buy-sell
agreements controlled transfer tax value under a Lauder II type

of analysis.[41]  Without a finding that the agreements were
testamentary devices, the District Court was free to consider the
buy-sell restrictions along with other relevant factors in
determining fair market value.  See Rev. Rul. 59-60, 1959-1 C.B.
at 244.

In the cases at hand, we also must determine, as part of our
evidentiary findings, fair market value on the agreement dates to
help us decide whether the True companies' buy-sell agreements
were testamentary devices.  However, in so doing, we would not
take into account any depressive effect that the buy-sell
agreements might have had on value; to do otherwise would be to
indulge in circular reasoning that would assume the answer at the
outset of the inquiry.  Therefore, the facts we must find in the
cases at hand (fair market value at agreement dates without
considering impact of buy-sell restrictions on value) were not
required to be found by the District Court in the 1971 and 1973
gift tax cases, leaving the matter open to our examination in the
cases at hand.

We analyze the differences between a formula price under a
buy-sell agreement and fair market value on the agreement date to

---

[41]The District Court's approach was similar to that employed
in Estate of Hall v. Commissioner, 92 T.C. 312 (1989), where we
did not decide whether the price determined under an adjusted
book value formula price was dispositive for estate tax purposes.
Instead we held, after reviewing the expert reports, that the
actual date of death fair market value of the shares did not
exceed the formula price.  See discussion infra pp. 141-144.

help expose any lack of arm's-length dealings or presence of
testamentary intent.  See <u>Estate of Bischoff v. Commissioner</u>, 69
T.C. at 41 n.9; <u>Bensel v. Commissioner</u>, 36 B.T.A. at 253; Lauder
II.  If the buy-sell agreement is found to be a testamentary
device, it is to be disregarded for purposes of determining
estate and gift tax value.  See discussion <u>infra</u> p. 153.
Accordingly, it would be incorrect to account for a buy-sell
agreement's effect on value in deriving an evidentiary fact (fair
market value at agreement date) that will be used to decide
whether the agreement should have an effect on value at a later
date.

In <u>Estate of Bischoff v. Commissioner</u>, <u>supra</u> at 35-36, 41
n.9., we compared the buy-sell formula price to the fair market
value of the underlying partnership assets on the date they were
transferred to the partnership (which was close to the agreement
date), and found consideration to be adequate and the buy-sell
agreement price to be equal to fair market value.  We did not
consider any depressive effect that the buy-sell agreement might
have had on underlying asset values at the agreement date.

In Lauder II, we analyzed various experts' valuations,
finding the comparative valuation approach that emphasized
price/earnings ratios of industry competitors to be the most
reliable basis for valuing the decedent's stock at the buy-sell
agreement dates.  We then allowed a discount for lack of

liquidity in computing fair market value; however, we did not attribute the lack of liquidity to the buy-sell agreements.  See id.

In summary, the 1971 and 1973 gift tax cases determined fair market value of the True Oil and Belle Fourche transferred interests at the dates of agreement by taking into account the depressive effect the buy-sell agreements had on value.  The District Court in those cases did not analyze whether the buy-sell agreements served as substitutes for testamentary dispositions and therefore was allowed to consider their effect on value.  This issue is not the same as the one in the cases before us, as we are required to disregard the buy-sell agreements in determining value at the relevant dates in order to make our determination of whether the True family buy-sell agreements were substitutes for testamentary devices.  Therefore, we are not bound by the District Court's determinations that tax book value equaled fair market value for the True Oil and Belle Fourche interests transferred as of the buy-sell agreement dates.

III.  Do True Family Buy-Sell Agreements Control Estate Tax
      Values?

We now apply the Lauder II test to the True family buy-sell agreements to determine whether the agreements control Federal estate tax value.  Because most of the buy-sell agreements at issue in these cases were modeled on the True Oil partnership agreement or the Belle Fourche stockholders' restrictive

agreement, we focus attention on the facts surrounding the creation and implementation of those agreements.

Petitioners assert that the True family buy-sell agreements satisfy all four prongs of the Lauder II test, while respondent contends that they flunk two of the four prongs.

A. Was the Offering Price Fixed and Determinable Under the Agreements?

The parties agree that the formula price set forth in the True family buy-sell agreements (tax basis book value) was both fixed and determinable.[42]  Thus, the first prong of the Lauder II test is satisfied.

B. Were Agreements Binding During Life and at Death?

Petitioners divide this test into two components:  the agreements must be enforceable under State law and must bind the transferors both during life and at death.  The True family buy-sell agreements must satisfy both of these components to fulfill the second prong of the Lauder II test.  See Lomb v. Sugden, 82 F.2d 166, 167 (2d Cir. 1936); Wilson v. Bowers, 57 F.2d 682, 683 (2d Cir. 1932); Estate of Salt v. Commissioner, 17 T.C. 92, 99-100 (1951); Lauder II.

First, respondent argues that the True companies' buy-sell agreements were not enforceable under Wyoming law.  We disagree.

---

[42]However, respondent challenges the propriety of using tax basis book value as a measure of fair market value.

Restrictions on transfers of corporate stock are valid and enforceable if authorized by statute. See Wyo. Stat. Ann. sec. 17-16-627(b) (Michie 1999). Authorized restrictions include those that (1) serve a reasonable purpose and (2) are not against public policy. See Wyo. Stat. Ann. sec. 17-16-627(c)(iii) (Michie 1999); Hunter Ranch Inc. v. Hunter, 153 F.3d 727 (10th Cir. 1998), 1998 W.L. 380556 (unpublished opinion). Respondent equates this requirement with the business purpose and nontestamentary disposition prongs of the Lauder II test (i.e., transfer restrictions must fulfill a business purpose and must not contravene public policy by serving as substitutes for testamentary dispositions). However, respondent provides no authority for his interpretation of the Wyoming statute, and it is not self-evident that a Wyoming court would consider transfer restrictions that served both business and testamentary purposes to violate public policy. In fact, the District Court in the 1971 and 1973 gift tax cases treated the Belle Fourche and True Oil buy-sell agreements as enforceable by factoring the transfer restrictions into the computation of fair market value.

Under the Wyoming Uniform Partnership Act (WUPA), partnership agreements govern relations among partners and between partners and the partnership. As such, the WUPA provides only default rules if the partnership agreement is silent. See Wyo. Stat. Ann. sec. 17-21-103(a) (Michie 1999). However,

certain rights cannot be varied by the partnership agreement. See id. at sec. 17-21-103(b). Such non-variable rights do not include the right to impose transfer restrictions on partnership interests. See id.

Respondent further argues that the buy-sell agreements should be set aside as unconscionable contracts of adhesion. Respondent points to Tamma Hatten's lack of legal representation when she acquired interests in the True companies and entered into the buy-sell agreements and withdrew from the True companies, her lack of control over the buy-sell agreement terms, and her inferior bargaining position to support his unconscionability argument. A "contract of adhesion" is a "standard-form contract prepared by one party, to be signed by the party in a weaker position, usu. a consumer, who has little choice about the terms." Black's Law Dictionary 318-319 (7th ed. 1999). Under Wyoming law, unconscionability is tested at the time of the agreement and "is considered as a form of fraud recognized in equity, but such fraud should be 'apparent from the intrinsic nature and subject of the bargain itself; such as no man in his senses and not under delusion would make on the one hand, and no honest and fair man would accept on the other'". In re Estate of Frederick, 599 P.2d 550, 556 (Wyo. 1979). We do not believe that conditions present at the inception of the True companies buy-sell agreements would meet these definitions. The

buy-sell agreements were not boilerplate documents and, in all likelihood, the weaker parties (the True children, according to respondent) would benefit the most from the non-arm's-length terms.  The fact that Tamma Hatten may ultimately have suffered financial detriment because she withdrew from the True companies at the time she did has no bearing on whether the agreements were unconscionable at inception or would be so regarded as of the times they were given effect in 1993 and 1994.  Accordingly, we conclude that the True family buy-sell agreements were enforceable under Wyoming law.

Second, respondent asserts that the buy-sell agreements, although binding by their explicit terms, were often modified and were not always followed by the parties, suggesting that they did not actually bind the parties during life.  On the contrary, we find that the amendments to and waivers of the buy-sell provisions were formally documented and were consistent with the terms and general intent of the agreements (i.e., to maintain family ownership).  For example, waivers to allow non pro rata purchases of interests by True family members, exchanges of stock incident to a merger, and sales of stock by the Toolpushers' Employees' Trust back to the company were normal responses to business exigencies.  Similarly, amendments allowing transfers to owners' revocable living trusts, clarifying the mechanics of the buy-sell provisions, and introducing the active participation

requirement were all in keeping with the general purpose of maintaining control of the True companies among family members who were active in the businesses.  Moreover, the invocation of the buy-sell provisions when Tamma Hatten withdrew from the True companies is persuasive evidence that the parties treated the agreements as binding.  See Estate of Bischoff v. Commissioner, 69 T.C. at 42 n.10.  Accordingly, the waivers and amendments do not jeopardize the binding nature of the buy-sell agreements. See Lauder II.

Third, respondent suggests that the corporate buy-sell agreements (except the White Stallion agreement) are not binding because Dave True had substantial power, as controlling shareholder, to alter their terms during his lifetime. Petitioners counter that Dave True did not have the ability unilaterally to alter the agreements by virtue of his majority ownership of the corporations.  They argue that control of the corporation is irrelevant because the buy-sell agreements were agreements among the shareholders that could not be amended or terminated without the shareholders' unanimous consent. Respondent and petitioners cited no cases to support their positions on this matter.  For the reasons stated below, we agree with petitioners.

In Bommer Revocable Trust v. Commissioner, T.C. Memo. 1997-380, we found that a buy-sell agreement was not binding on the

decedent during his lifetime because it explicitly gave the decedent unilateral power to alter or amend its terms, and the natural objects of the decedent's bounty were the other shareholders. In the cases at hand, we agree with petitioners that Dave True could not unilaterally terminate the agreements because, by their terms, the buy-sell agreements would not terminate until the death of the last surviving shareholder. However, contrary to petitioners' assertions, we note that each corporation was listed as a party to its own amended and restated buy-sell agreement dated August 11, 1984.

Notwithstanding this inconsistency, we believe that Dave True's controlling ownership did not give him unilateral authority to alter or amend the corporate buy-sell agreements so that they would be considered non-binding. First, the agreement in Bommer explicitly conferred on the decedent the unilateral power to amend. See id. This is not true in the cases at hand. Second, it appears that the primary parties to the instant agreements were the shareholders and that the corporation was included only to ensure that the stock certificates were marked with transfer restrictions. Therefore, contrary to respondent's assertions, we conclude that Dave True's majority ownership of the True corporations did not confer on him the unilateral authority to alter or amend the buy-sell agreements, which would

have been sufficient to render the agreements non-binding for estate tax purposes.

However, we note that the White Stallion buy-sell agreement allowed a different pricing formula for certain types of lifetime transfers, and thereby did not equally bind transferors during life and after death. Specifically, under the "Buy and Sell Agreement" provision, if a stockholder were to die, become legally disabled, or desire to sell all or part of his stock, the remaining members of his group would be obligated to purchase the stock on a pro rata basis for a price equal to book value at the end of the preceding fiscal year, less dividends paid within 2-1/2 months of such fiscal yearend. The transferring stockholder, his heirs, trustees, etc., reciprocally would be obligated to sell to those group members. Alternatively, under the "First Right of Refusal" provision, if all the shareholders of one group (selling group) wanted to transfer all their interests by lifetime sale to a third party who was unaffiliated with the other shareholder group (nonselling group), they could do so at any price. But, the selling group would be required first to offer the nonselling group the opportunity to purchase the stock on the same terms and conditions as any bona fide third party offer received by the selling group. Thus, a lifetime sale of all the selling group's stock could generate a higher price than would a transfer at death under the book value formula price.

Section 20.2031-2(h), Estate Tax Regs., states: "Little weight will be accorded a price contained in an option or contract under which the decedent is free to dispose of the underlying securities at any price he chooses during his lifetime." Similarly, in Estate of Weil v. Commissioner, 22 T.C. 1267, 1274 (1954), we explained:

> where the agreement made by the decedent and the prospective purchaser of his property fixed the price to be received therefor by his estate at the time of his death, but carried no restriction on the decedent's right to dispose of his property at the best price he could get during his lifetime, the property owned by decedent at the time of his death would be included as a part of his estate at its then fair market value. [Citations omitted; see also United States v. Land, 303 F.2d 170, 173 (5th Cir. 1962); Baltimore Natl. Bank v. United States, 136 F. Supp at 654.]

In the cases at hand, a complete, lifetime buy-out of one family group's interests in White Stallion could be achieved at the highest price the market would bear, while a transfer at death (or during life by less than all group members) would be limited to a book value purchase price. This runs afoul of the Lauder II requirements.

Because the buy-sell agreements for the True companies other than White Stallion were enforceable under State law and were binding on the transferors both during life and at death, we find that the second prong of the Lauder II test is satisfied as to those companies. However, the White Stallion buy-sell agreement

fails to satisfy the second prong of the Lauder II test because it was not equally binding during life and at death.

C. <u>Were Agreements Entered Into for Bona Fide Business Reasons</u>?

The buy-sell agreements in these cases were adopted and maintained to ensure continued family ownership and control of the True Companies. Dave True's experiences of owning and operating businesses with outsiders (and then having to buy them out) motivated him to use buy-sell provisions (even when Jean True was his only co-owner) to restrict a related owner's ability to sell outside the family. As previously stated, courts consistently have recognized the goal of maintaining exclusive family control over a business to be a bona fide business purpose. See <u>supra</u> p. 71.

By maintaining family control and ownership, Dave True was able to continue his policy of channeling profits from the True companies into True Oil to fund the costs of searching for additional reserves through exploratory drilling. In addition, the buy-sell agreements were used to secure active participation from owners of the True family businesses, because Dave True feared that passive owners would not share his long-term vision for the success and perpetuation of the True companies. Under the buy-sell agreements, an owner who with his or her spouse ceased to devote all or a substantial part of his or her time to the business would be required to sell his or her interest in the

business.  Thus, the buy-sell agreements enforced the active
ownership requirements that played a central role in Dave True's
business philosophy.  In this regard, courts have found that
using buy-sell agreements to assure continuity of company
management policies or to retain key employees are bona fide
business purposes that satisfy this prong of the Lauder II test.
See supra pp. 71-72.

The parties generally agree that the True family buy-sell
agreements were entered into for bona fide business reasons.[43]
Thus, for the reasons stated above, we find that the third prong
(business purpose prong) of the Lauder II test is satisfied.

_____

[43]However, respondent disagrees with petitioners' suggestion
that a finding of business purpose could preclude a finding of
testamentary intent.  Petitioners cite dicta in St. Louis County
Bank v. United States, 674 F.2d 1207, 1210 (8th Cir. 1982), which
stated that the "fact of a valid business purpose could, in some
circumstances, completely negate the alleged existence of a tax-
avoidance testamentary device as a matter of law".  Petitioners'
brief states: "In this case, the business purposes for the
agreements are sufficient to establish that the agreements are
bona fide business arrangements.  Petitioners do not rely solely
on those business purposes, however, to show that the agreements
are bona fide business arrangements."

We agree with respondent that established case law and
regulatory authority require that the bona fide business purpose
and nontestamentary disposition prongs of the Lauder II test must
be satisfied independently.  However, we acknowledge that in some
instances, the presence of a business purpose (e.g., a desire to
vest control of a company in an employee who is not related to
the testator by blood or marriage) may indicate that testamentary
motives are absent.  This is not the situation in the cases at
hand.  Alternatively, if the business purpose is to keep control
within the family, it is fully consistent with a testamentary
objective.  In such a case, the presence of a business purpose
does not negate the testamentary purposes.

D. <u>Were Agreements Substitutes for Testamentary Dispositions</u>?

We now consider whether the True companies' buy-sell agreements were adopted for the purpose of achieving testamentary objectives. As previously stated, greater scrutiny applies to intrafamily agreements restricting stock transfers in closely held businesses. This analysis requires us to apply the appropriate common law tests (along with other relevant factors) to the particular facts of the cases at hand. No one test or factor is determinative; rather, we must consider all relevant factors to decide whether the buy-sell agreements were used as substitutes for testamentary dispositions.

1. <u>Testamentary Purpose Test</u>

Respondent argues that the True companies' buy-sell agreements were not the result of arm's-length dealings and were designed to serve testamentary purposes. After evaluating the following factors, we agree with respondent that Dave True had testamentary objectives (conflated with the legitimate business reasons mentioned above) for adopting and maintaining the True family buy-sell agreements.

a. <u>Decedent's Health When He Entered Into Agreements</u>

Dave True was in good health when he entered into the first buy-sell agreements (Belle Fourche, True Oil, True Drilling) with his children in 1971 and 1973. However, by the time he made the

1993 transfers in issue, Dave True had a history of back problems and a chronic pulmonary insufficiency that required him to be on oxygen full time.

Courts have found that a decedent's ill health at the time he entered into a restrictive agreement indicated that he had testamentary purposes for doing so.  See, e.g., <u>St. Louis County Bank v. United States</u>, 674 F. 2d at 1210; <u>Lauder I</u>; <u>Estate of Slocum v. United States</u>, 256 F. Supp. at 755.  Therefore, Dave True's good health in 1971 and 1973 does not lead to any inference of testamentary motive for his entry into those agreements.  The subsequent decline in Dave True's health has no direct bearing on the likelihood of testamentary purpose when the agreements were originally entered into.

### b.  No Negotiation of Buy-Sell Agreement Terms

Petitioners have provided little evidence to show that the parties negotiated the terms of the buy-sell agreements. Although the True children in their testimony consistently characterized communications with their father regarding the buy-sell agreements as discussions, rather than as negotiations, there is no evidence that any changes were made to the buy-sell agreements as a result of those discussions.  The True children did not receive independent legal or accounting advice when they entered into the agreements, nor did they know who drafted them. Further, certain facts suggest that the buy-sell agreement terms were determined unilaterally by Dave True, based on his strong

beliefs concerning how his family should own and operate their businesses, beliefs that he ingrained in his children so that they readily consented to any ownership conditions proposed by their father.

Dave True's control over his children's interests in the True companies indicates that he had absolute discretion to set the buy-sell agreement terms. Before the True children had reached majority, Dave True transferred gifts of cash and minor interests in the True companies to the children's guardianship accounts, which he managed for their benefit. The children were unaware of how or when they acquired those early interests in the True companies. When the True children were in their early 20's and 30's, Dave True transferred to them (either by gift or sale) interests in three principal True companies, Belle Fourche, True Drilling, and True Oil. The True children's purchases of their interests in Belle Fourche were financed with cash gifts from their parents over the years and with earnings distributions from other True companies. They did not know why, in connection with their stock purchase, they also had to lend money to Belle Fourche. Although the True children (except Tamma Hatten) received gifts from Dave and Jean True every year but one between 1955 and 1993, they never received cash in hand. Instead, amounts were transferred (under Dave True's direction) to accounts that were accumulated for the children's benefit, monitored by the True companies' bookkeepers, used to purchase

interests in the True companies, and lent to relatives and the family businesses.

These facts indicate that Dave True exerted significant control over the True children's investments in the True companies. He determined the extent of their ownership, the timing of their acquisitions, and the methods of payment for the children's debt and equity interests. We conclude that Dave True's control over the means of conveying ownership to the children also allowed him unilaterally to determine the terms of the buy-sell agreements.

The specific terms of the buy-sell agreements also reflected Dave True's dominance over their creation. For instance, key provisions restricting transfers to outsiders and setting the transfer price at book value were included in the earliest buy-sell agreements between Dave and Jean True. Similar versions of those same provisions were incorporated into all subsequent buy-sell agreements with the True children. Moreover, Dave True's imposition of the active participation requirements was actuated by his strong personal bias against passive ownership. While the True children may have understood and even agreed with their father's reasons for imposing these requirements, it is clear that he had unfettered ability to do so, which he exercised, without the need for negotiations.

It also follows from the events surrounding the sale of Tamma Hatten's interests in the True companies that there was a

lack of negotiations among the parties.  Tamma Hatten did not seek separate legal or other professional counsel in connection with the sale.  Instead, she relied on Dave True and his advisers to determine the sales price under the buy-sell agreements and to structure the methods of payment.  Accordingly, Dave True's advisers drafted an agreement outlining the terms of sale and set up an escrow account for Tamma Hatten to receive roughly half of the sales proceeds.  The escrow arrangement, which departed from the requirements of the buy-sell agreements, was meant to reserve assets to pay Tamma's share of contingent liabilities and to provide a management vehicle for her investments.  Finally, Tamma Hatten was required (effectively) to pay the other owners in order to sell her interests in certain profitable companies that had negative book values at the buy-sell valuation date.

As previously discussed, Tamma Hatten, once she gave notice that she and her husband would no longer be active participants, was bound to sell her interests in the True companies pursuant to the terms of the buy-sell agreements.  However, it is likely that an unrelated party in similar circumstances would have hired separate counsel to interpret the buy-sell agreement terms, review the sales agreements, and question the reasonableness of being required to pay (i.e., take an offset against sales proceeds) to sell interests in profitable companies.  In addition, an unrelated seller would want to hire her own

investment manager, rather than agree to an escrow arrangement that was not required under the buy-sell agreements.

In other cases involving related party buy-sell agreements, we focused on the existence and extent of meaningful negotiations between the parties to determine whether the agreements were designed to serve testamentary purposes.  See Bensel v. Commissioner, 36 B.T.A. at 253 (finding no testamentary purpose due to evidence of extensive and hostile negotiations); Bommer Revocable Trust v. Commissioner, T.C. Memo. 1997-380 (finding no bona fide negotiations among related parties because family's attorney represented all parties to the buy-sell); Lauder II (finding that no negotiations and unilateral determination of formula price by decedent's son evidenced testamentary purpose).[44]  Petitioners argue that proving family members sought

---

[44]In Lauder II, supra, 64 T.C.M. (CCH) 1643, 1658-1659 n.20, 1992 T.C.M. (RIA) par. 92,736, at 92-3732 n.20, and accompanying text, we observed:

> the record is devoid of any persuasive evidence that the Lauders negotiated with respect to the formula price.  To the contrary, the record indicates that Leonard [decedent's son] unilaterally decided upon the formula price.  Ronald [decedent's son] could not remember who decided upon the formula and only recalled that Leonard had explained the formula to him.  Estee [decedent's wife] had no specific recollection of either of the agreements.  Given these circumstances, it appears that the parties never intended to negotiate the matter, fully recognizing that an artificially low price would provide estate tax benefits for all.* * *

---

[20]Presumably, if decedent and Estee were pursuing an

(continued...)

independent advice regarding buy-sell terms is not essential to showing that an agreement is a bona fide business arrangement and not a testamentary device. We agree that such a showing is not crucial to proving petitioners' case. As previously stated, the presence or absence of any particular factor is not dispositive on the question of testamentary intent. However, lack of independent representation among related parties to a buy-sell agreement reasonably suggests less than arm's-length dealings. See Lauder II.

### c. Enforcement of Buy-Sell Agreement Provisions

Courts have found the lack of enforcement of buy-sell provisions at the death or withdrawal of a party to evidence a testamentary purpose for the buy-sell arrangement. See, e.g., St. Louis County Bank v. United States, 674 F. 2d at 1211. However, the record in the cases at hand indicates that the True family generally complied with the terms of the buy-sell agreements, or executed formal waivers when circumstances made it

---

[44](...continued)
identical agreement with unrelated parties in the place of Leonard and Ronald, they would have been motivated, by virtue of their advanced age, to negotiate a formula ensuring as high a price as possible for their shares balanced against their desire to maintain continuity of management and control.

appropriate for them to deviate from those terms.[45]  Thus, this factor does not apply to the True companies' buy-sell agreements.

Petitioners cite our opinion in Estate of Bischoff v. Commissioner, 69 T.C. 32 (1977), for the proposition that enforcement of a buy-sell agreement against the estate of a son who predeceased his parents was strong evidence that the agreement was a bona fide business arrangement and not a device. Petitioners assert that Tamma Hatten's sale to her parents and brothers under the buy-sell agreements should be viewed as equally strong evidence of Dave True's lack of testamentary purpose.

Petitioners misconstrue the facts of Estate of Bischoff v. Commissioner, supra, and our comment in that case.  In Estate of Bischoff v. Commissioner, supra at 33-36, the partner-parties to the buy-sell agreement included Bruno Bischoff, who died in 1967; Bertha, his wife, who died in 1969; Herbert, their son, who died in 1973; and Frank Brunckhorst, Bertha's brother, who died in 1972.  Thus, Herbert did not predecease his parents.  Moreover, our comment addressed the Commissioner's assertion that the Bischoff partnership agreement could have been amended to circumvent the restrictive buy-sell provisions, so that those provisions should have been ignored for purposes of determining

_____

[45]But see supra pp. 105-106 regarding escrow set up for the Tamma Hatten sale that departed from requirements of buy-sell agreements.

value.  See <u>id.</u> at 42 n.10.  We disagreed and noted that the buy-sell provisions had been adhered to following the deaths of Bruno and Bertha Bischoff, Frank Brunckhorst, and "more importantly, following the death of decedent's son, Herbert." <u>Id.</u>  Thus, the comment concerned whether the buy-sell agreement was enforceable during life and at death, see <u>supra</u> p. 91, or whether decedent had the ability to alter its terms at any time, see <u>Bommer Revocable Trust v. Commissioner</u>, <u>supra</u> (explaining and distinguishing <u>Bischoff</u> based on <u>Bommer</u> decedent's unilateral ability to amend buy-sell agreement).  We did not say that an agreement would be respected for estate tax purposes in all circumstances as long as the parties adhered to its terms.  See <u>id.</u>

d.  <u>Failure To Seek Significant Professional Advice in Selecting Formula Price</u>

Dave True consulted Mr. Harris, the family's accountant and longtime financial adviser, about using a tax book value purchase price formula under the buy-sell agreements.  Dave True's expressed purposes for using book value were (1) to avoid the need for appraisals and (2) to provide an easily determinable price in order to prevent future conflicts within the family. When consulted, Mr. Harris indicated that he did not object to using a book value purchase price in the case of True Oil; however, in general, he believed that book value would not be representative of fair market value in the case of a stand-alone,

oil and gas exploration company.  In his opinion, book value would not reflect fair market value because the current value of proven oil and gas reserves would not be accounted for on the company's books.  However, in True Oil's situation, revenues generated through production extracted from those reserves, and revenues from other True companies, were being plowed back into True Oil.  He believed that the constant expenditure of True Oil's (and other True companies') resources to fund new and often unsuccessful exploratory drilling absorbed the unbooked value of the oil and gas reserves over time.  Mr. Harris reasoned that on a going-concern basis, True Oil's book value closely approximated fair market value at the date of the gifts.  He indicated that this would not be the case if True Oil were being valued on a liquidating basis.

Mr. Harris's expertise was in accounting, and he was well acquainted with the True companies' operations.  The record indicates that Mr. Harris was the only professional with whom Dave True consulted in selecting the book value formula price.  However, Mr. Harris stated that he did not have a detailed understanding of valuation methodologies, as he had no academic or practical experience in the valuation area.  On Mr. Harris's recommendation, Dave True obtained the B. Allen report, which appraised True Oil's reserves, before transferring 8-percent interests to the True children.  However, Mr. Harris indicated

that he only reviewed the B. Allen report in connection with subsequent litigation, not at the time of the gifts.

We reject any notion that Mr. Harris was qualified to opine on the reasonableness of using the tax book value formula in the True family buy-sell agreements. Mr. Harris was closely associated with the True family; his objectivity was questionable. More importantly, he had no technical training or practical experience in valuing closely held businesses. The record shows no technical basis (in the form of comparables, valuation studies, projections) for Mr. Harris's assertion that tax book value represented the price at which property would change hands between unrelated parties. In Lauder II, we were troubled by the fact that the decedent's son settled on a book value formula after having consulted with only a close family financial adviser. Similarly, in Bommer Revocable Trust v. Commissioner, T.C. Memo. 1997-380, we found it significant that the decedent consulted only with his attorney, who spent 1 day calculating the buy-sell agreement's fixed transfer price. On the basis of the record evidence, we find that Dave True's discussions with Mr. Harris were insufficient to assess objectively and accurately the reasonableness of using a tax book value formula price for the True companies' buy-sell agreements.

e.  Failure To Obtain or Rely on Appraisals
in Selecting Formula Price

Dave True obtained an appraisal (the B. Allen report) of
True Oil's oil and gas reserves contemporaneously with the 1973
gifts to his children.  Mr. Harris had suggested the appraisal
because he expected the tax book value gift valuation to be
challenged by the IRS.  Petitioners provided no evidence of
contemporaneous appraisals of any of the other True companies.
The B. Allen report found that, as of August 1, 1973, the fair
market value of True Oil's oil and gas properties was $9,941,000.
SRC later used this information to prepare its forensic appraisal
of True Oil in connection with the 1973 gift tax case.  SRC
determined that the freely traded value of an 8-percent interest
in True Oil (as of August 1, 1973) would have been $535,000, as
compared with the tax book value of $54,653.  The results of the
B. Allen report were discussed at family meetings, but there is
no clear evidence that the children reviewed the report in detail
before signing the True Oil buy-sell agreement.

Petitioners suggest that the logical inferences to be drawn
from the procurement of the B. Allen report were that:  (1) Dave
True wanted to assure that his children had sufficient knowledge
of True Oil's asset values so that their consent to the book
value price was informed, and (2) he obtained the report to help
determine whether to use a tax book value formula price in True
Oil's buy-sell agreement.  While these may have been secondary

considerations, we find that the B. Allen report was obtained primarily in anticipation of litigation and was not relied on by the parties to arrive at the buy-sell agreement's formula price.

First, because Dave True only obtained a contemporaneous appraisal of True Oil's assets, it is clear that the parties did not rely on appraisals before adopting the other True companies' buy-sell agreements. Second, as illustrated in the SRC report (which was not available, however, at the time of the gift), the appraised value of the reserves showed a significant disparity between tax book value ($54,653) and fair market value ($535,000) of an 8-percent interest in the assets of True Oil. Even without the benefit of the SRC report, petitioners should have assumed that almost $10,000,000 of unbooked asset value would increase the market price of an interest in the partnership. There is no evidence in the record of any attempt to reconcile this difference, except for Mr. Harris's rationalization that the unbooked reserve value would be consumed over time to fund oil and gas exploration. Third, petitioners have failed to show that the True children reviewed the report in detail before executing the True Oil buy-sell agreement, or that it made any difference in the terms of the agreement or their entry into it.

Our impression is that Dave True was predisposed toward using a tax book value formula because he had used it before in his buy-sell agreements with Jean True, and because he saw it as a relatively quick and easy way to determine price. He presented

the idea to Mr. Harris, who "did not object" to the use of tax book value in the special case of the True companies. Dave True then obtained the B. Allen report to fulfill his due diligence requirements, given the perceived threat of gift tax litigation. Even petitioners qualified their assertion that Dave True relied on the B. Allen report to assess whether to use a tax book value formula by stating on brief: "but, in reality, Dave True likely relied primarily on his own knowledge of the value of True Oil."

We have often found that failure to obtain comparables or appraisals to determine a buy-sell agreement's formula price indicates testamentary intent. See, e.g., Bommer Revocable Trust v. Commissioner, supra; Lauder II; cf. Estate of Hall v. Commissioner, 92 T.C. 312 (1989)(holding that the buy-sell price reflected fair market value, due in part to the efforts expended by the corporation to test the reasonableness of the adjusted book value formula). Moreover, cases in which the lack of outside appraisals did not evidence a testamentary intent involved buy-sell agreements between persons that were not the natural objects of the decedent's bounty. See, e.g., Estate of Bischoff v. Commissioner, 69 T.C. at 42 n.10.; Bensel v. Commissioner, 36 B.T.A. at 252-254.

### f. Exclusion of Significant Assets From Formula Price

In Lauder II, we questioned the propriety of expressly excluding the value of all intangible assets from the book value

formula, because we thought that much of the company's value was attributable to goodwill. Similarly, we question the reasonableness of omitting the value of proven oil and gas reserves from True Oil's buy-sell pricing formula, given that those reserves represent the focus of the business and its most valuable asset. Dave True's stated reasons for using book value were to avoid the need for appraisals and to provide an easily determinable price in order to prevent future conflicts within the family. However, as we stated in Lauder II, supra: "while we appreciate that an adjusted book value formula may provide a simple and inexpensive means for evaluating shares in a company, we cannot passively accept such a formula where, as here, it appears to have been adopted in order to minimize or mask the true value of the stock in question." Lauder II, T.C. Memo. 1992-736, 64 T.C.M. (CCH) 1643, 1659, 1992 T.C.M. (RIA) par. 92,736, at 92-3732 (citing Estate of Trammell v. Commissioner, 18 T.C. 662 (1952)).

### g. No Periodic Review of Formula Price

The True companies' buy-sell agreements did not provide a mechanism for periodic review or adjustment to the tax book value formula. Over the years, the buy-sell agreements were amended on several occasions. The 1984 amendments, which affected all buy-sell agreements and related to Tamma Hatten's withdrawal, made only minor changes to the tax book value formula price

computation. Since then, the tax book value formula price has not been altered.

We have found that buy-sell agreements were not testamentary substitutes if, inter alia, the agreements contained provisions for periodic review of the formula price. See Estate of Carpenter v. Commissioner, T.C. Memo. 1992-653 (dealing with buy-sell agreement among unrelated parties). We have also been persuaded that agreements without periodic review provisions were designed to serve testamentary purposes. See Bommer Revocable Trust v. Commissioner, T.C. Memo. 1997-380, 74 T.C.M. (CCH) 346, 355, 1997 T.C.M. (RIA) par. 97,380, at 97-2424 ("We find it unrealistic to assume that the decedent, as the majority shareholder, would have negotiated a fixed price for the agreements if he had been bargaining with unrelated parties"). Under the circumstances of the cases at hand, we believe that unrelated parties dealing at arm's length would have included a provision requiring periodic revaluation, or would have at least considered amending the tax book value formula price, for two reasons.

First, Mr. Harris opined, at the time of the agreement, that a tax book value pricing formula would be appropriate for True Oil only because of its history of expending the value of proven oil and gas reserves to discover new ones. If this were not the case, tax book value would not be a reliable indicator of value because the reserves' value would be omitted. Thus, we would

expect that unrelated parties dealing at arm's length would have included a provision requiring periodic redetermination of the pricing formula to allow for the future possibility that the value of new reserves might outstrip the costs of finding and developing them.

Second, when Tamma Hatten withdrew from and sold her interests in the True companies pursuant to the buy-sell agreements, it was clear that tax book value did not correspond to the intrinsic value of some of the companies. For instance, Eighty-Eight Oil, which was referred to as a "cash cow", had negative tax book value that required Tamma Hatten to offset the sales proceeds to which she was entitled in order to sell her interests. We would expect that unrelated parties dealing at arm's length would have re-evaluated the tax book value formula price in light of these anomalous results, especially if the agreements already had to be amended to reflect Tamma Hatten's withdrawal.

Petitioners argue that the lack of a periodic revaluation provision is legally irrelevant because unanimous agreement was required to amend the True companies' buy-sell agreements. Presumably, this means that the parties could always agree to amend the formula price even absent a specific provision granting revaluation authority. This argument ignores whether it was reasonable for the True family not to reconsider the tax book value pricing formula, given the actual and potential changes in

circumstances mentioned above. Petitioners counter that they did not amend the formula when they amended the agreements for other reasons because they believed that the agreements produced a fair and reasonable price. On the contrary, we believe that petitioners did not alter the formula price because the sons would benefit (taxwise and pricewise) from leaving in place a formula transfer price that was as low as possible.

### h. Business Arrangements With True Children Fulfilled Dave True's Testamentary Intent

Dave True's business arrangements with his children fulfilled his testamentary intent, as evidenced by his will and ancillary estate planning documents. At his death, Dave True's estate plan provided equally for his children, except Tamma Hatten. Dave and Jean True amended their estate planning documents to delete any specific provisions for Tamma Hatten and her family after her withdrawal from the family businesses. The advancement language in Dave True's appointment document explained that Tamma Hatten's "potential inheritance" had been fully satisfied when his daughter severed her financial ties with the True companies.

Since the 1970's, each of the True sons has managed one or more of the True companies. Hank True assumed responsibility for the oil and gas marketing, pipeline, and environmental cleanup businesses; Diemer True managed the trucking and tool supply companies; and David L. True ran the ranching and drilling

operations. Tamma Hatten worked only briefly for the True companies and not in a management capacity, and her husband never had more than a subordinate role in management of any of the True companies. However, the True children (including Tamma Hatten before her withdrawal) always owned equal percentage interests in each True company, regardless of the degrees of skill and effort required to manage the various businesses.

These facts suggest that Dave True's testamentary objectives were fulfilled, in large part, through lifetime transfers to his children of interests in the True companies. The buy-sell agreements ensured that those testamentary objectives were met by restricting transfers outside the family. The equality of the percentage interests, in spite of the different management responsibilities borne by each child, indicates that the transfers were based on family relationships, provided the minimal threshold participation requirement continued to be satisfied.

The True sons are now the only individual parties to most of the True companies' buy-sell agreements. Under the existing agreements, a predeceasing brother's interest would be sold to his surviving brothers at tax book value, and would not pass to his heirs. This assumes that the predeceasing brother had no heirs who actively participated in the family business. The True sons have discussed this "problem" with Mr. Harris and have decided not to make any changes to the existing buy-sell

agreements until the current estate and gift tax litigation is concluded.

We believe that the current buy-sell structure poses a problem only if the True sons consider tax book value not to fairly represent market value. Otherwise, it should not be a problem that their heirs, who did not actively participate in the True companies, might receive cash equal to the value of the True sons' business interests, as determined under the buy-sell agreements. The True sons were the natural objects of Dave True's bounty; they are not the natural objects of each other's bounty; their own children and grandchildren are the natural objects of their respective bounties. These facts lead us to infer that Dave True used the business arrangements with his children to fulfill his own testamentary objectives.

### 2. Adequacy of Consideration Test

The adequacy of consideration paid and received pursuant to a buy-sell agreement is generally measured at the date the agreement is executed. See supra p. 75. However, courts have also evaluated the adequacy of consideration and conduct of parties after the agreement date when intervening events within the parties' control caused a wide disparity between the formula price and fair market value. The standard for determining adequacy of consideration requires the formula price (1) to be comparable to what persons with adverse interests dealing at arm's length would accept and (2) to bear a reasonable

relationship to the unrestricted fair market value of the interest in question. See Lauder II. Again, these standards must be applied with the heightened scrutiny imposed on intrafamily agreements restricting transfers of closely held businesses. See Hoffman v. Commissioner, 2 T.C. at 1178-1179.

Petitioners argue that the book value formula price used in the True companies' buy-sell agreements reflected adequate and full consideration as required in section 20.2031-2(h), Estate Tax Regs., and as interpreted by relevant case law. For the reasons stated below, we disagree.

a. Petitioners' Brodrick v. Gore/Golsen Argument

Petitioners argue that the proper standard for determining whether consideration was adequate and full can be found in Brodrick v. Gore, 224 F.2d 892 (10th Cir. 1955). They contend that the Court of Appeals for the Tenth Circuit held in Brodrick v. Gore that, as a matter of law, an agreement containing legally binding and mutual obligations among family members to sell and purchase partnership interests at book value constitutes adequate and full consideration, absent a showing of bad faith. See supra pp. 65-66. Petitioners further argue that, under Golsen v. Commissioner, 54 T.C. 742, 756 (1970), affd. 445 F.2d 985 (10th Cir. 1971), we must follow Brodrick v. Gore because the cases at hand are appealable to the Court of Appeals for the Tenth Circuit.

Respondent counters that petitioners mischaracterize the Brodrick v. Gore holding.  According to respondent, Brodrick v. Gore did not hold that mutual buy-sell agreements are always binding and efficacious for estate tax valuation purposes as a matter of law.  Instead, the Court of Appeals for the Tenth Circuit held that the Government's failure to allege that the State court proceeding was collusive or otherwise invalid was fatal to the Government's case.  We agree with respondent's interpretation of Brodrick v. Gore.

Golsen v. Commissioner, 54 T.C. at 757, established the rule that this Court will "follow a Court of Appeals decision which is squarely in point where appeal from our decision lies to that Court of Appeals" (the Golsen rule).  We later clarified the reach of the Golsen rule by emphasizing that it should be construed narrowly and applied only if "a reversal would appear inevitable, due to the clearly established position of the Court of Appeals to which an appeal would lie".  Lardas v. Commissioner, 99 T.C. 490, 494-495 (1992).  This is because "our obligation as a national court does not require a futile and wasteful insistence on our view."  Id.  In the cases at hand, an appeal would lie to the Court of Appeals for the Tenth Circuit.  Therefore, under the Golsen rule, we are bound to follow the clearly established positions of that Court.  We conclude, however, that petitioners' formulation of the holding in Brodrick

v. Gore, supra, overstates the position of the Tenth Circuit Court of Appeals.

First, we note the peculiar procedural posture of Brodrick v. Gore. It was decided on motion for summary judgment and relied on a prior, unappealed determination by a State court. See Brodrick v. Gore, 224 F.2d at 894-896. Accordingly, because there was no genuine issue as to any pleaded, material fact, decision was rendered as a matter of law. See Fed. R. Civ. P. 56(c). Second, Brodrick v. Gore was decided before section 20.2031-2(h), Estate Tax Regs., which set out the bona fide business arrangement and not a testamentary device requirements, had been promulgated.[46] Third, the Court of Appeals for the Tenth Circuit has not revisited this question since the issuance of section 20.2031-2(h), Estate Tax Regs. We therefore conclude that Brodrick v. Gore is not "squarely in point" with the cases at hand and that its holding is not dispositive under the Golsen rule.

The taxpayers won in Brodrick v. Gore because (1) they showed that the agreement was equally binding on the estate and surviving partners, based on the facts found in the probate proceeding, and (2) the Government had failed to plead that the partnership agreement was tainted by bad faith or that the

[46]Brodrick v. Gore, 224 F.2d 892 (10th Cir. 1955), was decided July 22, 1955, and sec. 20.2031-2(h), Estate Tax Regs., was promulgated June 23, 1958. See id.; sec. 20.2031-2(h), Estate Tax Regs.

probate court proceeding was collusive or nonadversarial. Since the issuance of the section 20.2031-2(h), Estate Tax Regs., in 1958, courts have focused on whether a buy-sell agreement was a bona fide business arrangement and/or a testamentary device. See supra p. 70. For instance, in Lauder II, T.C. Memo. 1992-736, 64 T.C.M. (CCH) 1643, 1659, 1992 T.C.M. (RIA) par. 92,736, at 92-3733, we stated:

> the assumption that the formula price reflects a fair price is not warranted where * * * the shareholders are all members of the same immediate family and the circumstances show that testamentary considerations influenced the decision to enter into the agreement. In such cases, it cannot be said that the mere mutuality of covenants and promises is sufficient to satisfy the taxpayer's burden of establishing that the agreement is not a testamentary device. Rather, it is incumbent on the estate to demonstrate that the agreement establishes a fair price for the stock. * * *

Here, the True family buy-sell agreements and the transfers in issue all arose after the issuance of section 20.2031-2(h), Estate Tax Regs. Respondent essentially has pleaded the equivalent of bad faith (i.e., that the buy-sell agreements were substitutes for testamentary dispositions). Thus, different procedural settings and the intervening regulations prevent us from being constrained, under the Golsen rule, by the decision of the Court of Appeals for the Tenth Circuit in Brodrick v. Gore.

### b. Petitioners' Assertion That Respondent Impermissibly Applied Section 2703 Retroactively

Petitioners argue on brief: "Prior to the enactment of section 2703, no court had ever required a taxpayer to

demonstrate that the buy-sell agreement was comparable to similar arm's-length arrangements between unrelated parties" (arm's-length requirement) (emphasis added). They support this statement by citing the legislative history of section 2703, which states that the arm's-length requirement of section 2703(b)(3) was not present in prior law. See supra p. 81. According to petitioners, the heightened scrutiny that respondent has applied to the True companies' intrafamily buy-sell agreements amounts to a presumption of testamentary intent that could be rebutted only by meeting the arm's-length requirement. Petitioners characterize this as an impermissible, retroactive application of section 2703.

Respondent counters that petitioners misconceive the import of section 2703. To respondent, "the effect of section 2703(b)(3) was to elevate the arm's-length nature of the terms of the agreement from a factor to consider in determining [testamentary] intent to an absolute requirement." Thus, respondent insists that the arm's-length requirement was present before the enactment of section 2703, citing cases that antedated section 2703 and applied section 20.2031-2(h), Estate Tax Regs. We agree with respondent.

As already shown, courts often have considered whether buy-sell agreements were comparable to arm's-length arrangements between unrelated parties in cases that both predated and postdated issuance of section 20.2031-2(h), Estate Tax Regs., and

in cases that preceded the enactment of section 2703.  See, e.g.,
Dorn v. United States, 828 F.2d 177 (3d Cir. 1987); Estate of
Littick v. Commissioner, 31 T.C. 181 (1958); Bensel v.
Commissioner, 36 B.T.A. 246 (1937); Lauder II; Estate of
Carpenter v. Commissioner, T.C. Memo. 1992-653.  Thus, although
this requirement was not explicitly set out in section 20.2031-
2(h), Estate Tax Regs. (as noted in the legislative history of
section 2703), the arm's-length requirement has always been a
factor used by courts to decide whether a buy-sell agreement's
price was determinative of value for estate tax purposes.

Further, we do not believe that the heightened scrutiny
applied to intrafamily buy-sell agreements essentially creates a
presumption of testamentary purpose that can only be rebutted by
a showing that the agreement satisfied the arm's-length
requirement.  As we have stated many times, no one factor is
dispositive, and all circumstances must be evaluated to determine
whether a buy-sell agreement is intended to serve as a substitute
for a testamentary disposition.

Even if we were to treat the arm's-length requirement as a
"super factor" in our analysis, an impermissible, retroactive
application of section 2703 would not result.  The arm's-length
requirement played the same role in pre-section 2703 case law.
After surveying the cases that apply (either implicitly or
explicitly) the section 20.2031-2(h), Estate Tax Regs.,
requirement that a buy-sell agreement cannot be a testamentary

device, we see that certain patterns emerge.  The cases in which

the test was satisfied (i.e., no testamentary device found), and

the buy-sell agreement's price was held to determine fair market

value, involved buy-sell agreements that (1) were between

unrelated parties or related parties who were not the natural

objects of the decedent's bounty and (2) were either implicitly

or expressly found to be done on an arm's-length basis.[47]  Thus,

case law preceding the enactment of section 2703 shows that

courts were more likely to find that a buy-sell agreement's price

determined estate tax value under section 20.2031-2(h), Estate

Tax Regs., if the agreement was comparable to that which would be

---

[47]Cases involving intrafamily buy-sell agreements that were
held not to determine estate tax value include:  Dorn v. United
States, 828 F.2d 177 (3d Cir. 1987); St. Louis County Bank v.
United States, 674 F.2d 1207 (8th Cir. 1982); Estate of Reynolds
v. Commissioner, 55 T.C. 172 (1970); Hoffman v. Commissioner, 2
T.C. 1160 (1943); Bommer Revocable Trust v. Commissioner, T.C.
Memo. 1997-380; Lauder II; Slocum v. United States, 256 F. Supp
753 (S.D.N.Y. 1966).  But see Estate of Rudolph v. United States,
93-1 USTC par. 60,130, 71 AFTR 2d 93-2169 (S.D. Ind. 1993).
Cases involving buy-sell agreements that (1) were between
unrelated parties or parties that were not the natural objects of
decedent's bounty, (2) were implicitly or explicitly found to
have been transacted on an arm's-length basis, and (3) were held
to determine estate tax value include:  Estate of Bischoff v.
Commissioner, 69 T.C. 32 (1977) (brother and sister not
considered natural objects of each other's bounty; implicitly
arm's length); Estate of Littick v, Commissioner, 31 T.C. 181
(1958)(three of five parties to agreement were brothers;
explicitly arm's length); Bensel v. Commissioner, 36 B.T.A. 246
(1937), affd. 100 F.2d 639 (3d Cir. 1938) (son was not natural
object of decedent's bounty due to hostile relationship;
explicitly arm's length); Estate of Carpenter v. Commissioner,
T.C. Memo. 1992-653 (unrelated parties to agreement; explicitly
arm's length); Estate of Seltzer v. Commissioner, T.C. Memo.
1985-519 (only two of five parties to agreement were related;
implicitly arm's length).

derived (or actually was derived) from arm's-length dealings between adverse parties.

      c.  <u>Did Tax Book Value Pricing Formula Represent Adequate and Full Consideration?</u>

Petitioners make various arguments to support their contention that the tax book value pricing formula used in the True family buy-sell agreements represented adequate and full consideration under section 20.2031-2(h), Estate Tax Regs., and the Lauder II test. They contend that tax book value was adequate and full consideration because (1) it equaled fair market value at the dates of agreement for True Oil and Belle Fourche; (2) book value was a common pricing formula among related and unrelated parties at the dates of agreement; (3) the parties testified that they thought the price was realistic when they entered into the agreements; (4) there were bona fide business reasons for using a tax book value formula price; and (5) book value was not required to bear a predictable relationship to the fair market value of underlying assets, inasmuch as the True family had no plans to liquidate the True companies.

First, petitioners observe that no court has <u>required</u> a taxpayer to prove that a buy-sell agreement's formula price represented fair market value at either the date of agreement or at the time of the transfers at issue. Moreover, petitioners cite <u>St. Louis County Bank v. United States</u>, <u>supra</u>, for the

proposition that adequacy of the formula price is only one factor to consider in evaluating whether a buy-sell agreement is bona fide and not a device. They further contend that, under Estate of Bischoff v. Commissioner, 69 T.C. 32 (1977), if the formula price equaled fair market value at the agreement date, it was strong evidence of a fair or realistic buy-sell agreement price. Thus, petitioners argue that tax book value was a fair price because tax book value equaled fair market value at the dates of agreement for the True Oil and Belle Fourche interests transferred to the True children (as determined by the 1971 and 1973 gift tax cases).

We disagree with petitioners' contention. As previously discussed, see supra pp. 85-90, we are not bound by the District Court's determinations in the 1971 and 1973 gift tax cases that the tax book value of interests in True Oil and Belle Fourche equaled fair market value at the agreement dates. As a result, we are free to determine independently the fair market value of True Oil and Belle Fourche transferred interests at those dates, without taking into account the depressive effect of the buy-sell agreements. To do this, we refer to the valuation information provided in the SRC appraisals.

In the True Oil and Belle Fourche appraisals, which were prepared for litigation, SRC ostensibly used recognized valuation methods to derive a "freely traded value" for the transferred interests as of the agreement dates. The freely traded value for

Belle Fourche stock was $120 per share (or $57,120 per each 1-percent interest sold) on August 2, 1971. The freely traded value for each 8-percent partnership interest in True Oil was $535,000 on August 1, 1973.

SRC then examined average marketability discounts of comparable companies to determine the appropriate discount from freely traded value. In the Belle Fourche appraisal, the average marketability discount for investment companies[48] subject to investment letter restrictions ranged from 15 to over 50 percent, with an average discount of 33 percent. In the True Oil appraisal, which was performed 2 years later, the average marketability discount was within the same range, with an average discount of 34 percent.

SRC ultimately disregarded the average marketability discount information and opined that the buy-sell restrictions in the True Oil and Belle Fourche agreements absolutely precluded sales in the public market. As a result, SRC limited fair market value to the buy-sell formula prices, which amounted to discounts of 90 percent and 68 percent, respectively, from the freely traded value of the True Oil and Belle Fourche transferred interests. SRC effectively treated the buy-sell agreements as if they controlled Federal gift tax value; rather than solely as

---

[48]Described as public companies that as a policy invested in stock subject to investment letter restrictions. Investment letter restrictions prevented the holder from selling shares to the public for a fixed period of time (generally 2 to 3 years).

factors to be considered with other relevant factors in determining fair market value, as required under Rev. Rul. 59-60, 1959-1 C.B. 237.

As previously discussed, the proper approach to determining fair market value at the agreement date is to disregard the depressive effect of the buy-sell agreement on value. Accordingly, we do not follow SRC's methodology, which essentially treated the buy-sell agreements' formula prices as dispositive. Instead, we apply the average marketability discounts for comparable companies to the freely traded values determined by SRC to compute fair market value at the agreement dates. For Belle Fourche, fair market value of a 1-percent interest on August 2, 1971, was $38,270 (or $80.40 per share),[49] whereas tax book value on that date was $18,416 (or $38.69 per share). For True Oil, fair market value of an 8-percent partnership interest on August 1, 1973, was $353,100,[50] whereas tax book value on that date was $54,653. We therefore conclude that tax book value did not equal fair market value of the transferred interests in Belle Fourche and True Oil as of the buy-sell agreement dates.

--------

[49]Freely traded value of $120 per share multiplied by 476 shares transferred, the product of which is then discounted by 33 percent (average marketability discount averted to by SRC).

[50]Freely traded value of $535,000 discounted by 34 percent (average marketability discount averted to by SRC).

Second, petitioners assert that book value was the most common formula pricing provision in agreements between related and unrelated parties when the True family adopted the buy-sell agreements at issue in these cases. Petitioners cite Estate of Anderson v. Commissioner, 8 T.C. 706, 720 (1947), Estate of Carpenter v. Commissioner, T.C. Memo. 1992-653, Brodrick v. Gore, 224 F.2d at 897, Estate of Hall v. Commissioner, 92 T.C. 312 (1989), Estate of Bischoff v. Commissioner, 69 T.C. at 34-36, and Luce v. United States, 4 Cl. Ct. 212, 222-223 (1983), to support their position.

We acknowledge that these are cases in which courts have equated book value to fair market value. These cases involved transfers subject to buy-sell agreements between related parties, Brodrick v. Gore, supra; Estate of Bischoff v. Commissioner, supra, between unrelated parties, Estate of Carpenter v. Commissioner, supra; Estate of Anderson v. Commissioner; supra, and between related and unrelated parties, Estate of Hall v. Commissioner, supra, and transfers not subject to buy-sell agreements at all, Luce v. United States, supra. However, this information is not helpful in determining whether the True companies' tax book value pricing formula is comparable to a formula derived from arm's-length dealings between adverse parties. The Lauder II test requires scrutiny of the facts of each case. On brief, respondent distinguished most of petitioners' cited cases from the cases at hand on their facts,

procedural settings, or standards of law applied.  Indeed, we have found no decided cases in which a tax book value buy-sell agreement formula determined fair market value.[51]  Moreover, there are contrary cases holding book value to be an unreliable basis from which to determine a stock's fair market value.  See, e.g., Estate of Andrews v. Commissioner, 79 T.C. 938, 948 n.16 (1982); Biaggi v. Commissioner, T.C. Memo. 2000-48 (income tax case), affd. without published opinion __ F.3d __ (2d Cir. April 20, 2001); Estate of Ford v. Commissioner, T.C. Memo. 1993-580, affd. 53 F.3d 924 (8th Cir. 1995); Brown v. Commissioner, T.C. Memo. 1966-92; Estate of Cookson v. Commissioner, T.C. Memo. 1965-319.  Thus, petitioners do not persuade us that the True family's use of a tax book value pricing formula in their buy-sell agreements was comparable to what unrelated parties would use in similar circumstances.

Third, petitioners rely on Estate of Carpenter v. Commissioner, T.C. Memo. 1992-653, to claim that tax book value was a fair and realistic price because the True family testified that they considered it to be so.  However, that case involved arm's-length negotiations among unrelated parties to transfer interests at book value, whereas the True companies' buy-sell

---

[51]Again, we note that in the 1971 and 1973 gift tax cases, the District Court held that tax book value equaled fair market value, taking into account the depressive effect of the buy-sell agreements.  However, the District Court did not hold that the tax book value formula price determined gift tax value.  See discussion supra pp. 85-90.

agreements were among family members and there was no convincing evidence of arm's-length dealing. Moreover, the record shows that Dave True exerted significant control over his children's investments in the True companies. Although the True children may have agreed to the formula price provisions and other restrictions imposed by Dave True, that does not prove, under the circumstances, that those restrictions would be considered reasonable from an arm's-length perspective.

Fourth, petitioners argue that valid business reasons, rather than testamentary designs, motivated the True family's decision to use a tax book value pricing formula. They explain that the formula had to be (1) understandable to the parties, (2) predictable, and (3) easily determinable to avoid future conflicts and to accommodate the short timeframe (6 months from date of withdrawal) within which tax book value had to be computed and payments had to be made under the agreements. While there might have been valid business reasons for choosing a tax book value formula price, we note that legitimate business purposes are often mixed with testamentary objectives in the family context. See Lauder II. Thus, petitioners' argument does not dispose of the testamentary device and adequacy of consideration issue.

Fifth, petitioners contend that tax book value was not required to bear a predictable relationship to fair market value

of the underlying assets because the True family had no plans to liquidate the True companies. Petitioners argue on brief:

> book value likely would not have represented the fair market value of * * * [True Oil's and Belle Fourche's] assets upon liquidation. If the price under a buy-sell agreement * * * [were] the fair market value of the business in liquidation, then one of the primary purposes of a buy-sell agreement would be undermined. Since the primary business purpose of a buy-sell agreement is continuation of the business by its current owners, the agreed price likely will not equate to the value of the business in liquidation. * * *

At the same time, they argue that because True Oil's and Belle Fourche's tax book values equaled fair market values at the agreement dates, this is strong evidence that tax book value was a fair price.

To the contrary, respondent argues (citing St. Louis County Bank v. United States, supra) that the reasonableness of the formula price should be analyzed both at the date of agreement and at later dates to determine whether the agreement was a testamentary substitute. If the buy-sell agreement's formula could be expected to minimize the transfer price, this would indicate an intent to transfer the interest for less than adequate and full consideration. We agree.

As we stated in Lauder II, adequate and full consideration requires a formula price (1) to be comparable to that which would be negotiated by persons with adverse interests dealing at arm's length and (2) to bear a reasonable relationship to the unrestricted fair market value of the interest in question.

Under item (2), we must consider whether disparities (at the interest owner's death) between the fair market value of unrestricted interests and the buy-sell agreement's formula price could have been predicted by the parties at the time the agreements were executed. See Estate of Reynolds v. Commissioner, 55 T.C. at 194.

Certain facts indicate that the True companies' tax book value formula price was lower than the formula price that would have been negotiated by unrelated parties dealing at arm's length. For instance, petitioners concede that tax book value does not reflect the fair market value of underlying assets. They justify this disparity by saying that value should not be determined on a company-by-company, liquidating basis, but instead on an aggregate, going concern basis. Thus, petitioners contend that the value of True Oil's proven oil and gas reserves was properly omitted from the tax book value pricing formula because the reserves essentially were purchased with earnings from the other True companies and their value likely would be dissipated in the unsuccessful search for replacement reserves. We find it unreasonable to assume that Dave True, in a comparable situation with unrelated parties, would have agreed to a formula price that assumed that the value of True Oil's reserves would be expended indefinitely on dry holes resulting from unsuccessful efforts to locate additional reserves.

Moreover, the True family sometimes chose not to use tax book value pricing formulas in their dealings with unrelated parties. Petitioners highlight the fact that unrelated stockholders sold their stock in Belle Fourche to Dave and Jean True (not pursuant to buy-sell agreements) at a book value price. However, we note that one unrelated shareholder sold stock, which amounted to 24 percent of the stock initially issued by the corporation, for more than book value; in addition, the book value used in buying out unrelated shareholders of Belle Fourche was GAAP book value rather than tax book value. See supra p. 23. Also, the White Stallion buy-sell agreement, which included parties that would not be considered natural objects of Dave True's bounty (Dave True's brother and his family), was the only buy-sell agreement that departed from a pure tax book value pricing formula (see "First Right of Refusal" provision described supra p. 49). Similarly, the Toolpushers Employees' Trust was specifically exempted from Toolpushers' buy-sell agreement, thus allowing the Employees' Trust to sell its shares back to the company for more than book value. In an analogous situation, the True Oil employee profit-sharing plan's contribution formula required intangible drilling costs (IDC's), which were deducted for tax book purposes, to be added back to determine annual profits for the purpose of determining the employer's contribution obligations.

The True family's use of tax book value formula pricing for companies that engage in ranching and exploratory drilling for oil and gas further suggests an intention to transfer interests for less than adequate and full consideration.  Congress has granted various tax incentives to the oil and gas industry, which include the current write-off of IDC's and the deduction of cost or percentage depletion, whichever is higher.  Those incentives reduce book value for tax purposes, sometimes creating anomalous results such as True Oil's negative book value at the time of Tamma Hatten's sale.  Some of the incentives create only short-term timing differences between books reported on tax versus financial accounting bases (e.g., accelerated depreciation), while others create long-term or permanent differences (compare current deduction of IDC's to full cost method of accounting for exploration costs).

Additionally, tax incentives granted to the farming and ranching industries also create distortions between tax book value and underlying fair market value.  Because True Ranches deducted (when paid) feed and other costs incurred to raise livestock, none of those costs were capitalized as basis.  Therefore, raised livestock had no book value on True Ranches' tax basis books.

These facts suggest that the True family should have known, at the time the buy-sell agreements were executed, that tax book value would probably not bear a reasonable relationship to

(indeed be substantially less than) unrestricted fair market value.

Respondent also argues that the ranchland exchange transactions among True Oil, True Ranches, and Smokey Oil, discussed supra pp. 55-59, reflected petitioners' attempts artificially to reduce tax book value through aggressive tax planning (i.e., petitioners were "double-dipping"). Respondent suggests that even if these transactions were efficacious income tax planning techniques--which the Court of Appeals for the Tenth Circuit held they were not--their effect was to minimize or eliminate tax book value of certain assets so that Dave True could transfer interests in the affected True companies for less than adequate and full consideration. We agree.

Courts have evaluated conduct after the agreement date when intervening events within the parties' control caused a wide disparity between the buy-sell agreement's formula price and fair market value. See St. Louis County Bank v. United States, 674 F. 2d at 1211; Estate of Rudolph v. United States, 93-1 USTC par. 60,130, at 88449-88450, 71 AFTR 2d 93-2169, at 93-2176 through 93-2177 (S.D. Ind. 1993). Here, the ranchland exchange transactions were clearly within the True family's control. In addition, because of those transactions, True Ranches received ranchland properties with substantial fair market value and a zero tax book value, while the high basis assets received by Smokey Oil could be expected to be written down for tax purposes.

Thus, petitioners could have predicted that the ranchland exchange transactions would create a disparity in which actual fair market value would exceed the tax book value formula price under the True Ranches buy-sell agreement.[52]

### 3. True Family Buy-Sell Agreements Were Substitutes for Testamentary Dispositions

To summarize, we have found facts indicating that the buy-sell agreements at issue in these cases (1) were not the result of arm's-length dealings and served Dave True's testamentary purposes and (2) included a tax book value formula price that was not comparable to a price that would be negotiated by adverse parties dealing at arm's length and would not, over time, be expected to bear a reasonable relationship to the unrestricted fair market value of the ownership interests in the True companies.  In Lauder II, certain facts regarding how the agreement was entered into allowed us to infer that the buy-sell agreements served testamentary purposes.  We then went on to

---

[52]The Trues argued that evidence of legitimate business purposes for the ranchland exchange transactions should render the step transaction doctrine inapplicable.  They advanced an analogous argument in the cases at hand.  The Court of Appeals for the Tenth Circuit acknowledged the evidence of business purposes, but held that such evidence was not dispositive and that the step transaction doctrine should still apply.  See True v. United States, 190 F.3d 1165, 1176-1177 (10th Cir. 1999).  We also note the following observation of the Court of Appeals for the Tenth Circuit:  "None of the individual steps in the ranchland [exchange] transaction is the type of business activity we would expect to see in a bona fide, arm's length business deal between unrelated parties".  True v. United States, 190 F.3d at 1179.

determine whether consideration was full and adequate, to resolve whether the formula price was binding for estate tax purposes. See id. After considering all the circumstances, and particularly the arbitrary manner in which the formula price was selected, we concluded that the agreements were adopted for the principal purpose of achieving testamentary objectives and were not binding for estate tax purposes. See id.

Similarly, in the cases at hand we have weighed all material facts and conclude that the True companies' buy-sell agreements were substitutes for testamentary dispositions. Therefore, the fourth prong (nontestamentary disposition prong) of the Lauder II test has not been satisfied.

E. Conclusion: True Family Buy-Sell Agreements Do Not Determine Estate Tax Values

The True family buy-sell agreements do not satisfy the Lauder II test, because they are substitutes for testamentary dispositions. As a result, under section 2031 and the related regulations, the tax book value buy-sell agreement price does not control estate tax values of interests in the True companies at issue in the estate tax case.

Petitioners cite Estate of Hall v. Commissioner, 92 T.C. 312 (1989), in support of their position that the buy-sell agreement price should control estate tax value. In Estate of Hall, the estate of Joyce C. Hall, the founder of Hallmark Cards, Inc., reported the value of his Hallmark shares for estate tax purposes

at "adjusted book value", as determined under various buy-sell and option agreements.  We did not decide whether the price determined under the adjusted book value formula in those agreements was dispositive for estate tax valuation purposes; instead, we held, after careful review of the experts' reports, that the actual date of death fair market value of the shares did not exceed the price determined under the adjusted book value formula, as reported on the estate tax return.  In so doing, we did two things:  (1) We found no evidence to support respondent's intimations that the agreements "were merely estate planning devices [that served] no bona fide business purpose"; and (2) we concluded that "the transfer restrictions * * * and the prices set in the buy-sell and option agreements" could not be ignored in arriving at value because, among other things, "there [was] no persuasive evidence to support a finding that the restrictions, or the offers to sell set forth in the agreements, were not susceptible of enforcement or would not be enforced by persons entitled to purchase under them."  Estate of Hall v. Commissioner, supra at 334-335.

The differences between the cases at hand and Estate of Hall are significant and substantial.  In these cases we have found the buy-sell agreements to be testamentary devices, notwithstanding that they also served valid business purposes.  As a result, the depressing effect on value that the buy-sell agreements may have had in these cases is to be ignored, rather

than taken into account and given some effect, as in Estate of Hall. See infra p. 153.

An important factor that supports our conclusion in these cases and distinguishes Estate of Hall is the profound difference between the tax book value formula in the True family buy-sell agreements and the adjusted book value formula in Estate of Hall. Book value in the cases at hand is income tax basis book value, which gives effect to the income tax subsidies for the oil and gas and cattle industries, and accelerated depreciation, which have the effect of substantially reducing book value as compared with book value determined under generally accepted accounting principles. "Adjusted book value" in Estate of Hall was book value using financial statements prepared in accordance with generally accepted accounting principles, adjusted to reflect the value of intangibles arising from above-average earnings. In contrast, the tax basis book value formula in the True family buy-sell agreements ignores all intangibles, which, Lauder II indicated, suggests that an unadjusted book value formula has a testamentary purpose. It ignores the current "discovery value" of proven reserves, which would increase the price that a well-informed buyer would be willing to pay. It even ignores historic actually paid for costs, such as drilling costs and exploration expenditures attributable to proven reserves, and feed expense and other costs of homeraised calves that would enter into cost of goods on hand under generally accepted accounting principles,

as well as the basis reductions associated with accelerated depreciation for income tax purposes.

Petitioners' opening brief says: "Under the facts in this case, there is no reason to believe that any buyer of an interest in the True companies would pay more than the book value price of such interest", preceded by a quote from Estate of Hall v. Commissioner, 92 T.C. at 337, that "there was [not] even a remote possibility that any investor, including a permitted transferee, would purchase Hallmark shares at a price higher than adjusted book value." This is just not true in the cases at hand. There were instances of sales of higher than book value for profit sharing purposes and by unrelated parties. In any event, even if, as could have been expected, all of the sales in the transactions at issue between family members were at tax basis book value in accordance with the provision in the buy-sell agreements, there is no reason to believe, if the buy-sell agreements are disregarded, as they must be as a result of our testamentary device finding, that a hypothetical buyer would not have been willing to pay higher prices than the tax basis book values at which the subject interests changed hands between members of the True family.

IV. Do True Family Buy-Sell Agreements Control Gift Tax Values?

We now consider whether the buy-sell agreements at issue in these cases determine gift tax values for lifetime transfers of

interests in the True companies made by Dave and Jean True in 1993 and 1994, respectively.

A.  Framework for Analyzing Gift Tax Valuation Issues

Federal gift tax is imposed on transfers of property by gift by any individual during a calendar year.  See sec. 2501(a)(1). The gift is measured by the value of property passing from the donor and not by the resulting enrichment of the donee.  See sec. 25.2511-2(a), Gift Tax Regs.  The value of property transferred at the date of gift is considered to be the amount of the gift. See sec. 2512(a); sec. 25.2512-1, Gift Tax Regs.

The value of property for gift tax purposes is determined in the same manner as for estate tax purposes, see supra p. 60, by applying the hypothetical willing buyer and seller standard.  See Estate of Reynolds v. Commissioner, 55 T.C. at 187-188 (explaining that the estate and gift tax regulations provide identical definitions of value); compare sec. 25.2512-1, Gift Tax Regs., with sec. 20.2031-1(b), Estate Tax Regs.  Identical factors are used for gift and estate tax purposes to determine fair market value of a closely held business for which there is no public market or recent arm's-length sale.  See Ward v. Commissioner, 87 T.C. 78, 101 (1986); secs. 25.2512-2(a), 25.2512-2(f), 25.2512-3, Gift Tax Regs.

Transfers that are subject to Federal gift tax include sales, exchanges, and other dispositions of property for consideration.  See sec. 2512(b).  If property is transferred for

less than adequate and full consideration, the amount by which the value (as defined above) of property exchanged exceeds the value of consideration received is deemed to be a gift.  See sec. 2512(b); Commissioner v. Wemyss, 324 U.S. 303, 306-307 (1945) ("The section taxing as gifts transfers that are not made for 'adequate and full (money) consideration' aims to reach those transfers which are withdrawn from the donor's estate."); sec. 25.2512-8, Gift Tax Regs.  However, a sale, exchange, or other transfer of property made in the ordinary course of business, meaning a transaction that is bona fide, at arm's length, and free from any donative intent, will be considered as made for adequate and full consideration.  See Commissioner v. Wemyss, 324 U.S. at 306-307; sec. 25.2512-8, Gift Tax Regs.  As previously stated in the estate tax context, transactions within a family group are subject to special scrutiny, such that there is a presumption that intrafamily transfers are gifts.  See Harwood v. Commissioner, 82 T.C. 239, 259 (1984)(citing Estate of Reynolds v. Commissioner, 55 T.C. at 201), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986).

B. Buy-Sell Agreements Do Not Determine Value for Gift Tax Purposes

It is well settled that restrictive agreements, such as the buy-sell agreements at issue in the cases at hand, generally do

not control value for Federal gift tax purposes.[53]  At most, a
buy-sell agreement may be a factor to consider in determining
gift tax value.  See Ward v. Commissioner, 87 T.C. at 105;
Harwood v. Commissioner, 82 T.C. at 260; Berzon v. Commissioner,
63 T.C. 601, 613 (1975), affd. 534 F.2d 528 (2d Cir. 1976);
Estate of Reynolds v. Commissioner, 55 T.C. at 189; Rev. Rul. 59-
60, 1959-1 C.B. 237.  Many reasons have been advanced by this
Court and others for the disparate treatment accorded buy-sell
agreements for gift tax versus estate tax purposes.

In estate tax cases, the purchasing individuals or entities
have immediately exercisable, valid, and irrevocable rights to
purchase the decedent's interest from the estate as of the
valuation date.  The critical event (death) that subjects the
stock to the purchase right has occurred, and it is clear that
the seller-estate can receive no more than the formula price.
See Spitzer v. Commissioner, 153 F.2d 967, 970-971 (8th Cir.

---

[53]See Spitzer v. Commissioner, 153 F.2d 967, 971 (8th Cir.
1946); Krauss v. United States, 140 F.2d 510, 511 (5th Cir.
1944); Commissioner v. McCann, 146 F.2d 385, 386 (2d Cir. 1944),
revg. 2 T.C. 702 (1943); Ward v. Commissioner, 87 T.C. 78, 105
(1986); Harwood v. Commissioner, 82 T.C. 239, 260 (1984), affd.
without published opinion 786 F.2d 1174 (9th Cir. 1986); Berzon
v. Commissioner, 63 T.C. 601, 612-613 (1975), affd. 534 F.2d 528
(2d Cir. 1976); Estate of Reynolds v. Commissioner, 55 T.C. 172,
189-190 (1970); James v. Commissioner, 3 T.C. 1260, 1264 (1944),
affd. per curiam 148 F.2d 236 (2d Cir. 1945); Moore v.
Commissioner, 3 T.C. 1205, 1211 (1944); Rev. Rul. 59-60, 1959-1
C.B. 237; Hood et al., Closely Held Corporations in Business and
Estate Planning, Vol. II, sec. 9.13.2, p. 151-152 (1982); Bittker
& Lokken, 5 Federal Taxation of Income, Estates & Gifts, par.
135.3.10 at 135-57 through 135-59 (2d ed. 1993).

1946).  However, in gift tax cases, the transferring stockholder or partner (putative donor) is under no immediate obligation to sell.  See Commissioner v. McCann, 146 F.2d 385, 386 (2d Cir. 1944), revg. 2 T.C. 702 (1943); James v. Commissioner, 3 T.C. 1260, 1264 (1944).  Instead, he merely agrees to offer his interest to the other owners on stated terms if and when he decides to sell or transfer his interest.  Thus, the obligation to sell has not matured in the gift tax cases and therefore cannot set a ceiling on transfer tax value.

Resale value is not the only factor to consider in determining fair market value for gift tax purposes.  Until the transferor actually disposes of his interest, he is entitled to all the rights and privileges of ownership (e.g., rights to receive dividends and to decide when to dispose of his interest).  See Harwood v. Commissioner, 82 T.C. at 261; Estate of Reynolds v. Commissioner, 55 T.C. at 190; Baltimore Natl. Bank v. United States, 136 F. Supp. 642, 654 (D. Md. 1955).  Thus, courts found that gift tax fair market value should include this "retention value", which the buy-sell agreement price does not adequately capture.

C. <u>Application of Gift Tax Rules to Lifetime Transfers by Dave and Jean True</u>

    1.   <u>True Family Buy-Sell Agreements Do Not Control Gift Tax Values</u>

The weight of authority establishes that the True family buy-sell agreements do not fix values for Federal gift tax purposes. However, petitioners contend that identical standards should apply to determine whether buy-sell agreements control values for both estate and gift tax purposes. We disagree, for the reasons stated below.

First, petitioners argue that "fair market value" has the same meaning for estate tax and gift tax purposes; therefore, the standard for determining whether a buy-sell agreement controls fair market value should be the same under both regimes. Although petitioners' argument has superficial appeal, it does not reflect the development of the law in this area.

Second, petitioners attempt to distinguish the cases at hand from the many cases in which restrictive agreements were found not to determine gift tax value. Petitioners suggest that in those cases, courts emphasized that the event giving rise to an obligation to sell had not occurred as of the date of gift (i.e., gift transfers of stock or partnership interests did not trigger option or first-offer provisions). As a result, it was not certain whether or when the buy-sell provisions would be triggered. Petitioners contrast this with the treatment of transfers at death, stating that courts allowed buy-sell

agreements to determine estate tax value because death gave rise to the obligation to sell.  Petitioners argue that the events giving rise to the obligation to sell under the True buy-sell agreements were Dave and Jean True's decisions to sell their respective interests in 1993 and 1994; therefore, their lifetime transfers made <u>subject to</u> the buy-sell agreement restrictions should be treated under the same standard as transfers at death and not by the standard applied to gift transfers that do not trigger the buy-sell provisions.  We disagree.

Petitioners' analysis strikes us as mechanical and unreflective of the law's development in this area.  In <u>Harwood v. Commissioner</u>, 82 T.C. at 260, we said:  "Restrictive provisions in a partnership agreement which limit the amount received from the partnership by a withdrawing partner or the estate of a deceased partner to the book value of his partnership interest are not binding upon respondent for gift tax purposes."  The fact that the operation of the buy-sell agreements was triggered by Dave and Jean True's decisions to sell their interests in the True companies does not substantively distinguish these cases from those in which the transferor was not required first to offer his interest to others before making a gift to his family.  In either situation, the transferor has retained the right to choose when and if a disposition would occur.  In the meantime, the transferor is entitled to receive dividends or partnership distributions, and to enjoy the other

benefits associated with his or her investment.  The estate executor has no such discretion at the decedent-stockholder's or decedent-partner's death.

In any event, the same buy-sell agreements are at issue for both estate and gift tax purposes, and we have found them to be substitutes for testamentary dispositions under Lauder II and section 20.2031-2(h), Estate Tax Regs.  Therefore the True family buy-sell agreements at issue in the cases at hand do not control values for gift tax purposes.

2.   Lifetime Transfers by Dave and Jean True Were Not in Ordinary Course of Business

As previously discussed, sales or exchanges for less than adequate and full consideration constitute gifts.  See sec. 2512(b); Commissioner v. Wemyss, 324 U.S. 303 (1945); sec. 25.2512-8, Gift Tax Regs.  However, a sale made in the ordinary course of business (bona fide, at arm's length, and free from donative intent) is considered to have been made for adequate and full consideration.  See Commissioner v. Wemyss, 324 U.S. at 306-307; sec. 25.2512-8, Gift Tax Regs.

Dave and Jean True's sales of interests in the True companies were not made in the ordinary course of business.  In 1993, Dave True sold partial interests in the various True companies that were partnerships to ensure that, on his death, his estate would secure the benefits of pre-Chapter 14 rules regarding the determinative nature of buy-sell agreements for

estate tax valuation purposes.  Likewise, Jean True's sales to her sons in 1994, shortly after her husband's death, fulfilled the couple's overall testamentary plan to pass the family businesses to their sons.  These motivations for the sales were not devoid of testamentary (or donative) intent.  In addition, we have already discussed at length how the creation and continued enforcement of the True companies' book value buy-sell agreements lacked indicia of arm's-length dealing.  See <u>supra</u> pp. 101-144; <u>Harwood v. Commissioner</u>, 82 T.C. at 258 ("We do not believe that a transfer by a mother to her sons of her interest in the family partnership, structured totally by the family accountant, with no arm's-length bargaining, can be characterized as a transaction in the ordinary course of business.").

Petitioners erroneously argue that section 2512(b) does not apply to the lifetime sales by Dave and Jean True; therefore, they provide no evidence and only conclusory statements to support their conclusion that the sales were made in the ordinary course of business.

In conclusion, because the buy-sell agreements do not establish gift tax fair market value, we must independently determine value and compare that value to consideration paid in the 1993 and 1994 lifetime transfers to decide whether interests in the True companies were transferred for less than adequate and full consideration.  Any excess of the value of interests

transferred over the value of consideration received will constitute gifts under section 2512(b).

V.  Impact of Noncontrolling Buy-Sell Agreements on Estate and Gift Tax Valuations

Having held that the True companies' buy-sell agreements do not control fair market value for either estate tax or gift tax purposes, we must decide whether noncontrolling buy-sell agreements are factors to consider in valuing the subject interests under sections 2031 and 2512.

For estate tax purposes, section 20.2031-2(h), Estate Tax Regs., explicitly states that a buy-sell agreement price will be disregarded in determining the value of securities unless it is found that the agreement represents a bona fide business arrangement and not a device to pass the decedent's shares to the natural objects of his bounty for less than adequate and full consideration.  Therefore, only if the agreement is both a bona fide business arrangement and not a testamentary device would its price have an effect on estate tax value.  See Lauder II.

We applied this principle in Estate of Lauder v. Commissioner, T.C. Memo. 1994-527, 68 T.C.M. (CCH) 985, 998-999, 1994 T.C.M. (RIA) par. 94,527, at 94-2741 (Lauder III), in which we stated:

> We agree with respondent that, in light of our holding in * * * [Lauder II], it would be anomalous if particular portions of the shareholder agreement are now deemed relevant to the question of the fair market value of decedent's stock.  At the risk of belaboring the point, our responsibility is to determine the fair

market value of decedent's stock on the date of his death. In our prior opinion, we resolved that the formula price was intended to serve a testamentary purpose, and thus would not be respected for Federal estate tax purposes. It is worth noting at this point that we have not had the opportunity to address the validity of each and every aspect of the shareholder agreement. Nonetheless, we repeat the observation made earlier in these proceedings that there is no evidence in the record that the Lauders engaged in arm's-length negotiations with respect to any aspect of the shareholder agreement. Absent proof on that point, we presume that all aspects of the agreement, particularly those tending to depress the value of the stock, are tainted with the same testamentary objectives rendering the formula price invalid. [Fn. ref. omitted.]

In light of our holding in * * * [Lauder II] we hold that the specific provisions of the shareholder agreement are not relevant to the question of the fair market value of decedent's stock on the valuation date. Simply put, the willing buyer/willing seller analysis that we undertake in this case would be distorted if elements of such testamentary origin are injected into the determination.

Although we did not hold the buy-sell agreement in Lauder III invalid per se, the only evidentiary weight we accorded it was to recognize that it demonstrated the Lauders' commitment to maintaining family control over the business. That fact, among others, justified the use of a lack of a marketability discount in the valuation analysis. See Estate of Godley v. Commissioner, T.C. Memo. 2000-242 (disregarding option provision in valuing partnership interests because it served as substitute for testamentary disposition).

In the cases at hand, we hold for similar reasons that the restrictive provisions of the buy-sell agreements (including but

not limited to the formula price) are to be disregarded in determining fair market value for estate tax purposes.

Rev. Rul. 59-60, 1959-1 C.B. 237, which provides valuation guidance for both estate and gift tax purposes, states that a buy-sell agreement is a factor to consider with other relevant factors in determining fair market value. It further provides that it is always necessary to determine whether the agreement represents a bona fide business arrangement or is a testamentary device. See id. We take these statements, together with Lauder III and its interpretation of section 20.2031-2(h), Estate Tax Regs., to mean that the same rule should apply to disregard noncontrolling buy-sell agreements for gift tax and estate tax valuation purposes. Cf. Estate of Reynolds v. Commissioner, 55 T.C. at 194 (holding that voting trust agreement preemption provisions should not be disregarded in consolidated gift and estate tax cases because the agreement was not a testamentary device).

Issue 2. If True Family Buy-Sell Agreements Do Not Control Values, What Are Estate and Gift Tax Values of Subject Interests?

FINDINGS OF FACT

After respondent's concessions, the transferred interests whose values remain in dispute are: True Oil, Eighty-Eight Oil, and True Ranches, to be valued as of January 1, 1993, June 4, 1994, and June 30, 1994; Belle Fourche and Black Hills Trucking, to be valued as of June 4, 1994, and June 30, 1994; and White

Stallion, to be valued as of June 4, 1994 (disputed companies). See Appendix schedules 1-3. The parties have stipulated that the fair market values of the assets owned by the disputed companies, except White Stallion, were the same on June 30, 1994, as they were on June 4, 1994.

Financial information for the disputed companies was compiled and analyzed in the expert reports, which derived the data from the companies' Federal partnership and S corporation income tax returns for tax years 1988 through 1994. The disputed companies maintained tax basis books and records for management purposes and did not have financial statements that had been audited or otherwise reviewed by certified public accountants. See supra pp. 12-22 for historical background of disputed companies.

## I. True Oil

True Oil's proved oil reserves equaled 5,297,528 barrels (bbl) as of August 1, 1973, and 7,389,000 bbl as of June 4, 1994. Proved gas reserves were 8,551,994 thousands of cubic feet (Mcf) as of August 1, 1973, and 9,075,000 Mcf as of June 4, 1994. The parties have stipulated that the total fair market value of all oil and gas properties and related facilities owned by True Oil was $39,650,000 as of January 1, 1993, and $34,200,000 as of June 4, 1994. In addition, respondent agreed not to dispute petitioners' position that True Oil's reserves were 8.9 million

barrels of oil-equivalent (boe)[54] on January 1, 1993, and on June 4, 1994.

During the period 1988 through 1993, True Oil's revenues declined from a high of $25.8 million in 1990 to a low of $17.6 million in 1993. In addition, operating margins declined from 44.2 percent of revenues in 1990 to 35.8 percent of revenues in 1993. These declines can be attributed to increased competition within the industry and to True Oil's unsuccessful attempts to find new reserves. True Oil spent over $300 million on intangible drilling costs from 1972 through 1998; approximately 58 percent of those costs related to nonproductive wells.

True Oil's ordinary income also declined from a high of approximately $12.2 million in 1990 to a loss of $4.7 million in 1993. For the period 1988 through 1993, True Oil sustained net losses only in 1992 and 1993. In those 2 years, True Oil deducted extraordinary exploration costs of approximately $23 million on an unsuccessful venture in Honduras.

For the 6 months ending June 30, 1994, True Oil's revenues decreased sharply from approximately $11.3 million (for 6 months ending June 30, 1993) to $7.5 million. Likewise, net income was lower than for the same 6-month period in 1993.

---

[54]Barrels of oil-equivalent takes into account both oil and gas reserves. Gas is converted to boe units either based on a heating ratio (usually 6,000 cubic feet of gas to a barrel of oil) or on a current price ratio (about 9,000 to 1 in the 1993-94 period).

True Oil's fixed assets increased from $28.4 million in 1988 to $36.6 million in 1993. Total assets decreased from a high in 1991 of approximately $41.4 million to $18.4 million in 1993. Current liabilities increased from $7.8 million in 1990 to $8.1 million in 1993. True Oil carried no funded debt during the period being examined, so that current liabilities represented total liabilities.

During the period 1988 through 1994, withdrawals from partners' capital exceeded contributions by approximately $26.8 million. However, in the last 4 of those years (1991 to 1994), total contributions exceeded distributions by almost $2.5 million.

General partnership interests in True Oil have never been traded in public markets.

II. <u>Belle Fourche</u>

Belle Fourche's primary asset is a network of pipelines it uses to gather and transport crude oil. At the valuation dates, Belle Fourche had approximately 1,740 miles of gathering line and 870 miles of main line. Crude oil was collected into the gathering line system from the production point (e.g., wellhead or stock tank) and eventually reached a main line for distribution to the market via oil storage facilities or transportation to other pipelines.

Throughput is the standard measure for pipeline operations that describes the amount of fluid transported through the system

in a given period of time.  During the period 1979 through 1993, Belle Fourche's throughput ranged from approximately 26 to 36 million barrels per year;[55] the highest volume was in 1993 (36.2 million barrels), while the lowest volume was in 1988 (26.2 million barrels).  Since 1990, the company's throughput has steadily increased.

Belle Fourche earned revenue from its pipeline system by charging tariffs for transportation, delivery, and testing of crude oil.  Amounts charged by Belle Fourche were regulated by Federal and State agencies.

During the period 1988 through 1993, revenues increased at a compounded annual growth rate of 11 percent, from a low of $10.5 million in 1988 to a high of $17.5 million in 1993.  Belle Fourche was profitable from 1988 to 1993, generating the highest pre-tax income of $8.2 million in 1990 and the lowest of $3.7 million in 1993 (As an S corporation, Belle Fourche is not required to pay corporate level income taxes.).  However, pre-tax income margins have declined from a high of 61 percent in 1990 to a low of 21 percent in 1993.  This trend is attributable to a

---

[55]Petitioners' experts' reports stated that Belle Fourche's historical average throughput was 25,000 barrels per day. Annualizing that figure would result in average throughput of just over 9 million barrels per year.  The parties did not address this discrepancy at trial or on brief.  We find the 26 to 36 million barrels per year average to be more reliable because it was derived from respondent's expert's analysis of filings with regulatory agencies.

decline in production, which was expected to continue as of the valuation dates.

For the 6 months ending June 30, 1994, Belle Fourche's revenues declined from approximately $8.8 million (for 6 months ending June 30, 1993) to $7.3 million.  Likewise, net income was lower than for the same 6-month period in 1993.

Belle Fourche's fixed assets increased steadily from $57.6 million in 1988 to $78.6 million in 1993.  In 1992, Belle Fourche paid approximately $16 million to purchase a smaller crude oil common carrier system (the Thunderbird pipeline) located near its preexisting pipelines.

During the period 1988 through 1993, Belle Fourche carried long-term debt to shareholders, which rose most sharply from 1991 ($1.3 million) to 1992 ($18 million).  Shareholder debt was $17,115,350 as of December 31, 1993.  However, the corporation repaid $1.2 million of the debt in May 1994, resulting in shareholder debt of $15,915,350 on May 31, 1994, and June 30, 1994.  Interest on shareholder debt was calculated based on the greater of a Colorado bank's prime rate or the short-term applicable Federal rate.  The interest rate for 1994 ranged from 6 to 6.75 percent.

During the period 1988 through 1993, Belle Fourche distributed total cash or other property worth over $36 million to its shareholders, with average total distributions of over $5 million annually.  On average, these distributions exceeded the

shareholders' tax obligations on their distributive shares of taxable income.

Belle Fourche stock has never been traded in public markets.

III.  Eighty-Eight Oil

On brief, respondent adopted Mr. Kimball's marketable minority value for Eighty-Eight Oil of $25,174,683 as of January 1, 1993; Mr. Lax's marketable minority value was $40 million as of June 3, 1994.

During the period 1988 through 1993, Eighty-Eight Oil's revenues increased from $191.7 million in 1988 to $558.6 million in 1992, then decreased to $466.7 million in 1993.  Operating margins varied over the analyzed period from 2 percent of revenues in 1988 to .8 percent in 1993.

Eighty-Eight Oil generally was profitable from 1988 to 1993, generating the highest ordinary income of $4.1 million in 1992 and the lowest of $623,000 in 1988; however, the company sustained a $7 million loss in 1991.  During the period, Eighty-Eight Oil annually deducted, in arriving at ordinary income, an average of $1.2 million in total guaranteed payments to partners.

For the 6 months ending June 30, 1994, Eighty-Eight Oil's revenues declined from $242 million (for 6 months ending June 30, 1993) to $161 million.  However, Eighty-Eight Oil so managed its expenses that ordinary income increased as compared with the same 6-month period in 1993.

Eighty-Eight Oil's fixed assets increased from $714,000 in 1988 to approximately $13 million in 1993, as the company acquired buildings, equipment, and land.  Current assets increased from $20.6 million in 1988 to approximately $46 million in 1993, which is attributable to an increase in cash, cash equivalents, and prepaid crude oil purchases.  At the end of 1992 and 1993, current assets (i.e., cash, cash equivalents, accounts receivable, inventories, prepaid crude oil purchases) constituted more than 85 percent of Eighty-Eight Oil's total assets.  Total current liabilities decreased from $35.4 million in 1989 to $16.8 million in 1993.  A large reduction in current liabilities occurred between 1988 and 1989 after the company paid off $30.9 million in debt.  Eighty-Eight Oil carried no funded long-term debt during the period being examined, so that current liabilities represented total liabilities.

Eighty-Eight Oil's financial ratios improved over the analyzed period and were strong relative to the median oil industry ratios.  Between 1988 and 1993, the company's current ratio increased from .3 to 2.7, as compared with the industry average of 1.3 in 1993.  Eighty-Eight Oil's working capital increased significantly from $8.5 million in 1989 to $29.3 million in 1993.  The company's accounts receivable turnover ratio improved from 19.2 in 1990 to 24.5 in 1993, which is substantially above the industry average of 6.5.  Thus, during

the analyzed period, Eighty-Eight Oil increasingly became more liquid than the industry.

During the period 1988 through 1994, overall partners' capital contributions exceeded withdrawals by approximately $60 million. However, in the most recent of those years (1993 and 1994) total withdrawals exceeded contributions by over $36 million. Under the partnership agreement, additional capital contributions were to be made in the same percentages as the profit and loss sharing ratios. However, the partners' capital account balances were often not in proportion to their profit and loss sharing ratios. For example, Dave True's capital account balance at the end of 1992 was $7,046,509, while total partners' capital was $43,590,998. This gave Dave True a 16.17-percent interest in total partners' capital, as compared with his yearend profit and loss sharing ratio of 68.47 percent, according to the partnership agreement dated August 11, 1984, and the 1992 schedule K-1. Petitioners explained that disproportionate capital accounts were unique to Eighty-Eight Oil, which operated as a bank that held excess cash for the True family, and did not reflect the operations of the other True family partnerships.

The day before selling part of his interest in Eighty-Eight Oil to his sons as of January 1, 1993, Dave True contributed over $6 million to partners' capital. In accordance with the partnership agreement, he then sold 24.84 percent of his Eighty-Eight Oil partnership interest to his sons based on the book

value of his capital account as of the close of business on December 31, 1992, or $7,046,509. Thus, he sold 24.84 percent out of his 68.47-percent interest in profits, losses, and capital for $2,556,379. The consideration paid by the True sons for an aggregate 24.84-percent interest in Eighty-Eight Oil represented 5.86 percent of total partners' capital as of December 31, 1992. As a result of the sales, the True sons' profit and loss sharing ratios each increased by 8.28 percent, for a total increase of 24.84 percent.[56] If Dave True had not made the $6 million capital contribution to Eighty-Eight Oil on December 31, 1992, the price he would have been entitled to receive for the 24.84-percent partnership interest would have been less than $400,000.

General partnership interests in Eighty-Eight Oil have never been traded in public markets.

IV. Black Hills Trucking

Respondent has adopted the final Lax report's controlling equity value (using the net asset value method) of $10,933,730 as of June 3, 1994.

Black Hills Trucking engaged in interstate transport of oilfield and drilling equipment, specializing in on-road and off-road hauling of heavy equipment. From 1988 to 1994, Black Hills Trucking conducted 75 percent of its business with unrelated

---

[56]Because of the state of the record, we were unable to perform a similar analysis of partners' capital account balances in connection with the June 4 and June 30, 1994, transfers.

companies.  Black Hills Trucking's assets fell into three categories:  Power equipment, trailer equipment, and miscellaneous and office equipment.  Power equipment included trucks, tractors, cranes, forklifts, heavy construction equipment, and small vehicles; trailer equipment included flatbed, float, lowboy, tanker and dump trailers, and accessory trailers such as jeeps, boosters, dollies, light trailers, a barbeque pit, and other towed equipment; miscellaneous and office equipment included computers, maintenance and shop equipment, and furniture.  The ages of the various types of equipment ranged from 1 to 40 years.

During the period 1989 through 1993, revenues increased slightly from $15.1 million to $16.8 million.  Black Hills Trucking suffered losses over the analyzed period that ranged from a high of $6.1 million in 1990 to a low of $178,000 in 1992.  On average, the company annually deducted approximately $2.1 million of depreciation expense in computing its losses.

For the 6 months ending June 30, 1994, revenues increased from $9.086 million (for 6 months ending June 30, 1993) to $9.436 million.  Net losses for the period decreased from $2.628 million in 1993 to $220,680 in 1994.  However, management indicated that the company's outlook was bleak due to excess supply and insufficient demand in the trucking industry.

Total net fixed assets (tax basis) drastically declined over the period from $8.9 million in 1989 to $3.1 million in 1993 due

to the company's selloff of buildings and equipment. Total assets decreased over the period from $13.2 million in 1989 to $6.7 million in 1993.

During the period 1989 through 1993, Black Hills Trucking carried long-term shareholder debt that ranged from a high of $13.9 million in 1990 to a low of $855,000 in 1992. Shareholder debt was roughly $2.8 million at the end of 1993.

During the period 1988 through 1994, Black Hills Trucking distributed cash or other property to its shareholders only in 1989, in the amount of $213,000. On the other hand, shareholders' contributions to paid-in or capital surplus increased during the analyzed period, spiking from $1.4 million in 1990 to $16.7 million in 1991.

The stock of Black Hills Trucking has never been traded in public markets.

V.  Trne Ranches

Respondent adopts the entity values derived by Mr. Kimball under the net asset value method. Accordingly, the parties agree that the controlling equity value of True Ranches was

$41,003,000[57] as of January 1, 1993, and $45,297,509 as of June 30, 1994.

During the period 1989 through 1993, revenues fluctuated from a low of $23.3 million in 1991 to a high of $31.3 million in 1992. Ordinary income also fluctuated from a high of $2.1 million in 1992 to a loss of $3.6 million in 1991. The company incurred losses in 2 out of the 5 years being examined.

For the 6 months ending June 30, 1994, revenues decreased from $12.7 million (for 6 months ending June 30, 1993) to $9.3 million. Net losses for the period increased from $842,179 in 1993 to $1.9 million in 1994.

True Ranches had no current liabilities during the analyzed period. However, net working capital steadily declined from roughly $7 million in 1990 to $4.8 million in 1993.

During the period 1988 through 1994, partners' capital contributions exceeded withdrawals by approximately $64.4 million.

Partnership interests in True Ranches have never been traded in public markets.

---

[57]Originally, the Kimball report computed True Ranches' net asset value to be $40,863,000 as of Jan. 1, 1993; however, Mr. Kimball later revised his estimate to $41,003,000, based on clarifying data received from the ranch property appraisers. On brief, respondent agreed with Mr. Kimball's original value as of Jan. 1, 1993. We assume that respondent also adopts Mr. Kimball's revised value.

VI.  White Stallion

Respondent adopts the final Lax report's controlling equity value (using the net asset value method) of $1,139,080 as of June 3, 1994.

White Stallion operates a dude ranch near Tucson, Arizona, consisting of 250 acres of land and improvements.  During the period 1989 through 1992, revenues increased from $677,224 in 1989 to $1,042,260 in 1992.  The compounded annual growth rate for the period was approximately 15 percent.  Revenues for 1993 showed no substantial percentage growth.  Ordinary income increased during the period from $2,771 in 1989 to $166,922 in 1993.

During the period 1988 through 1993, the company carried long-term shareholder debt that ranged from roughly $46,000 (early years) to $92,000 (ending balance in 1993).

During the period 1988 through 1994, White Stallion made no distributions of cash or other property to its shareholders.  On the other hand, shareholders' contributions to paid-in or capital surplus slightly increased during the analyzed period.

White Stallion stock has never been traded in public markets.

OPINION

## I.   Expert Opinions

As is customary in valuation cases, the parties rely primarily on expert opinion evidence to support their contrary valuation positions.  We evaluate the opinions of experts in light of their demonstrated qualifications and all other evidence in the record.  See Anderson v. Commissioner, 250 F.2d 242 (5th Cir. 1957), affg. in part and remanding in part on another ground T.C. Memo. 1956-178; Parker v. Commissioner, 86 T.C. 547, 561 (1986).  We have broad discretion to evaluate "'the overall cogency of each expert's analysis.'"  Sammons v. Commissioner, 838 F.2d 330, 334 (9th Cir. 1988)(quoting Ebben v. Commissioner, 783 F.2d 906, 909 (9th Cir. 1986), affg. in part and revg. in part T.C. Memo. 1983-200), affg. in part and revg. in part on another ground T.C. Memo. 1986-318.  Although expert testimony usually helps the Court determine values, sometimes it does not, particularly when the expert is merely an advocate for the position argued by one of the parties.  See, e.g., Estate of Halas v. Commissioner, 94 T.C. 570, 577 (1990); Laureys v. Commissioner, 92 T.C. 101, 129 (1989).

We are not bound by the formulas and opinions proffered by an expert witness and will accept or reject expert testimony in the exercise of sound judgment.  See Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938); Anderson v. Commissioner, 250 F.2d at 249; Estate of Newhouse v. Commissioner, 94 T.C. at

217; <u>Estate of Hall v. Commissioner</u>, 92 T.C. at 338. We have rejected expert opinion based on conclusions that are unexplained or contrary to the evidence. See <u>Knight v. Commissioner</u>, 115 T.C. 506 (2000); <u>Rose v. Commissioner</u>, 88 T.C. 386, 401 (1987), affd. 868 F.2d 851 (6th Cir. 1989); <u>Compaq Computer Corp. v. Commissioner</u>, T.C. Memo. 1999-220.

Where necessary, we may reach a determination of value based on our own examination of the evidence in the record. See <u>Lukens v. Commissioner</u>, 945 F.2d 92, 96 (5th Cir. 1991)(citing <u>Silverman v. Commissioner</u>, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285); <u>Ames v. Commissioner</u>, T.C. Memo. 1990-87, affd. without published opinion 937 F.2d 616 (10th Cir. 1991). Where experts offer divergent estimates of fair market value, we decide what weight to give those estimates by examining the factors they used in arriving at their conclusions. See <u>Casey v. Commissioner</u>, 38 T.C. 357, 381 (1962). We have broad discretion in selecting valuation methods, see <u>Estate of O'Connell v. Commissioner</u>, 640 F.2d 249, 251 (9th Cir. 1981), affg. on this issue and revg. in part T.C. Memo. 1978-191, and in determining the weight to be given the facts in reaching our conclusions, inasmuch as "finding market value is, after all, something for judgment, experience, and reason", <u>Colonial Fabrics, Inc. v. Commissioner</u>, 202 F.2d 105, 107 (2d Cir. 1953), affg. a Memorandum Opinion of this Court. While we may accept the opinion of an expert in its entirety, see <u>Buffalo Tool & Die Mfg.</u>

Co. v. Commissioner, 74 T.C. 441, 452 (1980), we may be selective in the use of any part of such opinion, or reject the opinion in its entirety, see Parker v. Commissioner, supra at 561. Finally, because valuation necessarily results in an approximation, the figure we arrive at need not be directly attributable to specific testimony if it is within the range of values that may properly be arrived at from consideration of all the evidence. See Silverman v. Commissioner, supra at 933; Alvary v. United States, 302 F.2d 790, 795 (2d Cir. 1962).

## II. Experts and Their Credentials

### A. Petitioners' Expert, John H. Lax

Before filing the estate tax return, petitioners obtained an appraisal (initial Lax report) of the estate's corporate and partnership interests in the True companies as of June 3, 1994, from the Valuation Services Group of Arthur Andersen LLP (AA), Houston, Texas. John H. Lax (Mr. Lax), a principal at AA, participated in the evaluation of the True companies, assisted in the preparation of the reports, and testified at trial on behalf of petitioners. Mr. Lax specializes in financial analysis and appraisal of business enterprises, individual securities, and various intangible assets. He earned a Senior American Society of Appraisers designation in 1975 and became a Certified Management Accountant in 1976.

Petitioners provided a copy of the initial Lax report to the IRS during the 1993 gift tax return audit, which overlapped with

respondent's audits of the estate tax return and Mrs. True's 1994 gift tax return. In preparing the 1993 and 1994 gift tax notices and the estate tax notice, respondent used most of the entity values determined by Mr. Lax but entirely disallowed the claimed discounts.

Subsequently, Mr. Lax submitted a revised expert witness report (final Lax report) and testified at trial regarding the value of the estate's interests in the True companies as of June 3 and 4, 1994. The final Lax report differed from the initial Lax report in several ways; most importantly, the final Lax report repudiated certain marketability discounts found in the initial Lax report because AA had decided, subsequent to issuance of the initial Lax report, that market data did not justify measurable marketability discounts in connection with controlling interests.

B. Petitioners' Expert, Curtis R. Kimball

After petitions had been filed in these cases, petitioners engaged Willamette Management Associates (WMA) to appraise the transferred interests in the True companies. Curtis R. Kimball (Mr. Kimball), a principal of WMA and its national director for estate and gift tax matters, participated in the evaluations, assisted in the preparation of the resulting reports, and testified at trial on behalf of petitioners. Mr. Kimball has performed valuations of business entities and interests, analyzed publicly traded and private securities, and appraised intangible

assets and intellectual property.  He is an Accredited Senior Appraiser of the American Society of Appraisers and a Chartered Financial Analyst of the Association for Investment Management and Research.  Mr. Kimball personally had appraised interests in three closely held oil and gas companies before True Oil, and WMA had appraised interests in three others.  Also, WMA had appraised interests in closely held pipeline and oil tool manufacturing companies.

Mr. Kimball submitted two expert witness reports (Kimball reports) and testified at trial regarding the values of interests in the True companies as of January 1, 1993, June 4, 1994, and June 30, 1994.  He also prepared a rebuttal to respondent's expert reports.

Messrs. Lax and Kimball valued many of the same interests as of the same dates but came to different conclusions regarding value.  Petitioners introduced both experts' appraisals of value into evidence and did not choose between them.

C.  Petitioners' Expert, Dr. Robert H. Caldwell

Dr. Robert H. Caldwell (Dr. Caldwell) is co-founder of The Scotia Group, Inc., Dallas, Texas, which provides domestic and international oil and gas advisory services.  He has a Ph.D. in geology and is a Certified Petroleum Geologist.

Dr. Caldwell prepared expert witness reports (Scotia reports) for trial that computed the fair market value of True Oil's oil and gas properties as of January 1, 1993, and June 4,

1994.  Dr. Caldwell did not testify at trial because the parties eventually stipulated the values of the oil and gas properties on the basis of discussions between Dr. Caldwell and respondent's expert, Mr. Gustavson, <u>supra</u> p. 156-157.

D.  <u>Petitioners' Expert, Michael S. Hall</u>

Michael S. Hall (Mr. Hall) is president of Hall and Hall Mortgage Corp., Denver, Colorado, which provides farm real estate financing and appraisal services.  He is a C.P.A., a Certified General Appraiser in Colorado and Wyoming, and a qualified expert witness in U.S. Bankruptcy Court.  Mr. Hall prepared an expert witness report (H&H report) that valued the land and improvements of True Ranches as of January 1, 1993, and June 3, 1994; he also testified at trial.

E.  <u>Respondent's Expert, John B. Gustavson</u>

Respondent's only expert witness with respect to interests in the disputed companies was John B. Gustavson (Mr. Gustavson), of Gustavson Associates, Inc., Boulder, Colorado.  Mr. Gustavson is a minerals appraiser and a Certified Professional Geologist who has valued over 100 oil and gas properties.  He is not an expert in business valuations.

Mr. Gustavson submitted an expert witness report (Gustavson report) regarding the fair market values of oil and gas properties and assets owned by True Oil and assets owned by Belle Fourche as of January 1, 1993, and June 4, 1994.  The Gustavson report did not value 100 percent of the equity interests or the

subject interests in True Oil and Belle Fourche.  Mr. Gustavson

testified at trial regarding the fair market value of Belle

Fourche assets only, due to the parties' agreement on the value

of True Oil's oil and gas properties.  In addition, Mr. Gustavson

prepared reports (Gustavson rebuttals) and testified in rebuttal

to the final Lax report and the Kimball reports.[58]  Mr.

Gustavson's rebuttal testimony solely dealt with the valuations

of interests in True Oil and in Belle Fourche.

III.  <u>Preliminary Matters Regarding Valuation</u>

    A.  <u>Respondent's Alleged Concessions Regarding Valuation</u>
       <u>Discounts</u>

In a telephone conference on January 8, 1999, the Court

asked the parties to submit schedules, before trial, setting

forth their positions on the fair market values of the interests

still in dispute.  The parties responded by jointly submitting

schedules, attached to a cover letter dated January 14, 1999,

entitled "Comparison of Values of Transferred Interests"

determined as of January 1, 1993, June 4, 1994, and June 30, 1994

(Exhibit 262-P).

Exhibit 262-P contained information about each company under

the following headings:  Return Value/Book Value, IRS Value per

---

[58]Mr. Gustavson also prepared rebuttal reports to the Scotia
reports and the SRC appraisals.  As a result of the parties'
agreement regarding the value of True Oil's reserves, Mr.
Gustavson did not testify in rebuttal to the Scotia reports.
However, those rebuttal reports, as well as Dr. Caldwell's
rebuttal to the Gustavson report, were admitted into evidence.

Notice, AA Hypothetical Value, WMA Hypothetical Value, and Current IRS Value. A footnote to the "Current IRS Value" column in each schedule stated: "These values reflect respondent's agreement to allow combined minority interest and marketability discounts of up to 40 percent." For the most part, petitioners prepared Exhibit 262-P and then furnished it to respondent for his review and approval. However, respondent provided petitioners with the "Current IRS Value" information and text for the related footnote.

On February 16, 1999, the first day of trial, the parties filed a stipulation of facts and a supplemental stipulation of facts. The stipulations did not refer to "Current IRS Value[s]" or the combined minority and marketability discounts mentioned in Exhibit 262-P. However, the stipulations stated that respondent was no longer asserting adjustments in the value of transferred interests in certain companies, each of which had a "Current IRS Value" that approximated its "Return Value/Book Value".

Respondent's trial memorandum, dated January 28, 1999, stated:

> In [his] notice of deficiency respondent allowed no discounts to the underlying values of the transferred interests. Respondent has indicated to petitioners that minority and marketability discounts of up to 40% should be applied in determining the fair market values of the transferred interests.

In addition, "Current IRS Value[s]" differed from values reported in the statutory notices because the "Current IRS Value[s]"

incorporated Mr. Gustavson's underlying asset values for Belle Fourche and True Oil, rather than those of Mr. Lax, and reflected approximately $16 million of debt owed by Belle Fourche that had not been accounted for previously.

At trial, respondent's counsel characterized as a "concession" the position in Exhibit 262-P and the trial memorandum that allowed minority and marketability discounts. Both petitioners' counsel and the Court indicated that they did not understand exactly how "Current IRS Value[s]" were derived in all cases. Respondent's counsel stated that the combined discounts were different for each company and that the exact amounts would be fleshed out through further testimony[59] and on brief. Respondent's counsel also stated that the combined discounts were less than 40 percent in some cases and that respondent never intended the 40-percent figure to serve as a starting point for negotiation.

At trial's end, respondent's counsel asserted that "Current IRS Value[s]" had been put forth as a settlement position only, in an effort to resolve the case, and that respondent had not conceded that petitioners were entitled to combined, across-the-board discounts of no less than 40 percent as to all the disputed companies. Petitioners' counsel objected to respondent's

---

[59]However, respondent presented no additional testimony to explain the derivation of the discounts included in the "Current IRS Value[s]" figure or the amount of any discounts respondent was proposing in lieu thereof.

settlement position characterization, and the Court instructed the parties to address the issue in their arguments on brief.

Petitioners argue that respondent's concessions, presented at and before trial, indicating combined minority and marketability discounts of up to 40 percent to the True companies still in dispute, constituted admissions--clear, deliberate, and unequivocal statements regarding questions of fact. Claiming they relied on these admissions in presenting their case, petitioners argue that they would be prejudiced if respondent were allowed to change his position to claim that combined minority and marketability discounts are less than 40 percent of the prediscount values of any of the subject interests. We disagree.

Statements made by respondent's counsel during trial were not clear, deliberate, or unequivocal as to the level of discounts that respondent was or might be conceding. It is clear that respondent had abandoned the determinations of value in the statutory notices and had acknowledged that some minority and marketability discounts were appropriate. However, respondent's counsel indicated that "Current IRS Value[s]" represented different levels of combined discounts that could not be computed by simply applying a 40-percent discount to the entity values determined in the statutory notices or otherwise modified by the Gustavson reports. Before the end of trial, respondent's counsel explained that different discounts applied for each company,

combined discounts were less than 40 percent in some cases, and that a more detailed breakdown was pending. Indeed, the only "Current IRS Value[s]" that incorporated combined discounts of 40 percent were for interests in Eighty-Eight Oil and Black Hills Trucking. Thus, as of the end of trial, the discounts that respondent was conceding remained unclear. This lack of clarity is further evidenced by the failure of the parties to include stipulations regarding combined discounts in the joint stipulations introduced by the parties after they had submitted Exhibit 262-P to the Court.

More importantly, we do not believe that petitioners relied on respondent's statements regarding "Current IRS Value[s]" and combined discounts in presenting their case. In Ware v. Commissioner, 92 T.C. 1267, 1268 (1989), affd. 906 F.2d 62 (2d Cir. 1990), we said:

> The rule that a party may not raise a new issue on brief is not absolute. Rather, it is founded upon the exercise of judicial discretion in determining whether considerations of surprise and prejudice require that a party be protected from having to face a belated confrontation which precludes or limits that party's opportunity to present pertinent evidence. * * * [Citations omitted; see also Estate of Andrews v. Commissioner, 79 T.C. 938, 952 (1982).]

Petitioners obtained expert appraisals for the subject interests in all disputed companies, and their experts testified at trial in support of their findings on entity values and discounts. Petitioners appear to have accepted respondent's concessions regarding companies with "Current IRS Value[s]" that

roughly equal "Return Value/Book Value[s]", but have continued to litigate the values of the subject interests in other companies, proposing combined discounts exceeding 40 percent in most cases. Petitioners also presented rebuttal reports and expert testimony addressing Mr. Gustavson's criticisms of the Kimball and Lax reports. Finally, petitioners devoted large portions of their reply brief to rebutting respondent's posttrial valuation positions. All this indicates that petitioners continued to marshal their evidence and arguments to support valuation discounts greater than those reflected in the "Current IRS Value[s]" figures. Petitioners have not persuaded us that they would have presented their case any differently if respondent had made no statements regarding "Current IRS Value[s]". Accordingly, we find that respondent's disavowal or clarification of his pretrial statements of "Current IRS Value[s]" did not prejudice petitioners' ability to present valuation evidence.

B. Role of Burdens and Presumptions in Cases at Hand

Petitioners have also argued that if respondent is allowed to revert to the adjustments reflected in the deficiency notices, respondent should have the burden of proof on any adjustment that increased the value of a transferred interest to more than the "Current IRS Value". Moreover, petitioners contend that respondent did not sustain such burden, because he did not offer any expert testimony regarding the value of the subject interests. We disagree.

First, in all but two cases (Dave True's date of death interests in Black Hills Trucking and White Stallion), the values of the subject interests advanced by respondent on brief were lower than those determined in the deficiency notices. Therefore, respondent is not reverting to the deficiency notice values. Second, the mere fact that the position of one party is not supported by expert testimony does not require that the other party's position, which is so supported, will prevail. See Tripp v. Commissioner, 337 F.2d 432, 434-435 (7th Cir. 1964), affg. T.C. Memo. 1963-244; Wyoming Inv. Co. v. Commissioner, 70 F.2d 191, 193 (10th Cir. 1934), remanding on other grounds a Memorandum Opinion of the Board of Tax Appeals; Cupler v. Commissioner, 64 T.C. 946, 955-956 (1975); Estate of Scanlan v. Commissioner, T.C. Memo. 1996-331, affd. in an unpublished opinion 116 F.3d 1476 (5th Cir. 1997); Brigham v. Commissioner, T.C. Memo. 1992-413.

The presumption of correctness and the burden of proof have no bearing on our decisions in the cases at hand. There is sufficient evidence in the record to arrive at supportable positions on entity values and appropriate discounts, bearing in mind that opinions of value may legitimately differ within a reasonable range. See Silverman v. Commissioner, supra at 933; Alvary v. United States, 302 F.2d 790, 795 (2d Cir. 1962).

The peculiar circumstances of the cases at hand warrant our inquiries into, and ultimate findings of, intermediate values for the True companies that exceed tax book values but are less than the values determined by respondent in the notices. As discussed at length under issue 1 of this opinion, petitioners' buy-sell agreements requiring sales of interests in the True companies at tax book value virtually assured unrealistically low entity values for certain companies. This was due to the use of (1) accelerated depreciation methods by capital intensive companies and (2) enhanced write-offs of substantial asset costs and capital expenditures of the ranching and oil and gas companies. Thus, the method of accounting used to derive tax book values provided a basis for our holding that the buy-sell agreements were testamentary devices and for our hypothesis--without regard to the presumption of correctness or the burden of proof in sustaining or overturning the determinations in the notices--that petitioners' values did not accurately represent fair market value and that higher values would be appropriate.

Accordingly, we have not relied on the presumption of correctness or the burden of proof to decide the cases at hand. We have based our findings of value on our own examination of evidence in the record, including expert reports, published studies, witness testimony, exhibits, and joint stipulations of fact. See infra pp. 186-287; see also Burns v. Commissioner, 36

AFTR 2d 75-6235, 75-2 USTC par. 9774 (10th Cir. 1975), affg. T.C. Memo. 1974-220.

C. <u>Petitioners' Aggregation and Offset Argument</u>

The transferred interests whose values remained in dispute at the date of trial are listed in the Appendix.  The values of transferred interests in the other companies (undisputed companies) were not in controversy by the time of trial either because (1) respondent had not adjusted their values in the statutory notices or (2) the parties stipulated that respondent would no longer assert an adjustment in connection with those interests.  Even so, petitioners submitted appraisal information into evidence that valued some, but not all, of the undisputed companies as of the valuation dates.

In a footnote to their opening brief, petitioners argue that if the Court finds that the book value buy-sell price was not controlling for estate and gift tax purposes, an offset should be allowed in determining the overall value of the gross estate and taxable gifts to the extent that the value of any interest included in the gross estate or subject to gift tax is less than book value.  Petitioners reason that the estate tax is imposed on the fair market value of the total taxable estate, and that the gift tax is imposed on the fair market value of all taxable gifts during the taxable period.  Therefore, according to petitioners, any overreported value should offset any underreported value in

calculating the overall estate tax or gift tax liability.  We believe that petitioners' argument oversimplifies the issue; we do not agree that petitioners would be entitled to an offset for estate tax or gift tax purposes for the reasons set forth below.

First, petitioners reported on the 1993 and 1994 gift tax returns and on the estate tax return that the fair market value of every subject interest was the book value, as determined under each company's buy-sell agreement, at which the subject interest was sold.  See supra pp. 51-55.  Reported values are considered to be an admission by petitioners, so that lower values cannot be substituted without cogent proof that the reported values were erroneous.  See, e.g., Estate of Hall v. Commissioner, 92 T.C. 312, 337-338 (1989).  Here, petitioners did not provide evidence of value contrary to book value with regard to transferred interests in True Geothermal Energy, True Mining, and True Environmental Remediating LLC as of January 1, 1993, and Clareton Oil, Donkey Creek Oil, Pumpkin Buttes Oil, Sunlight Oil, and Wind River Oil as of June 4 and June 30, 1994.  Therefore, the record does not contain sufficient evidence to determine the aggregate fair market value of all the transferred interests.

Second, with respect to the gift tax, we have found no authority that would allow petitioners to offset sales of some companies for allegedly excess consideration (i.e., buy-sell formula price exceeded fair market value) against unrelated sales

of other companies for inadequate consideration (i.e., fair

market value exceeded buy-sell formula price) to produce a lower

net deemed gift.  Section 2512(b) provides:

> SEC.  2512(b).  Where property is transferred for less
> than an adequate and full consideration in money or
> money's worth, then the amount by which the value of the
> property exceeded the value of the consideration shall
> be deemed a gift, and shall be included in computing the
> amount of gifts made during the calendar year.

The language of the statute suggests that the gift amount is

reduced only by consideration received for the transferred

property that constitutes the gift.  See Robinson v.

Commissioner, 75 T.C. 346, 351 (1980), affd. 675 F.2d 774 (5th

Cir. 1982).  However, petitioners are in effect proposing that

sales of certain True companies for excessive consideration

served as consideration for sales of other True companies.  The

facts do not support this proposition.

Each of the True companies was subject to a separate buy-

sell agreement.  The parties could pick and choose which of the

companies they would sell and which they would retain.  Each sale

was a separate, independent transaction.  Accordingly, we see no

reason why consideration for the transfer of one interest should

serve as consideration for another separate transfer.

Third, with respect to estate tax, we are skeptical of

petitioners' claim that book values exceeded fair market values

for interests in certain True companies owned by Dave True at his

death.  We have said many times that a buy-sell agreement that

constitutes a testamentary device will not fix estate and gift tax value. More precisely, however, we would say that the buy-sell formula price does not set a ceiling on value, but that it does set a floor. The mandatory buy-sell provisions in the cases at hand effectively gave the estate a put, which set a minimum value for Dave True's interests owned at death. Even assuming that the buy-sell agreement does not set a floor on value, we doubt that book value actually and substantially exceeded estate tax fair market value. Petitioners generally base their claims of overreported value on appraisal information provided in the final Lax report. However, we often note in our analysis of the disputed companies, infra, that the final Lax report's valuation conclusions were unsubstantiated and result-oriented.

Therefore, we find that there is insufficient evidence to support lower fair market values for any of the undisputed companies than those originally reported on the 1993 and 1994 gift and estate tax returns.

IV. Valuations of True Companies in Dispute

    A. True Oil

        1. Marketable Minority Interest Value

        a. Kimball Reports

The Kimball reports determined the so-called hypothetical fair market value of the subject interests in the disputed companies by using generally accepted valuation procedures and by

disregarding the book value buy-sell price, but otherwise taking into account all other provisions of the buy-sell agreement. The reports outlined four generally accepted approaches for valuing closely held companies: (1) The guideline company method, (2) the discounted cash-flow method, (3) the asset accumulation method, and (4) the transaction method.

The guideline company method is a market-based valuation approach that estimates the value of the subject company by comparing it to similar public companies. First, a group of comparable "guideline" companies is selected and analyzed; then market multiples are derived and applied to the financial fundamentals of the subject company. Financial fundamentals include various measures of operating revenue, income, underlying asset values, and unit volume of production. This method yields the value of a marketable minority interest because value is determined based on publicly marketable minority interests in companies that have registered and traded securities.

The discounted cash-flow method is an income approach based on the premise that the subject company's market value is measured by the present value of future economic income it expects to realize for the benefit of its owners. This approach analyzes the subject company's revenue growth, expenses, and capital structure, as well as the industry in which it operates. The subject company's future cash-flows are estimated, and the

present value of those cash-flows is determined based on an appropriate risk-adjusted rate of return.

The asset accumulation method is a cost approach that estimates fair market value of the subject company based on the assets and liabilities reflected on its balance sheet. The fair market values of each company's assets and liabilities are first determined and accumulated; then the subject company's total equity is calculated by subtracting total liabilities from total assets. A closely held business owner must have the ability to liquidate the company to realize fully the value produced by this method. Thus, the asset accumulation method yields the value of a controlling interest, because a minority shareholder could not force liquidation.

The transaction method, another market-based approach, identifies and analyzes actual transactions (e.g., mergers and acquisitions) of companies with operations similar to those of the subject company. As with the guideline company method, market multiples are derived from the comparable companies and applied to the financial fundamentals of the subject company. This method yields the value of a controlling interest because mergers and acquisitions typically are accompanied by a complete change of control.

After considering these valuation approaches, Mr. Kimball concluded that a market-based approach, specifically the

guideline company method, would be used most appropriately to value the True Oil interests.  Mr. Kimball rejected the discounted cash-flow method because he believed it was too difficult to forecast the future prices of oil and gas needed to estimate future revenues and cash-flows.  He also rejected the transaction method because he found no data on transactions of companies with operations similar to True Oil.  Mr. Kimball did not apply the asset accumulation approach; instead, he used the stipulated physical volume of True Oil's proved reserves, measured in barrels of oil-equivalent, to derive the reserve multiple used in the guideline company method.

Mr. Kimball first identified eight guideline companies from the crude oil and natural gas industries, focusing on companies generally in the same geographic area (Rocky Mountain territory) as True Oil.

Mr. Kimball then focused his analysis on five market multiples:  Earnings before interest and taxes (EBIT); earnings before depreciation, interest, and taxes (EBDIT); revenues; tangible book value of invested capital (TBVIC); and reserves (BOE).  He calculated these multiples and True Oil's financial fundamentals over two time periods, the latest fiscal year and a simple average of the preceding 5 fiscal years.  Mr. Kimball placed a weight of 20 percent on each earnings multiple (EBIT, EBDIT, and revenues), 30 percent on the reserves multiple, and 10

percent on the TBVIC multiple.  Thus, earnings-based multiples
were weighed more heavily in aggregate.

Mr. Kimball selected low (rather than mean or average)
multiples of the guideline companies to apply against True Oil's
financial fundamentals, because he found that True Oil had low or
negative growth relative to the guideline companies.  He also
chose lower multiples because of the depressive effect of True
Oil's buy-sell agreement terms (other than the book value price
term).  Mr. Kimball did not adjust True Oil's actual earnings
over the valuation period to reflect differences in accounting
for intangible drilling costs, saying that such adjustments would
not be made by a hypothetical buyer of a closely held business.[60]
Instead, he made qualitative adjustments to the market multiples
to reflect such differences.  Mr. Kimball did not quantify the
effect of those adjustments on the market multiples.

Lastly, Mr. Kimball multiplied True Oil's financial
fundamentals by the selected multiples derived from guideline
company data, and he ascribed different weights to each product.
Because True Oil had no long-term debt, the sum of these amounts
represented the market value of its equity.

---

[60]As previously stated, True Oil deducted intangible
drilling costs in arriving at taxable income.  In contrast,
public companies would be required to capitalize some of those
costs under either the successful efforts or full cost method of
accounting required by SEC rules or GAAP.  See supra p. 23.

Mr. Kimball concluded that fair market value of True Oil's total equity on a marketable minority basis was $37,253,000 on January 1, 1993, and $34,623,000 on both June 4 and June 30, 1994.

### b. Final Lax Report

The final Lax report calculated fair market value of interests in the disputed companies without considering any obligations or restrictions imposed by the book value buy-sell agreement. Mr. Lax valued the subject interests as of June 3, 1994, the day before Dave True's death. However, he opined that the value remained unchanged on June 4, 1994.

The final Lax report employed two market-based valuation approaches, the guideline company method and the reserves method, to determine the value of True Oil.[61] First, Mr. Lax used the guideline company method to arrive at a marketable, minority value of $24,500,000. He identified six publicly traded companies that he considered to be comparable to True Oil; four of those companies also were used by Mr. Kimball. Mr. Lax applied EBDIT, EBIT, pretax earnings, and book value multiples to True Oil's financial results for the 12-month period ending May 31, 1994. Unlike the Kimball reports, the final Lax report did not provide detailed supporting schedules showing how Mr. Lax

---

[61]Mr. Lax stated that he did not employ the income approach for any of the True entities because, like Mr. Kimball, he believed that it was too difficult to forecast the future prices of oil and gas needed to estimate future revenues and cash-flows.

calculated guideline company multiples and True Oil's financial fundamentals.  In addition, the relative weight Mr. Lax placed on each multiple and whether he adjusted the data for differences in accounting methods are also unclear.

Second, Mr. Lax valued True Oil based on an estimated value of its reserves on June 3, 1994.  Mr. Lax adopted the conclusions of the Scotia report that fair market value of True Oil properties on the valuation date was $34,800,000, based on both a discounted cash-flow and comparative sales approach.  Mr. Lax weighted this value at 80 percent because he believed that a reserve analysis based on discounted cash-flows was the best indication of value for an exploration and production company. Next, Mr. Lax reviewed exploration and production industry acquisitions in the Rocky Mountain region that occurred within 1 year of the valuation date to establish an implied range of dollars per barrels of oil-equivalent, which he applied to the Scotia report's estimated reserve volume to arrive at a value of $27,000,000.  He weighted this value at 20 percent.  Mr. Lax did not update his conclusions after the parties agreed to the value and volume of True Oil's oil and gas properties.

After combining the weighted results of the two reserves methods, Mr. Lax computed a marketable, controlling value for True Oil of $33,200,000.  He converted this to a marketable minority value by applying a 25-percent minority discount,

resulting in a reserves value of $24,900,000. The final Lax report explained that AA relied on data from acquisition transactions and real estate investment trusts (REIT's) to compute the minority discounts applied to the subject interests. The report did not include either a description of the studies or their findings.

Mr. Lax compared the two indications of value, $24,500,000 under the guideline company method and $24,900,000 under the reserves method, and concluded that True Oil's marketable minority value was $24,820,000 on June 3, 1994.

### c. Gustavson Report and Respondent's Position

The Gustavson report valued major assets owned by True Oil as of January 1, 1993, and June 4, 1994, which included producing oil and gas properties, the Red Wing Creek gas plant, the Little Knife gas plant, and the Grampian pipeline. Mr. Gustavson did not value the company as a whole. He explained that industry practice would treat the value of proved reserves as the most important (if not the only) indicator of value for a small, independent oil and gas producer such as True Oil.

Mr. Gustavson used the discounted cash-flow method (income approach) to value producing properties, and he used the boe method (market approach) to verify those values because he considered the boe method to be the least reliable valuation

approach.  Mr. Gustavson also used an investment recovery method to value plant and pipeline facilities.

The Gustavson report valued True Oil's major assets at $48,000,000 on January 1, 1993, and $33,700,000 on June 4, 1994. Subsequently, Mr. Gustavson reconciled his valuation methodologies with those of Dr. Caldwell[62] to arrive at the True Oil stipulated asset values of $39,650,000 as of January 1, 1993, and $34,200,000 as of June 4, 1994.  See supra p. 156.  According to respondent, the value of True Oil's major assets represented the 100-percent equity value of the company.

Because Mr. Gustavson is not an expert in business valuations, he did not value the subject interests in any True company.  Instead, respondent argues on brief that the True Oil interests transferred by Dave and Jean True to their sons as of January 1, 1993 (Dave transferred an 8.28-percent interest to each son), and June 30, 1994 (Jean transferred a 5.74-percent interest to each son), were entitled to minority discounts of no more than 10 percent.[63]  Respondent bases his conclusions on a

---

[62]The Scotia reports also valued oil and gas properties owned by True Oil as of Jan. 1, 1993, and June 4, 1994.  Dr. Caldwell primarily relied on the discounted cash-flow method to value True Oil's proved reserves and other facilities, and applied the comparative sales method to test the reasonableness of those results.  The Scotia reports concluded that the fair market value of True Oil's major assets was $34,800,000 on both valuation dates.

[63]Petitioners interpreted respondent's statements on brief to mean that respondent was allowing combined minority and

(continued...)

student note published near the time of the transactions at issue in these cases, which found 10-percent discounts to be the starting point for minority discounts that had been upheld by courts. See DenHollander, Note, "Minority Interest Discounts and the Effect of the Section 2704 Regulations", 45 Tax Law. 877 (1992).

Respondent also argues that the 38.47-percent interest owned by Dave True at his death is not entitled to a minority discount, because it represents a significant ownership block that had swing vote potential. Respondent argues, on the ground that Dave True held the largest single block of voting rights in True Oil, that his block could be combined with any other single block to control the company, even though he did not own a stand-alone controlling interest. Accordingly, respondent contends that no minority discount should be allowed in valuing Dave True's interest in True Oil as of June 4, 1994.

In summary, respondent computed marketable minority values for the True Oil interests transferred as of January 1, 1993, and June 30, 1994, of $35,685,000 and $30,780,000, respectively.

---

[63](...continued)
marketability discounts of 20 percent for transfers of interests in True Oil by Dave True and Jean True as of Jan. 1, 1993, and June 30, 1994, respectively, and for the transfer of Jean True's interest in Belle Fourche as of June 30, 1994. We interpret respondent's statements to mean that separate minority and marketability discounts of 10 percent each should apply.

Respondent derived a marketable controlling value for the interest valued as of Dave True's death at $34,200,000.

### d. Court's Analysis

The positions of the parties and the Court's determination of the marketable minority values of True Oil's total equity at each of the valuation dates are summarized infra pp. 215-216.

In the cases at hand, we find that exclusive use by petitioners' experts of the guideline company method to calculate True Oil's marketable minority value is inappropriate. We recognize that market-based approaches are helpful tools for determining fair market value of unlisted stock. See sec. 20.2031-2(f), Estate Tax Regs; Rev. Rul. 59-60, sec. 3.03, 1959-1 C.B. at 238. However, in the case of an ongoing business, courts generally will not restrict consideration to only one valuation approach. See Hamm v. Commissioner, 325 F.2d 934, 941 (8th Cir. 1963), affg. T.C. Memo. 1961-347; Ward v. Commissioner, 87 T.C. 78, 102 (1986); Estate of Andrews v. Commissioner, 79 T.C. at 945; Portland Mfg. Co. v. Commissioner, 56 T.C. 58, 80 (1971), affd. without published opinion (9th Cir. 1975); Trianon Hotel Co. v. Commissioner, 30 T.C. 156, 181 (1958); Hooper v. Commissioner, 41 B.T.A. 114, 129 (1940).

We find it unreasonable to assume that a hypothetical willing buyer would rely entirely on public company multiples to

compute the purchase price of a closely held, family business[64] that derived all its value from its ability to discover and exploit oil and gas reserves. See Zukin, Financial Valuation: Businesses and Business Interests, par. 19.2[6] at 19-9, par. 19.2[8] at 19-13 (1990). If a company is primarily in the business of selling its assets, then hypothetical buyers most likely would be interested in the company's net asset value. See Ward v. Commissioner, 87 T.C. at 102 (citing Harwood v. Commissioner, 82 T.C. 239, 265 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986)(concerning company engaged in selling timber)); see also Estate of Jameson v. Commissioner, T.C. Memo. 1999-43. True Oil's proved oil and gas reserves are its most significant asset and its sole source of revenue, so it

_____

[64]Dr. Shannon Pratt (founder of WMA) and his colleagues articulated some of the fundamental differences between large and small companies that would diminish the value of the guideline company approach as follows:

Public companies are run by boards of directors and professional managers. These executives make operating decisions based on a different set of corporate objectives than private companies typically have. Private companies are more likely to have relationships with family members, employees, suppliers, customers, and the local community that have developed over a long period of time. These relationships can present the board and the management of the private company with corporate objectives that are different than a strict duty to maximize shareholder value. As an additional example, in private companies, the analyst is more likely to observe a strategy that is designed to minimize income taxes, compared with strategies of public companies. [Pratt et al., Valuing Small Businesses and Professional Practices 289 (3d ed. 1998).]

is appropriate to use the net asset value method (or what Mr. Kimball called the asset accumulation method), in conjunction with the guideline company method, to determine the value of True Oil. Accordingly, we treat the stipulated value of True Oil's major assets[65] as the company's net asset value.

Petitioners argue that the Kimball reports properly accounted for the value of True Oil's reserves by using the reserves multiple in the guideline company analysis. We disagree for two reasons. First, Mr. Kimball's reserves multiple was based on the stipulated physical volume of proved reserves measured in barrels of oil-equivalent, known as the boe method; however, the geological experts' reports of both parties favored the discounted cash-flow method to value True Oil's proved reserves and used the less reliable boe method only as a reasonableness test. Second, Mr. Kimball weighted the reserves multiple at only 30 percent, which we would consider low given the nature of True Oil's business.

Petitioners also contend that we should disregard altogether the net asset value method in determining True Oil's entity value because the subject interests carried no liquidation rights so that holders of such interests could not access the underlying asset values. We disagree. Although the net asset value method yields the value of a controlling interest, a minority discount

---

[65]True Oil had no long-term debt on or around the valuation dates, and current assets generally offset current liabilities.

would be applied to reflect the constraints imposed on minority owners. Moreover, True Oil is primarily in the business of selling its assets; thus, liquidation is not the only means by which an owner would have access to the company's net asset value. Here it is likely that a hypothetical purchaser would give substantial weight to True Oil's underlying asset values even though he would not have the ability immediately to realize those values in their entirety by forcing liquidation. See Estate of Andrews v. Commissioner, 79 T.C. at 945; Estate of Dunn v. Commissioner, T.C. Memo. 2000-12.

Turning to the guideline company method, the Kimball reports present a clear and adequately documented approach to determining True Oil's marketable minority value. However, we note a few areas of concern. First, we could not trace any adjustments made to either the guideline companies' earnings multiples or True Oil's financial fundamentals to reflect the fact that intangible drilling and dry hole costs were being accounted for differently. This omission could lead to significant distortions in value given True Oil's substantial intangible drilling (including nonproductive well) costs over the years. Second, Mr. Kimball's consistent choice of only the lowest guideline company multiples suggests a lack of comparability between the selected companies and True Oil. Third, the restrictive provisions (other than price) of True Oil's buy-sell agreement inappropriately

influenced Mr. Kimball's choice of multiples. As stated earlier, restrictive provisions of buy-sell agreements that are deemed to be testamentary devices should be disregarded in determining fair market value for estate and gift tax purposes. See supra p. 153. Adjustments for these errors would result in marketable minority values higher than those derived by Mr. Kimball.

The final Lax report's guideline company analysis was even more questionable. It provided no data to support the calculations of EBDIT, EBIT, pretax earnings, and book value for either the comparable companies or True Oil. Further, Mr. Lax did not explain the relative weight placed on each factor. The Lax report also applied market multiples to only 1 year's worth of financial data. We believe that using a 5-year average of True Oil's financial fundamentals (as Mr. Kimball did) would have provided more representative results. Without more data and explanations, we cannot rely on the final Lax report's valuation conclusions using the guideline company method.

We need not discuss the strengths or weaknesses of Mr. Lax's reserves method because the parties stipulated the value of True Oil's reserves as of the relevant measurement dates.

Regarding the issue of minority discounts, this Court recognizes that a minority interest in a company usually is worth less than a proportionate share of the company's total value, see Ward v. Commissioner, 87 T.C. at 106; Estate of Andrews v.

Commissioner, 79 T.C. at 953, because a minority interest holder lacks control over company policy, cannot direct payment of dividends, and cannot compel a liquidation of company assets, see Estate of Newhouse v. Commissioner, 94 T.C. at 249; Harwood v. Commissioner, 82 T.C. at 267. Applicability of minority discounts depends on the type of interest being appraised (i.e., degree of control the interest confers) and on any assumptions regarding control that are implicit in the entity-level valuation.

For estate tax purposes, the property being valued is the interest decedent owned at death. See sec. 2031. We arrive at this value by examining the degree of control inherent in the decedent's interest and not the control conveyed to the decedent's legatees. See Estate of Chenoweth v. Commissioner, 88 T.C. 1577 (1987). We determine whether a block of stock is a minority interest without considering the identity and prior holdings of the transferee, because the hypothetical willing buyer-willing seller test is an objective test. See Estate of Watts v. Commissioner, 823 F.2d 483, 486-487 (11th Cir. 1987), affg. T.C. Memo. 1985-595; Estate of Bright v. United States, 658 F.2d 999, 1005-1006 (5th Cir. 1981).

We find the 25-percent minority discount applied in Mr. Lax's reserves method analysis to be unsubstantiated and unreliable. The final Lax report vaguely described studies of

acquisition transactions and REIT's to support the chosen discount, but it did not cite specific studies, describe the studies' assumptions and findings, or analyze the control features of the True oil subject interests.  We therefore disregard the final Lax report's proposed minority discount.

We also disagree with respondent's argument that the 38.47-percent interest Dave True owned at death would be combined with any other single ownership block to control True Oil so that a minority discount is unjustifiable.  In determining whether a minority discount applies, we do not assume that the hypothetical buyer is a member of decedent's family.  See Propstra v. United States, 680 F.2d 1248, 1251-1252 (9th Cir. 1982); Estate of Hall v. Commissioner, supra; Minahan v. Commissioner, 88 T.C. 492, 499 (1987).  Here, we assume that the buyer is an unrelated party, but we are free to recognize Jean True and the True sons as the other general partners as of Dave True's death.  See Estate of Davis v. Commissioner, 110 T.C. 530, 559 (1998).  Given these assumptions, we find it unlikely that a member of Dave True's family would join forces with an unrelated purchaser to gain voting control over True Oil.  See id.  In addition, the concept of voting control does not apply to True Oil, a general partnership that is jointly managed by all of its owners.  Cf. Estate of Winkler v. Commissioner, T.C. Memo. 1989-231 (distinguishing voting from nonvoting stock for valuation

purposes and denying minority discount to voting stock because of swing vote potential).

A comparison of the marketable minority values for True Oil proposed by Mr. Kimball and by respondent follows:

| Valuation date | Kimball reports' guideline company method | Respondent's net asset value method |
|---|---|---|
| January 1, 1993 | $37,253,000 | $35,685,000 |
| June 4, 1994 | $34,623,000 | N/A |
| June 30, 1994 | $34,623,000 | $30,780,000 |

We have acknowledged the merits of both parties' valuation methods and believe that some combination of the two methods would most accurately measure True Oil's marketable minority value. However, Mr. Kimball's values would require adjustments for our stated concerns, which are likely to result in higher values. As it is, we need not compute Mr. Kimball's adjusted guideline company values because respondent's marketable minority values (shown above) are less than Mr. Kimball's as of January 1, 1993, and June 30, 1994. Thus, we accept respondent's marketable minority values as of January 1, 1993, and June 30, 1994, and treat them as concessions.

Respondent did not determine True Oil's marketable minority value as of June 30, 1994, because he treated Dave True as owning a controlling interest at death. However, we treat Dave True's

38.47-percent interest in True Oil as a minority interest, and we assume that True Oil's marketable minority value on June 4, 1994, was equal to its value on June 30, 1994 (i.e., $30,780,000).

### 2. Marketability Discounts

#### a. Kimball Reports

The Kimball reports discussed two types of empirical studies that WMA relied on to quantify marketability discounts for closely held companies. Those studies analyzed discounts on sales of restricted shares of publicly traded companies (restricted shares studies) and discounts on private transactions that preceded public offerings (pre-IPO studies).

The restricted shares studies sought to isolate marketability from all other value-affecting factors by analyzing the price differential between freely traded stock of a public company and stock that is otherwise identical except for certain time period restrictions on trading in the open market. The Kimball reports discussed the results of eight studies that covered the years 1966 through 1988, and found average marketability discounts ranging from approximately 26 to 45 percent.

The Kimball reports also discussed two pre-IPO studies that used data from SEC registration statements to compare share prices of companies before and after they had gone public. The

studies generally covered the years 1975 through 1995, and found marketability discounts ranging from 40 to 63 percent.[66]

Next, the Kimball reports generally addressed aspects of all the True companies' partnership agreements and Wyoming's general partnership law that made the subject partnership interests less liquid than publicly traded stock or limited partnership interests.  Mr. Kimball testified that he factored all the partnership agreement provisions (other than the book value buy-sell price) into his determination of marketability discounts.

First, the Kimball reports noted that transfer or assignment of a partnership interest would not terminate the partnership, so that a hypothetical buyer would have to litigate to force liquidation of a True partnership.

Second, the Kimball reports stated that Wyoming law required a buyer to obtain consent from the existing partners to be admitted as a new partner; otherwise, the buyer would be treated as a transferee with rights limited to receiving his or her pro rata share of current and liquidating distributions.  As a result, the Kimball reports concluded that potential purchasers would be discouraged from buying an interest in a True partnership without the assurance of gaining such consent.

Third, the Kimball reports observed that the mandatory buy-sell provisions would have a chilling effect on the market for

---

[66]One of the studies specifically omitted natural resource companies from the group of companies being examined.

interests in the True partnerships.  The reports stated that potential buyers would not want to spend time analyzing an offer price if there were other buyers with prior purchase rights, especially if those buyers were current owners and operators of the business.  Additionally, the universe of potential purchasers would be reduced by (1) the requirement that all partners (or their spouses) actively participate in the business and (2) the prohibition against encumbering partnership interests (treated as a sales event triggering mandatory buy-sell), because purchasers would have difficulty obtaining financing without pledging the subject interests.

Fourth, the Kimball reports suggested that potential investors would hesitate to expose themselves to personal liability as general partners given the environmental and business risks associated with the oil and gas industry.

Fifth, the Kimball reports observed that none of the True partnerships had made section 754 elections, so that a hypothetical purchaser of the subject interests would recognize built-in gain on sales by the partnerships of their assets.  The Kimball reports explained that this would adversely affect marketability because a hypothetical purchaser could avoid such built-in gain through an outright purchase of assets similar to those owned by the partnership.

Based on the foregoing, the Kimball reports concluded that the subject interests in True Oil were not readily marketable and applied 40-percent marketability discounts to the marketable minority values as of January 1, 1993, June 4, 1994, and June 30, 1994.

### b. Final Lax Report

The final Lax report contained only a brief justification for the marketability discounts applied to minority interests in True Oil. The report said that AA gathered data on discounts that have been realized on private market sales of restricted or illiquid ownership interests and also examined the cost of creating a public market for closely held interests. However, the underlying data from those studies was not included in the report. The final Lax report concluded that a minority interest in True Oil was relatively illiquid, because the company was closely held and its interests were unregistered; therefore, Mr. Lax applied a 45-percent marketability discount to the marketable minority value calculated as of June 3, 1994.

### c. Gustavson Report/Rebuttals and Respondent's Position

Respondent did not provide expert testimony regarding marketability discounts for any True company; instead, the Gustavson rebuttals criticized only the discounts applied in the Kimball and final Lax reports.

Respondent characterizes the True Oil interests as being
marketable and therefore proposes a 10-percent discount for
interests being valued as of January 1, 1993, and June 30, 1994,
and no discount (due to swing vote potential) for the interest
being valued as of June 4, 1994.

### d. Court's Analysis

A discount for lack of marketability reflects the absence of
a ready market for interests in closely held businesses.  See
Estate of Andrews v. Commissioner, 79 T.C. at 953.  The benchmark
for marketability of minority interests is the active public
securities market, where a security holder can quickly and easily
sell a minority interest at a relatively low cost.  The minority
owner of a closely held company does not have similar liquidity,
because the pool of potential purchasers is substantially smaller
and securities registration requirements impose substantial
delays and transaction costs.

To determine appropriate marketability discounts, this Court
has considered fundamental elements of value that investors use
to make investment decisions.  Some of the factors include: (1)
The cost of a similar company's stock; (2) an analysis of the
corporation's financial statements; (3) the corporation's
dividend-paying capacity and dividend payment history; (4) the
nature of the corporation, its history, its industry position,
and its economic outlook; (5) the corporation's management; (6)

the degree of control transferred with the block of stock to be valued; (7) restrictions on transferability; (8) the period of time for which an investor must hold the stock to realize a sufficient return; (9) the corporation's redemption policy; and (10) the cost and likelihood of a public offering of the stock to be valued.  See Estate of Gilford v. Commissioner, 88 T.C. 38, 60 (1987); Northern Trust Co. v. Commissioner, 87 T.C. 349, 383-389 (1986), affd. sub nom. Citizens Bank & Trust Co. v. Commissioner, 839 F.2d 1249 (7th Cir. 1988); Mandelbaum v. Commissioner, T.C. Memo. 1995-255, affd. without published opinion 91 F.3d 124 (3d Cir. 1996).

The factors limiting marketability of True Oil general partnership interests on the valuation dates included:  (1) The True family's commitment to keep True Oil privately owned; (2) the risk that a purchaser would not obtain unanimous consent to be admitted as a partner; (3) True Oil's declining revenues due to increased competition and failure to find new reserves or to increase production; (4) the subject interests' lack of control; (5) a purchasing partner's exposure to joint and several liability; and (6) the long holding period required to realize a return.

Under Issue 1 of this opinion, we have held that the restrictive provisions of the buy-sell agreements are to be disregarded in determining fair market value for estate and gift

tax purposes.  See supra pp. 153-155.  We concur with the reasoning of Lauder III, which found that all aspects of the buy-sell agreement, and particularly those tending to depress value, were tainted by the same testamentary objectives that made the formula price irrelevant for transfer tax purposes.

The Lauder III shareholders' agreement was a stand-alone document separate from the corporation's governing instruments (i.e., articles of incorporation, bylaws), much like the Stockholders' Restrictive Agreements of the True corporations. Accordingly, we disregard the Belle Fourche, Black Hills Trucking, and White Stallion buy-sell agreements entirely in determining fair market value of the subject interests in those companies.  By contrast, the True partnerships incorporated buy-sell restrictions among the governing provisions of the partnership agreements.  As a result, we disregard only the buy-sell provisions[67] of the True Oil, Eighty-Eight Oil, and True Ranches partnership agreements in determining fair market value of the subject interests in those companies.  We consider the buy-sell agreements only to recognize that their existence demonstrates the True family's commitment to maintain family control over the True companies.

_____

[67]The buy-sell provisions in the True Oil, Eighty-Eight Oil, and True Ranches partnership agreements are titled:  Par. 17. "Restriction on Partnership Interest"; Par. 18. "Sales Events"; Par. 19. "Buy and Sell Agreement"; Par. 20. "Price"; Par. 21. "Effective Date", and Par. 25. "Binding on Heirs".

The Kimball reports determined the so-called hypothetical fair market value of the subject interests by ignoring the book value buy-sell price, but otherwise regarding all other provisions of the buy-sell agreements.  Mr. Kimball factored the buy-sell agreement terms into his determination of both entity values and marketability discounts.  This is a major flaw in methodology that reduces the reliability of the conclusions of the Kimball reports.

While we ignore buy-sell restrictions for valuation purposes if they are deemed to be testamentary devices, we do not ignore State law transfer restrictions.  In determining the value of an asset for transfer tax purposes, State law determines what property is transferred.  See Morgan v. Commissioner, 309 U.S. 78, 80 (1940); Estate of Bright v. United States, 658 F.2d 999, 1001 (5th Cir. 1981); Estate of Nowell v. Commissioner, T.C. Memo. 1999-15.  Under the Wyoming Uniform Partnership Act (WUPA), a person may become a partner only with the consent of all partners.  See Wyo. Stat. Ann. sec. 17-21-401(j) (Michie 1999).[68] A partner's only transferable interest in the partnership is his or her interest in distributions.  See Wyo. Stat. Ann. sec. 17-21-502(a) (Michie 1999).  The transfer, in whole or in part, of a partner's transferable interest does not entitle the transferee

---

[68]All referenced sections of the Wyoming Uniform Partnership Act (WUPA) were in effect at the time of the subject transfers in 1993 and 1994.

to participate in the management or conduct of partnership business, to require access to information about partnership transactions, or to inspect or copy the partnership books and records. See Wyo. Stat. Ann. sec. 17-21-503(a) (Michie 1999). A transferee of a partner's transferable interest is entitled to receive current or liquidating distributions to which the transferor would otherwise be entitled. The transferor retains the rights and duties of a partner other than an interest in the distributions transferred. See Wyo. Stat. Ann. sec. 17-21-503(b) and (c) (Michie 1999).

The denial of management rights to a transferee interest would make it less marketable than a partnership interest. See Adams v. United States, 218 F.3d 383 (5th Cir. 2000). A hypothetical purchaser could not count on being admitted into partnership with the close-knit True family and would factor any uncertainty regarding his ownership rights and privileges into his offering price. See Estate of Newhouse v. Commissioner, supra at 230-233. Thus, we agree with the conclusion of the Kimball reports that this is a value-depressing factor.

On the other hand, we are troubled by the lack of any clear connection between the Kimball reports' general discussion of restricted stock and pre-IPO studies and the marketability discounts applied to the True Oil subject interests. For instance, there was no showing that the industries represented in

the studies had risks and other attributes similar to the oil and gas industry.  In fact, one of the pre-IPO studies specifically excluded natural resource companies from the companies being examined.

In addition, Mr. Kimball did not explain how his analysis of True Oil's historical financial data, see supra pp. 156-158, affected the marketability discounts.  We believe his analysis, by choosing comparison years that emphasized downward trends in True Oil's financial performance (e.g., extraordinary losses in Honduras), painted a bleaker picture than is appropriate.  On the positive side, True Oil replaced and slightly increased its proved reserves from 1973 to 1994 and did so without incurring outside debt.  Even allowing for this, we find that True Oil's substantial exploration expenditures, declining revenues, and inability to make significant net distributions to partners would adversely affect the marketability of an interest in the company.

We are dissatisfied completely with both Mr. Lax's and respondent's treatment of marketability discounts.  First, neither provided empirical data for average discounts in the market or an analysis of marketability factors particular to True Oil.  Second, the final Lax report applied higher marketability discounts than the Kimball reports, even though the final Lax report did not consider any value-depressing aspects of the True Oil buy-sell agreement.  Third, respondent's marketability

discounts are either unreasonably low (given the factors limiting marketability discussed above) or nonexistent, due to respondent's incorrect assumptions regarding swing vote potential.

Based on the record before us, we apply a 30-percent marketability discount to the minority interests in True Oil valued as of January 1, 1993, June 4, 1994, and June 30, 1994. We derive this figure first by acknowledging that the subject interests in True Oil are less marketable than actively traded interests, for reasons previously stated. We then use Mr. Kimball's discount as a starting point. Mr. Kimball did not explain clearly how he used market data to compute his marketability discounts. It appears that he chose a 40-percent discount to fall within the high range of discounts observed in the restricted stock studies (26 to 45 percent). We believe that the restricted stock studies provide more relevant data than the pre-IPO studies, because True Oil interests are subject to State law transfer restrictions and because True Oil is not comparable to a company on the verge of going public. Finally, we reduce the proposed 40-percent discount to 30 percent, because Mr. Kimball improperly considered the True Oil buy-sell agreement in developing his marketability discounts.

### 3. Summary of Proposed Values and Court's Determinations of Values of Interests in True Oil

| Value as of January 1, 1993 | Book value reportd on return | Statutory notice value | Kimball reports | Final Lax report | Respondent's position | Court's values |
|---|---|---|---|---|---|---|
| Entity Value (Controlling Basis) | N/A | N/A | N/A | N/A | $39,650,000 (3,965,000) | N/A |
| Less: Minority Discount | N/A | N/A | N/A | N/A | 10% | N/A |
| Marketable Minority Value | N/A | N/A | $37,253,000 | N/A | 35,685,000 | $35,685,000 |
| Less: Marketability Discount | N/A | N/A | (14,901,200) 40% | N/A | (3,568,500) 10% | (10,705,500) 30% |
| Nonmarketable Minority Value | N/A | N/A | 22,351,800 | N/A | 32,116,500 | 24,979,500 |
| Value of 24.84% Interests (total) Transferred to True Sons | 5,226,006 | 13,940,210 | 5,552,187 | N/A | 7,977,739 | 6,204,908 |

| Value as of June 4, 1994 | | | | | | |
|---|---|---|---|---|---|---|
| Entity Value (Controlling Basis) | N/A | N/A | N/A | N/A | 34,200,000 | N/A |
| Less: Minority Discount | N/A | N/A | N/A | N/A | N/A | N/A |
| Marketable Minority Value | N/A | N/A | 34,623,000 | 24,820,000 | N/A | 30,780,000 |
| Less: Marketability Discount | N/A | N/A | (13,849,200) 40% | (11,169,000) 45% | N/A | (9,234,000) 30% |
| Nonmarketable Minority Value | N/A | N/A | 20,773,800 | 13,651,000 | N/A | 21,546,000 |
| Value of 38.47% Interest Owned at Dave True's Death | 5,538,423 | 20,041,717 | 7,991,681 | 5,251,540 | 13,156,740 | 8,288,746 |

| Value as of June 30, 1994 | Book value reported on return | Statutory notice value | Kimball reports | Final Lax report | Respondent's position | Court's values |
|---|---|---|---|---|---|---|
| Entity Value (Controlling Basis) | N/A | N/A | N/A | N/A | $34,200,000 | N/A |
| Less: Minority Discount | N/A | N/A | N/A | N/A | (3,420,000) 10% | N/A |
| Marketable Minority Value | N/A | N/A | $34,623,000 | N/A | 30,780,000 | $30,780,000 |
| Less: Marketability Discount | N/A | N/A | (13,849,200) 40% | N/A | (3,078,000) 10% | (9,234,000) 30% |
| Nonmarketable Minority Value | N/A | N/A | 20,773,800 | N/A | 27,702,000 | 21,546,000 |
| Value of 17.23% Interests (total) Transferred to True Sons | 2,528,315 | 8,976,312 | 3,579,326 | N/A | 4,773,055 | 3,712,376 |

B.  Belle Fourche

    1.  Value of Total Equity on a Marketable Basis

       a.  Kimball Report

Mr. Kimball applied the guideline company method to value the subject interests in Belle Fourche as of June 4 and June 30, 1994.  He rejected the discounted cash-flow method, reasoning that the cash-flow projections and discount rate determinations required would be too difficult to compute and would not reflect investors' attitudes toward these types of companies.

First, Mr. Kimball identified four guideline companies from the crude petroleum pipeline and refined petroleum pipeline industries, which are similar but not identical to Belle Fourche's line of business.  Mr. Kimball could not identify any publicly traded companies that were engaged in crude oil gathering.

Mr. Kimball then analyzed six market multiples:  EBIT, EBDIT,  debt-free net income (DFNI), debt-free cash-flow (DFCF), revenues, and TBVIC.  As with True Oil, he used data from the latest year and an average of the 5 preceding years to calculate the multiples.  Mr. Kimball weighted the EBDIT and DFCF multiples at 30 percent each and the rest at 10 percent each.  Mr. Kimball explained that he chose low multiples to apply to Belle Fourche's financial fundamentals because the guideline companies were larger and more successful than Belle Fourche.

After subtracting debt owed to shareholders of $17,115,350, Mr. Kimball concluded that the fair market value of Belle Fourche's total equity on a marketable minority basis was $13,654,361 on both June 4 and June 30, 1994.

Mr. Kimball calculated total equity on a minority basis even though he was valuing a 68.47-percent interest as of June 4, 1994, because he found that the Belle Fourche buy-sell agreement eliminated any premium for control that might otherwise have attached to a block of stock representing voting control.

Relying on the opinion of a Wyoming attorney, Mr. Kimball explained that a hypothetical purchaser (other than a current stockholder) would not be recognized as a stockholder unless he or she complied with the buy-sell agreement terms or gained consent of the other stockholders. Mr. Kimball stated that a hypothetical purchaser who was not recognized as a stockholder would not have the right to vote, the right to distributions, or any other rights against the company, unless he or she successfully challenged enforcement of the buy-sell agreement in court. For these reasons, Mr. Kimball concluded that a hypothetical purchaser would not pay a premium for such questionable control.

### b. Initial and Final Lax Reports

The initial Lax report also used the guideline company method and compared Belle Fourche's financial results to those of six pipeline companies (none of which operated gathering lines).

Mr. Lax applied EBDIT, EBIT, and pre-tax earnings (EBT) multiples to Belle Fourche's financial results for the 12-month period ending May 31, 1994.  The initial Lax report did not disclose the selected guideline company multiples, Belle Fourche's financial fundamentals, or the weight assigned to each multiple to arrive at total equity value.

The initial Lax report concluded that the fair market value of Belle Fourche's equity as of June 3, 1994, on a marketable controlling basis, was $10 million, which included a 25-percent control premium.  According to the report, the premium was based on the specific control features of the subject interest (e.g., control over the company's distributions, assets, and management decisions) and on public market acquisition transactions.

As described in more detail later, the initial Lax report applied a 40-percent marketability discount to arrive at a nonmarketable controlling value for the 68.47-percent interest of $4,108,200 as of June 3, 1994.

Similarly, the final Lax report used the guideline company method and the same public company comparisons as the initial Lax report.  However, Mr. Lax stated that he did not compute an entity value for Belle Fourche in the final Lax report.  Instead, he purported to value the specific 68.47-percent interest without first deriving the total equity value of Belle Fourche on either a controlling or a noncontrolling basis.

Mr. Lax explained that even though a 68.47-percent interest wielded voting control over Belle Fourche, a hypothetical buyer would not pay a premium for the interest because of the interrelatedness of the True companies.  According to Mr. Lax, Belle Fourche is part of a network of interdependent, family-owned companies engaged in all aspects of the oil and gas business.  He emphasized that these companies shared management and administrative resources and relied on each other for success, so that it would be difficult for Belle Fourche to stand alone profitably.  He observed that as a pipeline company with no dedicated reserves, Belle Fourche depended on True Oil, True Drilling, and especially on Eighty-Eight Oil, as the shipper, to ensure continued operation of its pipeline.  Mr. Lax concluded that a hypothetical buyer would not assign additional value to voting control over Belle Fourche because the buyer could not obtain similar control over the related True companies.

The valuation analysis of the final Lax report concluded:

> Using the 12 months ended [May 31, 1994] EBDIT of $9,000,000 and multiples of 2, 2.5 and 3.0 less the interest bearing debt of $16,000,000; EBIT of $4,057,000 and multiples of 4.5, 5.0 and 5.5 less the debt of $16,000,000 and EBT of $2,975,000 and multiples of 2, 2.5, 3, we concluded an equity value for the 68.47 percent [interest] of $4,100,000 as of June 3, 1994.

The information above represents all the financial data that Mr. Lax provided to support his valuation conclusion.

As described infra, the final Lax report stated that no marketability discount would apply to Dave True's 68.47-percent

interest in Belle Fourche, contrary to the findings of the initial Lax report.

### c. Gustavson Report and Respondent's Position

Mr. Gustavson applied the discounted cash-flow (DCF) method to value pipeline assets owned by Belle Fourche as of June 4, 1994; he did not value the company as a whole. Under this method, Mr. Gustavson multiplied projected future throughput by estimated net revenue per barrel to develop annual net cash-flows, which he then discounted to account for the time value of money.

The Gustavson report projected discounted cash-flows for 15 years, assuming half a year's throughput in years 1 and 16. He estimated 1994 throughput based on one-half of actual 1993 throughput, or 18 million barrels. Mr. Gustavson incorporated an annual decline rate for throughput (7 percent) that mirrored the forecasted rate of decline in oil production for the State of Wyoming. Mr. Gustavson noted that his analysis of local production data yielded a 2-percent decline rate; however, he chose the higher statewide rate to be more conservative. Mr. Gustavson stated that he examined Belle Fourche's throughput data (derived from filings with regulatory agencies) going back 23 years, and that he found the flow to be fairly uniform.

Mr. Gustavson estimated net revenue per barrel by dividing Belle Fourche's historical net revenue[69] by its historical throughput.  He averaged the values for years 1990 through 1993 to derive an average net revenue per barrel of .24, and applied this to projected throughput in year 1.  Mr. Gustavson established a 4-percent annual decline rate for net revenue per barrel by consulting a survey conducted by the Society of Petroleum Evaluation Engineers (SPEE).  This assumed that increasing operating costs would decrease the profit margin on each barrel transported by the pipeline.

In his report, Mr. Gustavson applied a 14-percent discount rate to the projected net cash-flows.  He computed this rate by taking 10 percent, the regulated maximum tariff over cost of service that a pipeline operator was allowed to charge, and adding 2 percent, for the risk that new competition might undercut Belle Fourche's prices, and another 2 percent, to account for the risk that Belle Fourche's throughput might drop below the average decline rate.  Mr. Gustavson cited industry personnel as confirming that a 10- to 15-percent discount rate was typically used to analyze cash-flows of a pipeline company.

Mr. Gustavson stated that he did not conduct site visits or discuss his DCF projections with Belle Fourche's management.  He

---

[69]Historical net revenue was composed of gross operating revenue minus operating expenses, rent/lease payments, State and local property taxes, other taxes, and interest expense.

explained that it was not necessary to interview management in this case for a number of reasons:  Cash-flow was not influenced entirely by management; he assumed that management policies would remain unchanged; the pipeline industry was highly regulated on a Federal and State level; and public information was available regarding how much oil could be expected to flow through a pipeline.

Mr. Gustavson concluded that the fair market value of Belle Fourche's pipeline assets under the DCF method was $34.62 million on June 4, 1994.  Mr. Gustavson also briefly discussed the comparable sales and cost approaches to verify his conclusions under the DCF method.[70]

According to respondent, Mr. Gustavson's gross asset value of $34,600,000 (rounded) minus outstanding long-term debt of $17,115,350 represented the company's net asset value.  Thus, respondent derived a marketable controlling value for Belle Fourche of $17,484,650 as of June 4 and June 30, 1994.

---

[70]Under the comparable sales method, Mr. Gustavson examined an unrelated purchase of a Canadian crude oil pipeline in July 1993.  He used generally the same DCF analysis as he did for Belle Fourche; however, he assumed that fair market value equaled the purchase price and solved for net revenue per barrel of oil. This resulted in a net revenue figure of .26 per barrel, which closely approximated the .24 per barrel amount used for Belle Fourche.  Under the cost method, Mr. Gustavson reviewed appraisal information prepared for tax assessment purposes by the Wyoming Department of Revenue.  For 1995, the Department of Revenue valued Belle Fourche assets at $27,605,035, on a replacement cost basis.  Because this number was reasonably close to the DCF method's value, Mr. Gustavson stated that this validated his conclusions.

Respondent allowed a 10-percent minority discount in valuing the 17.23-percent interest transferred by Jean True as of June 30, 1994. Therefore, respondent asserts that Belle Fourche's marketable minority value was $15,736,185 on that date.

### d. Court's Analysis

The positions of the parties and the Court's determination regarding the marketable value of Belle Fourche's total equity at each of the valuation dates are summarized infra p. 240.

As with True Oil, we find it inappropriate to use only the guideline company method to value the subject interests in Belle Fourche. We believe that a hypothetical buyer would consider the company's underlying asset value in negotiating a purchase price, especially if purchasing a controlling interest. We therefore consider both the guideline company and net asset value methods to value the Belle Fourche interests at issue in these cases. First, however, we address the strengths and weaknesses of the experts' reports.

We have serious reservations about Mr. Lax's approach to valuing Belle Fourche; thus, for the reasons stated below, we reject the final Lax report's valuation conclusions.

First, the final Lax report's guideline company analysis suffers from the same lack of substantiation as its True Oil analysis. As the quoted material on page 220, supra, indicates, Mr. Lax provided no data showing: (1) How he computed the

guideline company multiples or the Belle Fourche financial fundamentals, (2) which of three multiples he applied to Belle Fourche's fundamentals, or (3) how he weighed each resulting product. Without more information we cannot evaluate the reliability of Mr. Lax's results.

Second, the final Lax report calculated the equity value of Dave True's 68.47-percent interest in Belle Fourche on a fully marketable noncontrolling basis without first valuing the company as a whole. This significantly departed from the initial Lax report's guideline company approach, which first valued the company on a marketable controlling basis, and then applied a 40-percent marketability discount. Even though both reports used the guideline company method, we believe the approaches were substantially different and find it remarkable that both reports arrived at the same ultimate value of roughly $4,100,000 for Dave True's interest. This suggests that the final Lax report was result-oriented.

Third, while Mr. Lax conceded that Dave True's 68.47-percent interest had voting control over Belle Fourche, he averred that a hypothetical buyer would not pay more for such voting control because he could not control the related True companies that Belle Fourche depended on for its business (e.g., True Oil, True Drilling, and especially Eighty-Eight Oil). We disagree.

Hank True testified that during the period 1992 through 1994, Belle Fourche's business primarily consisted of moving oil for unrelated companies.  Further, Mr. Gustavson observed that Belle Fourche's average annual throughput substantially exceeded the quantities of oil actually produced by the True companies.  Therefore, we are not persuaded that the value of a controlling interest in Belle Fourche would be diminished by its interrelatedness with the True companies.

Turning to the Kimball report, we find various errors in the computation of Belle Fourche's financial fundamentals, specifically EBDIT.  According to respondent, Mr. Kimball computed EBDIT by taking ordinary income reported on page 1 of Form 1120S (line 21) and by adding back interest expense (line 13) and depreciation (line 14c).  However, line 14c did not account for depreciation that was included in the computation of cost of goods sold, reported on Schedule A.  Respondent argues that total depreciation reported on line 14a, which included depreciation reported on Schedule A and elsewhere on the return, should have been added back to arrive at Belle Fourche's EBDIT.[71]

_____

[71]Arguably, it is possible that Mr. Kimball's computation of debt-free cash-flow (DFCF) omitted the same adjustment for depreciation that was included in cost of goods sold.  It also appears that cost of goods sold for some of the years being analyzed included amortization expense that should have been added back to DFCF and earnings before depreciation, interest, and taxes (EBDIT).  We do not adjust for these items, however, because respondent did not raise them and petitioners did not have the opportunity to respond to them.

(continued...)

The omitted Schedule A depreciation adjustments are listed by year in the table below.

| Tax year | Schedule A depreciation |
|----------|-------------------------|
| 1989 | $2,333,216 |
| 1990 | $1,857,056 |
| 1991 | $1,955,040 |
| 1992 | $2,523,597 |
| 1993 | $4,924,213 |

On brief, petitioners explain this omission by assuming that Mr. Kimball added back the smaller depreciation number to reflect differences in the methods used by Belle Fourche and the public companies to compute cost of goods sold. This explanation is unpersuasive. First, Schedule A reports cost of goods sold and/or cost of operations. Belle Fourche did not sell goods, it rendered services. Therefore, the costs reported by Belle Fourche reflected its cost of operations, which included depreciation, amortization, operating expenses, vehicle expenses, operating rents, fuel and power. We are aware of no accounting method issues that would prevent Mr. Kimball from adjusting net income for substantial depreciation deductions in order to arrive at multiples that served as proxies for cash-flows. Second, if such accounting method issues existed, it seems that adjustments

---

[71](...continued)

also should have been made to the other multiples that had
incorporated Schedule A depreciation deductions into the
computation of net income.  Third, we find it unlikely that Mr.
Kimball would make adjustments for accounting method differences
for Belle Fourche when he assumed that a hypothetical buyer would
not make such adjustments for True Oil.

Respondent asserts that adjusting Mr. Kimball's numbers by
the aforementioned depreciation amounts would result in the
following values (rounded to the nearest $1,000):

|  | Kimball report | Respondent's revisions |
|---|---|---|
| EBDIT latest 12 months | $4,957,000 | $9,881,000 |
| EBDIT 5-year average | $6,538,000 | $8,837,000 |

We agree with respondent's revision to EBDIT latest 12 months,
but we find that the 5-year average amount should have been
$9,257,000.  Adjusting for these changes, and using the same
selection of multiples and weighting factors employed by Mr.
Kimball, we find that the Kimball report's market value of
invested capital (debt and equity) should have been $37,240,000,
rather than $30,770,000.

Another apparent error in Mr. Kimball's computations relates
to debt owed by Belle Fourche to its shareholders as of the
valuation dates.  Mr. Kimball subtracted $17,115,350 of interest-

bearing shareholder debt in computing market value of equity as of June 4 and June 30, 1994.  However, Belle Fourche's shareholder debt had been paid down in May 1994, and was only $15,915,350 at the valuation dates.  Therefore, Mr. Kimball understated market value of equity by $1,200,000.[72]  Correcting for the debt, Mr. Kimball's fair market value of total equity on a marketable minority basis should have been $21,325,000 (rounded) on both June 4 and June 30, 1994.

Finally, we disagree with Mr. Kimball that Dave True's 68.47-percent interest in Belle Fourche, valued as of June 4, 1994, should be treated as a noncontrolling interest.  Mr. Kimball considered this interest as being equivalent in value to a minority interest in a public company, because a hypothetical buyer would expect the buy-sell agreement to impede his or her free exercise of voting control.  See supra p. 218.  However, under Lauder III, we disregard the Belle Fourche buy-sell agreement in determining fair market value of the subject interests.  As a result, we reject Mr. Kimball's reasoning for treating Dave True's 68.47-percent interest as noncontrolling.

Having disregarded the buy-sell agreement, we look to Wyoming law to determine the rights accorded a 68.47-percent

---

[72]Respondent made the same error in his computation of Belle Fourche's net asset value.  Mr. Lax's $16,000,000 debt subtraction presumably reflected the correct debt amount rounded to the nearest $100,000.

interest in Belle Fourche.  Unless the articles of incorporation provide otherwise, the Wyoming Business Corporation Act requires the following, in relevant part:  (1) Each outstanding share of stock is entitled to one vote, see Wyo. Stat. Ann. sec. 17-16-721(a) (Michie 1999)[73]; (2) all corporate powers are exercised by the board of directors, see Wyo. Stat. Ann. sec. 17-16-801(b) (Michie 1999); (3) directors are elected by a plurality of votes cast by the shares entitled to vote, see Wyo. Stat. Ann. sec. 17-16-728(a) (Michie 1999); (4) sales of assets other than in the regular course of business must be approved by a majority of all votes cast by shares entitled to vote, see Wyo. Stat. Ann. sec. 17-16-1202(e) (Michie 1999); and (5) dissolution of the corporation must be approved by a majority of all votes cast by shares entitled to vote, see Wyo. Stat. Ann. sec. 17-16-1402(e) (Michie 1999).

Belle Fourche's articles of incorporation and bylaws were not introduced in evidence.  We therefore assume that Belle Fourche's governing documents do not vary from the Wyoming corporate law requirements described above.  At his death, Dave True's 68.47-percent interest represented a majority of the shares entitled to vote, which allowed him to control the board of directors, sell corporate assets, or dissolve the corporation

---

[73]All referenced sections of the Wyoming Business Corporation Act were in effect at the time of the subject transfers in 1993 and 1994.

entirely.  Accordingly, we find that Dave True owned a controlling interest in Belle Fourche at his death.

Turning to respondent's proposed values, we find that the net asset value method yielded reliable controlling values for Belle Fourche's total capital as of June 4 and June 30, 1994. Mr. Gustavson used the discounted cash-flow method to value Belle Fourche's pipeline assets, and verified his results with both the comparable sales and cost approaches.  Under the DCF method, he computed net cash-flows based on 23 years of Belle Fourche's operating data and on published information from regulatory authorities and industry surveys.  Even though Belle Fourche's actual throughput had increased in the early 1990's, to be conservative in his estimates, Mr. Gustavson assumed the higher throughput decline rates projected by the State of Wyoming. Although cash-flow projections are inherently speculative, we find Mr. Gustavson's estimates to be sufficiently supported by Belle Fourche's past performance and by industry data.

Mr. Kimball criticized Mr. Gustavson's use of a 14-percent cost of capital to discount projected net cash-flows, claiming that the rate was unsubstantiated and that it was wrongly based on the pipeline industry's regulated profit margin (10-percent maximum tariff over cost of service).  We disagree with petitioners and accept Mr. Gustavson's proposed discount rate for the following reasons.

Generally, a regulated company may only charge customers what the regulatory authority deems to be a fair rate of return on the company's investment.  Such companies usually are regulated because they have a captive market and are in a monopoly position to supply needed services; thus, their cost of capital should be considerably lower than that of an average company.  Therefore, allowed rates of return for regulated companies are viewed as reasonable benchmarks for a minimum boundary of the overall cost of capital.  See Pratt et al., Valuing a Business 179 (3d ed. 1996).

In addition, we find Mr. Gustavson's 14-percent discount rate to be reasonable given that the Scotia reports used a 10-percent discount rate to value True Oil under the DCF method and that Mr. Gustavson's rate is substantially higher than the 6- to 6.75-percent interest rate charged to Belle Fourche by its shareholders for outstanding debt during the relevant period.

Finally, we agree, in theory, with petitioners' observation that Mr. Gustavson should have consulted with management to support his throughput, net revenue, and discount rate estimates. However, in this case, Mr. Gustavson's oversight does not significantly undermine his conclusions of value because he was conservative in his estimates, and he reasonably relied on public information from a highly regulated industry to derive his projections.

Accordingly, we accept Mr. Gustavson's gross asset value of $34,600,000 (rounded) and subtract the corrected amount of shareholder debt of $15,915,350, to arrive at respondent's marketable controlling value on a net asset value basis of $18,684,650 as of June 4 and June 30, 1994.

A comparison of the parties' adjusted marketable values for Belle Fourche follows:

| Valuation date | Kimball reports' guideline company method (adjusted) marketable minority value | Respondent's net asset value method (adjusted) marketable controlling value | Respondent's net asset value method (adjusted) marketable minority value |
| --- | --- | --- | --- |
| June 4, 1994 | $21,325,000 | $18,684,650 | N/A |
| June 30, 1994 | $21,325,000 | N/A | $16,816,185 |

Again, we believe that some combination of both parties' valuation methods would most accurately measure Belle Fourche's marketable value. However, because respondent's marketable values (shown above) are less than Mr. Kimball's on both valuation dates, we accept respondent's values and treat them as concessions.

2. Marketability Discounts

a. Kimball Report

In the True Oil section of this opinion, see supra p. 204, we described the Kimball report's general discussion of empirical studies on marketability discounts. This information seems to have informed Mr. Kimball's choice of marketability discounts for

all the True companies he valued; therefore we do not repeat that discussion here.

The Kimball report also addressed aspects of the Stockholders' Restrictive Agreements that made the subject shares in the True companies less liquid than publicly traded shares. In general, Mr. Kimball found that the corporate buy-sell agreements had the same negative impact on marketability of corporate shares as the identical partnership agreement restrictions had on marketability of partnership interests.

Mr. Kimball also observed that S corporations in general, and Belle Fourche, Black Hills Trucking, and White Stallion in particular, had features that affected the fair market value of their stock. The Kimball report explained that limitations on the number and types of investors in S corporations reduced marketability by restricting the pool of willing buyers. On the other hand, the Kimball report noted that the lack of corporate level income taxes allowed S corporations to distribute more cash to shareholders, thus enhancing marketability.

Based on the foregoing, the Kimball reports concluded that the subject interests in Belle Fourche were not readily marketable and applied 40-percent marketability discounts to the marketable minority values as of June 4 and June 30, 1994.

b. <u>Initial and Final Lax Reports</u>

The initial Lax report concluded that a 40-percent marketability discount was appropriate even for a controlling interest in a company because of the substantial time and expense required to sell an interest in the absence of an established market. For instance, Mr. Lax noted that the sale of an interest in Belle Fourche would require preparation of a selling memorandum and audited financial statements, location of a buyer, drafting of legal documents, and coordination of financing arrangements.

The final Lax report disclaimed the initial Lax report's conclusions and did not apply a marketability discount in valuing Dave True's 68.47-percent interest in Belle Fourche. Mr. Lax explained that there was no empirical evidence suggesting that a marketability discount would apply to an interest of greater than 50 percent. In fact, AA's research showed that in many cases, buyers placed a premium on control that fully offset the illiquidity problems identified in the initial Lax report, thereby resulting in a net premium.

### c. Respondent's Position

Respondent relied on Mr. Lax's final conclusions to argue that a marketability discount would not apply to Dave True's controlling interest in Belle Fourche valued as of June 4, 1994. However, respondent allowed a 10-percent marketability discount

for Jean True's minority interest transferred as of June 30, 1994.

### d. Court's Analysis

As stated earlier, under Lauder III we disregard the buy-sell agreement in determining fair market value of the subject interests in Belle Fourche. See supra pp. 209-210. We consider the agreement only to recognize that its existence demonstrates the True family's commitment to maintain control over Belle Fourche. Accordingly, we reject Mr. Kimball's justifications for marketability discounts that derive from the buy-sell agreement restrictions.

We also find that the restricted shares and pre-IPO studies referenced by Mr. Kimball are not useful in determining marketability discounts applicable to controlling interests, because those studies analyzed marketability of noncontrolling interests.

In the past, we have said that controlling shares in a nonpublic corporation could suffer from a lack of marketability because of the absence of a ready private placement market and the costs of floating a public offering. See Estate of Andrews v. Commissioner, 79 T.C. at 953. Therefore, we disagree with the positions of Mr. Lax and respondent that marketability or illiquidity discounts are never justified in the case of controlling interests in private corporations.

In Estate of Jameson v. Commissioner, T.C. Memo. 1999-43, 77
T.C.M. (CCH) 1383, 1397, 1999 T.C.M. (RIA) par. 99,043, at 269-
99, we noted that the terms marketability and illiquidity are
closely related but are not interchangeable.  Liquidity is a
measure of the time required to convert an asset into cash and
may be influenced by marketability.  On the other hand,
marketability is not a temporal measure--it is a measure of the
probability of selling goods at specified terms, based on two
variables:  Demand for the asset and existence of an established
market for buyers and sellers of that asset type.  See id.  Thus,
if the interest being valued had the power to liquidate the
corporation, then demand for the corporation's assets (rather
than its stock) and existence of a market for such assets are
most relevant to our analysis of marketability.  See id.

In the cases at hand, Dave True's 68.47-percent interest
could control liquidation of Belle Fourche; therefore, we must
examine the marketability of Belle Fourche's pipeline assets.
Petitioners did not address directly the demand for pipeline
assets in the region during the relevant period.  However, based
on Mr. Gustavson's conservative projections, a buyer could expect
the Belle Fourche pipeline to continue to generate cash-flow for
another 15 years.  Moreover, the stiff competition in the region
suggests that larger pipeline owners might consider buying out
smaller pipeline operations rather than building new lines.  This

might explain why Belle Fourche purchased the Thunderbird pipeline in 1992. For these reasons, we find that Belle Fourche's pipeline assets were marketable.

Based on the record, we apply a 20-percent marketability discount in valuing Dave True's 68.47-percent interest in Belle Fourche as of June 4, 1994. This level of marketability discount on a controlling interest is within the range previously allowed by this Court. See, e.g., Estate of Jones v. Commissioner, 116 T.C. 11 (2001) (allowing an 8-percent marketability discount on a 83.08-percent controlling interest); Estate of Maggos v. Commissioner, T.C. Memo. 2000-129 (allowing a 25-percent illiquidity discount on a 56.7-percent interest conveying effective operational control); Estate of Hendrickson v. Commissioner, T.C. Memo. 1999-278 (allowing a 30-percent marketability discount on a 49.97-percent effectively controlling interest); Estate of Jameson v. Commissioner, supra (allowing a 3-percent marketability discount on a 98-percent controlling interest).

To determine the appropriate marketability discount for Jean True's 17.23-percent interest in Belle Fourche transferred as of June 30, 1994, we draw from our earlier discussion of marketability discounts applicable to minority interests in True Oil. In our True Oil analysis, see supra pp. 213-214, we began with Mr. Kimball's 40-percent discount, presumably derived from

the restricted shares studies, and reduced it to 30 percent to eliminate the effects on value of the buy-sell agreement restrictions.

We find that a minority interest in Belle Fourche, like a minority interest in True Oil, is less marketable than actively traded interests because: (1) The True family is committed to keeping Belle Fourche privately owned, (2) the subject interest lacks control, and (3) Federal tax rules limit the pool of potential investors in S corporations. However, certain facts suggest that a minority interest in Belle Fourche would be more marketable than an equivalent interest in True Oil. First, Belle Fourche historically has been profitable, unlike True Oil. Second, on average Belle Fourche's distributions substantially exceeded the shareholders' tax obligations on their distributive shares of income, while True Oil's net distributions were not significant. Third, a purchaser of Belle Fourche stock would not be subject to joint and several liability.

Based on the foregoing, we conclude that a minority interest in Belle Fourche is more marketable than the same percentage interest in True Oil. Therefore, to remain within the 26 to 45-percent range of discounts observed in the restricted shares studies, we assign a 27-percent marketability discount to Jean True's 17.23-percent interest in Belle Fourche transferred as of June 30, 1994.

### 3. Summary of Proposed Values and Court's Determinations of Values of Interests in Belle Fourche

| Value as of June 4, 1994 | Book value reported on return | Statutory notice value | Kimball reports | Final Lax report | Respondent's position | Court's values |
|---|---|---|---|---|---|---|
| Entity Value (Controlling Basis) | N/A | N/A | N/A | N/A | $17,484,650 | $18,684,650 |
| Less: Minority Discount | N/A | N/A | N/A | N/A | N/A | N/A |
| Marketable Minority Value | N/A | N/A | $13,654,361 | N/A | N/A | N/A |
| Less: Marketability Discount | N/A | N/A | (5,461,744) 40% | N/A | N/A | (3,736,930) 20% |
| Nonmarketable Minority Value | N/A | N/A | 8,192,617 | N/A | N/A | 14,947,720 |
| Value of 68.47% Interest Owned at Dave True's Death | 747,723 | 19,801,518 | 5,609,485 | 4,100,000 | 11,971,740 | 10,234,704 |

| Value as of June 30, 1994 | Book value reported on return | Statutory notice value | Kimball reports | Final Lax report | Respondent's position | Court's values |
|---|---|---|---|---|---|---|
| Entity Value (Controlling Basis) | N/A | N/A | N/A | N/A | 17,484,650 | 18,684,650 |
| Less: Minority Discount | N/A | N/A | N/A | N/A | (1,748,465) 10% | (1,868,465) 10% |
| Marketable Minority Value | N/A | N/A | 13,654,361 | N/A | 15,736,185 | 16,816,185 |
| Less: Marketability Discount | N/A | N/A | (5,461,744) 40% | N/A | (1,573,618) 10% | (4,540,370) 27% |
| Nonmarketable Minority Value | N/A | N/A | 8,192,617 | N/A | 14,162,567 | 12,275,815 |
| Value of 17.23% Interests (total) Transferred to True Sons | 183,593 | 4,982,916 | 1,411,588 | N/A | 2,440,210 | 2,115,123 |

C.  <u>Eighty-Eight Oil</u>

    1.  <u>Marketable Minority Interest Value</u>

        a.  <u>Kimball Reports</u>

Mr. Kimball applied the guideline company method to value the subject interests in Eighty-Eight Oil as of January 1, 1993, June 4, 1994, and June 30, 1994.  First, Mr. Kimball identified five guideline companies that devoted some or all of their business to the marketing of crude oil and gas.  Mr. Kimball then analyzed four market multiples:  EBIT, EBDIT, Revenues, and TBVIC.  He used data from the latest year and an average of the 5 preceding years to calculate the multiples.  Mr. Kimball weighted the EBDIT and TBVIC multiples at 40 percent each and the rest at 10 percent each.

Mr. Kimball concluded that the fair market value of Eighty-Eight Oil's total equity on a marketable minority basis was $25,174,683 on January, 1, 1993, and $31,069,285 on both June 4 and June 30, 1994.

        b.  <u>Final Lax Report</u>

The final Lax report also used the guideline company method and compared Eighty-Eight Oil's financial results to those of six companies.  As a group, the chosen guideline companies engaged in all aspects of the oil and gas business, including acquisition of properties, exploration and production, and transportation and

marketing.  Mr. Lax used the same group of companies to value True Oil, Eighty-Eight Oil, and Smokey Oil.

Mr. Lax applied EBDIT, EBIT, EBT, and book value multiples to Eighty-Eight Oil's financial results for the 12-month period ending May 31, 1994.  As with the other True companies, Mr. Lax did not provide supporting schedules showing how he calculated the guideline company multiples and Eighty-Eight Oil's financial fundamentals.

The final Lax report concluded that the fair market value of Eighty-Eight Oil's total equity on a marketable minority basis was $40 million on June 3, 1994.

### c.  Respondent's Position

Respondent offered no expert testimony or other evidence regarding Eighty-Eight Oil's total equity value on the relevant dates.  Instead, respondent agrees with Mr. Kimball's marketable minority value of $25,174,683 as of January 1, 1993, and with Mr. Lax's "entity value" of $40 million as of June 3, 1994. Respondent did not explain why he rejected Mr. Kimball's June 4, 1994, value or how he justified the large disparity in entity values between proximate valuation dates.

Respondent also argues, as he did with True Oil, that Dave True's 38.47-percent interest owned at death is not entitled to a minority discount, because it represented a significant ownership

block that had swing vote potential.[74]

### d. Court's Analysis

The positions of the parties and the Court's determinations of the marketable minority values of Eighty-Eight Oil's total equity at each of the valuation dates are summarized infra pp. 250-251.

We accept the agreement of the parties that the marketable minority value of Eighty-Eight Oil's total equity was $25,174,683 on January 1, 1993. However, we have reservations regarding the reliability of this value, which we explain later.

We are critical of respondent's reliance on the final Lax report to establish marketable minority value as of June 4 and June 30, 1994. First, as noted several times in this opinion, the final Lax report's guideline company analyses lack adequate substantiation. In contrast, the Kimball reports are well documented, and the amounts reported therein are traceable to the various companies' Federal income tax returns. We are unable to reconcile Eighty-Eight Oil's financial fundamentals as reported

---

[74]This argument is inconsistent with respondent's acceptance of Mr. Lax's entity value as of June 3, 1994, which was derived on a marketable minority basis. Respondent explicitly argued, in connection with Dave True's controlling interests in Belle Fourche and Black Hills Trucking, that if those entities were valued on a minority basis, a control premium of 25 percent should have been applied to derive entity value. It is unclear whether respondent is making the same argument regarding Dave True's significant, but not controlling, ownership of Eighty-Eight Oil. We need not resolve this issue, however, because we reject respondent's swing vote argument infra p. 244.

in the Lax and Kimball reports, even though the reports covered roughly the same period and allegedly relied on the same tax return information.  Because of the Lax report's substantiation problems, we conclude that the Kimball reports provide more reliable conclusions of value.  Second, we find that the Kimball reports used guideline companies that were more comparable to Eighty-Eight Oil.  Three of the six guideline companies chosen by Mr. Lax engaged in oil and gas exploration and production and not in oil and gas marketing activities.  These companies may have been appropriate comparables for True Oil or Smokey Oil, but not for Eighty-Eight Oil.  Third, respondent provides no reasoned justification for choosing Mr. Kimball's January 1, 1993, value, but using Mr. Lax's significantly higher June 3, 1994, value.

We also reject respondent's swing vote argument concerning Dave True's 38.47-percent interest owned at death, for the reasons stated in our analysis of True Oil.  See supra pp. 201-202.

On the basis of the foregoing, we accept Mr. Kimball's marketable minority value for Eighty-Eight Oil of $31,069,285 as of June 4 and June 30, 1994.

Although we have accepted Mr. Kimball's marketable minority values, based on the agreement of the parties and our problems with respondent's reliance on the final Lax report, we note certain facts that cast doubt on the reliability of Mr. Kimball's

entity values.  First, as of January 1, 1993, Eighty-Eight Oil's total equity on a book basis was more than $43.5 million, which was primarily composed of cash, cash equivalents, and accounts receivable.  Given the lack of any substantial book to fair market value disparities for these liquid assets, we question the accuracy of Mr. Kimball's total equity value of just over $25 million.  If this difference only related to the fact that Mr. Kimball derived a minority value, and not a controlling value, that would suggest an implied minority discount of approximately 43 percent, which would be excessive.

Second, we are troubled by the differences in the way petitioners derived the sales price for the interest transferred by Dave True to his sons on January 1, 1993, compared to Mr. Kimball's method for valuing the subject interest.  The Eighty-Eight Oil buy-sell agreement required the selling partner to sell all or some of his interest for book value, as reflected by his capital account, as of the day immediately preceding the sales event.  As previously stated, the sales price under the buy-sell agreement amounted to approximately 5.86 percent of total partners' capital as of December 31, 1992.  However, Mr. Kimball valued the subject interests by computing total equity value on a minority basis, by applying a marketability discount, see infra, and then by multiplying total discounted equity by 24.84 percent.  Because Eighty-Eight Oil routinely allowed its partners to

maintain disproportionate capital accounts, the two approaches are fundamentally inconsistent. To the extent that the partnership agreement defines the interest being transferred, we doubt that Mr. Kimball has valued the correct interest. As a general matter, we are also concerned with the anomalous economic results[75] that have occurred due to the allowance of disproportionate capital accounts.

We account for the abovementioned concerns in our determination of marketability discounts.

2. Marketability Discounts

a. Kimball Reports

Mr. Kimball treated the subject interests in Eighty-Eight Oil as not being readily marketable for the same reasons

---

[75]We note again that in 1984, Tamma Hatten had to reduce her proceeds from the sales of other True companies in order to sell her interest in "cash cow" Eighty-Eight Oil because of her negative ending capital account. Also, Dave True's unusually low capital balance at the effective date of the 1993 transfers arguably created an additional gift to his sons, because the True sons only paid what amounted to 5.86 percent of total partners' capital ostensibly to purchase the right to an additional 24.84 percent of profits, losses, and partners' capital. It would appear that Dave True's unusual (the day before the sale) contribution to partners' capital of more than $6 million was intended to avoid a sale at a price so low in relation to overall book value of partners' capital and the percentage interest in profits being sold as to be impossible to justify with even a semblance of a straight face. Petitioners argue on brief that Dave True "substantially restored" his disproportionate capital account before the 1993 transfers because Eighty-Eight Oil required the extra cash to conduct its business. We are unconvinced by petitioners' justifications, and we note that Dave True's capital account remained disproportionately low even after the allegedly "substantial" restoration.

described in the True Oil section of this opinion. See supra pp. 204-206. Accordingly, Mr. Kimball applied 35-percent marketability discounts to the marketable minority values as of January 1, 1993, June 4, 1994, and June 30, 1994.

### b. Final Lax Report

The final Lax report concluded that a minority interest in Eighty-Eight Oil was relatively illiquid, for the same reasons described in the True Oil section of this opinion. See supra p. 207. Therefore, Mr. Lax applied a 45-percent marketability discount to the marketable minority value calculated as of June 3, 1994.

### c. Respondent's Position

Respondent characterizes the Eighty-Eight Oil interests as being marketable and therefore proposes a 10-percent discount for interests being valued as of January 1, 1993, and June 30, 1994, and no discount (due to swing vote potential) for the interest being valued as of June 4, 1994.

### d. Court's Analysis

First, we reject Mr. Kimball's justifications for marketability discounts that derive from the buy-sell agreement restrictions. Second, we reject Mr. Lax's and respondent's proffered marketability discounts for the same reasons stated in the True Oil section of this opinion. See supra p. 213.

We find that a minority interest in Eighty-Eight Oil was not fully marketable at the valuation dates because: (1) The True family was committed to keeping Eighty-Eight Oil privately owned; (2) there were risks that a purchaser would not obtain unanimous consent to be admitted as a partner; and (3) a purchasing partner would be exposed to joint and several liability.

However, a minority interest in Eighty-Eight Oil would be more marketable than an equivalent interest in True Oil or in comparable public companies. Unlike True Oil, Eighty-Eight Oil was profitable and consistently made guaranteed payments to its partners, who considered the company to be a "cash cow". Furthermore, during the period being examined, Eighty-Eight Oil was more liquid than the industry, and the concepts of liquidity and marketability are closely related. Finally, a general partner in Eighty-Eight Oil would exert more control over the business than a shareholder would in a comparable public company. Under the WUPA, partnership agreements generally govern relations among the partners and between the partners and the partnership. See Wyo. Stat. Ann. sec. 17-21-103(a) (Michie 1999). Eighty-Eight Oil's partnership agreement required the partners to manage jointly the partnership's affairs. Thus under Wyoming law, each partner had an equal vote in (among other things) appointing management, setting business policies, making distributions, buying and selling assets, and amending the partnership

agreement.  A minority shareholder could not exercise equivalent control over a public company because voting power is generally proportional to a shareholder's ownership interest.

On the basis of the foregoing, we conclude that minority interests in Eighty-Eight Oil are more marketable than either minority interests in True Oil or restricted shares in a publicly traded oil and gas marketing company.  In addition, as previously stated, we doubt the reliability of the entity values derived by the parties due to the widely disproportionate capital accounts. See supra pp. 244-246.  These facts suggest that no more than nominal discounts, if any, would be appropriate for the subject interests.  We, therefore, adopt and apply respondent's position allowing no more than 10-percent marketability discounts from minority value for the Eighty-Eight Oil interests valued as of January 1, 1993, June 4, 1994, and June 30, 1994.

### 3. Summary of Proposed Values and Court's Determinations of Values of Interests in Eighty-Eight Oil

| Value as of January 1, 1993 | Book value reported on return | Statutory notice value | Kimball reports | Final Lax report | Respondent's position | Court's values |
|---|---|---|---|---|---|---|
| Marketable Minority Value | N/A | N/A | $25,174,683 | N/A | $25,174,683 | $25,174,683 |
| Less: Marketability | | | (8,811,139) | | (2,517,468) | (2,517,468) |
| Discount | N/A | N/A | 35% | N/A | 10% | 10% |
| Nonmarketable Minority Value | N/A | N/A | 16,363,544 | N/A | 22,657,215 | 22,657,215 |
| Value of 24.84% Interests (total) Transferred to True Sons | 2,556,378 | 13,248,002 | 4,064,704 | N/A | 5,628,052 | 5,628,052 |

| Value as of June 4, 1994 | Book value reported on return | Statutory notice value | Kimball reports | Final Lax report | Respondent's position | Court's values |
|---|---|---|---|---|---|---|
| Marketable Minority Value | N/A | N/A | 31,069,285 | 40,000,000 | 40,000,000 | 31,069,285 |
| Less: Marketability | | | (10,874,250) | (18,000,000) | | (3,106,928) |
| Discount | N/A | N/A | 35% | 45% | N/A | 10% |
| Nonmarketable Minority Value | N/A | N/A | 20,195,035 | 22,000,000 | 40,000,000 | 27,962,357 |
| Value of 38.47% Interest Owned at Dave True's Death | 9,546,285 | 26,505,830 | 7,769,030 | 8,463,400 | 15,388,000 | 10,757,119 |

| Value as of June 30, 1994 | Book value reported on return | Statutory notice value | Kimball reports | Final Lax report | Respondent's position | Court's values |
|---|---|---|---|---|---|---|
| Marketable Minority Value | N/A | N/A | $31,069,285 | N/A | $40,000,000 | $31,069,285 |
| Less: Marketability Discount | N/A | N/A | (10,874,250) 35% | N/A | (4,000,000) 10% | (3,106,928) 10% |
| Nonmarketable Minority Value | N/A | N/A | 20,195,035 | N/A | 36,000,000 | 27,962,357 |
| Value of 17.23% Interests (total) Transferred to True Sons | 4,400,744 | 11,871,469 | 3,479,605 | N/A | 6,202,800 | 4,817,914 |

D.  Black Hills Trucking

    1.  Value of Total Equity on a Marketable Basis

        a.  Kimball Report

Mr. Kimball applied a combination of the guideline company and net asset value methods to value the subject interests in Black Hills Trucking as of June 4 and June 30, 1994.

Under the guideline company method, Mr. Kimball identified 10 companies from the trucking industry and analyzed revenue and TBVIC multiples, weighting each multiple equally.  He used data from the latest year and an average of the 5 preceding years to calculate the multiples.  Mr. Kimball selected revenue multiples that were lower than the lowest guideline company multiples; however, he selected a TBVIC multiple that approximated the median value among the guideline companies.  After subtracting debt to shareholders of $2.8 million, Mr. Kimball concluded that the fair market value of Black Hills Trucking's total equity on a marketable minority basis was $5,953,417, under the guideline company method.

Mr. Kimball calculated total equity on a minority basis even though he was valuing a 58.16-percent interest as of June 4, 1994, because he found, consistent with his analysis of Belle Fourche, see supra p. 218, that the Black Hills Trucking buy-sell agreement eliminated any premium for control that might otherwise have attached to a block of stock representing voting control.

Under the net asset value method, Mr. Kimball estimated the market value of Black Hills Trucking's individual assets by category. First, he adjusted the company's book value balance sheet to eliminate tax basis accumulated depreciation. Second, he reduced the cost basis of fixed assets to approximately 70 percent of book value. Third, Mr. Kimball subtracted liabilities to arrive at an adjusted NAV of $10,933,730 as of June 4 and June 30, 1994.

Mr. Kimball applied a 10-percent lack-of-control discount to adjusted NAV as of June 4 and June 30, 1994, for the same reasons mentioned above in the guideline company section. Thus, Mr. Kimball concluded that the fair market value of Black Hills Trucking's total equity on a marketable minority basis was $9,840,357, under the net asset value method.

### b. Initial and Final Lax Reports

The initial Lax report used only the net asset value method to value the subject interests in Black Hills Trucking, because the company consistently operated at a loss. Mr. Lax physically inspected only a few of the several hundred vehicles, trailers, and miscellaneous equipment owned by Black Hills Trucking; when inspection was infeasible, he relied on information provided by the company's representatives such as fixed asset records, vehicle maintenance logs, and depreciation schedules. In computing net asset value, Mr. Lax assumed that Black Hills

Trucking equipment could be sold in orderly fashion over a long period of time, rather than in a forced liquidation.

Mr. Lax used the market approach to value assets in the power and trailer equipment categories by gathering information on recent sales of similar property and by determining the most probable selling price of the subject property. In the process, Mr. Lax consulted auction guides, trade magazines, and new and used equipment dealers. He made no adjustments to market values to reflect physical depreciation or functional or economic obsolescence, assuming that these factors were incorporated into the market data.

Mr. Lax used the cost approach to value assets in the miscellaneous and office equipment category. He determined the cost of new replacement assets by contacting original manufacturers or by applying inflation factors to historical costs and verifying the results with vendors. He then made adjustments to each replacement cost figure to reflect depreciation and obsolescence.

After reducing the fair market value of underlying assets by total liabilities, the initial Lax report concluded that the controlling marketable value of a 100-percent interest in Black Hills Trucking was $10,933,730 as of June 3, 1994.

As described in more detail infra, the initial Lax report applied a 50-percent marketability discount to arrive at a

nonmarketable controlling value for Dave True's 58.16-percent interest of $3,179,530.

The final Lax report calculated the same controlling marketable equity value on a net asset value basis as the initial Lax report. However, Mr. Lax reduced the controlling value by 50 percent to reflect the fact that a 58.16-percent interest in Black Hills Trucking would not be entitled to a control premium.

Mr. Lax explained that the 50-percent reduction was not a marketability discount; instead it reflected Mr. Lax's impression that a willing buyer would not pay a price based on a proportional value of the company's underlying assets. He reasoned that because Black Hills Trucking operated at a loss, a hypothetical buyer with a controlling interest would liquidate the company's assets as soon as possible to stem further losses. Such a rapid disposition of specialized equipment within a limited geographic region generally would depress value by 50 percent, according to Mr. Lax.

Thus, the final Lax report concluded that the fair market value of a 58.16-percent equity interest in Black Hills Trucking was $3,179,530 as of June 3, 1994.

c. Respondent's Position

Respondent offered no expert testimony or other evidence regarding Black Hills Trucking's total equity value on the relevant dates. Instead, respondent adopted the net asset value conclusions of the final Lax report and treated $10,933,730 as

the controlling equity value of Black Hills Trucking on June 4 and June 30, 1994.

Respondent argues that Dave True's 58.16-percent interest owned at death should be valued as a controlling interest, contrary to Mr. Kimball's minority interest treatment under both the guideline company and net asset value methods. Respondent contends that if Mr. Kimball's minority values are accepted by the Court, a 25-percent control premium should be added to reflect Dave True's control at death. Respondent derived the premium amount from the initial Lax report, which applied a 25-percent control premium to compute the marketable controlling value of Belle Fourche, see supra p. 219.

Respondent also argues, as he did with True Oil, see supra pp. 194-195, that Jean True's 37.63-percent interest transferred as of June 30, 1994, was not entitled to a minority discount, because it represented a significant ownership block that had swing vote potential.

### d. Court's Analysis

The positions of the parties and the Court's determinations of the marketable value of Black Hills Trucking's total equity at each of the valuation dates are summarized infra pp. 266-267.

We accept the final Lax report's controlling equity value on a net asset value basis of $10,933,730 as of June 3, 1994. We believe that a hypothetical buyer would consider underlying asset value in negotiating a purchase price, especially if purchasing a

controlling interest. Mr. Lax's approach to valuing the different categories of fixed assets was reasonable and well documented. Furthermore, Mr. Kimball and respondent agreed with Mr. Lax's net asset value conclusions.

We disagree, however, with the conclusion of the final Lax report that a 50-percent discount should be applied to arrive at the fair market value of Dave True's 58.16-percent interest. Mr. Lax provided no empirical evidence to support this reduction. At trial, Mr. Lax tried to distinguish this discount from the 50-percent marketability discount taken in the initial Lax report. He explained that a reduction was necessary because a hypothetical buyer would be forced to sell immediately the company's assets to avoid additional operating losses. However, this statement contradicted Mr. Lax's earlier testimony, in which he explained that he had computed Black Hills Trucking's net asset value assuming an orderly disposition of assets, not a forced liquidation. If we accept that a hypothetical buyer would compute entity value under the orderly disposition premise, there is no reason for us to assume that the buyer would value a 58.16-percent interest in Black Hills Trucking under any other valuation premise. Moreover, the initial and final Lax reports both arrived at the same ultimate value of $3,179,530 for Dave True's interest using very different assumptions regarding marketability. This suggests that the final Lax report was result-oriented.

Turning to the Kimball report, we doubt the reliability of the guideline company method values.  First, we question whether the relationship between revenues, TBVIC, and market value of the selected public companies has any bearing on the market value of Black Hills Trucking.  The guideline companies were all profitable over the 5-year period, whereas Black Hills Trucking sustained losses every year.  Also, most of the guideline companies had significantly higher average revenues over the analyzed period than Black Hills Trucking.  As a result, Mr. Kimball applied multiples to Black Hills Trucking's revenues that were lower than the lowest industry multiples.  These facts suggest a lack of comparability between the selected companies and Black Hills Trucking.

Second, Mr. Kimball did not adjust the TBVIC multiple to reflect differences in accounting methods between Black Hills Trucking and the public companies.  TBVIC is a debt-free measure of a company's book value.  Black Hills Trucking's book value was computed on a tax basis, which allowed more accelerated depreciation deductions than GAAP basis financials.  Annually, the company deducted approximately $2.1 million in depreciation expense.  There is no evidence in the record indicating that Mr. Kimball adjusted the TBVIC multiples of either the guideline companies or Black Hills Trucking to reconcile any discrepancies in accumulated depreciation.

Third, contrary to the Kimball report's emphasis on the TBVIC multiple, we find that it is not a meaningful measure of value in this case. In general, book value of tangible assets would serve as a meaningful measure of value only if book value was close to market value on the valuation date. Thus, tangible asset values first should be adjusted to their respective fair market values to make price-to-asset-value ratios more relevant. Moreover, equipment varies from one company to another in age, condition, and importance to the operations, so that price-to-asset-value measures are difficult to implement on a comparison basis and frequently are not helpful. See Pratt et al., Valuing a Business 217 (3d ed. 1996).

Black Hills Trucking owned a variety of heavy specialized equipment that was purchased anywhere from 1 to 40 years before the valuation date. Mr. Kimball calculated the fair market value of equipment (under the NAV method) to be $11.5 million as of December 31, 1993, while net book value was $2.5 million. Such a large disparity between book value and fair market value suggests that TBVIC is not an appropriate basis for valuing Black Hills Trucking.

Fourth, we disagree with Mr. Kimball that Dave True's 58.16-percent interest in Black Hills Trucking, valued as of June 4, 1994, should be treated as a noncontrolling interest. As we said in the Belle Fourche section of this opinion, see supra pp. 229-230, we disregard the buy-sell agreement in computing fair market

value and look to Wyoming law to determine the rights accorded a 58.16-percent interest in Black Hills Trucking.

Wyoming law allows the holder of a majority of the shares entitled to vote to control the board of directors, sell corporate assets, or dissolve the corporation.  See discussion of Wyoming law supra p. 230.  No articles of incorporation or bylaws were introduced in evidence for Black Hills Trucking.  Therefore, we assume that the company's governing documents do not vary from Wyoming law.  Dave True's 58.16-percent interest represented a majority of the shares entitled to vote; therefore, Dave True owned a controlling interest in Black Hills Trucking at his death.  Accordingly, Mr. Kimball should have added a control premium to compute entity value under the guideline company method.

For the reasons stated above, we reject Mr. Kimball's valuation conclusions under the guideline company method.  We need not discuss the merits of Mr. Kimball's net asset value approach because his controlling interest value equaled that of Mr. Lax, which we have already adopted.  However, we reject Mr. Kimball's 10-percent lack of control discount to adjusted NAV as of June 4, 1994, because Dave True owned a controlling interest at death.

Turning to respondent's position, we agree that Dave True's 58.16-percent interest valued at June 4, 1994, is not entitled to a minority discount.  However, we disagree with respondent's

swing vote argument regarding Jean True's 37.63-percent interest transferred as of June 30, 1994, for the reasons stated in our analysis of True Oil, see <u>supra</u> pp. 202-203, and we find that a minority discount is warranted. We apply Mr. Kimball's proposed 10-percent lack-of-control discount to Mr. Lax's net asset value to arrive at a marketable minority value as of June 30, 1994, of $9,840,357 for the interest sold by Jean True to her sons.

A summary of our determinations regarding marketable entity values for Black Hills Trucking follows:

| Valuation date | Net asset value method marketable controlling value | Net asset value method marketable minority value |
|---|---|---|
| June 4, 1994 | $10,933,730 | N/A |
| June 30, 1994 | N/A | $9,840,357 |

2. <u>Marketability Discounts</u>

a. <u>Kimball Report</u>

Based on the reasoning described in the Belle Fourche section of this opinion, see <u>supra</u> pp. 233-234, Mr. Kimball concluded that the subject interests in Black Hills Trucking were not readily marketable, and he applied 45-percent marketability discounts to the marketable minority values as of June 4 and June 30, 1994.

The table below summarizes the nonmarketable minority values of the subject interests in Black Hills Trucking calculated using the guideline company and NAV methods.

| Valuation date | Guideline company method nonmarketable minority value of subject interest | NAV method nonmarketable minority value of subject interest |
|---|---|---|
| June 4, 1994 | $1,904,000 | $3,147,733 |
| June 30, 1994 | $1,232,149 | $2,036,609 |

Mr. Kimball then applied a 30-percent weight to the guideline company method valuation conclusions and a 70-percent weight to the NAV method conclusions, resulting in final nonmarketable minority values (rounded) for the subject interests of $2,775,000 as of June 4, 1994, and $1,795,000 as of June 30, 1994.

### b. Initial and Final Lax Reports

As previously stated, the initial Lax report concluded that a 50-percent marketability discount was appropriate even for a controlling interest in a company because of the substantial time and expense required to sell an interest in the absence of an established market.

However, the final Lax report applied no marketability discounts to Dave True's 58.16-percent interest in Black Hills Trucking for the reasons described in the Belle Fourche section of this opinion. See supra p. 235.

### c. Respondent's Position

Respondent relied on Mr. Lax's final conclusions to argue that a marketability discount would not apply to Dave True's

controlling interest in Black Hills Trucking valued as of June 4, 1994. Similarly, respondent denied any marketability discount to Jean True's 37.63-percent interest valued as of June 30, 1994, because the transferred interest had swing vote potential.

### d. Court's Analysis

As stated earlier, under Lauder III, we disregard the buy-sell agreement in determining fair market value of the subject interests in Black Hills Trucking. See supra pp. 209-210. Accordingly, we reject Mr. Kimball's justifications for marketability discounts that derive from the buy-sell agreement restrictions.

We find that the restricted shares and pre-IPO studies referenced by Mr. Kimball are not useful in determining marketability discounts applicable to controlling interests, because those studies analyzed marketability of noncontrolling interests.

We also disagree with the positions of Mr. Lax and respondent that marketability or illiquidity discounts are never justified in the case of controlling interests in private corporations. See Estate of Andrews v. Commissioner, 79 T.C. at 953.

In the cases at hand, Dave True's 58.16-percent interest could control liquidation of Black Hills Trucking; therefore, we must examine the marketability of Black Hills Trucking's assets. Mr. Lax valued Black Hills Trucking's power and trailer equipment

by consulting auction guides, trade magazines, and new and used equipment dealers. This suggests an active market for these types of assets. However, Black Hills Trucking's fixed assets had a low tax basis relative to their resale value, which would trigger a tax liability on sale. Also, a willing seller would incur other transaction costs to dispose of the company's assets either on a bulk sale or an item-by-item basis.

Based on the record, we apply a 20-percent marketability discount in valuing Dave True's 58.16-percent interest in Black Hills Trucking as of June 4, 1994. This level of marketability discount on a controlling interest is within the range previously allowed by this Court. See cases cited supra p. 238.

To determine the appropriate marketability discount for Jean True's 37.63-percent interest in Black Hills Trucking transferred as of June 30, 1994, we draw from our discussion of discounts applicable to minority interests in Belle Fourche. See supra pp. 238-239.

We find that a minority interest in Black Hills Trucking, like a minority interest in Belle Fourche, is less marketable than actively traded interests because: (1) The True family is committed to keeping Black Hills Trucking privately owned, (2) the subject interest lacks control, and (3) Federal tax rules limit the pool of potential investors in S corporations. Moreover, certain facts suggest that a minority interest in Black Hills Trucking would be less marketable than a minority interest

in Belle Fourche.  First, Black Hills Trucking was unprofitable, unlike Belle Fourche.  Second, Black Hills Trucking's shareholder distributions were negligible, while Belle Fourche's were significant.  In fact, during the period analyzed, shareholders lent or contributed substantial amounts to Black Hills Trucking.

Based on the foregoing, we conclude that a minority interest in Black Hills Trucking was less marketable than a minority interest in Belle Fourche.  Therefore, we assign a 30-percent marketability discount to Jean True's 37.63-percent interest in Black Hills Trucking transferred as of June 30, 1994.

3. Summary of Proposed Values and Court's Determinations of Values of Interests in Black Hills Trucking

| Value as of June 4, 1994 | Book value reported on return | Statutory notice value | Kimball reports | | Final Lax report | Respondent's position | Court's values |
|---|---|---|---|---|---|---|---|
| | | | Guideline co. | NAV method | | | |
| Entity Value (Controlling Basis) | N/A | N/A | N/A | $10,933,730 | $10,933,730 | $10,933,730 | $10,933,730 |
| Less: Minority Discount | N/A | N/A | N/A | (1,093,373) 10% | N/A | N/A | N/A |
| Marketable Minority Value | N/A | N/A | $5,953,417 | 9,840,357 | N/A | N/A | N/A |
| Less: Marketability Discount | N/A | N/A | (2,679,038) 45% | (4,428,161) 45% | N/A | N/A | (2,186,746) 20% |
| Nonmarketable Minority Value | N/A | N/A | 3,274,379 | 5,412,196 | N/A | N/A | 8,746,984 |
| Value of 58.16% | | | 30% | 70% | | | |
| Interest Owned at Dave True's Death | 951,467 | 6,359,055 | 2,774,727 | | 3,179,530[1] | 6,359,057 | 5,087,246 |

[1] Mr. Lax applied a 50-percent reduction to controlling marketable equity value to arrive at the value of the subject interest. He did not consider the reduction to be a marketability discount.

| Value as of June 30, 1994 | Book value reported on return | Statutory notice value | Kimball reports | | Final Lax report | Respondent's position | Court's values |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Guideline co. | NAV Method | | | |
| Entity Value (Controlling Basis) | N/A | N/A | N/A | $10,933,730 | N/A | $10,933,730 | $10,933,730 |
| Less: Minority Discount | N/A | N/A | N/A | (1,093,373) 10% | N/A | N/A | (1,093,373) 10% |
| Marketable Minority Value | N/A | N/A | $5,953,417 | 9,840,357 | N/A | N/A | 9,840,357 |
| Less: Marketability Discount | N/A | N/A | (2,679,038) 45% | (4,428,161) 45% | N/A | N/A | (2,952,107) 30% |
| Nonmarketable Minority Value | N/A | N/A | 3,274,379 | 5,412,196 | N/A | N/A | 6,888,250 |
| | | | 30% | 70% | | | |
| Value of 37.63% Interests (total) Transferred to True Sons | 590,511 | 4,147,164 | 1,795,271 | | N/A | 4,114,363 | 2,952,048 |

E.  True Ranches

    1.  Marketable Minority Interest Values

        a.  H&H Report

Hall and Hall Mortgage Corp. (H&H) prepared a detailed appraisal of land and improvements owned by True Ranches as of January 1, 1993, and June 3, 1994.[76]  Mr. Hall and his colleagues gathered data from local sources, including ranch owners, government offices, other appraisers, and real estate agents. They also personally inspected the True Ranches properties and examined comparable sales.  Mr. Hall concluded that the highest and best use of True Ranches' property was its current use as an integrated commercial livestock range and finishing operation.

    Mr. Hall found the cost approach to be the most reliable measure of fair market value for True Ranches' land and improvements; however, he also used the income and sales comparison approaches to corroborate his cost approach values. Mr. Hall explained that the term "cost approach" was misleading, because even though the method valued improvements based on estimated replacement cost, it valued land based on comparable sales.

---

[76]H&H conducted a full appraisal of the subject property as of June 3, 1994.  The H&H report stated that fair market value did not change between June 3 and June 4, 1994.  Mr. Hall adjusted the June 3, 1994, value to reflect fair market value as of Jan. 1, 1993, rather than conducting another full appraisal. These adjustments took into account property acquisitions and inflation in land values between the two valuation dates.

After computing the total value of land and improvements under the cost approach, Mr. Hall then reduced this value by a 20-percent size adjustment.  Relying on market data, Mr. Hall concluded that large or noncontiguous parcels of land generally sold for lower prices per acre.  The majority of the available data used in the cost approach related to sales of relatively small parcels of land (generally less than 20,000 deeded acres).  However, True Ranches' land holdings consisted of large, mostly noncontiguous parcels (approximately 265,000 total deeded acres).  Thus, Mr. Hall applied the 20-percent size adjustment to eliminate this disparity.

To check the reasonableness of the size adjustment, Mr. Hall compared the computed per acre value (after size adjustment) of True Ranches' largest parcel (Plains Rangeland--183,990 deeded acres) to the three largest actual sales for which data was available (each comprising over 30,000 deeded acres) and concluded that the per acre values were within a reasonable range of each other.  To further support his discount, Mr. Hall cited a publication prepared by the University of Wyoming, which stated that in the mid-1990's, ranches of 600 animal units sold for 16 percent less than ranches with 300 to 400 animal units.  True Ranches' estimated capacity was 12,500 animal units.  Finally, Mr. Hall testified that the 20-percent size adjustment did not represent a discount for lack of marketability of the land and improvements.

### b.  Kimball Reports

Mr. Kimball used the net asset value method to compute controlling equity value of True Ranches.  The company's major assets included land and improvements, machinery and equipment, and feed and livestock inventories.  Mr. Kimball relied on the following appraisals to derive the company's net asset value: (1) Land and improvements appraisal prepared by H&H as of January 1, 1993, and June 3, 1994, (2) machinery and equipment appraisal prepared by Don Helberg as of June 1994, and (3) feed and livestock inventories appraisal prepared by the superintendent of True Ranches as of January 1, 1993, and June 4, 1994.  With this information, Mr. Kimball adjusted True Ranches' book value balance sheet to reflect the fair market value of assets and liabilities and calculated an adjusted net asset value of $41,003,000 as of January 1, 1993, and $45,297,509 as of June 4 and June 30, 1994.

Mr. Kimball then applied a 25-percent minority discount, reflecting the subject interests' lack of control, to arrive at a marketable minority value of $30,752,250 as of January 1, 1993, and $33,973,132 as of June 4 and June 30, 1994.

### c.  Final Lax Report

The final Lax report also used the net asset value method to value True Ranches' total equity, generally relying on the same asset appraisals used in preparing the Kimball reports.  However, Mr. Lax adjusted True Ranches' balance sheet information as of

April 30, 1994, whereas Mr. Kimball adjusted the June 4, 1994, balance sheet.  As a result, the final Lax report arrived at a net asset value as of June 3, 1994, of $44,643,191, which was slightly lower than the amount computed by Mr. Kimball.

Next, Mr. Lax applied a combined minority and marketability discount from net asset value of 60 percent.  He derived the combined discount by examining three published studies containing economic and market price information on publicly registered real estate partnerships that traded in secondary markets.  According to the final Lax report, the studies showed that partnerships owning income producing properties but not making regular cash distributions sold at average combined discounts of 43 percent in 1992, 51 percent in 1993, and 76 percent in 1994.

Mr. Lax noted that the combined discounts reported in the studies reflected the lack of control of limited partners over partnership distributions and liquidation.  He explained that the same lack of control applied to limited partners in private partnerships.  In addition, Mr. Lax found that private partnerships were less marketable than the study partnerships, because private partnerships did not trade on an informal secondary market.  He also observed that private partnerships often placed burdensome transfer restrictions on ownership interests.

On the basis of the foregoing, Mr. Lax concluded that general partnership interests in True Ranches were similar to the

limited partnership interests reported in the studies. However, he found that True Ranches interests were less liquid than the reported partnerships because True Ranches had not made recent distributions as of the valuation date and the interests were not publicly traded. Thus, Mr. Lax chose a 60-percent combined discount to reflect the increasing trend of average discounts reported in the studies.

### d. Respondent's Position

Respondent offered no expert testimony or other evidence regarding True Ranches' total equity value as of the relevant dates. Instead, respondent has adopted Mr. Kimball's adjusted net asset values of $41,003,000 as of January 1, 1993, and $45,297,509 as of June 4 and June 30, 1994.

Respondent argues that interests in True Ranches transferred individually by Dave and Jean True to their sons as of January 1, 1993, and June 30, 1994, respectively, were entitled to minority discounts of no more than 10 percent. Additionally, respondent argues that the 38.47-percent interest owned by Dave True at death is not entitled to a minority discount, because it represented a significant ownership block that had swing vote potential.

Based on the foregoing, respondent proposes marketable minority values for the True Ranches interests transferred as of January 1, 1993, and June 30, 1994, of $36,902,700 and $40,767,758, respectively. Respondent argues that the marketable

controlling value for the interest valued as of Dave True's death was $45,297,509.

e. Court's Analysis

The positions of the parties and the Court's determinations of the marketable minority values of True Ranches' total equity at each of the valuation dates are summarized infra pp. 278-279.

We accept the agreement of the parties that controlling equity value on a net asset value basis was $41,003,000 as of January 1, 1993, and $45,297,509 as of June 4 and June 30, 1994.

However, we reject the parties' proposed minority discounts. Mr. Kimball derived a 25-percent minority discount from studies of premiums offered during tenders for control of publicly traded companies. He found that the observed average control premiums of 30 to 40 percent translated into minority discounts of 23 to 29 percent. We find this analysis to be unhelpful because a general partner in True Ranches would exert more control over the business than a shareholder in a comparable public company. The True Ranches partnership agreement required the partners to manage jointly the partnership's affairs. Thus, each partner had an equal vote in (among other things) appointing management, setting business policies, making distributions, buying and selling assets, and amending the partnership agreement. A minority shareholder could not exercise equivalent control over a public company.

Similarly, we reject Mr. Lax's combined 60-percent minority and marketability discount, because the studies that he relied on dealt with transactions in limited partnership interests, not general partnership interests.

We find respondent's proposed 10-percent minority discounts for interests transferred by Dave and Jean True to be unsubstantiated and insufficient. Even though a general partner in True Ranches may exert more control than a shareholder in a public company or a limited partner in a publicly registered partnership, he would not have unilateral control over business decisions. Further, we reject respondent's swing vote argument regarding Dave True's 38.47-percent interest owned at death, for the reasons stated in our analysis of True Oil. See supra pp. 202-203.

Based on the record, we apply a 15-percent minority discount to the controlling equity values computed by Mr. Kimball to arrive at a marketable minority value for True Ranches of $34,852,550 as of January 1, 1993, and $38,502,883 as of June 4, and June 30, 1994.

### 2. Marketability Discounts

#### a. Kimball Reports

Mr. Kimball treated the subject interests in True Ranches as not being readily marketable for the same reasons described in the True Oil section of this opinion. See supra pp. 204-206. Accordingly, Mr. Kimball applied 35-percent marketability

discounts to the marketable minority values as of January 1, 1993, June 4, 1994, and June 30, 1994.

### b. Final Lax Report

As previously described, see <u>supra</u> p. 271, Mr. Lax applied a combined minority and marketability discount from net asset value of 60 percent. Thus, Mr. Lax's nonmarketable minority value as of June 3, 1994, was $6,869,694.[77]

### c. Respondent's Position

Respondent argues that the size adjustment applied by Mr. Hall to value True Ranches' land and improvements reflected the difficulties associated with marketing such a large ranch. Respondent contends that the marketability discounts applied my Messrs. Kimball and Lax incorporated similar considerations. Therefore, respondent concludes that the marketability discounts in the Kimball and Lax reports are redundant and allows no marketability discounts in valuing the subject interests in True Ranches.

### d. Court's Analysis

We reject Mr. Kimball's justifications for marketability discounts that derive from the buy-sell agreement restrictions.

We also reject respondent's argument that any marketability discount used to determine the fair market value of an interest

---

[77]Due to a computational error, the final Lax report incorrectly computed the nonmarketable minority value to be $7,084,370.

in True Ranches would replicate the size adjustment employed to determine the underlying value of True Ranches' net assets. First, Mr. Hall's size adjustment under the cost approach was required to account for substantial differences in size between the comparable sales and the True Ranches properties being analyzed. Second, marketability discounts measure the probability of selling goods at specified terms based on the demand for those goods and the existence of an established market. See Estate of Jameson v. Commissioner, T.C. Memo. 1999-43, 77 T.C.M. (CCH) 1383, 1397, 1999 T.C.M. (RIA) par. 99,043, at 269-99. Because the subject interests do not have the ability to liquidate, we focus on the marketability of general partnership interests in True Ranches. The fact that the underlying asset values incorporate a size adjustment has no bearing on whether there is demand for or an active market in True Ranches partnership interests.

We find that a minority interest in True Ranches was not fully marketable at the valuation dates because: (1) The True family was committed to keeping True Ranches privately owned; (2) there were risks that a purchaser would not obtain unanimous consent to be admitted as a partner; and (3) a purchasing partner would be exposed to joint and several liability.

A minority interest in True Ranches suffered from the same marketability problems as an equivalent interest in True Oil. Both companies incurred losses in the years being examined, and

neither company made substantial distributions to partners.
Accordingly, we apply the same 30-percent marketability discount
to True Ranches that we applied to True Oil.  See <u>supra</u> pp. 213-
214.

### 3. Summary of Proposed Values and Court's Determinations of Values of Interests in True Ranches

| Value as of January 1, 1993 | Book value reported on return | Statutory notice value | Kimball reports | Final Lax report | Respondent's position | Court's values |
|---|---|---|---|---|---|---|
| Entity Value (Controlling Basis) | N/A | N/A | $41,003,000 | N/A | $41,003,000 | $41,003,000 |
| Less: Minority Discount | N/A | N/A | (10,250,750) 25% | N/A | (4,100,300) 10% | (6,150,450) 15% |
| Marketable Minority Value | N/A | N/A | 30,752,250 | N/A | 36,902,700 | 34,852,550 |
| Less: Marketability Discount | N/A | N/A | (10,763,288) 35% | N/A | N/A | (10,455,765) 30% |
| Nonmarketable Minority Value | N/A | N/A | 19,988,962 | N/A | N/A | 24,396,785 |
| Value of 24.84% Interests Transferred to True Sons | 3,265,647 | 12,193,990 | 4,965,258 | N/A | 9,166,631 | 6,060,161 |
| **Value as of June 4, 1994** | | | | | | |
| Entity Value (Controlling Basis) | N/A | N/A | 45,297,509 | 44,643,191 | 45,297,509 | 45,297,509 |
| Less: Minority Discount | N/A | N/A | (11,324,377) 25% | (26,785,915) 60%[1] | N/A | (6,794,626) 15% |
| Marketable Minority Value | N/A | N/A | 33,973,132 | N/A | N/A | 38,502,883 |
| Less: Marketability Discount | N/A | N/A | (11,890,596) 35% | N/A | N/A | (11,550,865) 30% |
| Nonmarketable Minority Value | N/A | N/A | 22,082,536 | 17,857,276 | N/A | 26,952,018 |
| Value of 38.47% Interest Owned at Dave True's Death | 5,777,943 | 20,283,447 | 8,495,152 | 6,869,694 | 17,425,952 | 10,368,441 |

[1] Combined minority and marketability discount

| Value as of June 30, 1994 | Book value reported on return | Statutory notice value | Kimball reports | Final Lax report | Respondent's position | Court's values |
|---|---|---|---|---|---|---|
| Entity Value (Controlling Basis) | N/A | N/A | $45,297,509 | N/A | $45,297,509 | $45,297,509 |
| Less: Minority | | | (11,324,377) | | (4,529,751) | (6,794,626) |
| Discount | N/A | N/A | 25% | N/A | 10% | 15% |
| Marketable Minority Value | N/A | N/A | 33,973,132 | N/A | 40,767,758 | 38,502,883 |
| Less: Marketability | | | (11,890,596) | | | (11,550,865) |
| Discount | N/A | N/A | 35% | N/A | N/A | 30% |
| Nonmarketable Minority Value | N/A | N/A | 22,082,536 | N/A | 40,767,758 | 26,952,018 |
| Value of 17.23% Interests (total) Transferred to True Sons | 2,712,212 | 9,084,581 | 3,804,821 | N/A | 7,024,285 | 4,643,833 |

F.  White Stallion

    1.  Marketable Minority Interest Values

        a.  Kimball Report

Mr. Kimball used the net asset value method to compute controlling equity value of White Stallion.  He relied on an appraisal of land and improvements performed by Jeffery C. Patch as of June 9, 1991, to derive the company's underlying asset value.  With this information, Mr. Kimball adjusted White Stallion's June 4, 1994, balance sheet to reflect the fair market value of assets and liabilities and calculated adjusted net asset value of $1,138,698.[78]

Mr. Kimball then applied a 20-percent minority discount to reflect the subject interest's lack of control.  Mr. Kimball concluded that the marketable minority value of White Stallion as of June 4, 1994, was $910,958.

        b.  Initial and Final Lax Reports

The initial and final Lax reports also used the net asset value method to value White Stallion's total equity, relying on the same asset appraisal used in the Kimball report.  Mr. Lax adjusted White Stallion's balance sheet as of April 30, 1994, to arrive at net asset value of $1,139,080 as of June 3, 1994.

---

[78]Mr. Kimball's calculations contained a mathematical error. Adjusted net asset value should have been $1,139,000.

In the initial Lax report, Mr. Lax applied a 25-percent minority discount to net asset value, along with a 45-percent marketability discount.

In the final Lax report, however, Mr. Lax applied a combined minority and marketability discount from net asset value of 60 percent. He explained that the combined discount was derived from the studies described in the True Ranches section of this opinion. See supra p. 271. Mr. Lax considered the subject interests to be less marketable than the interests in the studies because White Stallion had no history of paying dividends and there was no active market for investments of this type.

### c. Respondent's Position

Respondent offered no expert testimony or other evidence regarding White Stallion's total equity value as of June 4, 1994. Instead, respondent adopts Mr. Lax's net asset value of $1,139,080.

Respondent argues that the 34.235-percent interest owned by Dave True at death is not entitled to a minority discount, because it represented a significant ownership block that had swing vote potential.

### d. Court's Analysis

The positions of the parties and the Court's determinations of the marketable minority values of White Stallion's total equity are summarized infra p. 287.

We accept the agreement of the parties that controlling equity value on a net asset basis was $1,139,080 as of June 3, 1994.  However, we reject respondent's swing vote argument, for the reasons stated in our analysis of True Oil.  See supra pp. 202-203.

We find the final Lax report's combined discount of 60 percent to be excessive and unsubstantiated.  Mr. Lax solely relied on sales of registered real estate limited partnership interests as benchmarks for the discount he applied to White Stallion.  However, we do not believe that registered real estate limited partnerships are comparable to White Stallion, an operating dude ranch organized as an S corporation.  Further, we cannot evaluate the reasonableness of the final Lax report's minority discount relative to Mr. Kimball's, because of Mr. Lax's combined discount approach.  We are not convinced that using a combined discount is appropriate, inasmuch as marketability and minority discounts are conceptually distinct.  See Estate of Newhouse v. Commissioner, 94 T.C. at 249.

The final Lax report did not discuss the requirements for control under Arizona law or White Stallion's governing documents before concluding that Dave True's interest lacked control.  In addition, Mr. Lax did not provide a theoretical basis for his change in approach to calculating discounts (going from separate to combined discounts) between the initial and final Lax reports.  This makes Mr. Lax's conclusions seem arbitrary.

Similarly, Mr. Kimball generally based his 20-percent minority discount on data from studies of premiums offered during tenders for control of publicly traded companies. He also did not consider the specific control attributes of White Stallion stock to arrive at the minority discount.

Unless the articles of incorporation provide otherwise, Arizona corporate law requires the following, in relevant part: (1) Each outstanding share of stock is entitled to one vote, see Ariz. Rev. Stat. Ann. sec. 10-721(A) (West 1996);[79] all corporate powers are exercised by the board of directors, see Ariz. Rev. Stat. Ann. sec. 10-801(B) (West 1996); (3) directors are elected by a plurality of votes cast by shares entitled to vote, see Ariz. Rev. Stat. Ann. sec. 10-728(A) (West 1996); (4) sales of assets other than in the regular course of business must be approved by a majority of all votes cast by shares entitled to vote, see Ariz. Rev. Stat. Ann. sec. 10-1202(E) (West 1996); (5) dissolution of the corporation must be approved by a majority of all votes cast by shares entitled to vote, see Ariz. Rev. Stat. Ann. sec. 10-1402(E) (West 1996).

White Stallion's articles of incorporation and bylaws were not introduced in evidence. Therefore, we assume that White Stallion's governing documents do not vary from Arizona corporate

---

[79]Title 10, Corporations and Associations, was reorganized by 1994 Ariz. Sess. Laws ch. 223 (effective Jan. 1, 1996). The sections cited in our discussion were not substantively changed but were renumbered by the new law.

law.  At his death, Dave True's 34.235-percent interest did not represent a majority of the shares entitled to vote.  Thus it did not give him the power to sell corporate assets or to dissolve the corporation entirely.  However, it could have given him a plurality in electing board members, which would have allowed him to influence distribution policies.

On this record, we find that a 15-percent minority discount is appropriate for Dave True's interest in White Stallion.

### 2.  Marketability Discounts

#### a.  Kimball Report

Mr. Kimball treated the subject interest in White Stallion as not being readily marketable for the same reasons described in the Belle Fourche section of this opinion.  See supra pp. 233-234.  Accordingly, Mr. Kimball applied a 35-percent marketability discount to arrive at nonmarketable minority value of $592,123 as of June 4, 1994.

#### b.  Initial and Final Lax Reports

As previously described, see supra pp. 280-281, the initial Lax report showed a 45-percent marketability discount, whereas the final Lax report indicated a combined minority and marketability discount of 60 percent.  Thus, nonmarketable minority values derived by the initial and final Lax reports as of June 3, 1994, were $160,860 and $155,986, respectively.[80]

---

[80]The final Lax report incorrectly computed the
(continued...)

### c. Respondent's Position

Respondent argues that no marketability discount is appropriate for Dave True's 34.235-percent interest in White Stallion because it represented a significant ownership block that had swing vote potential.

### d. Court's Analysis

We reject Mr. Kimball's justifications for marketability discounts that derive from the buy-sell agreement restrictions.

We also reject respondent's swing vote argument for the reasons stated in our analysis of True Oil, see supra pp. 202-203, and Mr. Lax's combined discount approach for reasons stated supra p. 282.

We find that a minority interest in White Stallion, like a minority interest in Belle Fourche, was less marketable than actively traded interests because: (1) The two branches of the True family are committed to keeping White Stallion privately owned; (2) the subject interest lacks control; and (3) Federal tax rules limit the pool of potential investors in S corporation. Moreover, certain facts suggest that a minority interest in White Stallion would be less marketable than a minority interest in Belle Fourche. Although White Stallion was modestly profitable, it was not a "cash cow" like Belle Fourche. Also, White Stallion

---

[80](...continued)
nonmarketable minority value to be $160,860 due to a math error that arose from Mr. Lax's change in discount approaches between the initial and final Lax reports.

made no distributions to shareholders during the analyzed period. Instead, shareholders lent or contributed funds to the company.

On the basis of the foregoing, we conclude that a minority interest in White Stallion is less marketable than a minority interest in Belle Fourche. Therefore, we assign a 30-percent marketability discount to Dave True's 34.235-percent interest in White Stallion, valued as of June 4, 1994.

3. Summary of Proposed Values and Court's Determinations of Values of Interests in White Stallion

| Value as of June 4, 1994 | Book value reported on return | Statutory notice value | Kimball reports | Final Lax report | Respondent's position | Court's values |
|---|---|---|---|---|---|---|
| Entity Value (Controlling Basis) | N/A | N/A | $1,138,698 | $1,139,080 | $1,139,080 | $1,139,080 |
| Less: Minority | | | (227,740) | (683,448) | | (170,862) |
| Discount | N/A | N/A | 20% | 60%[1] | N/A | 15% |
| Marketable Minority Value | N/A | N/A | 910,958 | N/A | N/A | 968,218 |
| Less: Marketability | | | (318,835) | | | (290,465) |
| Discount | N/A | N/A | 35% | N/A | N/A | 30% |
| Nonmarketable Minority Value | N/A | N/A | 592,123 | 455,632 | N/A | 677,753 |
| Value of 34.235% Interest Owned at Dave True's Death | 153,434 | 389,964 | 202,713 | 155,986 | 389,964 | 232,029 |

[1] Combined minority and marketability discount

Issue 3.  Did Jean True Make Gift Loans When She Transferred
Interests in True Companies to Sons in Exchange for Interest-Free
Payments Received Approximately 90 Days After Effective Date of
Transfers?

On June 30, 1994, and July 1, 1994 (hereinafter sometimes
referred to as the notice dates), Jean True gave notice to her
sons that she wanted to sell her interests in 22 True companies.
The buy-sell agreements governing transfers of interests in the
companies provided that, upon giving this notice, Jean True
became required to sell, and the sons became required to buy, her
interests.

The buy-sell agreements also provided that the "effective
date[s]" of the resulting sales were the notice dates.  From and
after June 30, 1994, the True companies treated the income and
expenses associated with the interests sold as belonging to the
sons, not to Jean True.  Moreover, the sales prices for Jean
True's interests were not adjusted for any income or loss of,
distributions made by, or changes in the value of the True
companies, after June 30, 1994.

Notwithstanding the foregoing, the buy-sell agreements gave
the sons 6 months from the notice dates to "consummate" the
sales.  Jean True did not receive payment for her interests until
September 30, 1994, 3 months after the notice dates.  The total
amount she received, $13,298,978, did not include any interest to
compensate her for this 3-month delay.

Respondent determined in the gift tax statutory notice to Jean True that this deferred payment arrangement was a "below-market gift loan" subject to section 7872, which gave rise to a taxable gift from Jean True to her sons, in the amount of $192,307. Petitioners dispute this determination.

FINDINGS OF FACT

In 1994, Jean True sold her interests in 22 True companies to her sons.[81] Five of the companies were partnerships, one was a limited liability company (LLC), and 16 were corporations. All the corporations were S corporations, except for Midland Financial Corp., which was a C corporation.

Substantially identical buy-sell agreements governed transfers of interests in these companies. The buy-sell agreements were contained in partnership agreements (partnership buy-sell agreements) and in stockholders' restrictive agreements (corporate buy-sell agreements).

The buy-sell agreements were triggered when Jean True gave her sons notice of her intention to sell her interests. Jean True gave notice of her intention to sell her stock in the 16 corporations on June 30, 1994. She gave notice of her intention to sell her interests in the five partnerships and the LLC on July 1, 1994.

---

[81]See Appendix schedule 3 for a list of these companies.

Once triggered by Jean True's notice, the buy-sell agreements required Jean True to sell, and her sons to purchase, her interests.  Each of the buy-sell agreements provided that the "effective date" of the resulting sale was the applicable notice date.

Although the buy-sell agreements defined the effective dates of Jean True's sales as the notice dates, other provisions of the buy-sell agreements required only that the "sale and purchase" of stock or partnership interests "be consummated" within 6 months after those dates.  In fact, Jean True did not receive payment for her stock and partnership interests until September 30, 1994 (payment date).

The record does not establish exactly what happened on or around the payment date, other than the receipt of payment by Jean True.  It appears that the reissuance of stock certificates to the sons was authorized by the corporations' boards of directors on September 29, 1994.  However, the minutes of the board meetings authorizing this action refer to "the transfer of the shares formerly owned" by Jean True, and state that "appropriate action should be taken * * * to accept and acknowledge the transfer of ownership that occurred effective June 30, 1994".  The accompanying board resolutions similarly discuss the "sale and transfer effective June 30, 1994" of "the shares previously held" by Jean True.

Each of the buy-sell agreements also contained a provision entitled "Further Assurances". The further assurances provision of the partnership buy-sell agreements stated:

> Before any retiring Partner, former Partner, or other person selling his interest shall be entitled to receive any money in payment of or on account of his partnership interest * * * he shall deliver or cause to be delivered to the remaining Partners such instruments as the remaining Partners may reasonably request in order to establish a record that the retiring Partner or a former Partner's interest in the partnership has passed to and become vested in the remaining Partners.

The further assurances provision of the corporate buy-sell agreements stated that each of the stockholders and the relevant corporation agrees "to make, execute and deliver to the other parties all assignments, transfers or other documents necessary to carry out and accomplish the terms" of the corporate buy-sell agreements. However, the corporate buy-sell agreements did not state that the seller was not entitled to receive payment until she supplied whatever documents were required.

The buy-sell agreements required Jean True's sales to be made at formula prices based on book value. The price provision of the partnership buy-sell agreements provided that "The price of any partnership interest or portion thereof shall be the book value of the Selling Partner's capital account as of the close of business of the day immediately preceding the sales event." Jean True's giving notice of her intention to sell was the sales event. The partnership buy-sell agreements therefore provided that the price for Jean True's sale of a partnership interest was

equal to the book value of her capital account in that partnership as of the close of business on June 30, 1994, the day before the day she gave notice of her intent to sell her partnership interests.

The corporate buy-sell agreements provided:

> The price of any shares sold hereunder shall be the book value of the stock at the end of the preceding fiscal year, less any and all dividends paid to the Shareholders prior to the effective date of sale, plus income computed in accordance with the Internal Revenue regulations generally requiring allocation on a per share, per day basis.

As applied to Jean True's 1994 sales, the corporate buy-sell agreements therefore provided that the sale price of stock was equal to: (1) The book value of that stock as of the end of the corporation's fiscal year preceding June 30, 1994, minus (2) the dividends (if any) paid from the end of that fiscal year to June 30, 1994, plus (3) a pro rata share of the corporation's income for the fiscal year including June 30, 1994.

As shown by the foregoing citations to the buy-sell agreements, the agreements did not provide for any adjustments to be made to the formula prices on account of the income or loss of, the dividends paid or distributions made by, or any change in the value of a True company, after June 30, 1994.[82]

---

[82]Although the buy-sell agreements did not provide for any price adjustments to be made on account of the True companies' financial performance after June 30, 1994, the price paid for some of Jean True's stock may have been affected by post-June 30, 1994, events. The corporate buy-sell agreements required the preceding fiscal year's ending book value to be increased by a

(continued...)

The buy-sell agreements also did not provide for any interest to be paid on the sales price on account of any passage of time between the effective dates of the sales and the date payment was ultimately made.

From and after June 30, 1994, the 22 True companies considered the income and expenses associated with the interests sold by Jean True to belong to her sons, not to Jean True. Moreover, the True companies filed their Federal income tax returns consistently with this consideration. For example, as part of its Federal partnership return (Form 1065) for 1994, True Oil filed three Forms 8308, "Report of a Sale or Exchange of Certain Partnership Interests"; these forms reported that the "Date of Sale or Exchange of Partnership Interest" with respect to Jean True's sale of her interest in True Oil was June 30,

---

[82](...continued)
pro rata share of the corporation's income for the year of sale, computed in accordance with the Internal Revenue laws.

Sec. 1377(a)(1) provides that a stockholder's pro rata share of S corporation income for a taxable year is calculated by allocating an equal portion of the corporation's items to each day in the year. Under this method, a selling shareholder's pro rata share of income for the year of sale will be affected by corporate items realized after the sale date, because a portion of such items will be allocated to her period of ownership. Sec. 1377(a)(2), however, provides that under certain circumstances the shareholders may elect to compute the selling shareholder's pro rata share as if the taxable year terminated on the sale date.

It appears that the True family made the election to compute Jean True's pro rata share of income as if the corporation's taxable year ended on June 30, 1994, with respect to some (but not all) of the 15 S corporations in which she sold her stock.

1994.  True Oil's 1994 return also contained schedules showing that after June 30, 1994, Jean True owned a zero percent share of True Oil's income, deductions, losses, credits, capital account, and other items.  Similarly, Belle Fourche's Federal tax return (Form 1120S) for 1994 contains a schedule of changes in ownership; that schedule showed that Jean True owned no Belle Fourche stock after June 30, 1994.

The amount of the payment Jean True received on the payment date (September 30, 1994) in exchange for her interest in a True company was equal to the formula price of that interest as determined under the corresponding buy-sell agreement.  The parties agree that the prices of Jean True's interests as determined under the buy-sell agreements, and the amounts received by Jean True on the payment date in exchange for those interests, were as shown in the following table:

| Entity | Formula price and amount received on payment date |
|---|---|
| True Oil | $2,528,315 |
| Eighty-Eight Oil | 4,400,744 |
| True Ranches | 2,712,212 |
| Rancho Verdad | 226,759 |
| True Mining Co. | 176 |
| True Environmental Remediating LLC | 205,886 |
| Belle Fourche | 183,593 |
| Black Hills Trucking | 590,511 |
| Midland Financial Corp. | 2,226,338 |
| Toolpushers Supply Co. | 137,872 |
| Black Hills Oil | 60 |
| Bonanza Publishing, Inc. | 395 |
| Clareton Oil Co. | 58 |
| Equitable Oil Purchasing Co. | 2,304 |
| Fire Creek Oil Co. | 1,193 |
| Pumpkin Buttes Oil Co. | 51 |
| Roughrider Pipeline Co. | 55,208 |
| Sunlight Oil Co. | 57 |
| True Geothermal Drilling Co. | 111 |
| True Wyoming Beef | 638 |
| Wind River Oil Co. | 59 |
| True Land and Royalty Co. | 26,438 |
| Total | 13,298,978 |

Respondent has conceded that the fair market value, as of June 30, 1994, of the interests sold by Jean True did not exceed the formula prices of those interests, except in the case of the

following companies:  True Oil, Eighty-Eight Oil, True Ranches, Belle Fourche, and Black Hills Trucking.

As a result of Dave True's death on June 4, 1994, Jean True acquired part of the stock and partnership interests she ultimately sold to her sons.  Dave True's death triggered the buy-sell agreements and required Jean True and the sons to buy the interests formerly held by Dave True.

The sales of stock triggered by Dave True's death apparently were not formally closed until about September 20, 1994. Although the record does not establish precisely what happened on September 20, 1994, it appears that the reissuance of stock certificates to reflect the transfer of ownership from Dave True to Jean True and the sons was authorized on that date.  However, the buy-sell agreements defined the effective date of these transfers as the date of Dave True's death.  Consistent with this definition, the minutes of the board meetings concerning the reissuance of Dave True's stock treat Dave True's death as the date ownership of the stock was transferred to Jean True and the sons.[83]

On a schedule attached to Jean True's amended Federal gift tax return for 1994, Jean True reported the 1994 sales of her interests to her sons as gifts with a "Value at date of gift" of

---

[83]Respondent has not determined or otherwise asserted that any gift loans resulted from the sales triggered by Dave True's death on June 4, 1994, even though some of those sales may not have been formally closed until Sept. 20, 1994.

zero.  This schedule reported the "Date of gift" as June 30, 1994.

In the statutory notice, respondent determined, without citing any authority, that the value of the gift Jean True made by lending her sons the sales price from June 30, 1994, to the payment date was $192,307.  The notice explained that this amount was equal to 91 days of interest on the $13,298,978 aggregate sales price, calculated using the 5.9-percent interest rate the True family used for other intrafamily loans.  Although the notice stated that "Arguably, the 5.9% is below-market", it also stated that "no adjustment will be made for this due to the extreme difficulty of computing it".  The notice did not cite any authority for these conclusions.

OPINION

I.   Summary of Arguments

On June 30, 1994, and July 1, 1994 (notice dates), Jean True gave her sons notice that she wanted to sell her interests in 22 True companies.  This notice triggered the provisions of the buy-sell agreements that required Jean True to sell her interests to her sons.

The buy-sell agreements provided that the effective dates of these sales were the notice dates.  However, the buy-sell agreements also stated that the sales did not have to "be consummated" until 6 months after those dates.  In fact, Jean True did not receive payment for her interests until September

30, 1994, 3 months after the notice dates.  We hereinafter refer to the deferred payment of the sales price for Jean True's interests, pursuant to the provisions of the buy-sell agreements giving the parties up to 6 months to "consummate" the sales, as the deferred payment arrangement.

The amount Jean True received on the payment date, $13,298,978, was equal to the sum of the formula prices for the interests she sold, calculated as provided in the buy-sell agreements.  This sum did not include any stated interest or any other adjustments to take account of the 3-month period between the notice dates and the payment date.

Respondent asserts that the sales of Jean True's interests were completed for tax purposes on June 30, 1994, because the benefits and burdens of ownership were transferred on that date. Respondent further asserts that because the deferred payment arrangement allowed 3 months to pass between the sale completion date and the payment date, Jean True effectively lent her sons (during that 3-month period) an amount equal to the $13,298,978 sales proceeds she was entitled to receive.  Finally, respondent asserts that this loan was in the nature of a gift, and that Jean True therefore made a taxable gift to her sons of the value of the use of the sale proceeds from June 30, 1994, to September 30, 1994.

Respondent has continued to assert, as determined by the statutory notice, that the value of Jean True's gift is $192,307.

However, respondent now argues that the reason for this is that the deferred payment arrangement was a "below-market loan" subject to section 7872. Sec. 7872(c)(1)(A). Notwithstanding this new argument, respondent does not explain why the True family's 5.9-percent intrafamily interest rate used to calculate the value of Jean True's gift in the statutory notice should apply, rather than the "applicable Federal rate" expressly referenced by section 7872(e), (f)(1), and (f)(2).

Petitioners make three arguments why the deferred payment arrangement was not a gift loan. First, petitioners argue that the sales of Jean True's interests were completed for tax purposes on September 20, 1994, instead of on June 30, 1994, as asserted by respondent. According to petitioners, Jean True was not entitled to receive the sales proceeds--and therefore could not have lent them to her sons--until the sales were complete.[84]

Second, petitioners argue that the deferred payment arrangement cannot be a below-market loan subject to section 7872 because: (1) If the deferred payment arrangement were a "contract for the sale or exchange of any property" within the

---

[84]Petitioners do not explain why Sept. 20, 1994, is the relevant date. However, we note that Jean True's acquisition (from Dave True) of some of the stock she ultimately sold to her sons appears to have been closed on that date.

Petitioners also do not explain why, if Sept. 20, 1994, was the sale completion date, Jean True could not have made a below-market gift loan from that date to the payment date on Sept. 30, 1994.

meaning of section 483, no portion of the sales price would be recharacterized as interest under that section; and (2) if the deferred payment arrangement were a "debt instrument given in consideration for the sale or exchange of property" within the meaning of section 1274, no portion of the sales price would be treated as original issue discount (OID) under that section.

Third and finally, petitioners argue that even if the deferred payment arrangement was a "below-market loan" to which section 7872 could apply, it was not a "gift loan" actually subject to that section, because allowing short delays in the payment of sales proceeds, without charging interest, is a normal commercial practice satisfying the ordinary business transaction exception set forth in section 25.2512-8, Gift Tax Regs.

We consider these arguments seriatim. We conclude that: (1) The sales of Jean True's interests were completed for tax purposes on June 30, 1994, and July 1, 1994 (i.e., on the notice dates, which are also the effective dates defined by the buy-sell agreements); (2) sections 483 and 1274 do not prevent the application of section 7872 to the deferred payment arrangement; and (3) the deferred payment arrangement is a below-market gift loan subject to section 7872, rather than an ordinary business transaction.

## II. Jean True's Sales Were Completed on Notice Dates

The "Further Assurances" provisions of the partnership buy-sell agreements stated:

Before any retiring Partner * * * shall be entitled to receive any money in payment of or on account of his partnership interest * * * he shall deliver or cause to be delivered to the remaining Partners such instruments as the remaining Partners may reasonably request in order to establish a record that the retiring * * * Partner's interest in the partnership has passed to and become vested in the remaining Partners.

Petitioners claim these further assurances provisions were not satisfied until September 20, 1994, when title to Jean True's stock and partnership interests "vested" in her sons.[85] Petitioners assert that as a result, Jean True could not have lent her sales proceeds to her sons on June 30, 1994, as contended by respondent--because under the terms of the buy-sell agreements, Jean True was not entitled to receive those proceeds until the "vesting" date.

As a preliminary matter, we note that petitioners' argument on this point cites no authority and is hard to follow. However, the thrust of petitioners' argument appears to be that the sales of Jean True's interests were not completed for tax purposes until September 20, 1994. For the reasons set forth below, we disagree, and conclude that the sales were completed on June 30, 1994, and July 1, 1994 (the notice dates, also the effective dates as defined by the buy-sell agreements).

First, we note that the "Further Assurances" provisions of the corporate buy-sell agreements are different from the

---

[85]As noted supra p. 299, it is not clear why petitioners believe Sept. 20, 1994, is the relevant date.

provisions of the partnership buy-sell agreements relied upon by petitioners.  The further assurances provisions of the corporate agreements state only that each of the stockholders and the relevant corporation agrees "to make, execute and deliver to the other parties all assignments, transfers or other documents necessary to carry out and accomplish the terms" of the corporate buy-sell agreements.  However, the corporate buy-sell agreements do not state that delivery of these documents is a condition precedent to the right to receive payment, or to any other right or obligation arising under the agreements.

Second, the buy-sell agreements, when read in their entirety, show Jean True and her sons intended that a binding contract of sale would be created on the notice dates, even though payment was not required to be made on those dates.  For example, the partnership buy-sell agreements define the term "sales event" to include "the events outlined in Paragraph 18 the occurrence of which, under the terms hereof, triggers the mandatory purchase and sale agreement."  Paragraph 18 in turn provides that a voluntary sale is a "sales event", and states:

> In the event any Partner desires at any time to sell all or a part of his or her partnership interest in the Company, he or she shall so notify the Purchasing Partners in writing.  * * *  Thereafter, the Selling Partner shall sell and the Purchasing Partners shall purchase such partnership interest in accordance with the terms of paragraphs 19 [restating the buy-sell agreement, and providing that purchases shall be made by Purchasing Partners in proportion to interests already owned], 20 [defining formula price] and 21 [defining

effective date as the notice date] * * * . * * *
[Emphasis added.]

Nothing in these operative provisions suggests that the buy-sell obligations arising on the notice dates were conditioned upon the selling partner's compliance with the "Further Assurances" provision. Indeed, they do not even refer to the "Further Assurances" provision.[86]

Third and most importantly, the terms of the buy-sell agreements, the conduct of the parties to those agreements, and the actions of the True companies all show that Jean True and her sons intended the benefits and burdens of ownership of Jean True's interests to shift to her sons on the notice dates.

Petitioners correctly note that Jean True did not receive payment for her interests in the 22 True companies until September 30, 1994. In addition, it appears that the corporations were authorized on or around that date to reissue the shares Jean True sold in the names of Jean True's sons.

The record does not establish precisely what happened on or around the payment date, other than the receipt of payment and the reissuance of some stock certificates. However, petitioners have not shown (or even claimed) that the sons did not take possession of Jean True's stock certificates, or that the partnership records did not reflect a change in ownership, well

---

[86]The "sales event" and "sale" provisions of the corporate buy-sell agreements are substantially the same as the cited provisions of the partnership buy-sell agreements.

before the payment date. To the contrary, the board minutes and resolutions concerning the reissuance of stock treat June 30, 1994, as the date ownership of Jean True's stock passed to the sons. Similarly, Jean True's amended 1994 Federal gift tax return reported that the 1994 sales of her interests occurred on June 30, 1994.

We also note that under relevant State (Wyoming) law, board of directors' approval and recording on the corporate books are not conditions precedent to a valid transfer of stock ownership. See Jones v. Central States Inv. Co., 654 P.2d 727 (Wyo. 1982). Also, although neither party has argued that, until the payment date, the buy-sell agreements created an incomplete gift, we note that a stock gift may be complete before the donee receives possession of or title to the stock. See Estate of Davenport v. Commissioner, 184 F.3d 1176 (10th Cir. 1999), affg. T.C. Memo. 1997-390.

More generally, a sale is complete for Federal income tax purposes when the benefits and burdens of ownership shift; this may occur well before title passes or a formal closing of the sale occurs. See Derr v. Commissioner, 77 T.C. 708, 723-724 (1981) (for Federal income tax purposes, sale occurs upon transfer of benefits and burdens of ownership rather than upon satisfaction of technical requirements for passage of title under State law; applicable test is facts and circumstances test with no single factor controlling); Hoven v. Commissioner, 56 T.C. 50,

55 (1971) (in determining date of property transfer, date on which benefits and burdens or incidents of ownership of property pass must be considered); Merrill v. Commissioner, 40 T.C. 66, 74 (1963) (where delivery of deed is delayed to ensure payment, intent of parties as to when benefits and burdens of ownership are to be transferred, as evidenced by factors other than the passage of bare legal title, controls for tax purposes), affd. 336 F.2d 771 (9th Cir. 1964); cf. Dyke v. Commissioner, 6 T.C. 1134 (1946) (stock sale not completed until all conditions of escrow agreement (including payment) were satisfied and stock was actually delivered, even though buyer was entitled to corporation's earnings for approximately 1 month before delivery date).

Taking into account all the facts and circumstances of the case at hand, we conclude that Jean True and her sons intended the benefits and burdens of ownership of Jean True's stock and partnership interests to pass to the sons on the notice dates; i.e., on June 30, 1994, in the case of her stock and on July 1, 1994, in the case of her partnership (and LLC) interests. We further conclude that the benefits and burdens of ownership in fact shifted on those dates. These conclusions are based on the following observations:

1. The buy-sell agreements expressly provided that the notice dates were the effective dates of Jean True's sales to her sons. The buy-sell agreements also expressly provided that on

those dates Jean True became obligated to sell, and her sons became obligated to buy, her interests in the 22 True companies.

2.   From and after June 30, 1994, the 22 True companies considered the income and expenses associated with the interests sold by Jean True to belong to the sons, not to Jean True. Moreover, the True companies filed their Federal tax returns consistently with this observation.

3.   Although the reissuance of some stock certificates to reflect the change in ownership of Jean True's stock was authorized on September 29, 1994, the minutes of the board meetings concerning this action refer to "the transfer of the shares formerly owned" by Jean True, and state that "appropriate action should be taken * * * to accept and acknowledge the transfer of ownership that occurred effective June 30, 1994". (Emphasis added.)  Similarly, the accompanying board resolutions discuss "the sale and transfer effective June 30, 1994" of "the shares previously held" by Jean True.  (Emphasis added.)[87]

4.   The partnership buy-sell agreements provided that the price for a partnership interest owned by Jean True was equal to

---

[87]As noted supra p. 299, petitioners argue that Jean True's sales were completed for tax purposes on Sept. 20, 1994.  It is not clear why petitioners chose this date.  It appears that a formal closing of Jean True's purchase (from Dave True) of some of the stock she ultimately sold to her sons was held on or around that date.  However, the minutes of the Sept. 20, 1994, board meetings authorizing the reissuance of Dave True's stock to Jean True treat June 4, 1994 (the date of Dave True's death), as the effective date of the transfer of ownership of that stock to Jean True.

the book value of that interest as of the close of business on June 30, 1994. This price was not adjusted for any income or loss, distributions made by, or change in the value of the partnership, for any period after June 30, 1994. As a result, once Jean True gave notice, all she could receive in exchange for a partnership interest was its book value as of June 30, 1994. Jean True's sons became entitled to the economic benefits, and would suffer the economic burdens, flowing from the partnerships after June 30, 1994.

5. Similarly, the corporate buy-sell agreements provided that the price for stock owned by Jean True was based on the book value of the stock as of the last day of the fiscal year ending before June 30, 1994. This price was not adjusted for any income or loss, distributions made by, or change in the value of the related corporation, after June 30, 1994.[88] As a result, once Jean True gave notice, all she could receive for her stock was its book value as of June 30, 1994. Jean True's sons became entitled to all the economic benefits, and would suffer all the economic burdens, flowing from the stock after June 30, 1994.

---

[88]The purchase price of stock did include a pro rata share of the corporation's income for the year including June 30, 1994. With respect to some of the corporations, this pro rata share may have reflected income realized after June 30, 1994. See supra pp. 292-293 note 82.

For all these reasons, we hold that for Federal income tax purposes Jean True sold her stock on June 30, 1994, and her partnership (and LLC) interests on July 1, 1994.[89]

III.  Sections 483 and 1274 Do Not Prevent Below-Market Loan Treatment Under Section 7872

The deferred payment arrangement allowed 3 months to pass between the dates Jean True's sales were completed for tax purposes and the payment date.  For this reason, respondent asserts that the deferred payment arrangement should be considered to be a loan (from Jean True to her sons) of the $13,298,978 sales price for that 3-month period.  Because Jean True did not charge or receive any interest on this amount, respondent further asserts that the deferred payment arrangement was a below-market gift loan to which section 7872 applies.

Petitioners argue that even if Jean True's sales were completed on the notice dates (as we have decided), section 7872 cannot apply to the deferred payment arrangement.  The buy-sell agreements required Jean True's sales to be consummated within 6 months after the notice dates.  As a result, if the deferred payment arrangement were a "contract for the sale or exchange of

_____

[89]Respondent maintains that Jean True sold all her interests on June 30, 1994.  We disagree.  Jean True did not give notice of her desire to sell her partnership (and LLC) interests until July 1, 1994.  Until she gave notice, she was not required to sell, and her sons were not required to buy, those interests.  Also, the buy-sell agreements defined the effective date of the sale of her interests as the notice dates.  For these reasons we conclude that the sale of Jean True's partnership (and LLC) interests occurred on July 1, 1994, as stated in the text.

any property" to which section 483 ordinarily could apply, no portion of the sales price would be recharacterized as interest under that section.  See sec. 483(a), (c)(1) (although sec. 483 generally applies to payments made under any contract for the sale or exchange of any property, it does not apply unless some contract payments are due more than 1 year after the sale or exchange).  Similarly, if the deferred payment arrangement were a "debt instrument given in consideration for the sale or exchange of property" to which section 1274 ordinarily could apply, no portion of the sales price would be recharacterized as original issue discount (OID) under that section.  See sec. 1274(c)(1) (although sec. 1274 generally applies to any debt instrument given in consideration for the sale or exchange of property, it does not apply unless some payments under the debt instrument are due more than 6 months after the date of the sale or exchange).

Petitioners assert that because no portion of the $13,298,978 aggregate sales price would be recharacterized as interest or OID under section 483 or 1274, the deferred payment arrangement cannot be treated as a below-market loan subject to section 7872.  We disagree.  In Frazee v. Commissioner, 98 T.C. 554 (1992), we considered the relationship of sections 483, 1274, and 7872 for gift tax purposes and rejected arguments quite similar to those made by petitioners in the case at hand.

The taxpayers in Frazee sold property to family members in exchange for a note.  The interest rate on the note, although less than a market rate, was sufficient to avoid the recharacterization of any part of the stated principal of the note as interest under section 483.  The Frazee taxpayers argued that as a result, the note could not be a "below-market loan" subject to section 7872.  We disagreed.  In our view, sections 483 and 1274 were enacted to ensure the proper characterization of payments as principal or interest for income tax purposes.  By contrast, the key issue for gift tax purposes is the valuation of all payments (both principal and interest).  See Krabbenhoft v. Commissioner, 94 T.C. 887, 890 (1990), affd. 939 F.2d 529 (8th Cir. 1991).  We held in Frazee that sections 483 and 1274 simply were not relevant for that gift tax purpose.

The Commissioner's primary position in Frazee was that the value of the intrafamily note for gift tax purposes should be its "present value" under section 7872 (i.e., a value determined by reference to the applicable Federal rate), rather than its fair market value under general tax principles (i.e., a value determined by reference to market interest rates).  Although we found this position to be "anomalous" because it was contrary to the traditional fair market value approach, Frazee v. Commissioner, supra at 590, we nevertheless accepted the Commissioner's treatment of the intrafamily note as a below-

market gift loan subject to section 7872. See id.; cf. Blackburn v. Commissioner, 20 T.C. 204 (1953).

Petitioners correctly observe that section 7872(f)(8) provides that section 7872 does not apply to any loan to which section 483 or 1274 applies. This prohibition is not applicable to the case at hand. Technically, neither section 483 nor section 1274 applies to the deferred payment arrangement, because the buy-sell agreements required payment to be made within 6 months after the notice dates. See sec. 483(c)(1) (sec. 483 does not apply where no payment is due more than 1 year after the sale or exchange); sec. 1274(c)(1) (sec. 1274 only applies where at least one payment is due more than 6 months after the sale or exchange).

Petitioners also observe that certain proposed section 7872 regulations state that section 7872 does not apply to any loan given in consideration for the sale or exchange of property, within the meaning of sections 483(c)(1) and 1274(c)(1), even if the rules of those sections do not technically apply by reason of safe harbors or other exceptions. See sec. 1.7872-2, Proposed Income Tax Regs., 50 Fed. Reg. 33553, 33557 (Aug. 20, 1985). We note, however, that although proposed regulations constitute a body of informed judgment on which courts may draw for guidance, see Frazee v. Commissioner, supra at 582, we accord them no more weight than a litigating position, see KTA-Tator, Inc. v.

Commissioner, 108 T.C. 100, 102-103 (1997); F.W. Woolworth Co. v.
Commissioner, 54 T.C. 1233, 1265-1266 (1970).

The Commissioner proposed section 1.7872-2, Proposed Income
Tax Regs., supra, in 1985, and has never adopted it in final
form.  The Commissioner has since asserted that section 7872 can
apply to loans given in consideration for the sale or exchange of
property, in both Frazee v. Commissioner, supra, and the case at
hand.  Moreover, our acceptance in Frazee of the Commissioner's
position that section 7872 applied to the intrafamily note
necessarily rejected the position taken in the proposed
regulation.

For all these reasons, consistent with our decision in
Frazee, we hold that the deferred payment arrangement may be a
below-market loan subject to section 7872, even though no part of
the sales price would be treated as interest or OID under
sections 483 and 1274.[90]

---

[90]The Court of Appeals for the Seventh Circuit held, in
Ballard v. Commissioner, 854 F.2d 185 (7th Cir. 1988), revg. T.C.
Memo. 1987-128, that a note should have no gift tax consequences
where it stated interest at the "safe harbor" rate referred to by
sec. 483 and no portion of the note's stated principal amount
would be recharacterized as interest for that reason.  In
Krabbenhoft v. Commissioner, 94 T.C. 887 (1990), affd. 939 F.2d
529 (8th Cir. 1991), we reconsidered our position on the
relevance of sec. 483 for gift tax purposes in light of the
reversal of our Ballard decision, and decided not to follow that
reversal except where required by the Golsen rule (see Golsen v.
Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir.
1971)).  Moreover, the Court of Appeals for the Tenth Circuit, to
which an appeal of this case would lie, has agreed with our view,
(continued...)

IV. <u>Deferred Payment Arrangements Are Below-Market Gift Loans
    Subject to Section 7872</u>

Section 7872(c)(1)(A) provides (subject to certain exceptions not relevant to the case at hand) that section 7872 applies to "Any below-market loan which is a gift loan." Therefore, section 7872 applies to the deferred payment arrangement if that arrangement is: (1) A "loan", (2) a "below-market loan", and (3) a "gift loan".

   A. <u>Loan</u>

Section 7872 does not define the term "loan". However, the legislative history indicates that "loan" should be interpreted broadly to include any extension of credit. See <u>Frazee v. Commissioner</u>, 98 T.C. at 589 (citing conference report). We concluded in <u>Frazee v. Commissioner</u>, <u>supra</u> at 588-589, that section 7872 does not apply solely to loans of money; it also applies to seller-provided financing for the sale of property. In our view, the fact that the deferred payment arrangement in the case at hand was contained in the buy-sell agreements, rather than in a separate note as in <u>Frazee</u>, does not require a different result.

---

[90](...continued)
as affirmed by the Court of Appeals for the Eighth Circuit in <u>Krabbenhoft</u>, that sec. 483 is not relevant for gift tax valuation purposes. See <u>Schusterman v. United States</u>, 63 F.3d 986 (10th Cir. 1995).

For these reasons we conclude that the deferred payment arrangement is a "loan" for purposes of section 7872.

B.  Below-Market Loan

Section 7872 sets forth two definitions of below-market loans.  One definition applies to demand loans; the other applies to term loans.  Sec. 7872 (e)(1)(A), (B).

A "demand loan" is defined as "any loan which is payable in full at any time on the demand of the lender."  Sec. 7872(f)(5).  A "term loan" is defined as "any loan which is not a demand loan."  Sec. 7872(f)(6).

The deferred payment arrangement required Jean True's sales to be consummated "within 6 months" after the notice dates.  It did not give Jean True the right to payment on demand.  Because the deferred payment arrangement was not a "demand loan" as defined in section 7872(f)(5), it is a "term loan" under section 7872(f)(6).

A term loan is a "below-market loan" if the "amount loaned" exceeds the present value of all payments due under the loan, discounted at the applicable Federal rate in effect as of the date of the loan.  Sec. 7872(e)(1)(B), (f)(1).  Neither party has argued that the "amount loaned" was other than the $13,298,978 aggregate sales price of Jean True's interests under the buy-sell agreements, and we assume that the "amount loaned" was equal to that price.

The amount Jean True ultimately received on the payment date (September 30, 1994) was equal to the $13,298,978 "amount loaned".  Because the "present value" of $13,298,978 to be paid up to 6 months in the future, without interest, is less than $13,298,978, the deferred payment arrangement was a "below-market loan".  Sec. 7872(e)(1)(B).

C.  <u>Gift Loan</u>

Section 7872 applies to certain defined categories of below-market loans.  See sec. 7872(c)(1).  One of these categories is gift loans.  See Sec. 7872(c)(1)(A).

A gift loan is defined as "any below-market loan where the foregoing of interest is in the nature of a gift."  Sec. 7872(f)(3).  As we said in <u>Frazee v. Commissioner</u>, <u>supra</u> at 589:

> The question of whether the forgoing of interest is in the nature of a gift is determined under the gift tax principles of chapter 12.  See sec. 7872(d)(2).  Under traditional gift tax principles, we look to whether the value of the property transferred exceeds the value of the consideration received, dispensing with the test of donative intent.  <u>Therefore, a below-market loan will be treated as a gift loan unless it is a transfer made in the ordinary course of business, that is, unless it is a transaction which is bona fide, at arm's length, and free of donative intent</u>. * * * [Emphasis added.]

See also sec. 25.2512-8, Gift Tax Regs.  We also note that intrafamily transactions are subject to special scrutiny and are presumed to be gifts.  See <u>Harwood v. Commissioner</u>, 82 T.C. 239, 259 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986).

As discussed <u>supra</u> under Issue 2 of this opinion, we have found that Jean True's sales of her interests in True Oil, Eighty-Eight Oil, True Ranches, Belle Fourche, and Black Hills Trucking gave rise to taxable gifts, because the fair market value of Jean True's interests in those companies exceeded the sales prices for those interests determined under the buy-sell agreements. This establishes that the sales of Jean True's interests in those companies, including the parts of the deferred payment arrangement relating to those sales, were not transactions in the ordinary course of business and were gifts. See <u>Frazee v. Commissioner</u>, 98 T.C. at 589.

With respect to the sales of Jean True's interests in the remainder of the 22 True companies, respondent has not asserted that the formula sales prices were less than fair market value. We have found, however, that Jean True transferred the benefits and burdens of ownership of her interests in those companies to her sons on the notice dates, even though the sons were not required to pay for those interests until 6 months after those dates. We believe that parties dealing at arm's length would not have transferred ownership of such business interests on these terms. Independent parties would have required either the payment of interest on the purchase price during the period from the notice dates to the payment date, or an adjustment to the

formula prices to reflect the financial performance of the True companies during that period.

For all these reasons, we conclude that the deferred payment arrangement was not a transaction in the ordinary course of business and was therefore a gift loan.

V.   Amounts of the Gifts--Application of Section 7872

We have just concluded that for purposes of section 7872, the deferred payment arrangement was a term loan and a gift loan. Section 7872 treats the lender of a gift term loan as having transferred to the borrower, on the date the loan is made, a cash gift in an amount equal to the excess of:  (1) The "amount loaned", over (2) the present value of all payments required to be made under the loan, discounted at the applicable Federal rate.  See sec. 7872(b)(1), (d)(2), (f)(1).

It is not entirely clear how this provision should be applied to the case at hand.  The buy-sell agreements required payment to be made within 6 months of the notice dates. Therefore, as of the notice dates, the deferred payment arrangement could have been considered to be a 6-month loan, prepayable without penalty.[91]

---

[91]We note that certain proposed sec. 7872 regulations state that an option to prepay should be disregarded in determining the term of a loan.  See sec. 1.7872-10, Proposed Income Tax Regs., 50 Fed. Reg. 33553, 33566 (Aug. 20, 1985).

If the deferred payment arrangement were considered to be a 6-month term loan, then section 7872 would deem Jean True to have made a gift, on the notice dates, of approximately 6 months' worth of interest on the $13,298,978 aggregate purchase price. Although Jean True actually received payment only 3 months after the notice dates, section 7872 does not appear to provide explicitly for any adjustment to be made to the amount of the gift if a gift term loan is prepaid.

Respondent's determination appears to be a reaction to the possible harshness of such a result. In the statutory notice, respondent asserted that the amount of Jean True's gift arising from the deferred payment arrangement was $192,307. The notice stated that this amount represented 91 days of interest on the $13,298,978 sales price. Although respondent now maintains that the consequences of the deferred payment arrangement should be determined under section 7872, respondent has not increased the amount of the asserted gift.

Respondent's calculation of the amount of the gift is consistent with the treatment that would obtain under section 7872, if the deferred payment arrangement were treated as a demand gift loan rather than a term gift loan.[92] Although

---

[92]The provisions requiring payment "within six months" after the notice dates, the fact that payment was in fact made only 3 months after those dates, and the possible harshness of imputing, under these circumstances, a gift in an amount equal to the value
(continued...)

respondent apparently could have asserted that a larger gift was made, we accept respondent's concession that in the case at hand the amount of the gift should be computed as though the deferred payment arrangement were a demand gift loan. However, consistent with this opinion (and with respondent's position that section 7872 applies), respondent's determination should be modified in two respects. First, the portion of the aggregate sales price attributable to Jean True's partnership (and LLC) interests should be considered to be a loan outstanding from July 1, 1994 rather than from June 30, 1994. Second, the amount of the gift should be computed using the applicable Federal rates prescribed by section 7872, rather than the 5.9-percent True family rate referred to in the statutory notice.[93]

---

[92](...continued)
of 6 months' use of the amount lent, suggest that the deferred payment arrangement might preferably be viewed as a demand loan of indefinite maturity, rather than a term loan. Sec. 7872(f)(5) gives the Secretary regulatory authority to treat indefinite maturity loans as demand loans. However, because the Secretary has not exercised that authority, a loan that is not a demand loan ordinarily must be treated as a term loan for sec. 7872 purposes. See sec. 7872(f)(6); KTA-Tator, Inc. v. Commissioner, 108 T.C. 100, 104-105 (1997).

[93]The short-term applicable Federal rate for June 1994, based on semiannual compounding, was 5.48 percent; the corresponding rate for July, 1994, was 5.55 percent. See Rev. Rul. 94-44, 1994-2 C.B. 190; Rev. Rul. 94-36, 1994-1 C.B. 215.

Respondent's trial memorandum erroneously referred to the 5.9-percent interest rate used to value the gift in the statutory notice as the "applicable Federal rate".

Issue 4.  Are Petitioners Liable for Valuation Understatement Penalties Under Sections 6662(a), (g), and (h)?

FINDINGS OF FACT

On an attachment to his 1993 gift tax return, Dave True disclosed the sale to his wife and sons of 30-percent interests in the True partnerships listed in Appendix schedule 1.  The attachment listed the partnerships whose interests were sold and indicated, in general terms, that the sales price was book value, without providing actual numbers.  The 1993 gift tax return reported zero as the value of gifts attributable to these transactions.  Petitioners did not engage a professional appraiser to value the transferred interests in the True partnerships for gift tax reporting purposes.

The estate tax return did not list individually the interests in True companies that Dave True owned at death.  Instead, it showed on Schedule F, Other Miscellaneous Property Not Reportable Under any Other Schedule, the value of Dave True's living trust, which owned his interests in the True companies at death.  Another schedule attached to the estate tax return provided a breakdown of the assets owned by the living trust as of June 4, 1994, which included cash of $39,349,150, investments, notes receivable from some of the True companies, and miscellaneous assets.  Total book value of all the True companies owned by Dave True at his death was $37,894,797, see Appendix schedule 2.  The living trust document, which was attached to the

estate tax return, listed the interests in the True companies that Dave True originally conveyed to the living trust at its inception. The estate tax return made no further disclosure of the valuation of the True companies under the buy-sell agreements.

On brief, petitioners explained that the book value of Dave True's interests in the True companies was reported as a cash asset of the living trust because, under the terms of the buy-sell agreements, the sales were deemed to have been transacted as of the day before Dave True's death, or June 3, 1994.

Petitioners hired Mr. Lax to value Dave True's interests in the True companies before filing the estate tax return. Petitioners instructed Mr. Lax to disregard the buy-sell agreements in so doing. For the most part, Mr. Lax's values for the disputed companies approximated book value. However, book values for the subject interests in Belle Fourche and Black Hills Trucking were only 18.20 and 29.92 percent, respectively, of Mr. Lax's values. In any event, petitioners did not use any of Mr. Lax's values, but instead in effect reported the interests at book value.

On an attachment to her amended 1994 gift tax return,[94] filed on or around June 19, 1996, Jean True disclosed the sale to her

---

[94]Jean True's 1994 gift tax return as originally filed did not disclose the sales of her remaining interests in the True companies.

sons of her entire interest in the True companies listed in Appendix schedule 3. The attachment listed the interests in the partnerships and corporations that were sold and indicated, in general terms, that the sales price was book value, without providing actual numbers. The amended 1994 gift tax return reported zero as the value of gifts attributable to these transactions. Jean True did not disclose the gift loan that arose out of the deferred payment transaction on either her original or her amended 1994 gift tax return.

In the August 1988, "Policy for the Perpetuation of the Family Business" (policy), the True family agreed that tax planning played a crucial role in every business decision. The policy stated: "In considering potentially controversial tax issues, we will include the criteria [sic] whether we are willing to take the issue to court."

In the statutory notices, respondent determined accuracy-related penalties under section 6662(a), (g), and (h) attributable to valuation misstatements allegedly reported in the 1993 and 1994 gift tax returns and the estate tax return. Respondent continued to argue for imposition of these penalties at trial and on brief.

OPINION

Section 6662 imposes a 20-percent penalty on any portion of an underpayment of tax that is attributable to, inter alia, any

substantial estate or gift tax valuation understatement.  See

sec. 6662(a) and (b).[95]  An estate or gift tax valuation

understatement is substantial if the value of any property

claimed on an estate or gift tax return is 50 percent or less of

the amount determined to be the correct value.  See sec.

6662(g)(1).  No penalty is imposed unless the portion of the

underpayment attributable to substantial estate or gift tax

valuation understatements for the taxable period (or with respect

to the estate of the decedent) exceeds $5,000.  See sec.

6662(g)(2).  The penalty is increased from 20 percent to 40

percent and is a gross valuation misstatement, if the value of

---

[95]SEC 6662.   IMPOSITION OF ACCURACY-RELATED PENALTY.

(a) Imposition of Penalty.--If this section applies to any portion of an underpayment of tax required to be shown on a return, there shall be added to the tax an amount equal to 20 percent of the portion of the underpayment to which this section applies.

(b) Portion of Underpayment to Which Section Applies.--This section shall apply to the portion of any underpayment which is attributable to 1 or more of the following:

(1) Negligence or disregard of rules or regulations.
(2) Any substantial understatement of income tax.
(3) Any substantial valuation misstatement under chapter 1
(4) Any substantial overstatement of pension liabilities.
(5) Any substantial estate or gift tax valuation understatement.

any property claimed on the return is 25 percent or less of the amount determined to be the correct value.  See sec. 6662(h).

Section 6664 provides an exception to the imposition of accuracy-related penalties if the taxpayer shows that there was reasonable cause for the understatement and that the taxpayer acted in good faith.  See sec. 6664(c); see also United States v. Boyle, 469 U.S. 241, 242 (1985).  Whether a taxpayer acted with reasonable cause and in good faith is a factual question.  See sec. 1.6664-4(b), Income Tax Regs.  Generally, the most important factor is the extent to which the taxpayer exercised ordinary business care and prudence in attempting to assess his or her proper tax liability.  See Estate of Simplot v. Commissioner, 112 T.C. 130, 183 (1999) (citing Mandelbaum v. Commissioner, T.C. Memo. 1995-255), revd. on another issue 249 F.3d 1191 (9th Cir. 2001); sec. 1.6664-4(b), Income Tax Regs.

Under section 6662(g),[96] respondent apparently takes the position that the determination whether the percentage threshold for a substantial or gross valuation understatement has been reached is made on a property-by-property basis.  See Part XX Penalties Handbook, Internal Revenue Manual (RIA), sec. 120.1.5.11.2.  In the absence of any argument to the contrary by any of the parties in this case, we use this specifically targeted approach.

---

[96]SEC 6662(g).  SUBSTANTIAL ESTATE OR GIFT TAX VALUATION UNDERSTATEMENT.

(1) In General.--For purposes of this section, there is a substantial estate or gift tax valuation understatement if the value of any property claimed on any return of tax imposed by subtitle B is 50 percent or less of the amount determined to be the correct amount of such valuation.

* * * * * * *

(h)  INCREASE IN PENALTY IN CASE OF GROSS VALUATION MISSTATEMENTS.

(1) In General.--To the extent that a portion of the underpayment to which this section applies is attributable to one or more gross valuation misstatements, subsection (a) shall be applied with respect to such portion by substituting "40 percent" for "20 percent".
(2) Gross Valuation Misstatements.--The term "gross valuation misstatements" means--

* * * * * * *

(C) any substantial estate or gift tax valuation understatement as determined under subsection (g) by substituting "25 percent" for "50 percent".

The penalty applies to all property included in the gross estate under section 2031 or transferred for less than adequate and full consideration under sec. 2512(b). See Estate of Owen v. Commissioner, 104 T.C. 498, 505-506 (1995) (applying section 6660, which was the precursor of section 6662(g)).

In the cases at hand, we determine whether the percentage threshold for a substantial or gross valuation understatement has been reached by individually comparing the book value of the subject interests in the disputed companies claimed on the 1993 and 1994 gift tax returns and the estate tax return[97] with our determinations of the correct values of those interests. The table below shows reported value as a percentage of actual value

---

[97]The way in which the transactions were reported (as sales on the gift tax returns and as cash proceeds in the living trust on the estate tax return) might raise a question about whether there was an understatement of value of property "claimed on any return of tax imposed by subtitle B". However, petitioners raised no such question. Indeed, they contend that they disclosed the value of the transferred interests at book value, according to the terms of the buy-sell agreements. Petitioners' brief states:

the Estate reported on the Estate Tax Return an amount equal to the book value price of the interests owned by Dave True as of the date of his death. In calculating their gift tax, Dave and Jean True valued the interests that they sold at book value so there was no gift to report. Therefore, the accuracy-related penalty mathematically should be calculated based on the difference between the correct value of the property and the book value used to calculate the tax as reported.

(as determined by the Court) for each of the subject interests in the disputed companies.

| Subject interest claimed on estate or gift tax return | Reported book value | Actual value determined by Court | Reported as a percentage of actual value |
|---|---|---|---|
| **True Oil** | | | |
| 1993 gift tax return | $5,226,006 | $6,204,908 | 84.22% |
| Estate tax return | 5,538,423 | 8,288,746 | 66.82% |
| 1994 gift tax return | 2,528,315 | 3,712,376 | 68.11% |
| **Belle Fourche** | | | |
| Estate tax return | 747,723 | 10,234,704 | 7.31% |
| 1994 gift tax return | 183,593 | 2,115,123 | 8.68% |
| **Eighty-Eight Oil** | | | |
| 1993 gift tax return | 2,556,378 | 5,628,052 | 45.42% |
| Estate tax return | 9,546,285 | 10,757,119 | 88.74% |
| 1994 gift tax return | 4,400,744 | 4,817,914 | 91.34% |
| **Black Hills Trucking** | | | |
| Estate tax return | 951,467 | 5,087,246 | 18.70% |
| 1994 gift tax return | 590,511 | 2,952,048 | 20.00% |
| **True Ranches** | | | |
| 1993 gift tax return | 3,265,647 | 6,060,161 | 53.89% |
| Estate tax return | 5,777,943 | 10,368,441 | 55.73% |
| 1994 gift tax return | 2,712,212 | 4,643,833 | 58.40% |
| **White Stallion** | | | |
| Estate tax return | 153,434 | 232,029 | 66.13% |

As the table indicates, the subject interests in Belle Fourche were valued on the estate tax return and the 1994 gift tax return at less than 25 percent of the correct value, which result in gross valuation misstatements under section 6662(h). The subject interest in Eighty-Eight Oil was valued on the 1993 gift tax return at more than 25 percent, but less than 50 percent of the correct value, which results in a substantial gift tax valuation understatement under section 6662(g). Finally, the subject interests in Black Hills Trucking were valued on the estate tax return and the 1994 gift tax return at less than 25 percent of the correct value, resulting in gross valuation misstatements under section 6662(h).[98]

Unless the reasonable cause exception to the accuracy-related penalties applies, the 40-percent penalty will apply to the portion of any underpayment of estate tax or 1994 gift tax attributable to the gross valuation understatement of the subject interests in Belle Fourche and Black Hills Trucking. Moreover, the 20-percent penalty will apply to the portion of any underpayment of 1993 gift tax attributable to the substantial valuation understatement of the subject interest in Eighty-Eight Oil.

---

[98]The gift loan derived from the deferred payment transaction was not property "claimed on any return of tax imposed by subtitle B" and is therefore not subject to the valuation understatement penalties.

There is no statutory, regulatory, or case law guidance for the calculation of the portion of the underpayment attributable to a substantial or gross valuation understatement for estate or gift tax purposes. However, section 1.6664-3, Income Tax Regs., provides rules for determining the order in which adjustments to a return are taken into account to compute penalties imposed under the first three components of the accuracy-related penalty (i.e., penalties for negligence or disregard of rules or regulations, substantial understatement of income tax, and substantial (or gross) valuation misstatements under chapter 1). See secs. 1.6662-1 and 1.6664-3, Income Tax Regs. Therefore, we draw from those regulations to determine the portions of the underpayments attributable to substantial or gross valuation understatements in the cases at hand.

According to the regulations, in computing the portions of an underpayment subject to penalties imposed under sections 6662 and 6663, adjustments to a return are considered made in the following order:

(1) Those with respect to which no penalties have been imposed.

(2) Those with respect to which a penalty has been imposed at a 20 percent rate (i.e., a penalty for negligence or disregard of rules or regulations, substantial understatement of income tax, or substantial valuation misstatement, under sections 6662(b)(1) through 6662(b)(3), respectively).

(3) Those with respect to which a penalty has been imposed at a 40 percent rate (i.e., a penalty for a gross valuation misstatement under sections 6662(b)(3) and (h)).

(4) Those with respect to which a penalty has been imposed at a 75 percent rate (i.e., a penalty for fraud under section 6663). [Sec. 1.6664-3(b), Income Tax Regs.]

Examples under the regulations, and our opinion in Lemishow v. Commissioner, 110 T.C. 346 (1998), illustrate how the regulations would apply to the cases at hand. Step 1 is to determine the portion, if any, of the underpayment on which no accuracy-related penalty or fraud penalty is imposed by increasing reported taxable income for understated income that is not subject to penalty (adjustment 1), recomputing the tax, and comparing it to the tax shown on the return. Step 2 determines the portion, if any, of the underpayment on which a penalty of 20 percent is imposed by increasing taxable income derived in step 1 for understated income subject to the 20-percent penalty (adjustment 2), recomputing the tax, and comparing it to the tax computed in step 2. Finally, step 3 determines the portion, if any, of the underpayment on which a penalty of 40 percent is imposed by computing the total underpayment attributable to all understated income and subtracting the portions of such underpayment calculated in steps 1 and 2. See Lemishow v. Commissioner, 110 T.C. 346 (1998); see also Todd v. Commissioner,

89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988; sec. 1.6664-3(d), Income Tax Regs.

In the cases at hand, the same methodology should apply to compute the portions of the underpayments attributable to the substantial and gross valuation understatements, identified above, that were reported on the 1993 and 1994 gift tax returns and on the estate tax return.

Finally, we hold that the reasonable cause exception to the accuracy-related penalties does not apply to the cases at hand. The facts of record indicate that petitioners did not exercise ordinary business care and prudence in attempting to assess the proper estate and gift tax liabilities for the years in question.

In having the 1993 gift tax return prepared, Dave True did not engage a professional appraiser to value the transferred interests in the True partnerships. Instead, he wanted to test, through litigation, the ability of the buy-sell agreements to fix Federal gift tax value. Petitioners claimed to rely on the decisions in the 1971 and 1973 gift tax cases, which held that book value equaled fair market value, when they valued the subject interests in the cases at hand at book value. We find that such reliance was not reasonable; petitioners did not engage counsel to advise them of the legal effects of those cases on future transfers pursuant to the buy-sell agreements. Moreover, the opinions of the District Court in the 1971 and 1973 gift tax cases did not address whether the buy-sell agreements were

testamentary devices; therefore, those opinions and the resulting decisions did not provide adequate support for petitioners' reporting positions on the gift and estate tax returns.

In having the estate tax return prepared, petitioners engaged Mr. Lax to value Dave True's interests in the True companies as of June 3, 1994. However, petitioners obviously did not rely on Mr. Lax's conclusions. If they had done so, they would not have grossly understated the date-of-death value of Dave True's interest in Belle Fourche and substantially understated the date-of-death value of his interest in Black Hills Trucking.

Unlike the taxpayers in Mandelbaum v. Commissioner, T.C. Memo. 1995-255, Dave True and the True family had substantial sophistication in legal, valuation, and tax matters; they were accustomed to working with and using lawyers on both tax[99] and non-tax[100] matters. In fact, the family's business policy

---

[99]See, e.g., True v. United States, 190 F.3d 1165 (10th Cir. 1999); True Oil Co. v. Commissioner, 170 F.3d 1294 (10th Cir. 1999), affg. Nielson-True Partnership v. Commissioner, 109 T.C. 112 (1997); True v. United States, 35 F.3d 574 (10th Cir. 1994)(unpublished opinion); True v. United States, 894 F.2d 1197 (10th Cir. 1990); True v. United States, 80 AFTR 2d 97-7918, 97-2 USTC par. 50,946 (D. Wyo. 1997); True v. United States, 72 AFTR 2d 93-5660, 93-2 USTC par. 50,461 (D. Wyo. 1993); True v. United States, 629 F. Supp. 881 (D. Wyo. 1986); True v. United States, 547 F. Supp. 201 (D. Wyo. 1982); True v. United States, Docket No. C79-131K (D. Wyo., Oct. 1, 1980)

[100]See, e.g., Walker v. Toolpushers Supply Co., 955 F. Supp. 1377 (D. Wyo. 1997); True Oil Co. v. Sinclair Oil Corp., 771 P.2d 781, 794 (Wyo. 1989); True v. High Plains Elevator Mach. Co., 577
(continued...)

explicitly stated that for every business deal they would consider its tax consequences, and they would evaluate whether to litigate potentially controversial tax issues.  In the cases at hand, the True family was well aware of the issues in controversy and the dollars at stake.  They took aggressive positions on the estate and gift tax returns to test the effectiveness of the buy-sell agreements to fix transfer tax values.  They did not rely, in good faith, on professional appraisals or obtain professional advice on the effects of the decisions in the prior gift tax cases.  Accordingly, we hold that the reasonable cause exception to the accuracy-related penalties does not apply to the cases at hand.

To reflect the foregoing,

<u>Decisions will be entered under Rule 155</u>.

---

[100](...continued)
P.2d 991 (Wyo. 1978); <u>True Oil Co. v. Gibson</u>, 392 P.2d 795 (Wyo. 1964).

Appendix

1993 Transfers by Dave True

| | Interest transferred to True sons[1] | Fair market value of 100% interest per 1993 gift tax notice[2] | Fair market value of True sons' 24.84% aggregate interests per 1993 gift tax notice | Total purchase price paid by True sons (book value) |
|---|---|---|---|---|
| Disputed Companies | | | | |
| True Oil | 24.84% | $56,120,008 | $13,940,210 | $5,226,006 |
| Eighty-Eight Oil | 24.84% | 53,333,341 | 13,248,002 | 2,556,378 |
| True Ranches | 24.84% | 49,090,137 | 12,193,990 | 3,265,647 |
| Subtotal | | 158,543,486 | 39,382,202 | 11,048,031 |
| Undisputed Companies | | | | |
| Rancho Verdad | 24.84% | 2,175,048 | 540,282[3] | 327,012 |
| True Drilling | 24.84% | 4,605,773 | 1,144,074[3] | 848,208 |
| True Geothermal Energy | 24.84% | 1,226,039 | 304,548 | 304,548 |
| True Mining | 24.84% | 1,027 | 255 | 255 |
| True Envir. Rem. LLC | 24.84% | 1,111,256 | 276,036 | 276,036 |
| Subtotal | | 9,119,143 | 2,265,195 | 1,756,059 |
| Grand total | | 167,662,629 | 41,647,397 | 12,804,090 |

[1] Aggregate interests in each company transferred by Dave True to Hank, Diemer, and David L. True. Interests sold to Jean True were not included in the 1993 gift tax notice.

[2] The 1993 gift tax notice did not separately state the values of the transferred interests. The values shown above are based on the Revenue Agent's Reports and the 1994 estate tax notice.

[3] Respondent no longer asserts a gift tax deficiency related to this entity.

1994 Transfers by Estate

| | Interest owned by Dave True at death[1] | Fair market value of 100% interest per 1994 estate tax notice[2] | Fair market value of Dave True's interest owned at death per 1994 estate tax notice | Total purchase price paid by Jean True & True sons (book value) |
|---|---|---|---|---|
| Disputed Companies | | | | |
| True Oil | 38.47% | $52,097,003 | $20,041,717 | $5,538,423 |
| Eighty-Eight Oil | 38.47% | 68,900,000 | 26,505,830 | 9,546,285 |
| True Ranches | 38.47% | 52,725,363 | 20,283,447 | 5,777,943 |
| Belle Fourche | 68.74% | 28,919,991 | 19,801,518 | 747,723 |
| Black Hills Trucking | 58.16% | 10,933,726 | 6,359,055 | 951,467 |
| White Stallion | 34.235% | 1,139,080 | 389,964 | 153,434 |
| Subtotal | | 214,715,163 | 93,381,531 | 22,715,275 |
| | | | | |
| Undisputed Companies | | | | |
| Rancho Verdad | 38.47% | 2,175,053 | 836,743[3] | 506,308 |
| True Drilling | 38.47% | 4,605,776 | 1,771,842[3] | 938,940 |
| Tool Pushers | 70.683% | 6,500,000 | 4,594,395[3] | 2,173,211 |
| Midland Financial | 68.47% | 20,000,001 | 13,694,001[3] | 8,761,108 |
| Roughrider Pipeline | 68.47% | 325,001 | 222,528[3] | 217,396 |
| Smokey Oil | 72.394% | 2,399,983 | 1,737,444[3] | 1,733,359 |
| True Geothermal Energy | 38.47% | 662,516[2] | 254,870 | 254,870 |
| True Mining | 38.47% | 1,024 | 394 | 394 |
| True Envir. Rem. LLC | 38.47% | 1,234,656 | 474,972 | 474,972 |
| Black Hills Oil Marketers | 68.47% | 349 | 239 | 239 |
| Bonanza Publishing | 68.47% | 2,294 | 1,571 | 1,571 |
| Clareton Oil | 68.47% | 334 | 229 | 229 |
| Donkey Creek Oil | 68.47% | 334 | 229 | 229 |
| Equitable Oil Purchasers | 56.51% | 5,764 | 3,257 | 3,257 |
| Fire Creek Oil | 68.47% | 6,282 | 4,301 | 4,301 |
| Pumpkin Buttes Oil | 68.47% | 296 | 203 | 203 |
| Sunlight Oil | 68.47% | 332 | 227 | 227 |
| True Geothermal Drilling | 68.47% | 894 | 612 | 612 |
| True Wyoming Beef | 68.47% | 4,092 | 2,802 | 2,802 |
| Wind River Oil | 68.47% | 340 | 233 | 233 |
| True Land & Royalty | 68.47% | 153,441 | 105,061 | 105,061 |
| Subtotal | | 38,078,762 | 23,706,153 | 15,179,522 |
| Grand total | | 252,793,925 | 117,087,684 | 37,894,797 |

[1] Dave True's total interest in each company as of his death. Respondent has agreed that any adjustment to the value of the interest transferred to Jean True qualifies for the marital deduction.

[2] Fair market value of 100% interest amounts for True Geothermal Energy and following were extrapolated from 1994 estate tax notice

[3] Respondent no longer asserts an estate tax deficiency related to this entity.

1994 Transfers by Jean True

| | Interest transferred by Jean True | Fair market value of 100% interest per 1994 gift tax notice | Fair market value of aggregate interests transferred by Jean True per 1994 gift tax notice | Total purchase price paid by True sons (book value) |
|---|---|---|---|---|
| Disputed Companies | | | | |
| True Oil | 17.23% | $52,097,000 | $8,976,312 | $2,528,315 |
| Eighty-Eight Oil | 17.23% | 68,900,000 | 11,871,469 | 4,400,744 |
| True Ranches | 17.23% | 52,725,360 | 9,084,581 | 2,712,212 |
| Belle Fourche | 17.23% | 28,920,000 | 4,982,916 | 183,593 |
| Black Hills Trucking | 37.93%[1] | 10,933,730 | 4,147,164 | 590,511 |
| Subtotal | | 213,576,090 | 39,062,442 | 10,415,375 |
| Undisputed Companies | | | | |
| Rancho Verdad | 17.23% | 2,175,051 | 374,761[2] | 226,759 |
| Tool Pushers | 4.54% | 6,500,000 | 295,100[2] | 137,872 |
| Midland Financial | 17.23% | 20,000,000 | 3,446,000[2] | 2,226,338 |
| Roughrider Pipeline | 17.23% | 320,417 | 55,208[2] | 55,208 |
| True Mining | 17.23% | 1,023 | 176 | 176 |
| True Envir. Rem. LLC | 17.23% | 1,194,929 | 205,886 | 205,886 |
| Black Hills Oil Marketers | 17.23% | 347 | 60 | 60 |
| Bonanza Publishing | 17.23% | 2,292 | 395 | 395 |
| Clareton Oil | 17.23% | 334 | 58 | 58 |
| Equitable Oil Purchasers | 40.00% | 5,761 | 2,304 | 2,304 |
| Fire Creek Oil | 17.23% | 6,924 | 1,193 | 1,193 |
| Pumpkin Buttes Oil | 17.23% | 295 | 51 | 51 |
| Sunlight Oil | 17.23% | 330 | 57 | 57 |
| True Geothermal Drilling | 17.23% | 642 | 111 | 111 |
| True Wyoming Beef | 17.23% | 3,700 | 638 | 638 |
| Wind River Oil | 17.23% | 340 | 59 | 59 |
| True Land & Royalty | 17.23% | 153,441 | 26,438 | 26,438 |
| Subtotal | | 30,365,826 | 4,408,495 | 2,883,603 |
| Grand total | | 243,941,916 | 43,470,937 | 13,298,978 |

[1] Jean True's percentage interest should be 37.63%.
[2] Respondent no longer asserts a gift tax deficiency related to this entity.